<u>EXHIBIT 1</u>

 **CT Corporation**

**TO:** George R Jurch, General Counsel
Continental Automotive, Inc.
1830 MacMillan Park Drive
Fort Mill, SC 29707

**RE:** **Process Served in Tennessee**

**FOR:** Contitech North America, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | NISSAN NORTH AMERICA, INC., PLTF. vs. CONTINENTAL AUTOMOTIVE SYSTEMS, INC., ETC., ET AL., DFTS. // TO: Contitech North America, Inc. |
| **DOCUMENT(S) SERVED:** | LETTER, SUMMONS, RETURN, COMPLAINT, EXHIBIT(S) |
| **COURT/AGENCY:** | Rutherford County Circuit Court, TN Case # 75651 |
| **NATURE OF ACTION:** | Product Liability Litigation - Manufacturing Defect - The Delta Stroke Sensor |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Knoxville, TN |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 04/15/2019 postmarked on 04/12/2019 |
| **JURISDICTION SERVED :** | Tennessee |
| **APPEARANCE OR ANSWER DUE:** | WITHIN 30 DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU |
| **ATTORNEY(S) / SENDER(S):** | Eugene N. Bulso, Jr. LEADER, BULSO AND NOLAN, PLC 414 Union Street, Suite 1740 Nashville, TN 37219 615-780-4114 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/15/2019, Expected Purge Date: 04/20/2019 |
| | Image SOP |
| | Email Notification, George R Jurch george.jurch@continental-corporation.com |
| | Email Notification, GINA WARAKOIS gina.warakois@continental.com |
| | Email Notification, RHONDA SEIDEL rhonda.seidel@continental-corporation.com |
| | Email Notification, KIM MONTANO kim.montano@continental.com |
| | Email Notification, KEVIN COLLINS kevin.collins@continental.com |
| | Email Notification, AUGUST SHEEHAN august.sheehan@continental.com |
| | Email Notification, CAROLYN MILLER carolyn.miller@continental.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

<u>EXHIBIT 1</u>

 CT Corporation

**Service of Process Transmittal**
04/15/2019
CT Log Number 535289453

**TO:**  George R Jurch, General Counsel
Continental Automotive, Inc.
1830 MacMillan Park Drive
Fort Mill, SC 29707

**RE:**  **Process Served in Tennessee**

**FOR:**  Contitech North America, Inc.  (Domestic State: DE)

**SIGNED:**  C T Corporation System
**ADDRESS:**  300 Montvue RD
Knoxville, TN 37919-5546
**TELEPHONE:**  312-345-4336

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EXHIBIT 1



**CERTIFIED MAIL®**

7017 0190 0000 3282 0370



PRIORITY MAIL

US POSTAGE
02 1P    $ 014.60⁰
0001206450    APR 12 2019
MAILED FROM ZIP CODE 37219

**Leader, Bulso & Nolan, PLC**

*Attorneys At Law*
414 Union Street - Suite 1740
Nashville, Tennessee  37219-1734

CT CORPORATION SYSTEM
300 MONTVUE RD
KNOXVILLE TN  37919-5546

EXHIBIT 1

# Leader, Bulso & Nolan, PLC

*Attorneys at Law*

GEORGE NOLAN
Direct Dial: 615-780-4114
Direct Fax: 615-780-4122
gnolan@leaderbulso.com

April 12, 2019

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

CT Corporation System
300 Montvue Road
Knoxville, TN 37919-5546

Re:    Nissan North America, Inc. v. Continental Automotive Systems, Inc. (successor
to Continental Teves, Inc.); Contitech North America, Inc.; and Continental Tire
the Americas, LLC (successor to Continental Tire North America, Inc.);
Rutherford County Circuit Court; Case No. 75651

Dear Sir/Madam:

Enclosed please find the service copy of a Summons and Complaint for Defendant
Continental Automotive Systems, Inc. with respect to the above matter.

Thank you.

Very truly yours,

George Nolan

GN/sjc
Enclosures

EXHIBIT 1

| STATE OF TENNESSEE<br>16th JUDICIAL DISTRICT<br>CIRCUIT COURT | **SUMMONS** | CASE FILE NUMBER<br>*75651* |
|---|---|---|

| PLAINTIFF<br><br>NISSAN NORTH AMERICA, INC. | DEFENDANT<br><br>**vs.** CONTITECH NORTH AMERICA, INC. |
|---|---|

**TO: (NAME & ADDRESS OF DEFENDANT)**
CONTITECH NORTH AMERICA, INC.
SERVE: Registered Agent
CT Corporation System
300 Montvue Rd.
Knoxville, Tennessee 37919-5546

**List each defendant on a separate summons.**

**YOU ARE HEREBY SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, RUTHERFORD COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU ARE DIRECTED TO FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGEMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff:<br>(Name, address & telephone number)<br>George Nolan<br>Leader, Bulso & Nolan, PLC<br>414 Union Street, Suite 1740<br>Nashville, Tennessee 37219<br>615-780-4114 | DATE ISSUED & ATTESTED<br>*April 5, 2019*<br><br>MELISSA HARRELL, Circuit Court Clerk<br><br>By: _____ Deputy Clerk |
|---|---|

**CERTIFICATION**

I, MELISSA HARRELL, Clerk of the Circuit Court of Rutherford County, Tennessee, do certify this to be true and correct copy of the original summons issued in this cause.

BY: _____ DEPUTY CLERK

| TO THE SHERIFF:<br><br>Please execute this summons and make your return within thirty days of issuance as provided by law. | DATE RECEIVED<br><br>**Sheriff** |
|---|---|

**RETURN ON PERSONAL SERVICE OF SUMMONS**

I hereby certify and return that I served this summons together with the complaint as follows:

| DATE OF PERSONAL SERVICE: | |
|---|---|
| | **Sheriff**<br>BY: |

Submit three copies: service copy, defendant's copy, file copy.    ⚖ADA COORDINATOR (615-494-4480)

EXHIBIT 1

## ACCEPTANCE OF SERVICE

I do hereby accept service of process and a copy of this complaint in this cause for all purposes.
This the _____ day of _____, 20 _____.

_____

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20 _____, I sent, postage prepaid by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case # _____ to the defendant _____, on the _____ day of _____, 20 _____. I received the return receipt, which has been signed by _____ on the _____ day of _____, 20 _____. The return receipt is attached to this original summons to be filed by the Clerk of Court.

| Sworn to and subscribed before me this _____ day of _____, 20 _____. | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process |
|---|---|
| My Commission Expires: _____, 20 _____. | |
| ### NOTICE OF PERSONAL PROPERTY EXEMPTION | |
| **TO THE DEFENDANT(S):**     Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. This list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. | ATTACH RETURN RECEIPT HERE (IF APPLICABLE) |

Mail list to:     MELISSA HARRELL, Circuit Court Clerk
                Room 106, Judicial Center
                116 W. Lytle Street
                Murfreesboro, TN 37130

Please state file number on list.

<u>EXHIBIT 1</u>

IN THE CIRCUIT COURT FOR RUTHERFORD COUNTY, TENNESSEE

| | |
|---|---|
| NISSAN NORTH AMERICA, INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CONTINENTAL AUTOMOTIVE | ) |
| SYSTEMS, INC. (successor to Continental | ) |
| Teves, Inc.); CONTITECH NORTH | ) |
| AMERICA, INC.; and CONTINENTAL | ) |
| TIRE THE AMERICAS, LLC (successor to | ) |
| Continental Tire North America, Inc.), | ) |
| | ) |
|     Defendants. | ) |

**FILED**

APR 05 2019

8-17 O'CLOCK ___ M
MELISSA HARRELL
DEPUTY CLERK

Case No. _75651_

<u>COMPLAINT FOR BREACH OF INDEMNITY AND HOLD HARMLESS AGREEMENT</u>

      Plaintiff, Nissan North America, Inc., for its cause of action against the Defendants, respectfully states as follows:

<u>PARTIES</u>

    1.    Plaintiff Nissan North America, Inc. ("Nissan") is a corporation organized under the laws of the State of California. Its principal office is located in Franklin, Tennessee.

    2.    Defendant Continental Automotive Systems, Inc. is a corporation organized and existing under the laws of the State of Delaware. Its principal office is located at 1 Continental Drive, Auburn Hills, Michigan 48326-1581. Its registered agent for service of process in Tennessee is CT Corporation System, 300 Montvue Rd., Knoxville, Tennessee 37919-5546. Defendant Continental Automotive Systems, Inc. is the successor, by merger, to a company formerly known as Continental Teves, Inc., a Delaware corporation.

    3.    Defendant Contitech North America, Inc. is a corporation organized and existing under the laws of the State of Delaware. Its principal office is located at 703 S. Cleveland

EXHIBIT 1

Massillon Rd., Fairlawn, Ohio 44333-3023. Its registered agent for service of process in Tennessee is CT Corporation System, 300 Montvue Rd., Knoxville, Tennessee 37919-5546.

4.     Defendant Continental Tire the Americas, LLC is a limited liability company organized and existing under the laws of the State of Ohio. Its principal office is located at 1830 MacMillan Park Drive, Fort Mill, South Carolina 29707-7712. Its registered agent for service of process in Tennessee is CT Corporation System, 300 Montvue Rd., Knoxville, Tennessee 37919-5546. Continental Tire the Americas, LLC was formerly known as, and is successor to, Continental Tire North America, Inc., an Ohio corporation.

5.     Defendants Continental Automotive Systems, Inc., Contitech North America, Inc., and Continental Tire the Americas, LLC are hereinafter collectively referred to as "CONTINENTAL".

JURISDICTION, VENUE AND GOVERNING LAW

6.     Nissan and CONTINENTAL are parties to a Master Purchase Agreement dated October 22, 2004 (hereinafter "the Agreement").

7.     A true and correct copy of the Agreement is attached hereto as Exhibit A.

8.     Under Article 36, Section 36.1 of the Agreement, Nissan and CONTINENTAL agreed that any legal proceedings arising out of, or in connection with, the Agreement "shall be brought in the state court located in Rutherford County, Tennessee."

9.     Under Article 36, Section 36.3 of the Agreement, CONTINENTAL irrevocably waived and agreed not to raise any objection to litigating disputes under the Agreement in state court in Rutherford County, Tennessee.

10.     Article 35 of the Agreement provides that the Agreement "shall be governed by and construed in accordance with the laws of the state of Tennessee."

EXHIBIT 1

11.     Under Article 36, Section 36.2, the parties agreed that "[t]he governing law and jurisdiction designations in this Agreement are irrevocable and are for the exclusive benefit of Nissan."

## FACTS

12.     Nissan engages in the design in part, manufacture in part, assembly and sale of motor vehicles.

13.     CONTINENTAL engages in the design, manufacture and sale of motor vehicle components.

14.     Pursuant to the Agreement, CONTINENTAL agreed to design and manufacture certain motor vehicle components, and it agreed to supply those motor vehicle components to Nissan.

15.     The terms of the Agreement are supported by consideration.  That consideration includes, but is not limited to, promises contained in the Agreement as well as moneys paid by Nissan to CONTINENTAL for motor vehicle components designed, manufactured and supplied by CONTINENTAL.

16.     Pursuant to the Agreement, CONTINENTAL designed, manufactured and supplied components of the braking system used in 2004 Infiniti QX56 vehicles, including a component known as the Delta Stroke Sensor ("DSS").

17.     Under the terms of the Agreement, CONTINENTAL agreed to indemnify and hold Nissan completely harmless from and against any and all losses, liability, and costs arising out of lawsuits *alleging* defects in the design or performance of components made or designed by CONTINENTAL.  Specifically, Article 12 of the Agreement states in pertinent part:

**Article 12.     Indemnification**

12.1     In addition to what is specified elsewhere in this Agreement, **Supplier shall indemnify and hold harmless Nissan** and its dealers (to the extent indemnified by

EXHIBIT 1

Nissan or Nissan Affiliates), its Affiliates and their dealers (to the extent indemnified by Nissan or Nissan Affiliates), and their respective officers directors and employees (the "Nissan Indemnified Parties"), **in full against all loss, liability, damages, costs and all expenses, including attorney fees and expert fees, arising out of claims or lawsuits for personal injury, property damage or economic damage alleging:**

(1)   **defects in design** (to the extent that supplier has furnished the design), warnings (to the extent that Supplier has furnished the warnings), materials, workmanship and **performance;**

. . .

(emphasis added).

18.   Nissan and CONTINENTAL were named as party defendants in a consolidated product liability lawsuit styled *Hilario Cruz, an individual, vs. Solomon Methenge* [*sic*]*, an individual and Does 1 to 100, inclusive, Los Angeles County Superior Court ("LASC")* Case No. BC493949 (consolidated with the product liability lawsuits styled *Juana De La Cruz Bernardino, an individual, and as successor-in-interest to decedent Saida Mendez-Bernardino v. Nissan North America, Inc., a California corporation; Continental Automotive Systems, Inc., a Delaware corporation (formerly known as Continental Teves); and Does 1 to 25, inclusive,* LASC Case No. BC 577815, *and Araceli Mendez, a minor by and through her guardian ad litem Juana Bernardino vs. Solomon Methenge* [*sic*]*, an individual; and Does 1 to 20, inclusive,* LASC Case No. BC529912)*.* Nissan and CONTINENTAL were also named as cross-defendants in a cross-action Solomon Mathenge filed in the lawsuit styled *Hilario Cruz, an individual, vs. Solomon Methenge, an individual and Does 1 to 100, inclusive,* LASC Case No. BC493949. The consolidated product liability lawsuit and cross-action shall herein be identified as "the Lawsuit".

19.   In the Lawsuit, the plaintiffs alleged that CONTINENTAL defectively designed, manufactured and supplied a DSS used in the braking system of a 2004 Infiniti QX56, VIN 5N3AA08C14N809115 ("Subject Vehicle"). The plaintiffs alleged that the defective DSS, which CONTINENTAL designed and manufactured, resulted in a loss of braking power. The plaintiffs

<u>EXHIBIT 1</u>

alleged that the loss of braking power caused a fatal collision that killed a mother and her two children.

     20.    In the Lawsuit, the plaintiffs filed a Consolidated Complaint against CONTINENTAL and Nissan. That Consolidated Complaint contained the following allegations regarding the component designed, manufactured and supplied by CONTINENTAL:

> 11.   . . . CONTINENTAL designed, manufactured, and supplied defective component parts of the SUBJECT VEHICLE in the U.S. market including California and maintains business and engineering offices in California.
>
> . . .
>
> 15.   Defendant CONTINENTAL was the designer, manufacturer, assembler, tester, inspector, distributor, supplier, and seller of the defective component parts installed in the SUBJECT VEHICLE.
>
> . . .
>
> 17.   The Defective Vehicles posed a significant and immediate safety threat to all users of such vehicles and to the public in general in that the Delta Stroke Sensor ("DDS"), an integral electronic component of the vehicles which affects critical safety aspects of braking, was well known by Defendants NISSAN and CONTINENTAL to be defective and faulty, having a high and unreasonably high incidence of failure during normal and customary use. The failure of this defective part disables the braking ability of the Defective Vehicles to the point where drivers are, without warning and suddenly, unable to stop their vehicle within a reasonably safe time and distance, or at all.
>
> . . .
>
> 21.   The failure of the Delta Stroke Sensor in the SUBJECT VEHICLE may have caused Defendant METHENGE to drive through a controlled and busy intersection, and despite applying the brakes in a manner reasonably anticipated to bring the SUBJECT VEHICLE to a complete stop, he lost control of it and collided with the vehicle occupied by Cruz's two daughters and MENDEZ's mother/BERNARDINO's daughter, causing their deaths.
>
> 22.   <u>Delta Stroke Sensor Function and Failure in the SUBJECT VEHICLE</u>
>
> > a.    The Delta Stroke Sensor (or "DSS") in the Defective Vehicles is an electronic component which interfaces with and connects to the Electronic Control Unit ("ECU"). The Delta Stroke Sensor, which is contained within the sealed Brake Booster Assembly, collects information about a vehicle's primary

EXHIBIT 1

mechanical braking system and provides input and information to the ECU.

b.      The Delta Stroke Sensor measures the application of manual driver pressure to the brake pedal.  The Delta Stroke Sensor determines whether the driver has pressed the brake pedal, and if so, how far and how quickly.  The Delta Stroke Sensor performs these measurements by converting the mechanical movement of the brake pedal into an electrical signal within a range of pre-set values to be communicated to the ECU.

c.      When properly functioning, the DSS monitors the performance of the primary mechanical braking system and reports a failure of that system to the ECU which will then trigger the functioning of the vehicle's secondary braking system.  The defect in the DSS results in a deactivation of an otherwise properly functioning primary mechanical braking system, and as Defendants have known, materially and adversely affects the braking power of the Defective Vehicles.  Defendants NISSAN and CONTINENTAL have likewise known that it is not possible to predict when a DSS failure will occur.

. . .

e.      Ultimately, as a result of a DSS failure, a Defective Vehicle will experience a substantial loss of braking power, approximately fifty percent.   In other words, a Defective Vehicle's stopping distance can more than double.  When this occurs, routine traffic stops become emergency events where crashes are avoided only by the favor of good fortune. Moreover, no inspection of a Defective Vehicle's mechanical brake system would reveal the latent and dangerous defect hidden within the sealed Brake Booster Assembly that manifests itself intermittently.

. . .

FIRST CAUSE OF ACTION
STRICT PRODUCTS LIABILITY-WRONGFUL DEATH-SURVIVAL CLAIM
(By Plaintiffs CRUZ, MENDEZ, and BERNARDINO Against Defendants
NISSAN and CONTINENTAL and DOES 1-18 and 21-98)

. . .

30.    Defendants CONTINENTAL and DOES 1-18 and 21-98 designed, engineered, manufactured, tested, assembled, distributed, supplied, and/or sold and otherwise put into the stream of commerce the defective Brake Booster Assembly, including the defective Delta Stroke Sensor, installed in the SUBJECT VEHICLE that caused the brake failure experienced by Defendant METHENGE on August 29, 2012.

EXHIBIT 1

31.     Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98 are strictly liable for the death of Plaintiff CRUZ's children because the SUBJECT VEHICLE and its component parts were defective and unreasonably dangerous for normal use due to its defective design, manufacture, production, assembly, marketing, advertising, testing, sale, maintenance and service; and due to said Defendants' failure to provide adequate warnings of the substantial dangers known or knowable at the time of the SUBJECT VEHICLE's design, engineering, manufacturing, testing, assembly, marketing, advertising, inspection, maintenance, sale and/or distribution.

32.     Defendants NISSAN, CONTINENTAL and DOES 1-19 and 21-98 designed, engineered, manufactured, tested, assembled, marketed, advertised, inspected, maintained, sold, distributed, and placed on the market and in the stream of commerce a defective product, the SUBJECT VEHICLE, which was unreasonably dangerous to the consumer, knowing that the product would reach and did reach the ultimate consumer without substantial change in the defective condition it was in from the date when it left said Defendants' control.

. . .

34.     The SUBJECT VEHICLE was defective when it left the control of Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98.

35.     Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98 knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the SUBJECT VEHICLE, whose defective design, manufacturing and lack of warnings caused it to have an unreasonably dangerous propensity to lose substantial braking ability without warning—creating an unreasonably dangerous condition that would inevitably result in a fatal traffic collision.

36.     The SUBJECT VEHICLE was, at the time of the collision, being used in the manner intended by Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98, and in a manner that was reasonably foreseeable by said Defendants. Upon seeing the traffic stopping in front of him, Defendant METHENGE attempted to apply his brakes but was unable to stop the SUBJECT VEHICLE as a result of brake failure consistent with the failure of the Defective Vehicles' defective Delta Stroke Sensor (DSS). Defendant METHENGE drove around the stopped cars in front of him and drove on opposite lanes of travel (i.e. southbound lanes) in an attempt to avoid a collision with the car driven by decedent Saida Mendez-Bernardino.

. . .

39.     The failure of Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98 to design, manufacture, and/or provide adequate warnings of the risks of substantial harm associated with the foreseeable use of the SUBJECT VEHICLE was a substantial factor, and legal and proximate cause, in causing the injuries and

EXHIBIT 1

wrongful death of Plaintiff CRUZ's daughters and MENDEZ's mother/BERNARDINO's daughter.

. . .

## SECOND CAUSE OF ACTION
### NEGLIGENCE—WRONGFUL DEATH—SURVIVAL CLAIMS
(By Plaintiffs CRUZ, MENDEZ, BERNARDINO Against Defendants
NISSAN, CONTINENTAL and DOES 1-18 and 21-98)

. . .

49.    At all times herein relevant, Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 were and are engaged in the business of selling, designing, manufacturing, fabricating, distributing, retailing, wholesaling, recommending, testing, modifying, controlling, advertising, creating, processing, preparing, constructing, packaging, utilizing, warranting, servicing, repairing, maintaining, marketing, leasing, renting, vending, installing, handling, labeling, promoting, advertising, furnishing, retailing, analyzing, inspecting, supplying, warning and placing into the stream of commerce the Defective Vehicles including the SUBJECT VEHICLE.

50.    Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, including their employees, agents, directors, officers, shareholders, partners and associates, had a legal duty to act reasonably to protect persons who may come in contact with their product which includes adequately and properly managing and operating their business and retail operations; and to use reasonable care in the design, engineering, manufacturing, testing, assembly, marketing, advertisement, inspection, maintenance, sale, supply, warning and distribution of the Defective Vehicles including the SUBJECT VEHICLE; and to adequately and properly train and supervise their employees and agents, including their designers, inspectors, quality control agents and other manufacturing, testing, distribution, and delivery personnel; recalling the Defective Vehicles including the SUBJECT VEHICLE; and acting without negligence, conscious disregard, despicable or other wrongful conduct.

51.    Defendants NISSAN and CONTINENTAL and DOES 1-18 and 21-98 breached said duties and are guilty of one or more of the following negligent acts and/or omissions:

a.    Failing to use due care in the design, engineering, manufacturing, testing, assembly, marketing, advertising, inspection, maintenance, sale and/or distribution of the SUBJECT VEHICLE and its components, and/or to utilize and/or implement reasonably safe designs and/or warnings in its manufacture;

. . .

EXHIBIT 1

53.     Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98 knew or should have known that the SUBJECT VEHICLE and its components had a propensity to become unreasonably dangerous during a catastrophic braking failure. ...

54.     Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98 designed, engineered, manufactured, tested, assembled, marketed, advertised, inspected, maintained, sold, distributed, placed on the market and in the stream of commerce, and/or maintained and serviced the SUBJECT VEHICLE in a manner and in a condition that was unreasonably dangerous.

. . .

56.     The failure of Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98 to design, manufacture, or provide adequate warnings of the risks of substantial harm associated with the foreseeable use of the SUBJECT VEHICLE was a substantial factor, and legal and proximate cause, in causing the injuries and wrongful death of CRUZ's children and Plaintiff MENDEZ's mother/Plaintiff BERNARDINO's daughter.

. . .

21.     A true and correct copy of the Consolidated Complaint filed in the Lawsuit is attached as Exhibit B.  In addition to that Consolidated Complaint, a Cross-Complaint was filed against Nissan and CONTINENTAL by the Defendant Solomon Mathenge in the Lawsuit.  That Cross-Complaint likewise contains allegations that the DSS designed and manufactured by CONTINENTAL was defective.  A true and correct copy of the Cross-Complaint, which contains allegations substantially similar to those contained in the Consolidated Complaint, is attached as Exhibit C.

22.     The allegations of the Consolidated Complaint and the Cross-Complaint filed in the Lawsuit fall squarely within the scope of the indemnification provision found in Article 12 of the Agreement.

23.     Because Article 12 of the Agreement obligates CONTINENTAL to indemnify and hold Nissan harmless from the claims alleged in the Lawsuit, Nissan tendered the defense of the

EXHIBIT 1

Lawsuit to CONTINENTAL by letter dated May 7, 2015. A copy of that letter is attached as Exhibit D.

24.    By letter dated June 22, 2015, CONTINENTAL refused to fulfill its indemnification obligation and refused to accept Nissan's tender of the defense of the Lawsuit. A copy of that letter is attached as Exhibit E.

25.    CONTINENTAL breached the Agreement when it refused to accept Nissan's tender of the defense of the Lawsuit and when it failed to fulfill its obligations of indemnification under Article 12 of the Agreement.

26.    Shortly before trial of the Lawsuit, CONTINENTAL settled the plaintiffs' claims against it, leaving Nissan to defend the braking system that CONTINENTAL designed and made.

27.    On July 21, 2017, a jury in the trial of the Lawsuit rendered a verdict against Nissan in the total amount of $24,931,109. As part of its verdict, the jury found that the design of the 2004 Infiniti QX56's braking system was a substantial factor in causing harm to the plaintiffs.

28.    Nissan incurred over $2 Million in attorney fees and litigation costs in defending the Lawsuit.

29.    Under the terms of the indemnification provision found in Article 12 of the Agreement, CONTINENTAL is required to indemnify and hold Nissan harmless from all liability and costs associated with the Lawsuit.

30.    Nissan is entitled to recover a judgment against CONTINENTAL in the amount of $24,931,109, plus interest and any other amounts that Nissan may be required to pay in connection the Lawsuit. In addition, Nissan is entitled to recover its defense costs incurred in defending the Lawsuit, which presently total more than $2 Million and which continue to increase as the judgment in the underlying Lawsuit is appealed.

EXHIBIT 1

31.     Nissan appealed the judgment entered against it in the Lawsuit.  On February 26,

2019, the Court of Appeals for the State of California issued an opinion affirming that judgment.

Nissan filed a petition for rehearing with the Court of Appeals and will also seek review by the

California Supreme Court.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff Nissan requests:

(a)     a judgment against the Defendants in the amount of $24,931,109 plus interest and

any other amounts that Nissan may be required to pay in connection with the Lawsuit;

(b)     a judgment against the Defendants fully compensating Nissan for its attorney fees

and litigation costs incurred in defending the Lawsuit, which presently total an amount in excess

of $2 Million and which continue to increase as the judgment in the underlying Lawsuit is on

appeal;

(c)     an award of reasonable attorney's fees and costs incurred in this action pursuant to

Article 37 of the Agreement;

(d)     an award of prejudgment interest; and

(e)     for such further and other relief as this Court deems just and equitable.

Respectfully submitted,

LEADER BULSO & NOLAN, PLC

By: _____

Eugene N. Bulso, Jr. (BPR 012005)
George Nolan (No. 14974)
414 Union Street, Suite 1740
Nashville, Tennessee 37219
(615) 780-4114

*Attorneys for Plaintiff*

State of Tennessee, Rutherford County
The undersigned, Circuit Court Clerk of
the said County and State, hereby certifies
that the foregoing is a correct copy of
the instrument filed in the foregoing case
in the Circuit Court of Murfreesboro Tennessee.
This _____ day of _____
                              MELISSA HARRELL
                              _____
                              Deputy Clerk

EXHIBIT 1

EXHIBIT 1

DATED OCTOBER 22, 2004

BETWEEN

**NISSAN NORTH AMERICA, INC.**

**AND**

CONTINENTAL TIRE NORTH AMERICA, INC.
CONTINENTAL TEVES, INC.
CONTITECH NORTH AMERICA, INC.

**MASTER PURCHASE AGREEMENT**

**Revisions to MPA Articles as dated above:**
**Article 1.1, 2.1, 2.3, 3.1(2), 3.2, 4.1, 4.1.2, 4.2, 4.2.1, 4.2.2, 4.3, 4.4, 4.5, 5.1, 6.2, 6.4, 7.2, 7.2.1, 8.1, 8.1(2), 9.2, 9.2.1, 10, 11, 12.1, 12.2, 12.3, 14.1, 14.2, 15.2, 15.3, 15.4, 15.5, 16.1, 16.2, 16.3, 16.4, 16.5, 16.6, 16.7, 17.1, 17.1.1, 17.2, 18.1.1, 18.2.1, 18A.1, 19, 22.6(1), 25(5), 27.5A.1, 27.5A.4, 27A, 29.3, 29.4, 34, 39.1, 39.2, 39.3**

**CCP: Article 1.1, 4, 5, 6.1, 6.1, 6.5, 6.6, 8(c), 9**

**Exhibit A**

149629v5

# EXHIBIT 1

## TABLE OF CONTENTS

Article 1.    Definitions and Interpretation.................................................................. 1
Article 2.    Agreement................................................................................................ 6
Article 3.    Specifications.......................................................................................... 6
Article 4.    Vendor Release and Delivery................................................................. 7
Article 5.    Receipt and Inspection; Title & Risk of Loss........................................ 8
Article 6.    Packaging, Marking and Shipping.......................................................... 9
Article 7.    Price, Invoicing and Payment................................................................10
Article 8.    Changes...................................................................................................11
Article 9.    Warranties...............................................................................................12
Article 10.   Quality Assurance...................................................................................12
Article 11.   Recall and Reimbursement.....................................................................13
Article 12.   Indemnification....................................................................................... 13
Article 13.   Right of Access to Supplier's Claims' Information................................. 14
Article 14.   Handling of Drawings.............................................................................. 14
Article 15.   Intellectual Property Rights.................................................................... 15
Article 16.   Infringement........................................................................................... 16
Article 17.   Nissan Property...................................................................................... 17
Article 18.   Tooling....................................................................................................18
Article 18A.  Insurance................................................................................................ 19
Article 18B.  Grounds for Insecurity; Adequate Assurance of Performance.................... 20
Article 19.   Service Parts.......................................................................................... 20
Article 20.   Sales to Third Party............................................................................... 21
Article 21.   Subcontracting....................................................................................... 21
Article 22.   Confidentiality........................................................................................ 22
Article 23.   Advertising.............................................................................................. 23
Article 23A.  Audits..................................................................................................... 23
Article 24.   Facility Inspection.................................................................................. 24
Article 25.   Change of Circumstances....................................................................... 24
Article 26.   Term........................................................................................................ 24
Article 27.   Termination and other Remedies............................................................ 25
Article 27A.  Product Liability Limitation..................................................................... 29
Article 28.   Waiver and Remedies............................................................................. 29
Article 28A.  Notices.................................................................................................... 30
Article 29.   Entire Agreement.................................................................................... 30
Article 30.   Assignment............................................................................................. 30
Article 31.   Independence.......................................................................................... 31
Article 32.   Severability............................................................................................. 31
Article 33.   Force Majeure......................................................................................... 31
Article 34.   Survival................................................................................................... 32
Article 35.   Governing Law........................................................................................ 32
Article 36.   Jurisdiction............................................................................................. 32
Article 37.   Attorneys' Fees...................................................................................... 32
Article 38.   Hazardous Substances........................................................................... 33
Article 39.   Taxes...................................................................................................... 33
Article 40.   Compliance with Laws............................................................................ 35
Article 41.   Third Party Beneficiaries........................................................................ 36
Article 42.   Covenant of Further Assurances............................................................ 36
Article 43.   Negotiated Term..................................................................................... 36
Article 44.   [Reserved].............................................................................................. 36
Article 45.   Counterparts........................................................................................... 36

149629v5

## EXHIBIT 1

| | | |
|---|---|---|
| Article 46. | Safety Issues............................................................................................ | 36 |
| Article 47. | Records Management Program................................................................. | 37 |
| | | |
| Schedule 1. | Claim Compensation Procedure.............................................................. | 39 |
| PART 1. | Definitions and Interpretation | |
| Article 1 | Definitions and Interpretation............................................................... | 39 |
| PART 2. | Warranty Claim | |
| Article 2. | Purpose.................................................................................................. | 40 |
| Article 3. | Scope...................................................................................................... | 40 |
| Article 4. | Applicable Warranty Period................................................................... | 40 |
| Article 5. | Warranty Expenses................................................................................ | 41 |
| Article 6. | Liability Rate......................................................................................... | 42 |
| Article 7. | Compensation Calculation & Payment................................................... | 44 |
| PART 3. | Plant Claim | |
| Article 8. | Procedure for Plant Claim...................................................................... | 44 |
| PART 4. | Tires | |
| Article 9. | Warranty Procedure for Tires................................................................. | 45 |
| | | |
| Exhibit A | Supplier Competitors............................................................................. | 46 |

149629v5

EXHIBIT 1

This Master Purchase Agreement is made the 22 day of October, 2004 ("Effective Date").

BETWEEN:

(1)    Nissan North America, Inc., a corporation organized and existing under the laws of California and having its registered office at 18501 South Figueroa Street, Gardena, CA 90248 ("Nissan")**, and its address for notice purposes at Nissan North America, Inc. Attn. Purchasing (Bin 39D), 983 Nissan Drive, Smyrna, TN 37167**; and

(2)    CONTINENTAL TIRE NORTH AMERICA, INC.("CTNA"), a corporation organized and existing under the laws of the state of Ohio **and having its registered office at 1800 Continental Blvd. Charlotte, North Carolina**, CONTINENTAL TEVES, INC.("TEVES"), a corporation organized and existing under the laws of Delaware **and having its registered office at One Continental Drive, Auburn Hills, Michigan,** and CONTITECH NORTH AMERICA, INC., a corporation organized and existing under the laws of Delaware **and having its registered office at 136 Summit Avenue, Montvale, New Jersey** ("CONTITECH") (collectively, the "Supplier").

(collectively, the "Parties" and individually a "Party").

Background

(A)    Nissan and its Affiliates (defined below) are engaged in the design, manufacture, assembly and/or sale of motor vehicles and motor vehicle components.

(B)    TEVES, CTNA, and CONTITECH are engaged in the design, manufacture and/or sale of motor vehicle components and tires.

(C)    Nissan wishes to procure motor vehicle components from Supplier under the following terms and conditions.

Now, Therefore, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to the terms and conditions set forth in this Agreement.

## Article 1. Definitions and Interpretation

1.1    In this Agreement, the following terms shall have the following meanings:

"Acceptance Drawing"           a drawing in any medium, including an electronic version in a CAD format, made by Supplier based upon specification tenders provided by Nissan or any of its Affiliates and design-released by Nissan or any of its Affiliates;

(1)

EXHIBIT 1

| | |
|---|---|
| "Affiliate" | an entity that:<br>(i)    is controlled directly or indirectly by;<br>(ii)   controls directly or indirectly; or<br>(iii)  is under common control with Nissan or Supplier, as the case may be. "Control" for this purpose shall mean having a fifty percent (50%) or greater interest in the issued share capital of the other entity; |
| "Agreement" | this Master Purchase Agreement, including the Claim Compensation Procedure, as amended from time to time; |
| "Alliance Partner" | has the meaning set out in Article 14.1. |
| "Applicable Law" | (i) all laws, rules, regulations and executive or judicial orders applicable to the design and manufacture of the Parts or the operation of the facilities (including laws relating to employees and safety) and applicable in (i) any jurisdiction where the Parts are manufactured, (ii) any other jurisdiction specified in Nissan Drawings and accepted by Supplier, and (iii) any other jurisdiction expressly agreed between the Parties. |
| "Background Rights" | (i) any registered patent, registered utility model or registered design right acquired or owned before or after starting Development Work; or<br>(ii) any application to register a patent, utility model or design right filed before or after starting the Development Work. |
| "Change in Control" | the ceasing of Continental AG to have beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended) or control of greater than fifty-one percent (51%) (on a fully-diluted basis, disregarding any director qualifying share ownership) of the combined voting power of the then outstanding interests or stock of the Supplier entitled to vote generally in the election of directors. |
| "Claim Compensation Procedure" | the procedure by which Nissan is reimbursed for the warranty cost by Supplier, a copy of the |

EXHIBIT 1

|  |  |
|---|---|
|  | current version of which is attached hereto as Schedule 1; |
| "Confidential Information" | has the meaning set out in Article 22.1; |
| "Date of Last Production" | as to any vehicle model Program for which Parts were supplied, the last date upon which Nissan produces such vehicle; |
| "Development Work" | all work necessary to develop the Parts so that the Parts meet all Specifications and are fit for their intended purpose. ***Development Work includes, without limitation, all initial technical discussions (for example, brainstorming sessions) between Supplier and Nissan, regardless of whether Nissan and Supplier have signed a definitive contract at the time of such discussions. Such discussions may include the exchange of Confidential Information, which shall be treated by the Parties in accordance with Article 22.*** |
| ***"Force Majeure"*** | ***has the meaning set forth in Article 33.*** |
| "Intellectual Property Rights" | any patent, utility model, design right, copyright (including any right in computer software), database right and topography right (whether or not any of these are registered and including applications for registrations of any such thing) and any trade secret, know-how or any right or form of protection of a similar nature or having equivalent or similar effect to any of those which may subsist anywhere in the world, and for the purpose of Articles 16 and 17 shall also include any trademark, service mark, ***trade dress,*** trade or business name; |
| ***"Nissan Change"*** | ***a change made by Nissan (without the consent or agreement of Supplier) in the quantity, Price, Specifications, delivery date, shipping method, packaging method with respect to any Parts for which Nissan has issued a Purchase Order or a Release, including changes made pursuant to Articles 4.4 or 8.1.*** |

(3)

149629v5

EXHIBIT 1

"Nissan Drawing"

a drawing in any medium, including an electronic version in a CAD format, specification tender, standard or other technical document of similar nature made by or belonging to Nissan or any of its Affiliates;

"Nissan Indemnified Party"

has the meaning set out in Article 12.1.

"Nissan Property"

means all Nissan Drawings, Nissan Trademarks, other Intellectual Property Rights owned by Nissan, Nissan Background Rights, Nissan Intellectual Property Rights, and Confidential Information of Nissan disclosed to Supplier by Nissan has the meaning set out in Article 17.2;

"Nissan Other Property"

has the meaning set out in Article 17.2.

"Nissan Trademarks"

has the meaning set out in Article 6.6.

"Non-conforming Parts"

means Parts that do not conform to the warranty provisions set forth in Article 9.

"Parts"

all goods more particularly described in any Purchase Order including, production parts and service parts, *including trial parts and sample parts (only if included in vehicles deemed to be salable to consumers),* accessories, raw materials, and Vendor Tooling *together with any related services required by Nissan and provided by Supplier.*

"Price"

the price of the Parts identified in the applicable Purchase Order;

*"Program"*

*a vehicle type, model year or model years using the same or substantially the same Parts as identified by Nissan as a "Program" in the Sourcing Documents. The intent of the Parties is to cover the five to seven year life of the model.*

"Purchase Order"

any purchase order or amendment to a purchase order submitted by Nissan *and accepted by Supplier* on or after the Effective Date. *For purposes of this definition, Supplier will be deemed to have accepted the purchase order if (i) it fails to object to it in writing*

(4)

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 25 of 130 PageID #: 210

EXHIBIT 1

|  | within ten (10) business days after receipt, or (ii) Supplier acknowledges in writing its acceptance of the Purchase Order or amendment thereto; |
|---|---|
| "Release" | Nissan's authorization for shipment of the Parts, which may be electronic or in writing; |
| "Service Parts" | has the meaning set out in Article 19; |
| "Sourcing Documents" | has the meaning set out in Article 29.4. |
| "Specification" | any specification tender (including quality and reliability standards), drawings in any medium (including electronic versions in a CAD format), data descriptions, samples or other information relating to the Parts; |
| "Subcontractors" | has the meaning set out in Article 21; |
| "Supplier Competitor" | means any automotive parts, tires, electronics or components suppliers set forth on Exhibit A. Supplier shall be solely responsible for updating Exhibit A in writing from time to time; |
| *"Supplier Property"* | *means all Background Rights of Supplier, all Supplier Technical Information, all Tooling (other than Vendor Tooling), all Intellectual Property Rights owned by Supplier and all Confidential Information of Supplier disclosed to Nissan;* |
| "Technical Information" | has the meaning set out in Article 14.2; |
| "Tooling" | all tools, jigs, dies, gauges, fixtures, moulds, patterns and other equipment used by Supplier in manufacturing the Parts; and |
| "Vendor Tooling" | all Tooling paid or to be paid for by Nissan, and used by Supplier in manufacturing the Parts. |

1.2     In this Agreement:

(1)     the above definitions are equally applicable to both the singular and plural forms of any of the terms defined in this Article;

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 26 of 130 PageID #: 211

EXHIBIT 1

    (2)    reference to Articles and Schedules are to Articles and Schedules of this Agreement;

    (3)    the headings are for convenience only and shall not affect the interpretation of this Agreement;

    (4)    the word "including" shall not be given a restrictive interpretation by reason of it being followed by words indicating a particular class of acts, matters or things; and

    (5)    any reference to a statutory provision includes a reference to any modification or re-enactment of the provision from time to time in force and all subordinate instruments, orders or regulations made under it.

**Article 2.    Agreement**

2.1    Nissan agrees to purchase and Supplier agrees to sell the Parts under the terms and conditions of this Agreement; provided, however, that any specific commitment to purchase and sell shall be subject to the acceptance by Supplier of Purchase Orders issued by Nissan and the Releases thereunder. ***Nissan shall have no obligation to purchase any Parts before such Purchase Orders and/or Releases are issued. No modification or waiver of this Agreement or any Purchase Order shall be deemed effected by either Party's acknowledgment or confirmation containing other or different terms. Should any acknowledgment or confirmation received from the other Party contain additional or different terms than this Agreement or Nissan's Purchase Orders, those terms shall be considered proposals by the other Party that are hereby rejected.***

2.2    Supplier agrees to pursue actively ongoing reduction in the Price and ongoing improvement in the quality of the Parts.

***2.3    The rights of Nissan and obligations owing to Nissan pursuant to this Agreement also shall be enforceable by Nissan with respect to Parts otherwise provided through a tire and wheel assembly provider.***

**Article 3.    Specifications**

3.1    Supplier shall manufacture the Parts in accordance with:

    (1)    Nissan Drawings furnished from Nissan to Supplier and agreed to by Supplier;

    (2)    Acceptance Drawings as defined in Article 1; and

    (3)    Specifications designated by Nissan and agreed to by Supplier and Specifications proposed by Supplier and approved by Nissan.

149629v5

EXHIBIT 1

3.2 After Nissan Drawings and Specifications are provided to Supplier, and before Supplier manufactures the Parts, Supplier shall review and agree to the same. Supplier shall immediately notify Nissan in the event that Supplier has reason to believe that any Nissan Drawing or Specification are inadequate to produce the Parts that will satisfy all warranties in Article 9 and the other provisions of this Agreement and that will function throughout the greater of the expected life of the Parts of the applicable warranty period.

**Article 4.    Vendor Release and Delivery**

4.1 In conjunction with each issued Purchase Order, Nissan may, issue one or more Release(s) to Supplier specifying the quantities of the Parts to be purchased and the required delivery dates. *Nissan may identify each such quantity or date requirement with a Release Authorization Number ("RAN").*

*4.1.1  At the time of each shipment, Supplier will transmit to Nissan as mutually agreed, an Advanced Shipping Notice ("ASN") which shall include part number, RAN, date of shipment, quantity shipped, forwarding information and other information specified by Nissan.*

*4.1.2  To the extent that one or more RANs have been issued and inventory authorized under such RAN at Supplier's location becomes obsolete due to a Nissan Change, Supplier's raw and fab authorization shall be as set forth in the Sourcing Documents.*

4.2 *In consideration of Nissan's entering into this Agreement with Supplier, during the term of this Agreement, Supplier shall deliver the Parts, including trial parts and sample parts, to Nissan in the quantity and by the time specified by Nissan in the Purchase Orders and Releases, except in the event of a Force Majeure.*  Supplier's obligations relating to the time for production and/or delivery of the Parts are integral parts of and constitute conditions of this Agreement.  In the event that the delivery of the Parts to Nissan is likely to be delayed by reason of Supplier, Supplier shall notify Nissan thereof in advance; provided that such notice shall not release Supplier from its liabilities for all direct costs, losses and damages resulting from incomplete or delayed delivery; without prejudice to Nissan's other available rights and remedies, Nissan shall have the right to reject in whole or in part the delivery of the Parts.  Supplier is responsible for all costs (including those arising out of direct losses *consisting of line stoppages*) and other losses (including loss of profits), as reasonably calculated by Nissan  due to incomplete or delayed delivery, except in the event of a Force Majeure.  Nothing herein shall prohibit Supplier from objecting to the calculation of costs and Supplier herein does not waive its rights to disagree or object to such calculation.

*4.2.1  If delivery of the Parts is not completed by the time specified (unless such delay is due to a Force Majeure), Nissan reserves the right, without liability, in addition to other remedies available to it by law, to terminate all or any part of the relevant Purchase Order or Release.*

149629v5

EXHIBIT 1

**4.2.2** *Nissan may, from time to time, upon reasonable notice, change shipping schedules provided in the Purchase Order, or contained in Releases, or direct temporary suspension of scheduled shipments. Nissan and Supplier shall negotiate in good faith in order to minimize any impact on either Party's operation as a result of such change in shipping schedule or suspension of shipments.*

4.3     Shipments in excess of quantities specified by Nissan may be returned to Supplier, and Supplier shall pay Nissan for all return handling and transportation expenses. Nissan reserves the right to accept, at its sole discretion, in whole or in part, any Parts delivered in excess of those specified by Nissan.  Within a reasonable time after Nissan's discovery of the overage or Nissan's receipt of written notice from Supplier claiming the delivery of excess quantities, the Parties shall meet in good faith to (i) confirm the number of excess Parts received by Nissan and (ii) determine the Price payable by Nissan for such excess Parts (assuming Nissan has elected to accept such Parts) based upon the Price of the applicable Purchase Order less the additional costs and expenses incurred by Nissan due to the receipt of such Parts, including without limitation, extra handling, transportation, storage and administrative costs and expenses.

4.4     Nissan reserves the right, at its sole discretion, to place emergency orders in addition to regular orders placed from time to time under this Agreement or to require Supplier to deliver the Parts earlier than the time originally specified by Nissan.  In any such case Supplier shall use its best efforts to comply with such emergency orders or revised timetable.  Nissan shall reimburse Supplier for any increased transportation cost actually incurred by Supplier due to its compliance with Nissan's emergency order (other than those emergency orders caused by or resulting from Supplier's failure to comply with the terms and conditions of a Purchase Order and/or Release) or revised timetable.

**4.5** *As to new Parts being sourced or to be sourced under this Agreement, Nissan shall provide Supplier in the Sourcing Documents a written list of each of the countries where the Parts or vehicles equipped with the Parts are to be sold.*

## Article 5.     Receipt and Inspection; Title and Risk of Loss

5.1     The title to and risk of loss or damage to the Parts shall pass from Supplier to Nissan at the time of delivery of the Parts to Nissan *or Nissan's authorized carrier*. Nissan reserves the right to inspect the Parts in accordance with the standards issued by Nissan from time to time.  Nissan may reject any Non-conforming Part at any time before sale of the Parts or vehicles equipped with the Parts.  Payment to Supplier shall not be construed as acceptance by Nissan or agreement by Nissan that the Parts conform to the terms and conditions of this Agreement.  Any inspection or testing by Nissan shall not relieve Supplier of its obligations under this Agreement.

EXHIBIT 1

**5.1.1** *In the event of Nissan's rejection of any Non-conforming Parts or revocation of acceptance for Non-conforming Parts, risk of loss or damage shall be treated as never having passed to Nissan and as having rested on Supplier. Acceptance of any Parts under any Purchase Order shall not bind Nissan to accept future shipments, nor deprive it of the right to return the Non-conforming Parts already accepted, nor constitute a waiver of any other right or remedy of Nissan.*

5.2     If any Non-conforming Parts are rejected, Supplier shall, at Nissan's request and at no additional cost to Nissan, promptly deliver replacement Parts conforming to the Specifications and delivery instructions.

**Article 6.     Packaging, Marking and Shipping**
6.1     All Parts shall be properly packaged, labeled, marked and shipped at Supplier's expense (which shall be included in the Price) in accordance with Nissan's requirements:

**6.1.1** *Unless Nissan specifies otherwise, such requirements shall mean in accordance with good industry practices and in such a manner that will not only protect the Parts against hazards of shipment, storage, and exposure, but will permit the securing of the lowest transportation rates consistent with the delivery terms specified in the Purchase Order. Unless otherwise provided in this Agreement or in the applicable Purchase Order, no separate charges shall be made for containers, crating, boxing, bundling, dunnage, drayage, storage or freight provided dunnage requiring replacement due to loss or damage resulting from Nissan's mishandling, abuse or neglect shall, upon Supplier's request, be paid for by Nissan.*

**6.1.2** *Any transportation charges paid by Supplier and to which Supplier is entitled to reimbursement under the terms of the Purchase Order, shall be added to Supplier's invoice as a separate item and the receipted freight bill shall be attached thereto. If Supplier is paid by Evaluated Receipt System (as referred to in Article 7.3) the invoice should be a separate invoice. Any deviation from shipping and billing instructions specified in the Purchase Order shall be at Supplier's risk.*

**6.1.3** *In the event that Nissan's instructions or a Nissan Change result in packaging or freight costs in excess of customary and standard packaging or freight Nissan shall pay Supplier such excess; provided, that if the extraordinary shipping instructions are due to circumstances or delays within the control of Supplier, Supplier shall be responsible for such costs.*

6.2     If Nissan is responsible for arranging transportation, Supplier shall comply with Nissan's instructions. Supplier shall comply with Nissan's requirements to the extent that such requirements are reasonable.

(9)

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 30 of 130 PageID #: 215

EXHIBIT 1

6.3     Each packing slip, bill of lading, shipping notice and invoice shall bear Nissan's applicable part number, Release number, Purchase Order number, date of shipment, quantity shipped, address of Nissan, forwarding information and any other information reasonably requested by Nissan, including serial numbers, if applicable.

6.4     Supplier is responsible for all Nissan's costs, losses, and damages, actually incurred by Nissan, due to Supplier's failure to comply with any or all of its obligations under this Article 6.

**6.5     Supplier agrees to mark all Parts manufactured on behalf of Nissan according to applicable patent and trademark laws, as instructed by Nissan in writing by Nissan from time to time. Nissan shall supply, at its expense, all necessary camera ready art and text and all other necessary information and materials necessary for Supplier's use of the Nissan Trademarks (as defined below). Nissan shall review and approve each use of the Nissan Trademarks before Supplier begins mass production thereof.**

**6.6     Nissan hereby grants Supplier a limited license to use Nissan's trademarks, service marks and logos ("Nissan Trademarks") solely for the purposes of complying with the terms of this Article 6. All goodwill related to the Nissan Trademarks shall inure solely to the benefit of Nissan. Supplier acknowledges Nissan's ownership of the Nissan Trademarks.**

**Article 7.     Price, Invoicing and Payment**

7.1     Unless otherwise agreed in writing, Supplier shall invoice Nissan for the Parts after delivery of the Parts. The Price shall be Supplier's full compensation for the Parts. Nissan shall have no obligation to make any further payment to Supplier in connection with the Parts. No increase in Price shall be accepted by Nissan and no decreases in Price shall be accepted by Supplier without prior written agreement. Invoices shall include all data and supporting documentation requested by Nissan.

7.2     Invoices may be rejected for material non-compliance with any of the provisions of this Agreement. Nissan shall make payment of the Price to Supplier in in accordance with the payment procedure established by Nissan.

**7.2.1  The payment procedure will be set forth in the Purchase Order.**

**7.3     If directed by Nissan, Nissan's Evaluated Receipt System (ERS) shall be applicable to all shipments pursuant to this Agreement or any applicable Purchase Order, and payment to Supplier shall be made in accordance with that system. The date used to calculate payment and any applicable discount shall be based on the receipt date of the Part. Payment terms will be noted on the face of the Purchase Order.**

**7.4     If not directed by Nissan to use ERS, the following rules apply: Invoices shall be received promptly and in duplicate, cover not more than one**

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 31 of 130 PageID #: 216

EXHIBIT 1

*Purchase Order and be marked "Attention: Accounts Payable". The date used to calculate payment and applicable discounts shall be based on the date the Parts are received or the date of the receipt of a proper invoice, whichever is later.*

**7.5** *Nissan shall, within forty-eight (48) hours after exercising an offset, give written notice to Supplier specifying the reason in detail, withhold payment under this Agreement, any Purchase Order or any other agreement between Supplier and Nissan, and apply the withheld payments as offsets against costs, damages or other payment due to Nissan under this Agreement, any Purchase Order or any other agreement between Supplier and Nissan. Disputed invoices shall be paid only after resolution of the dispute provided that Nissan may only withhold payment of disputed amounts if it provides Supplier with written notice of the amount and the nature of the dispute.*

**Article 8.    Changes**
8.1    Nissan may, following consultation with Supplier, by notice to Supplier, at any time change any one or more of the following:

(1)    quantity;

(2)    Specifications; provided, however, that if Supplier, without any delay after its receipt of the notice from Nissan, submits in writing an explanation that it is reasonably impossible for Supplier to follow such change in specifications, Nissan will discuss another solution with Supplier; or

(3)    methods of packaging or shipment.

If such change results in an increase or a decrease in cost to Supplier, Nissan and Supplier shall mutually agree, after good faith negotiation upon a reasonable adjustment to the Price or other terms as a result of any such change.

**8.1.1** *Neither Supplier nor Nissan, however, shall be allowed during the term of this Agreement to terminate or modify any existing Purchase Order or Release, or to obtain an adjustment in the Price based on its loss or reduction of anticipated profits.*

8.2    Supplier shall not make any changes in the design or composition of any Parts without Nissan's prior written agreement.

**8.2.1** *In the event that any materials used by Supplier in making the Parts become unavailable, Supplier shall locate a source for, and propose to Nissan, alternative materials for use in making the Parts. Nissan shall, in its sole discretion, determine whether the use of such alternative materials is acceptable, and whether an adjustment to the Price or other terms will occur as a result of such change.*

(11)

EXHIBIT 1

**Article 9.    Warranties**

9.1    Supplier warrants that it has good and merchantable title to the Parts and that the Parts shall:

    (1)    be free from defects in design (to the extent that Supplier has furnished the design), materials, workmanship and performance;

    (2)    be of merchantable quality and fit for the particular purpose for which the Parts are sold;

    (3)    comply with all Nissan Drawings, Acceptance Drawings, and Specifications designated or approved by Nissan and agreed to by Supplier pursuant to Article 3.1(3);

    (4)    be free and clear of all liens and encumbrances;

    (5)    comply with all Applicable Laws provided; however, that Nissan will notify Supplier of the jurisdictions where the Parts or vehicles equipped with the Parts will be sold.

9.2    Warranties shall extend to Nissan for at least the time and mileage limitations of relevant customer warranties.  With respect to handling of and reimbursement for warranty claims, the Parties shall comply in all respects with the terms and conditions of the Claim Compensation Procedure, which shall constitute an integral part of this Agreement.  For the avoidance of doubt, the Parties hereby confirm that the scope of compensation to be reimbursed by Supplier to Nissan in connection with Warranty Claims (as defined in the Claim Compensation Procedure) shall be limited to the Warranty Expenses as more specifically and conclusively defined in the Claim Compensation Procedure.

***9.2.1    Notice of Non-Conforming Parts shall be deemed sufficient if given by Nissan within one hundred eighty (180) days after discovery by Nissan. Such notice may be given orally or in writing.  Nissan shall notify Supplier that the Parts are Non-conforming, troublesome, need repair, or must be watched. Nissan will make commercially reasonable efforts to include a clear statement of all objections that shall be relied upon by Nissan as the basis for breach.***

**Article 10.    Quality Assurance**

    Supplier shall manufacture the Parts in accordance with quality procedures already agreed and/or to be agreed between Nissan and Supplier.  In addition, Supplier shall continuously monitor the Parts and promptly report to Nissan any Parts that do not comply with the Specifications ***and the warranties required of Supplier in Article 9, and shall promptly notify Nissan of any defects or deficiencies in***

149629v5

EXHIBIT 1

*Supplier's design including if Supplier has reason to believe that any Specifications provided by Nissan are not adequate to produce the Parts that will function throughout the greater of the expected life of the Parts or the applicable warranty period, manufacture, or in-use performance.*

### Article 11.   Recall and Reimbursement

Supplier shall reimburse Nissan, to the extent attributable to a defect in Supplier's product, for all reasonable costs incurred by Nissan (including costs for notification, replacement parts, labor, penalties, and fines as a result of any recall, service campaign or similar program initiated by Nissan, or required for compliance with any Applicable Law. Supplier shall also reimburse Nissan for any vehicle repurchase due to the Parts and made pursuant to any laws, rules, regulations, administrative or judicial decisions or orders which require Nissan to repurchase the vehicle under the specific circumstances of the specific situation.  Following prior consultation with Supplier, whenever possible, all decisions regarding recalls, service campaigns, and similar programs shall be made by Nissan, upon consultation in good faith with Supplier in advance.  In cases where the Supplier may be responsible, in whole or in part, for non-conformity or breach of Supplier's warranties of the Parts which may necessitate a recall campaign, service campaign, and similar programs, Nissan will keep Supplier informed of non-privileged facts in connection therewith, and both Parties will negotiate and determine in good faith whether and to which extent the Supplier will reimburse the costs of a recall campaign, service campaign, and similar program; and Supplier shall reimburse Nissan for these costs to the extent attributable to Supplier as determined through the aforementioned discussion. However, if Nissan's decision to carry out such campaign is for the purpose of protecting its reputation and preserving the good will of its customers and, if there is no specific defect attributable to Supplier, Supplier shall not be held liable for any cost therefor.

### Article 12.   Indemnification

12.1   In addition to what is specified elsewhere in this Agreement, Supplier shall indemnify and hold harmless Nissan and its dealers (to the extent indemnified by Nissan or Nissan Affiliates), its Affiliates and their dealers(to the extent indemnified by Nissan or Nissan Affiliates), and their respective officers, directors and employees (the "Nissan Indemnified Parties"), in full against all loss, liability, damages, costs and all expenses, including attorney fees and expert fees, arising out of claims or lawsuits for personal injury, property damage or economic damage alleging:

(1)   defects in design (to the extent that Supplier has furnished the design), warnings (to the extent that Supplier has furnished the warnings), materials, workmanship and performance;

(2)   any violation by Supplier of Applicable Law to Supplier or Supplier's business, facilities or operations;

(13)

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 34 of 130 PageID #: 219

EXHIBIT 1

(3)     any act or omission of Supplier or its employees, agents or sub-contractors designing, manufacturing, supplying or delivering the Parts, including any injury, loss or damage to persons caused or contributed to by any of their negligence or by faulty design, workmanship or materials; or

(4)     any other claims resulting from the negligent acts or omissions of Supplier or its employees, agents or sub-contractors.

In each case above, Supplier shall not be required to indemnify Nissan for those damages and expenses resulting from allegations of conduct or defect reasonably attributable to Nissan or others.  Supplier shall not be required to compensate all or any part of expenses for settlement unless Supplier has been informed in advance that settlement discussions will take place, and, to the greatest extent possible in good faith, has been afforded the opportunity to discuss and consult on the terms of such settlement in advance.

12.2   Upon request from Nissan, Supplier shall, at its sole expense, provide Nissan with reasonable access to documents, records and witnesses in connection with Nissan's defense and resolution of any claim, action or lawsuit described in Article 12.1.

**Article 13.    Right of Access to Supplier's Claims Information**
At Nissan's request, Supplier shall promptly provide access to its records of warranty or product liability claims relating to the Parts other than records or information constituting attorney-client privilege or constituting attorney work product material. Nissan has the right to review and copy such records, and to require Supplier,  to prepare and provide reports or analyses of the quality, reliability, performance, or safety of the Parts, and/or complaints, actions or claims relating to the Parts. Supplier shall retain such records, reports and analyses as required by the applicable laws or for at least five (5) years, whichever is longer.

**Article 14.    Handling of Drawings**
14.1   Supplier shall furnish Nissan with the Acceptance Drawings.  Notwithstanding the provisions of Article 22, Nissan may copy, prepare derivative works and disclose the Acceptance Drawings to any third party, and Nissan and such third party may use such Acceptance Drawings; provided, however, that Nissan shall obtain the consent of Supplier prior to disclosure to a third party (other than Nissan Affiliates or entities with which Nissan has a publicly announced significant business relationship which may be referred to as an "alliance partner" or "strategic alliance" or some relationship similar to the Nissan/Renault Alliance (an "Alliance Partner") and excluding any alliance with any Supplier Competitor, of those Acceptance Drawings that Supplier has designated at the time of submission to Nissan as "Confidential— Not To Be Disclosed To Third Parties Without Consent." If Supplier refuses to grant consent for disclosure of any Acceptance Drawing, Supplier shall, upon request from Nissan, prepare and submit to Nissan within a commercially reasonable time period drawings that can be disclosed to a third party in place of the subject Acceptance

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 35 of 130 PageID #: 220

EXHIBIT 1

Drawings ("Substitute Acceptance Drawings"), after consultation with Nissan regarding the content thereof. In this event, notwithstanding the provisions of Article 22, Nissan may copy, prepare derivative works and disclose the Substitute Acceptance Drawings to any third party and Nissan and such third party entity that Nissan recognizes as a direct competitor of Supplier at the time of such disclosure, may use such Substitute Acceptance Drawings.

14.2   Supplier shall furnish Nissan with access to specifications, concept sheets, CAD data, information and other data Supplier acquires or develops in the course of Supplier's activities under this Agreement as well all other information and data that Nissan deems reasonably necessary to understand the Parts covered by this Agreement and their manufacture, except for highly confidential and proprietary in the organization (including but not limited to source code, software and FMEA) (collectively the "Technical Information"), provided, however, that Supplier may consult with Nissan upon the content of the Technical Information to be furnished to Nissan. As to any Technical Information that is Confidential Information (as defined in Article 22), Nissan  shall not copy and disclose such Technical Information to any third party without the prior consent the prior consent of Supplier, except to the limited extent permitted under Article 22.

## Article 15.   Intellectual Property Rights

15.1   Each Party and/or its Affiliates will retain its rights in the Intellectual Property Rights that it acquired, generated or created at any time.

15.2.   Supplier shall grant and hereby grants Nissan and its Affiliates a perpetual, paid-up, royalty-free, non-exclusive, world-wide irrevocable license to all Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Acceptance Drawings, except for Patents of Supplier (this exclusion shall also apply to the license granted in subparagraph (1) below), with a right to grant sub-licenses to others to use, offer to sell, sell, repair, reconstruct or rebuild the Parts. In the event Nissan has requested Supplier's consent to disclose the Acceptance Drawings to a third party pursuant to Article 14.1, Supplier shall grant and hereby grants Nissan and its Affiliates (1) a perpetual, paid-up, royalty-free, non-exclusive, world-wide irrevocable license to all Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Substitute Acceptance Drawings, with a right to grant sub-licenses to others, to make, have made, use, offer to sell, sell, repair, reconstruct or rebuild, and have repaired, reconstructed or rebuilt, products including the Parts and products similar or identical to the Parts.

15.3   If requested by Nissan, Supplier shall in good faith discuss the granting to Nissan or any of its Affiliates a non-exclusive license with a right to grant sub licenses to others to Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Parts, other than those licensed by Supplier to Nissan and its Affiliates pursuant to Article 15.2, on terms to be agreed by the Parties.

15.4   If either Party makes or creates an invention, patentable discovery, improvement or

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 36 of 130 PageID #: 221

EXHIBIT 1

process based on the technical data, information, proposals or opinions provided by the other Party, the other Party shall forthwith notify the other Party thereof and the Parties shall discuss in good faith and agree on the ownership of the Intellectual Property Rights subsisting or embodied therein and shall enter into an agreement with respect thereto. If the Parties intend to jointly develop any products each of the Parties agrees that prior to engaging in joint development work of products the Parties will enter into a separate writing setting forth the rights of the Parties as to Intellectual Property and other matters.

15.5    Except as specifically set forth in this Article 15 and Article 27, no right or license, expressed or implied, under any patent or patent application is granted by either Party to the other Party under this Agreement.

**Article 16.    Infringement**

16.1    Subject to Article 16.5, Supplier shall defend, indemnify and hold harmless Nissan and the Nissan Indemnified Parties, in full against all loss, liability, damages, costs and all expenses, including attorney fees and expert fees, arising directly or indirectly out of any claims, actions or lawsuits, alleging infringement of any Intellectual Property Rights   (other than those of Nissan or any Nissan Affiliate) ("Third Party Rights") in connection with the Parts, the operation of the Parts, or their manufacture; provided, however, that the pecuniary amount for which Supplier is liable pursuant to this Article shall be separately discussed and determined by the Parties, in the event that the subject claim, action or lawsuit (i) arises from instructions given by Nissan on the basis of Nissan's own idea or concept and expressly described in any Nissan Drawings , and (ii) arises in spite of Supplier's every due care in conducting appropriate searches to determine whether any Third Party's Rights may be infringed by following Nissan's instructions.

16.2    Nissan agrees that as a condition to Supplier's foregoing obligation to indemnify, Nissan will give reasonably prompt notice of any such claim, demand, loss, expense, damage or injury but in any event within fourteen (14) calendar days after the service of any plaintiff's petition, complaint or claim and shall thereafter cooperate at Supplier's expense with Supplier in the defense thereof. In the event Nissan fails to give timely notice, the obligation to indemnify remains to the extent Supplier has not been prejudiced by such delay.  Supplier shall be responsible for the defense of all such claims and suits; provided, however, that Nissan shall have the right, at its option, to be represented at its own expense, by counsel of its own selection to participate in the defense of any such claim or suit.

16.3    Nissan shall furnish copies of any pleadings which have been served to date, together with all information then available regarding the circumstances giving rise to the suit or claim and cooperate with Supplier, as reasonably requested, in such defense at the expense of Supplier and provide Supplier with reasonable access to documents, records and witnesses in connection with any allegations with respect to

149629v5

(16)

## EXHIBIT 1

the infringement of any Third Party Right. Supplier shall not admit to any liability of Nissan in connection with any judgment or settlement without Nissan's prior consent, which consent shall not be unreasonably withheld.

16.4    In the event any claim, action or lawsuit described in Article 16.1 includes allegations of infringement against more than one supplier, including Supplier, Nissan and Supplier agree to cooperatively discuss and determine whether Nissan, entirely or in part, controls or participates with Supplier in the defense and resolution of such claim, action or lawsuit. In the event that Nissan conducts its own defense under this Section 16.4, with Supplier's consent through such discussion, Supplier shall, unless otherwise agreed upon between the Parties, still be liable for the reasonable support and costs of such defense, including reasonable attorney fees and court costs, together with any judgment or final settlement; provided, however, that any final settlement shall be subject to the approval of Supplier, which approval shall not be unreasonably withheld. Nissan will include Supplier in settlement discussions where indemnity has been or will be sought from Supplier under this Section 16.4. Nissan will not settle or compromise any third party claim that gives rise to an indemnification claim under this Section 16.4 without notifying Supplier in advance that settlement discussions will take place and affording Supplier the opportunity to discuss, consult, and participate on the terms of such settlement in advance.

16.5    The indemnification provisions of this Article 16 shall apply only in case that at least one claimed Intellectual Property Right from the intellectual property right family of such third party has been published either by the European Patent Office or by competent patent authorities in Germany, France, U.K., Japan, U.S, China, Spain, Mexico and Korea. In case that neither the claimed patent nor any patent of its patent family of such third party has been either published by the European Patent Office or by competent patent authorities in any of the aforementioned countries at the time of first delivery of the Parts which are subject of such alleged infringement, the scope and pecuniary amount for which Supplier is liable pursuant to this Article 16 shall be separately discussed and determined by the Parties.

16.6    In the event that either Party is involved in a dispute with a third party in connection with Supplier's Intellectual Property Rights relating to the Parts, or either Party believes that there is a likelihood that such a dispute may occur, such Party shall immediately notify the other Party, and shall furnish all information in its possession or under its control relating to such dispute.

16.7    Other than as provided in Article 27.5, this Article 16 states the entire liability of Supplier for any such claim for indemnification with respect to the infringement of any Third Party Right.

## Article 17.   Nissan Property
17.1    All Nissan Drawings, Intellectual Property Rights owned by Nissan and Confidential Information supplied to Supplier by Nissan ("Nissan Property") shall remain the

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 38 of 130 PageID #: 223

EXHIBIT 1

property of Nissan, and Supplier shall use such property only for the purpose of fulfilling its obligations under this Agreement.

***17.1.1All Supplier Property shall remain the property of Supplier and Nissan shall use such property only for the purposes of and subject to the restrictions of this Agreement.***

17.2    All supplies, materials or other items paid for or reimbursed by Nissan to perform Supplier's obligations hereunder (collectively the "Nissan Other Property") shall remain the property of Nissan. Supplier shall use the Nissan Other Property only in connection with this Agreement, and shall not use the Nissan Other Property in any manner whatsoever for the benefit of any other customer or third party without Nissan's prior written consent. Supplier shall, immediately upon Nissan's request, deliver the Nissan Other Property to Nissan or its nominee in accordance with Nissan's instructions. The Nissan Other Property shall be marked as the property of Nissan by Supplier, shall not be commingled with the property of Supplier or any third person, and shall not be moved from Supplier's premises without Nissan's prior written approval.

## Article 18.    Tooling
18.1    Supplier shall maintain the Tooling in good condition so that the manufacture of the Parts is not interrupted.

***18.1.1Supplier shall properly house, care for, repair or, if necessary, replace all Vendor Tooling and shall bear the risk of loss or damage thereto (including normal wear and tear) for the production life of the applicable Program (including Service Parts), whether determined by time period or volume produced.  The Vendor Tooling is lent by Nissan to Supplier.***

18.2    Supplier shall only use the Vendor Tooling for manufacturing the Parts for Nissan. Supplier shall, immediately upon Nissan's request, deliver the Vendor Tooling to Nissan or its nominee in accordance with Nissan's instructions.  All Vendor Tooling shall be marked as the property of Nissan by Supplier, shall not be commingled with the property of Supplier or any third person, and shall not be moved from Supplier's premises (except for repair or modification) without Nissan's prior written approval. Supplier shall not modify, lease, transfer or dispose of any Vendor Tooling unless Supplier obtains Nissan's prior written consent.

***18.2.1Nissan and Supplier recognize that the Price quoted by Supplier for the Vendor Tooling ordered by Supplier will be an estimate.  Nissan and Supplier agree, however, that absent any changes by Nissan to the plans for the Vendor Tooling that affect the Price,  the estimated total price represents a maximum cost of the Vendor Tooling and that the firm price shall be based on the actual cost to Supplier of production of the Vendor Tooling.  At such time as firm pricing is established, Nissan will issue an amendment to the applicable Purchase Order to reflect that pricing. Supplier***

EXHIBIT 1

*shall use commercially reasonable efforts to produce the Vendor Tooling at the lowest possible cost consistent with Nissan's production part quality requirements. Nissan reserves the right to audit Vendor Tooling cost at tool sign-off. Notwithstanding the foregoing, any increase in the amount of any applicable Purchase Order may be accomplished only upon agreement of Nissan. In the event of a Nissan directed design change in any Part, Supplier shall submit a revised quotation reflecting new maximum Vendor Tooling costs.*

### Article 18A. Insurance

**18A.1** *Supplier shall maintain insurance and keep itself adequately insured with a reputable insurance company against all insurable liability under and against the consequences for any act of Supplier's employees while on the premises of Nissan. The Supplier shall obtain from an insurance provider, reasonably acceptable to Nissan, policy or policies of "All Risk" insurance with respect to the interests of Nissan Property on Supplier's premises or within the care, control or custody of Supplier. Policy limits must be sufficient to cover replacement cost of the Nissan Property (as defined in Article 17) on Supplier's site, or other site as authorized in Article 22 (Subcontracting). Nissan shall be named as an additional insured or loss payee on such policies with a deductible consistent with the deductible maintained by Supplier in the ordinary course of its business.*

*Supplier agrees to carry insurance coverage for activities reasonably connected with this Agreement and applicable Purchase Orders, in the types and at the minimum amounts listed below:*

| | |
|---|---|
| **Commercial General Liability including:**<br>- **Broad From Contractual**<br>- **Personal Injury, including advertising liability** | **$1 million – BI/PD – Combined Single Limit per occurrence** |
| **Automobile Liability (covering all owned, hired and non-owned vehicles)** | **$1 million combined single limit per occurrence** |
| **Workers' Compensation (endorsed to cover volunteers, if applicable)** | **Statutory Limits** |
| **Employer's Liability** | **$1,000,000 per occurrence** |
| **Excess Liability**<br>- **Product Liability** | **$10,000,000 per occurrence** |

149629v5

EXHIBIT 1

> **Property Insurance – All**　　　　**See above**
> **Risk**

> *All policies shall contain a provision whereby the insurer(s) agrees not to cancel or materially alter coverage without thirty- (30) days prior written notice to Nissan.　Nissan shall not be liable for premium associated with any such policy.*

> *Supplier shall furnish Nissan with Certificates of Insurance evidencing the above coverages within five (5) business days of execution of this Agreement.*

**18A.2** *Nothing herein shall limit or prohibit Nissan from obtaining insurance for its own account, at its own expense, and any proceeds payable thereunder shall be payable as provided in the underlying policy.*

**Article 18B.  Grounds for Insecurity; Adequate Assurance of Performance**
> *When, in Nissan's good faith opinion, reasonable grounds for insecurity arise with respect to Supplier's performance, Nissan may demand from Supplier adequate assurance of future performance.  If assurance of due performance as required herein is not timely provided by Supplier, Nissan may, at its option, treat any applicable Purchase Order as repudiated by Supplier.*

**Article 19.　Service Parts**
> Unless otherwise agreed in writing between the Parties, Supplier agrees to continue to supply service parts, as required by Nissan ("Service Parts"), for each model of vehicle, for ten (10) years from the date of last production of such vehicle model for which the Parts were supplied, with the exception of Nissan Motor Co., Ltd., which will require fifteen (15) years.　The Service Parts shall be supplied at full production assembly level and/or at sub-component level, as required by Nissan.  The Service Parts shall meet all Specifications provided by Nissan.

**19.1** *The Price for the Service Parts will be the same as under Purchase Orders for corresponding production Parts until the Date of Last Production.  After the Date of Last Production, the Parties shall negotiate in good faith the price for the Service Parts.*

**19.2** *After the Date of Last Production, certain materials or components for Service Parts may become actually or practically unavailable.  In the event of such actual or practical unavailability, Supplier reserves the right to substitute materials or components of like quality and functionality that meet the technical specifications for the Part, other than the specific specification for the material or component.*

149629v5

EXHIBIT 1

## Article 20.   Sales to Third Party

20.1   Supplier shall not, without Nissan's prior written consent, manufacture for the benefit of or supply to a third party any goods that:

(1)   are based in whole or in part upon the Nissan  Drawings;

(2)   use any Intellectual Property Right of Nissan or any Nissan Affiliates.

(3)   are based in whole or in part upon the Acceptance Drawings, or any derivative or copy thereof, except that such Acceptance Drawings, or any derivative copies thereof solely reflect Supplier's independently developed and/or owned products.

20.2   Nissan will not withhold its consent to the use of Nissan Drawings and/or Acceptance Drawings by Supplier provided the use of such Nissan Drawings and/or Acceptance Drawings does not require the use of any Intellectual Property Rights of Nissan or any of its Affiliates.  This provision shall not be construed as limiting Supplier's use of its Intellectual Property Rights.

## Article 21.   Subcontracting

Supplier may delegate or subcontract the manufacture of the Parts to third parties ("Subcontractors").   Supplier shall use commercially reasonable efforts to ensure that all Subcontractors adequately support Supplier's obligations under this Agreement, and in no event shall Supplier be released from any of its obligations under this Agreement. ***If Nissan notifies Supplier that Nissan has an objection to a particular Subcontractor due to such Subcontractor's performance, Supplier and Nissan shall discuss in good faith the performance of such Subcontractor and shall mutually determine whether such Subcontractor should be terminated.***

## Article 22.   Confidentiality

22.1   The Parties recognize that each of them ("Receiving Party") may, during the course of this Agreement, gain knowledge of, have access to, and have otherwise disclosed to it certain nonpublic information that is proprietary to the other Party and its Affiliates ("Disclosing Party") and which is of a secret or confidential nature to the Disclosing Party ("Confidential Information").   The following information shall be considered the Confidential Information:

(1)   Non-public information concerning the business operations of such Party, its Affiliates or dealers (including product planning, manufacturing, advertising programs, sales promotions, complaints, budgets, and forecasts); and

(2)   inventions, designs, and research and development programs.

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 42 of 130 PageID #: 227

EXHIBIT 1

22.2 The Receiving Party shall not disclose, publish, release, transfer or otherwise make available Confidential Information of the Disclosing Party in any form to, or for the use or benefit of, any third party without the Disclosing Party's prior written consent.

22.3 The obligations of confidentiality shall not apply if:

   (1) the Confidential Information is or becomes (other than through a breach of this Agreement) generally known to the public;

   (2) the Confidential Information was in the Receiving Party's possession prior to its disclosure by the Disclosing Party, as demonstrated by the Receiving Party's written records;

   (3) the Confidential Information is developed independently by the Receiving Party without reliance on information or materials provided by the Disclosing Party, as demonstrated by the Receiving Party's written records;

   (4) the Confidential Information was rightfully received by the Receiving Party without obligation of confidentiality from a third party, as demonstrated by the Receiving Party's written records; or

   (5) disclosure is required by law; provided that the Receiving Party gives the Disclosing Party prompt notice of the request for disclosure, cooperates with the Disclosing Party in obtaining a protective order or other remedy, and discloses only that portion of the Confidential Information which it is legally compelled to disclose.

***22.4 Disclosure.  The Receiving Party shall use the same degree of diligence and effort to protect its Confidential Information as the Disclosing Party's Confidential Information from disclosure to third parties as Receiving Party uses to protect its own confidential information, but in no event shall the Receiving Party use less than reasonable and customary diligence and effort in protecting such Confidential Information.***

22.5 Each Party acknowledges that the other Party is providing the Confidential Information only for the limited purpose of enabling the Parties hereunder to perform their respective obligations under this Agreement and the Purchase Orders.    The transfer of Confidential Information to the Receiving Party shall not be construed as granting the Receiving Party license or rights in or to the Confidential Information, except the limited right to use the Confidential Information as necessary to perform hereunder.

22.6 Notwithstanding the provisions of Article 22.2:

   (1) Nissan may disclose Supplier's Confidential Information not only to Nissan Affiliates ***on a need to know basis*** but also to an Alliance Partner  provided that (i) Nissan shall ensure that such  Affiliates  and entities  are aware of and

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 43 of 130 PageID #: 228

EXHIBIT 1

undertake to maintain the secret or confidential nature of Supplier's Confidential Information and further that (ii) Nissan's permitted disclosure shall be limited to Nissan Affiliates if such Supplier's Confidential Information is also Technical Information; and (iii) Nissan shall not disclose Supplier's Confidential Information to any entity that Nissan recognizes as a Supplier Competitor.

(2) Supplier may disclose Nissan's Confidential Information to any of the Subcontractors defined in Article 21 to the extent necessary for performing Supplier's obligations under this Agreement; provided that Supplier shall ensure that such Subcontractors are aware of and undertake to maintain the secret or confidential nature of Nissan's Confidential Information.

22.7 In any case where Confidential Information is released to a third party entities as permitted under this Agreement, such disclosure shall only be made after the Receiving Party obtains written assurances to hold such Confidential Information as confidential.

22.8 Each Party acknowledges that the disclosure of the other Party's Confidential Information may result in irreparable injury to that Party and that such Party will be entitled to seek injunctive relief in addition to any other legal or equitable remedies that may be available.

22.9 ***Copies and Return of Information. Upon written request after termination of this Agreement, or earlier if so requested by the Disclosing Party, the Receiving Party of any Confidential Information shall immediately return to the Disclosing Party all originals and copies of the Confidential Information of such Party, including all notes, computer disks, records, drawings or other documents ,or the Receiving Party may destroy all copies of such Confidential Information and certify, in writing, to the Disclosing Party, that all such copies have been so destroyed.***

## Article 23.   Advertising

Supplier shall not in any way advertise the fact that Supplier has entered into this Agreement with Nissan without Nissan's prior written consent.  In addition, Supplier shall not use any trademark, trade name, trade dress, logo or other marks in which Nissan or any Nissan Affiliate has an interest except in such manner as Nissan may direct in writing in advance as provided in Article 6 of this Agreement.

## Article 23 A.  Audits

***Supplier shall maintain accurate and complete records of all expenses incurred under the terms of this Agreement and applicable Purchase Orders. Such records shall be maintained in accordance with generally accepted accounting principles and in a manner that facilitates auditing.  Supplier further agrees to permit Nissan or its representatives to examine and/or***

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 44 of 130 PageID #: 229

<u>EXHIBIT 1</u>

***audit such records as necessary for Nissan to (i) verify the cost of Vendor Tooling, (ii) verify Supplier's compliance with the requirements of Article 47, and/or (iii) comply with the obligations imposed upon Nissan when acting as a Foreign Trade Zone at reasonable times while this Agreement and applicable Purchase Orders remain in force and for two (2) years after termination.***

**Article 24.  Facility Inspection**

Nissan shall have the right to inspect Supplier's facilities and operations at any time during Supplier's business hours and upon reasonable notice  for purposes of verifying Supplier's compliance with its obligations under this Agreement, including, , those relating to Supplier's manufacturing process and quality assurance systems.

**Article 25.  Change of Circumstances**

If any of the following circumstances occur or are likely to occur in relation to Supplier, Supplier shall immediately inform Nissan in writing:

(1)     the transfer of all or any substantial part of its business or assets;

(2)     a Change of Control;

(3)     Supplier agrees to keep Nissan informed regarding merger or amalgamation to the extent permitted by the applicable laws or unless restricted by contractual obligations;

(4)     Supplier agrees to keep Nissan informed regarding alteration of its trade name or official name, executive management, location of premises other substantial organization changes; or

(5)     Supplier's voluntary bankruptcy, Supplier's being involuntarily being placed into bankruptcy and such involuntary proceeding is not dismissed within 90 days, Supplier's being placed into administration, receivership or liquidation, commencement of proceedings to be wound up, entering into any voluntary arrangement with its creditors, or the happening of any similar event according to the laws of its domicile.

**Article 26.  Term**

This Agreement shall commence on the Effective Date and, unless earlier terminated as provided herein, shall continue in force for an initial period of three (3) years. Unless either Party notifies the other Party in writing at least six (6) months prior to the last day of the initial term or any extension thereof, the term of this Agreement shall be automatically extended for a further period of one (1) year.

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 45 of 130 PageID #: 230

EXHIBIT 1

**Article 27.    Termination and Other Remedies**

27.1    Notwithstanding the provisions of Article 26 **and 27.6**, either Party may terminate this Agreement effective immediately by notice in writing  without liability to the other if the other is in material breach of this Agreement and, if such breach is remediable, such breach has not been remedied within thirty (30) days of written notice.

27.1.1 *Material breaches as set forth in Article 27.1 ("Material Breach"), specifying the details of such breach in reasonable detail, shall include, but not be limited to a Party's:*

*(1)    refusal or failure to make or accept deliveries of conforming Parts in whole or in part covered by any applicable Purchase Order within the time specified in any Purchase Order or RAN; or*

*(2)    failure to perform any other provision of any applicable Purchase Order or any provision of this Agreement and such failure continues for a period of thirty (30) days after the non-breaching party delivers notice to the breaching party of the alleged breach; or*

*(3)    failure to make progress so as in the reasonable opinion of Nissan to endanger the performance of any applicable Purchase Order in accordance with its terms and does not cure such failure within the time period after receipt of notice pursuant to Article 27.1 from Nissan specifying such failure.*

27.2    Notwithstanding the provisions of Article 26, either Party may terminate this Agreement without liability to the other and with immediate effect by serving a written notice on the breaching party in the event that the breaching  party:

(1)    voluntarily becomes bankrupt, is involuntarily placed into bankruptcy and such involuntary proceeding is not dismissed within 90 days, is placed into administration, receivership or liquidation, commences proceedings to be wound up, enters into any voluntary arrangement with its creditors, or on the happening of any similar event according to the laws of its domicile; or

(2)    Supplier undergoes any **Change in Control** or disposes of all or a substantial part of its business or assets (other than for the purposes of a legitimate re-organization) without Nissan's prior written consent, which consent shall not be unreasonably withheld or delayed (provided that Nissan may withhold such consent if it does not receive adequate evidence of Supplier's ability to continue to perform its obligations in accordance with the terms of this Agreement).

27.3    In the event of expiration or termination of this Agreement unless otherwise agreed between the Parties, the following shall apply:

(1)    If the fulfillment of any Release confirmed by Supplier is pending at the time

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 46 of 130 PageID #: 231

EXHIBIT 1

of the termination by Nissan (terminated for reasons attributable to Supplier) according to Article 27.1 or 27.2 (1), Nissan shall have the right, at its sole discretion, to cancel any such Release or to have it completed by Supplier. If Nissan elects to cancel such Release, Supplier shall immediately terminate all work under this Agreement. Nissan shall furthermore have the option to purchase completed Parts, Parts in the process of manufacture used exclusively to manufacture the Parts, which are possessed by Supplier, at reasonable prices as shall be agreed between the Parties. If Nissan elects to have such Release completed, this Agreement shall continue to apply to such Release.

(2) If this Agreement is terminated for reasons attributable to Nissan, Nissan shall, upon request from Supplier, purchase completed Parts at the Price and/or Parts in the process of manufacture, which are possessed by Supplier, at reasonable prices as shall be agreed and, unless already covered by a separate development agreement, Nissan shall make appropriate reimbursement for development or other expenses actually incurred and specified in Supplier's quotation, the amount of which Nissan had explicitly agreed to compensate but not amortized as of the date of termination.

(3) Supplier shall immediately deliver, at Supplier's expense, the Nissan Property, Vendor Tooling, and Acceptance Drawings (if they contain Intellectual Property Rights owned by Nissan) to Nissan or its nominee in accordance with Nissan's instructions; provided, however, that if this Agreement is terminated for reasons attributable to Nissan, the expenses shall be borne by Nissan.

(4) Each Party shall take all reasonable action necessary to protect property in such Party's possession in which the other Party has an interest. In this case, the possessing party shall reimburse the non-possessing party for reasonable costs (determined in the non-possessing Party's reasonable sole discretion) incurred in connection with such protective action.

(5) Supplier shall immediately deliver, at Supplier's expense, the Nissan Property, Nissan Drawings, Acceptance Drawings and Vendor Tooling to Nissan or its nominee in accordance with Nissan's instructions.

(6) If Supplier possesses completed Parts, Parts in the process of manufacture, or Tooling (excluding Vendor Tooling) used exclusively to manufacture the Parts for Nissan, Nissan shall have the option upon written request, to purchase the same at fair market value prices as shall be agreed between the Parties;

(7) Supplier shall immediately return all Confidential Information of Nissan, or destroy it and certify such destruction.

27.4 In addition, in the event of expiration of this Agreement by its terms or termination of this Agreement for any reason, Nissan and Supplier shall meet and discuss in good faith any matters not described above or further details. The principal objective of

EXHIBIT 1

such meeting will be to discuss how to minimize any disruption to Nissan's and Supplier's business.

**27.5** *Upon termination by Nissan under Article 27.6, Nissan shall pay to Supplier the following amounts without duplication, and Nissan shall have no further liability under this Agreement or any applicable Purchase Order:*

 **(1)** *The Price contracted for but not previously paid for Parts (including profit) that have been completed and delivered in accordance with the terms of applicable Purchase Order(s); and*

 **(2)** *The actual costs incurred by Supplier in accordance with applicable Purchase Order(s) to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting practices to the terminated portion of the Purchase Order(s), including the actual cost of work in process and materials delivered to Nissan, and including the actual cost of discharging allocable or apportionable liabilities.*

**27.4A** *Supplier recognizes that (a) if this Agreement is terminated due to Supplier's inability, failure or refusal to perform, or Supplier's Material Breach, insolvency, bankruptcy, being placed into administration, receivership or liquidation, commencement of proceedings to be wound up, entering into any voluntary arrangement with its creditors, or on the happening of any similar event according to the laws of its domicile, and (b) if Supplier is the sole source of the Parts to Nissan for the Program in questions, in order to facilitate Nissan's procurement of the Parts from an alternate supplier, Nissan shall have the following additional rights; provided that such rights shall be limited to the remaining period of the Program and the period required for Service Parts for the Program as provided under this Agreement:*

 **27.5A.1** *In addition to those rights granted in Article 15 or elsewhere in this Agreement, or in any other agreement, Supplier hereby grants Nissan and its Affiliates a paid-up, royalty-free, non-exclusive, world-wide irrevocable license limited to the purpose and period set forth above to all Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Acceptance Drawings, as well as those Intellectual Property Rights (including Background Rights of Supplier) subsisting or embodied in or used in connection with the Parts or their manufacture, with a right to grant sub-licenses to others, to make, have made, use, offer to sell, sell, repair, reconstruct or rebuild, and have repaired, reconstructed or rebuilt: (a) the Parts for the Program or; (b) parts used by Nissan or its Affiliates as a substitute for the Parts, Service Parts, or products similar or identical to the Parts for the Program (collectively, the "Substitute Parts"). The license*

(27)

EXHIBIT 1

*described in this paragraph shall apply only to those Substitute Parts that Nissan or its Affiliates use to replace Parts, Service Parts, or products similar or identical to the Parts for the Program that would otherwise have been provided by Supplier under this Agreement, had this Agreement not been terminated for a reason described in this Article 27.5.*

**27.5A.2** *In the event of a termination as described in this Article 27.5, in order to exercise the rights described in this Article and promptly secure an alternative source of supply for the Program, notwithstanding any other provision in this Agreement (including Article 22), Nissan may copy, prepare derivative works and disclose to an alternate supplier Acceptance Drawings and Technical Information and any other drawings, information or data that Nissan or the alternate supplier deems necessary to procure or produce the Substitute Parts. Supplier agrees to provide all such Acceptance Drawings and Technical Information, drawings, information or data to Nissan promptly upon Nissan's request. In the event of a disclosure under this paragraph, upon Supplier's request, Nissan shall secure the agreement of such alternate supplier to maintain the confidentiality of such information, to use such information for the sole purpose of supplying Substitute Parts for the Program to the extent permitted in Article 27.5.1, and to return all such information to Nissan upon the completion of supplying such Substitute Parts for the Program.*

**27.5A.3** *In the event of a termination as described in this Article 27.5, Supplier agrees that with respect to those Intellectual Property Rights described in Article 15.2, Nissan and its Affiliates shall be entitled, at minimum, to a perpetual, paid-up, royalty-free, non-exclusive, world-wide irrevocable license, with a right to grant sublicenses to use for any purpose without additional compensation to Supplier.*

**27.5A4** *This Article 27.5 shall not apply if Nissan has alternate sources for the Parts. This Article 27.5 shall not apply in the event the Purchase Order is terminated at the option of Nissan pursuant to Article 27.6 below.*

**27.6** *Termination of Purchase Order at Option of Nissan*
*Nissan may terminate any Purchase Order, in whole or in part at any time (including the existence of Force Majeure) by giving thirty (30) days' advance written notice to Supplier. Upon receipt of a termination notice under this Article 27.6 only, Supplier may submit to Nissan within thirty (30) days from the effective date of termination (unless otherwise extended by Nissan) its termination claim arising out of such termination of orders and related subcontracts. If Supplier fails to submit a timely termination*

149629v5

EXHIBIT 1

*claim, Nissan may determine the amount, if any, due to Supplier with respect to the termination, and such determination shall be subject to negotiation between Supplier and Nissan. Under this Article 27.6 only, Nissan shall pay to Supplier the following amounts without duplication, as a termination claim, and Nissan shall have no further liability under any applicable Purchase Order with respect to types of costs set forth below:*

*(1) The Price not previously paid for Parts that have been completed and delivered in accordance with the terms of applicable Purchase Order(s); and*

*(2) The actual costs incurred by Supplier in accordance with applicable RANs issued under the Purchase Order(s) to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of the RANs , including the actual cost of work in process and materials delivered to Nissan, and including the actual cost of discharging allocable or apportionable liabilities.*

## Article 27A. Product Liability Limitation

If the applicable law in the jurisdiction where the Product Liability Claim is pending provides a certain limitation on the legal remedies available to the claimant or the plaintiff of such Product Liability Claim, such as, but not limited to, Sections 10 and 11 of German Product Liability Law, Supplier's indemnification obligations under Articles 12.1 and 12.2 with respect to such particular Product Liability Claim shall not exceed such limitation as required by such applicable law, excluding for avoidance of doubt any contractual obligations made by Nissan.

## Article 28. Waiver and Remedies

No delay or omission by either Party in exercising any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any other breach of such or any other provision. All waivers must be signed by an authorized representative of the Party waiving its rights. Except as specifically limited by this Agreement as provided in Article 27 remedies available to Nissan or Supplier under this Agreement shall be cumulative and additional to any other or further remedies implied or available at law, in equity or under this Agreement.

*28.1 The acceptance of a Non-Conforming Part is not a waiver of any breach as to that Part or other Parts. The failure of Nissan to insist upon performance of any of the terms or conditions in this Agreement or any applicable Purchase Order shall not be construed as thereafter waiving any such terms or conditions as to an existing or future breach.*

EXHIBIT 1

**Article 28A. Notices**

*Any notice, request or demand to be given by Nissan or any of its Affiliates to Supplier or any of its Affiliates or vice versa under this Agreement or any applicable Purchase Order must be in writing and delivered to the address specified in this Agreement or, with respect to notices under a Purchase Order, such other address as is specified in the relevant Purchase Order, as such addresses may have been modified by proper notice. If any notice is given (i) by a private delivery service or recognized overnight courier, it shall be deemed to have been given and received when delivered or attempted to be delivered to the address of the party to whom it is addressed, (ii) by facsimile transmission, it shall be deemed to have been given and received at the time confirmation of such transmission is received by the sender, (iii) by certified or registered mail, it shall be deemed to have been given and received three (3) days after a certified or registered letter containing such notice, properly addressed, with postage prepaid, is deposited in the mail, and (iv) by any other method, it shall be deemed to have been given and received upon actual receipt thereof regardless of how such delivery was accomplished.*

## Article 29.    Entire Agreement

29.1    This Agreement sets forth the entire and only agreement and understanding between Nissan and Supplier and supersedes all negotiations, commitments and writings prior to the date of this Agreement pertaining to the subject matter of this Agreement.

29.2    This Agreement may not be modified, supplemented or amended except by a written agreement executed by both Nissan and Supplier.

29.3    In the event of any inconsistencies between the terms of this Agreement and the terms contained in any other document, instrument, agreement, Purchase Order or Release related to the supply of the Parts by Supplier to Nissan, the terms of this Agreement shall prevail.

29.4    The Parties agree that in the event of a conflict between the terms of any sourcing documents, including, but not limited to request for quote issued by Nissan, commercial commitment letter signed by Supplier after the date of this Agreement (collectively, "Sourcing Documents") and this Agreement, the terms of the Sourcing Documents shall govern.

## Article 30.    Assignment

The rights and obligations under this Agreement or this Agreement itself, either in whole or in part, shall not be assigned or transferred by either Party without the prior written consent of the other Party, which consent shall not be unreasonably delayed or withheld. Any assignment or attempted assignment of this Agreement or any part thereof, whether by voluntary act or operation of law, shall be null and void,

149629v5

EXHIBIT 1

unless it is approved in writing by the other Party in advance, which approval shall not be unreasonably delayed or withheld. Notwithstanding the foregoing, Nissan may, upon prior written notice to Supplier, assign its rights and obligations under this Agreement to any of its Affiliates so long as Nissan guarantees the payment and performance of the obligations of such Nissan Affiliates.

## Article 31.  Independence

This Agreement shall not constitute either Party as the agent or legal representative of the other Party for any purpose whatsoever. Neither Party is granted any express or implied right or authority to assume or to create any obligation or responsibility on behalf of or in the name of the other Party or to bind the same in any manner whatsoever.

**31.1  *Neither Party's personnel, whether or not located on the other Party's premises, shall represent themselves a, the other Party's employees or agents. Each Party assumes full responsibility for the acts of its agents and employees. No employee, agent, or contractor hired by Supplier to perform work under this Agreement or any Purchase Order is an employee, agent or contractor of Nissan or any other Nissan Affiliate.***

## Article 32.  Severability

If any court of competent jurisdiction finds any provision of this Agreement to be unenforceable or invalid in whole or in part, such finding shall not affect the validity of the other provisions of this Agreement or the remainder of the provision in question.

## Article 33.  Force Majeure

*Neither Party shall be responsible to the other by reason of failure to perform obligations hereunder to the extent that the failure to perform is caused by an act of God, flood, fire, storm, earthquake, shipwreck, acts of public enemy, acts of terrorism as declared by any governmental authority, or acts or omissions of any sovereign government, federal, state, provincial, local board, branch or agency thereof and other similar events beyond reasonable control of the Party whose performance is prevented or interfered with (each a "Force Majeure"), The affected Party shall promptly notify the other Party and shall not be responsible for its failure to perform any obligation required under this Agreement as a result of any of the foregoing. The Parties specifically agree that strikes and labor disputes at the Party whose performance is prevented or interfered with, shall not be included in the force majeure events if those are merely in-house strikes and/or labor disputes which can be controlled by either Party. However, in case of general strikes and labor disputes organized by unions or employers association (i.e. not in-house associations of either Party), which shall be regarded as force majeure of either Party, both Parties will immediately*

(31)

149629v5

<u>EXHIBIT 1</u>

*consult and discuss in good faith how to cope with such situation in order not to interrupt the business.*

*Notwithstanding the foregoing, in no event shall any event referenced in this Article 33 relieve any obligation of Nissan to make any payment hereunder for Supplier's performance already completed at the time of the Force Majeure.*

**Article 34.   Survival**
*Article 1 (Definitions), Article 9 (Warranties), Article 11 (Recall and Reimbursement), Article 12 (Indemnification), Article 13 (Right of Access to Supplier's Claims Information), Article 14.2 (Handling of Drawings), Article 15 (Intellectual Property Rights), Article 16 (Infringement), Article 17 (Nissan Property), Article 18.2 (Vendor Tooling), Article 19 (Service Parts), Article 20 (Sales to Third Parties), Article 22 (Confidentiality), Article 23 (Advertising), Article 23.A (Audits), Articles 27.3, 27.4, 27.5, 27.5A and 27.6 (Post-Termination Rights), Article 27.A, Article 30 (Assignment), Article 35 (Governing Law), Article 36 (Jurisdiction), Article 37 (Attorneys' Fees), Article 38 (Hazardous Substances), Article 39 (Taxes), Article 40 (Compliance with Laws), 41 (Third Party Beneficiaries), Article 42 (Covenant of Further Assurances), Article 43 (Negotiated Terms) and Article 47 (Records Management Program) shall survive the expiration or termination of this Agreement for any reason whatsoever.*

**Article 35.   Governing Law**
*This Agreement and all Purchase Orders shall be governed by and construed in accordance with the laws of the state of Tennessee.*

**Article 36.   Jurisdiction**
*36.1   Any proceeding, suit or action arising out of or in connection with this Agreement or any Purchase Order ("Proceedings") with respect to Nissan shall be brought in the state court located in Rutherford County, Tennessee.*

*36.2   The governing law and jurisdiction designations in this Agreement are irrevocable and are for the exclusive benefit of Nissan.*

*36.3   Supplier irrevocably waives (and irrevocably agrees not to raise) any objection, on the ground of forum non conveniens or on any other ground, to the taking of Proceedings in any court referred to in this Article. Each Party also irrevocably agrees that a judgement against it in Proceedings brought in any jurisdiction referred to in this Article shall be conclusive and binding upon it and may be enforced in any other jurisdiction.*

149629v5

EXHIBIT 1

**Article 37.    Attorneys' Fees**
   *If either Party institutes a Proceeding to interpret or enforce the terms of this Agreement or any Purchase Order, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs, to the extent permitted by law.*

**Article 38.    Hazardous Substances**
   *Supplier agrees to promptly furnish to Nissan Material Safety Data Sheets ("MSDS") conforming to the requirements of the Occupational Safety and Health Administration's Hazard Communication Standard, Title 29, C.F.R. Part 1910, 1200, with respect to the Parts supplied pursuant to this Agreement or any applicable Purchase Order, and to furnish any other information on the Parts and/or substances contained therein which is necessary to enable Nissan to comply with the Hazard Communication Standard and/or other Applicable Laws pertaining to hazardous or harmful substances.*

**Article 39.    Taxes**

**39.1 General Provisions**

   *Supplier shall be responsible for all federal, state and local taxes levied or assessed with respect to the manufacture, transportation, and sale of the Parts.  Supplier shall also be responsible for any state and local property taxes assessed on the Vendor Tooling; subject to the exceptions set forth in Article 39.2 below.  In order to fulfill its responsibility with respect to state and local property taxes on Vendor Tooling, Supplier will include such tooling on its own property rendition forms and pay property taxes on such tooling as if it were owned by Supplier.  Nissan will cooperate with Supplier in obtaining any necessary approvals as may be required by state or local authorities for this procedure.  Supplier shall comply with all applicable valuation and reporting rules for such tooling, including the use of valid non-standard valuations as may be appropriate to accurately reflect the true value of the tooling and legally minimize property tax liabilities.  Supplier shall pay all taxes assessed on such tooling directly to the appropriate authorities in a timely manner.  Supplier shall be responsible for all personal property tax audits and other inquires by the state and local taxing authorities concerning the tooling.  Supplier shall perform the foregoing activities at its own cost and will indemnify Nissan for any taxes, penalties, interest, legal fees, or other costs incurred by Nissan as a result of Supplier's failure to properly perform these activities.  As owner of the Vendor Tooling, Nissan is entitled to all federal and state income and franchise tax credits applicable to such tooling investment. Other property and inventory taxes shall be borne by the Party holding title to the Parts. Supplier shall indemnify and hold Nissan harmless for Supplier's failure to*

(33)

EXHIBIT 1

pay any wages, benefits, taxes or other compensation or amounts owed by Supplier on account of the Parts.

**39.2 Vendor Tooling Property Tax Exceptions**

a. **Definition and Intent.** The intent of this Article 39.2 is to clarify that because the Parties, through this Agreement, have expressly assigned the responsibility of Vendor Tooling property tax to the Supplier, the Supplier would have been unable to include in its quote and, consequently, the Parties would not have included in the Price, an adequate sum to ensure that Supplier was properly compensated for this Vendor Tooling property tax responsibility. Under such conditions, the Parties herein agree that the Supplier should be entitled to recover from Nissan such additional expense through a Price adjustment or through some other method to be mutually agreed upon by the Parties, including without limitation a lump sum payment at the end of each future tax period for which Supplier is required to pay tax on Nissan's Vendor Tooling. However, in no event shall a Supplier be permitted to recover such additional expense if Supplier was simultaneously negotiating this Agreement and quoting upon new business and should have included an adequate sum in its Parts quotation or its Vendor Tooling Price quotation to compensate Supplier for the responsibility for Vendor Tooling property tax. The term "Old Program Vendor Tooling" shall be utilized in this Article 39.2 to mean any and all Vendor Tooling for which Supplier should be permitted to recover the additional expense of accepting responsibility for Nissan Vendor Tooling property tax if such recovery is consistent with the foregoing intent.

b. **Exceptions.**

i. **Future Tax Periods.** For all tax periods ending after the Parties have signed this Agreement, Supplier shall be entitled to submit a written claim to Nissan for property tax payments made by Supplier on Old Program Vendor Tooling for any and all jurisdictions for which the Supplier would not have otherwise been required under Applicable Law to pay such tax. Upon receipt of the written claim, the Parties will promptly agree upon the proper method for allowing Supplier to recover such expense from Nissan.

1) **Written claim.** The written claim shall include all reasonable data and calculations used to determine the amount of the tax; a copy of the tax return and receipt or, in lieu of a receipt, such other sufficient documentation to evidence actual payment of the tax to and filing of the necessary documents with the taxing authority; and any other reasonable information requested by Nissan from time to time. Such "reasonable data and calculations used to determine the amount of the tax" shall include without

(34)

EXHIBIT 1

*limitation a list of the tools; their dates of acquisition; their cost that relates to each return filed by Supplier; a breakout of the tools included above categorizing them into one of the following: (1) Used for vehicle production parts, (2) Used for service parts only, and (3) Obsolete; and a clear explanation of how the tax liability was calculated showing at a minimum the assessment rate and tax rate for each "return filed amount" charged to Nissan.*

ii.     *Prior Tax Periods.  For all tax periods ending before the Parties have signed this Agreement, Nissan will be responsible for any and all necessary tax filings and/or payments on Vendor Tooling to the extent Nissan was required by Applicable Law to make such filings and/or payments.  In the event a taxing authority attempts to assess Supplier with property tax on Vendor Tooling for tax periods ending prior to execution of this Agreement, Supplier shall immediately notify Nissan and Nissan shall indemnify and hold Supplier harmless for any and all liabilities associated with such assessment of property taxes on Vendor Tooling for such prior tax periods to the extent Nissan was required by Applicable Law to make such filings and/or payments.*

iii.    *Cooperation.  Supplier shall cooperate with Nissan to identify obsolete tooling or tooling no longer in full production in order to value such tooling at a lower value for property tax purposes.  Supplier and Nissan shall further cooperate with one another and provide such reasonable information necessary to defend a taxing authority's attempt to assess tax on Vendor Tooling for tax periods ending prior to execution of this Agreement.*

**Article 40.    Compliance with Laws**

*Each Party warrants to the other that it has and will continue, in performing hereunder, to comply with all Applicable Laws, including, without limitation, the Magnuson-Moss Consumer Warranty Act, the Occupational Safety and Health Act of 1970, federal and state automotive and other safety requirements, the Fair Labor Standards Act of 1938, and (if the applicable Purchase Order is made with reference to a government contract) the applicable provisions of the Armed Services Procurement Regulations, the Federal Procurement Regulations, and Executive Order 11246 of September, 1965.   In the event that any Parts sold do not conform to such requirements, standards or regulations, Nissan, at its option, may return the Parts for correction or replacement at Supplier's expense, or may demand a full refund of all monies paid pursuant to any applicable Purchase Order. Supplier commits to fulfill all requests for content data on Parts supplied to Nissan, including, without limitation, requests for NAFTA (North American Free Trade Agreement), CAFE (Corporate Average Fuel Economy) and AALA (American Automotive Labeling Act) documentation.  Any costs incurred by*

149629v5

EXHIBIT 1

*Nissan as a result of Supplier's non-compliance may be charged back to Supplier. The remedies provided for in this Article shall be in addition to any other remedies provided for herein or by law.*

**Article 41.   Third Party Beneficiaries**
*Except with respect to the Non-Competitive Affiliates, the Parties intend that neither this Agreement nor any Purchase Order shall benefit, or create any right or cause of action in or on behalf of, any person or entity other than the Parties.*

**Article 42.   Covenant of Further Assurances**
*The Parties covenant and agree that, subsequent to the execution and delivery of this Agreement and, without any additional consideration, each of the Parties shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.*

**Article 43.   Negotiated Terms**
*The Parties agree that the terms and conditions of this Agreement are the result of negotiations between the Parties and that this Agreement shall not be construed in favor of or against either Party by reason of the extent to which either Party or its professional advisors participated in the preparation of this Agreement.*

**Article 44.   [Reserved]**

**Article 45.   Counterparts**
*This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a Party by facsimile transmission shall be deemed to be an original signature hereto.*

**Article 46.   Safety Issues**
*Each Party agrees that its employees, when present at the other Party's facility, will abide by the other Party's personnel and safety policies, including without limitation:*
*(1)   Any tobacco-free environment policy, which prohibits the use of all tobacco products within such Party's plants and offices;*

149629v5

EXHIBIT 1

    **(2)**     *all safety and substance abuse policies, which, among other things, mandate all individuals on Nissan property to follow certain safety procedures and strictly prohibit all individuals while on such Party's property from possessing, using, selling, purchasing, or having present in the body, drugs or alcohol; and*

    **(3)**     *such Party's solicitation and distribution policy, which, among other things, prohibits all non- employees of such Party, including without limitation Suppliers and their agents, contractors, and employees, from soliciting or distributing any literature or other materials while on the other Party's property.*

**Article 47.**     ***Records Management Program***
*The Records Management Program (the "RMP") at Nissan is an affiliate wide program that involves and concerns all employees, contractors, vendors and suppliers. The RMP encompasses both electronic and paper records on all types of media and includes an annual records training and review process. All suppliers who are listed on a Nissan Records Retention Schedule as the "Office of Record" or as "Custodians" for official Nissan company records and those who maintain confidential or proprietary Nissan company records shall maintain those records in compliance with Nissan's Records Management Policy (the "Policy"). Employees of Supplier who manage Nissan records shall attend annual records management training as scheduled and review records annually, maintaining or deleting records in accordance with the current approved Nissan Records Retention Schedules and Records Management Policies and Procedures. Nissan departments shall provide instruction and coordinate with Supplier to ensure compliance with the Policy. Supplier will be notified in writing by Nissan if Supplier will be designated as the Office of Record or Custodian for any specific Nissan records.*

In Witness Whereof, the Parties have executed this Agreement in duplicate in English by causing these presents to be signed by their duly authorized representatives on the date first above written.

Nissan North America, Inc.,             Continental Teves, Inc.,
a California corporation                 a Delaware corporation

(name and title)                     (name and title)   *WILLIAM L. KOZYRA*
                                                *PRESIDENT*

                                (name and title)
                                *George R. Jursch III, Secretary*

EXHIBIT 1

Address for Notices:

Nissan North America, Inc.
Attn: Production Purchasing
983 Nissan Drive
Smyrna, Tennessee 37167
Telecopy: 615-355-2443

With a copy to:
Nissan North America, Inc.
Betsy B. Kohan,
Legal Department
990 West 190th Street
Torrance, California 90502
310-719-8282

CONTITECH NORTH AMERICA, INC.,
a Delaware corporation

(name and title)  Timothy P. Rogers

(name and title)
George R. Jurch III, Secretary
Contitech North America, Inc.
Attn: President
136 Summit Avenue
Montvale, New Jersey 07645
Telecopy: 201-930-0050

A copy of each notice of breach or notice
claiming indemnification to be sent to:

Continental Tire North America, Inc.
Attn: George Jurch
General Counsel
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-8722

Address for notices:

Continental Teves, Inc.
Attn: President
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-5802

A copy of each notice of breach or notice
claiming indemnification to be sent to:

Continental Teves, Inc.
Attn: George Jurch
General Counsel
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-8722

CONTINENTAL TIRE NORTH AMERICA, INC.,
an Ohio corporation

(name and title)  H. J. H. de hour.

(name and title)
George R. Jurch III, Asst. Sec.
Continental Tire North America, Inc.
Attn: President
1800 Continental Blvd.
Charlotte, North Carolina 28273
Telecopy: 704-583-8698

A copy of each notice of breach or notice
claiming indemnification to be sent to:

Contitech North America, Inc.
Attn: George Jurch
General Counsel
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-8722

(38)

149629v5

EXHIBIT 1

(39)

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 60 of 130 PageID #: 245

# EXHIBIT 1

## Schedule 1

### CLAIM COMPENSATION PROCEDURE

Nissan is committed to achieve customer satisfaction by producing the highest quality vehicles.

Warranty claim is a measure of potential customer dissatisfaction and will be regarded by the parties as opportunities to improve the quality of vehicles manufactured and distributed by Nissan and Parts supplied by Supplier. Supplier shares the responsibility of ensuring that warranty claims and expenses are minimized.

This is the Claim Compensation Procedure ("CCP") referenced in Article 9.2 of the Master Purchase Agreement between Nissan and Supplier and constitutes part of the Master Purchase Agreement. Nissan and Supplier hereby agree to the following terms and conditions regarding compensation related to claims for the parts and vehicles equipped with the Parts.

## PART 1. Definitions and Interpretation

### Article 1. Definitions and Interpretation

1.1  In this CCP the following terms shall have the following meanings:

| | |
|---|---|
| "Claimed Parts" | those Parts which caused Warranty Claims, and any other parts that are damaged due to those Parts; |
| "Collected Parts" | Claimed Parts collected by Nissan; |
| "Flat Rate Schedule" | Nissan's applicable schedule of labor hours allowed for repair operations; |
| *"Module Assembly"* | *an assembly of multiple Parts that have been bundled for the purpose of sourcing to a single supplier that is responsible to manage each aspect of Nissan's Quality, Cost, Development, Delivery and Management (QCDDM) requirements.* |
| "Plant Claim" | a claim related to a defect in the vehicle attributable to the Parts that is found between the time of delivery of the Parts by Supplier |

(40)

149629v5

EXHIBIT 1

|  |  |
|---|---|
|  | to Nissan and the time the vehicles equipped with the Parts are completed and leave the Nissan's manufacturing plant; |
| "Replacement Parts" | parts that are used to replace or repair the Claimed Parts; |
| "Warranty Claim" | a claim related to a defect in a vehicle or in a Part, which if related to a vehicle is discovered after the completed vehicle leaves Nissan's manufacturing plant, repair of which vehicle or replacement of which Part Nissan must perform free of charge in accordance with the applicable Nissan warranty for the vehicle or Part; and |
| "Warranty Expense" | any cost or expense incurred by Nissan in connection with a Warranty Claim as set forth in Article 5. |

1.2    In this CCP all words and phrases not defined herein shall have the meanings set out in the Master Purchase Agreement and this CCP shall be interpreted in accordance with Article 1 of the Master Purchase Agreement which shall be deemed to have been incorporated by reference, *mutatis mutandis*, into this CCP.

1.3    References to Articles are reference to Articles in this CCP unless otherwise specified.

1.4    The word "including" shall not be given a restrictive interpretation by reason of it being followed by words indicating a particular class of acts, matters or things.


**PART 2. Warranty Claim**

**Article 2. Purpose**

This CCP describes how responsibility for Warranty Claims is assigned, how Warranty Expenses are determined, and how Warranty Expenses are allocated between Nissan and Supplier.

**Article 3. Scope**

This CCP applies to all the Parts purchased by Nissan from Supplier for use by Nissan in the manufacture of vehicles or for sale by Nissan as service parts or accessories for the vehicles.  This CCP does not apply to recalls.

**Article 4. Applicable Warranty Period**

(41)

149629v5

EXHIBIT 1

For Parts installed in the vehicles at the time of, or prior to the vehicle delivery date to the original retail customer, the same time and mileage limitations as provided by Nissan in its applicable warranty, the basic conditions of which shall be described by Nissan in its request for quotation of the Parts and accepted by Supplier in its quotation before the issuance of the Purchase Order, shall apply.

For service parts, the warranty period shall be the greater of:

1)    the remainder of the applicable Nissan warranty period for the Nissan vehicle in which the part is installed; or
2)    the applicable Nissan service part warranty period.

Nissan will separately notify Supplier of the warranty period and mileage limitations applicable for new vehicles, parts and accessories.  When Nissan changes such warranty periods or mileage limitations, Nissan will provide Supplier with up-dated information twice a year at regular intervals.

In the event that Nissan extends the warranty period for the Parts and such change results in an increase in cost to Supplier, Nissan and Supplier shall mutually agree, after good faith negotiation upon a reasonable adjustment to the Price as to the newly extended portion. If the extended warranty period applicable to any market other than Japan, the United States, Mexico, Canada and Europe does not exceed the maximum warranty period which Supplier or any Supplier Affiliate provides to Nissan or any Nissan Affiliate for the Parts, then there shall be no revision of the Price.


**Article 5. Warranty Expenses**

Warranty Expenses include the following costs:

a)    Parts' Costs:
      The Parts' Costs are Nissan's purchase cost of Replacement Parts used, as well as Replacement Parts' packing, transportation and handling costs, with all taxes and import duties. The "Parts' Costs" shall also include the distributor and dealer handling allowance, which consist of a fee paid by Nissan to its distributors, dealers and/or other repairing agents for the cost of maintaining a service parts inventory and providing warranty claim clerical processing.

b)    Labor Costs:
      The Labor Costs are Nissan's authorized hourly labor rate for the repair and installation of Replacement Parts by the dealer multiplied by the time allowance given by Nissan for the repair in the Flat Rate Schedule.

c)    Other Costs:
      These mean all other reasonable costs and expenses incurred by Nissan in connection with Warranty Claims not included in the Parts' Costs or the Labor

# EXHIBIT 1

Costs and that are authorized and reimbursed by Nissan to its distributors, dealers and other repairing agents performing the repair according to the required Nissan standards. Other Costs include sublets, towing, rental reimbursement, cost of travel and transportation, and other miscellaneous direct costs incurred by Nissan or reimbursements made by Nissan in connection with the repair or replacement of the Claimed Parts.

All Warranty Claims shall be subject to Nissan's normal validation procedures and Nissan's applicable Flat Rate Schedule in accordance with Nissan warranty policies.

Warranty Expenses will be identified in Nissan's periodic Supplier Warranty Claim reports, showing all claims approved and paid by Nissan relating to the Parts. Such report will be made available to Supplier on a regular basis.

If Supplier notices a material increase in other costs, Supplier can request a review of Other Costs. Based on the results of such review, the Parties will discuss in good faith whether an invoice adjustment is appropriate.

[Local term for Europe only:]

***All existing warranty agreements for carryover Parts and all Parts which the Supplier has provided prior to the execution of the MPA and CCP, which the Supplier continues to provide, shall remain valid.***

**Article 6. Liability Rate**

Nissan and Supplier shall determine Supplier's responsibility percentage of the Claimed Parts (the "Liability Rate") based on the analysis of the Collected Parts. The Liability Rate will be considered as Supplier's responsibility in the Warranty Expenses in accordance with the following provisions:

6.1     Newly Developed Parts

For newly developed and released parts, the initial Liability Rate shall be established at the rate of 60% for Supplier and 40% for Nissan, or tentative agreed Liability Rate. Upon Supplier's request, Nissan shall provide Supplier a representative sample of Collected Parts for review by Nissan and Supplier. Following such review, the initial Liability Rate shall be revised based on the review results of Collected Parts. In no case shall Supplier be responsible for Warranty Claims where Collected Parts contain no defect attributable to Supplier. However, the Parties shall share, on a 50/50 basis, the responsibility for Warranty Claims where the defect cannot be ascertained in the review of Collected Parts (no defect found), it being understood that it is inexpedient for the Parties to spend unreasonable time and costs to determine the root cause of the defect and/or claims and that the number of such Warranty Claims tends to be limited. If such review results in a change from the initial Liability Rate, the new rate shall thereafter be applied until further revision.

149629v5

EXHIBIT 1

Upon Supplier's request, Nissan and Supplier shall arrange for one or more subsequent review(s) of Collected Parts to review the applicable Liability Rate, provided that such reviews shall be conducted no more frequently than once every twelve (12) months. Nissan reserves the right to review the Liability Rate as deemed necessary to ensure the quality of the vehicles and/or allocation of Supplier responsibility.

**6.1.1** *Warranty Compensation Exclusions.*
*Supplier shall in no case be liable for:*
*1) defects which are due to an improper installation, modification, use or handling by Nissan, its agents or customers;*
*2) normal wear and tear of the Parts;*
*3) lack of or improper maintenance of the Parts.*

6.2     Carryover Parts

Carryover Parts are all parts which Supplier has provided Nissan prior to the execution of this CCP and which Supplier continues to provide Nissan.  As to such parts, Supplier's Liability Rate shall be as set forth in any agreement between Supplier and Nissan executed prior to the Effective Date of the Agreement,  or in the absence of such agreement as has been established by the past business practices of the Parties.  By mutual consent the Parties may agree to be bound by Article 6.1 as to some or all Carryover Parts by indicating such in a separate writing executed by both Parties.

6.3     Disagreements

In case of disagreement in the joint review of Collected Parts for review of the Liability Rate at working level, the responsible persons at both Parties' higher level (including management level, if necessary) will discuss and shall solve the issue in good faith.

6.4     Possession of Collected Parts

Collected Parts will be kept by Nissan.  Upon Supplier's request, Nissan may, but shall not be obligated to, return Collected Parts to Supplier for Supplier's analysis.  In this case Supplier shall inspect all returned parts and give a prompt report to Nissan detailing investigation results, causes for failure and countermeasure proposals.

**6.5     *Module Assemblies***
***Not withstanding any provision to the contrary, for Parts installed within Module Assemblies the initial Liability Rate shall be established at the rate of 100% for Supplier.  Upon Supplier's request, Nissan and Supplier may review Module Assemblies in the field, or may engage in a study of such kind to which both Parties agree is reasonable, in order to determine whether and to what extent the initial Liability Rate for Module Assemblies***

149629v5

EXHIBIT 1

*should be adjusted. In no event will Nissan be expected to provide a representative sample of Collected Parts for Module Assemblies and any contrary provision set forth in Article 6.4 of this CCP or elsewhere in the CCP or Master Purchase Agreement shall be inapplicable to Module Assemblies.*

**6.6**    ***Service Parts and Accessories***
*Unless installed as part of a Module Assembly, service parts, audio or video components, mobile entertainment units, navigation systems, and accessories (including both port and dealer installed accessories as well as factory installed accessories) during the initial Nissan warranty period for the Nissan vehicle, the initial Liability Rate shall be established at the rate of 100% for Supplier.  Upon Supplier's request, Nissan will provide a representative sample of Collected Parts for review by Nissan and Supplier. Following such review, the initial Liability Rate may be revised based on the review results of Collected Parts. For the Parts described in this Article 6.6 sold after the initial Nissan warranty period for the Nissan vehicle, the Liability Rate shall be 100%.*

## Article 7. Compensation Calculation & Payment

Nissan shall calculate Supplier's payment obligations under this procedure by multiplying Warranty Expenses by the applicable Liability Rate and shall issue debits or other requests for payment to Supplier for the resulting amounts. Supplier shall follow the payment method as instructed by the appropriate Nissan department.

## PART 3. Plant Claim

## Article 8. Procedure for Plant Claim

Supplier agrees to pay Nissan for 100% of the Plant Claim expenses incurred by Nissan due to Supplier's responsibility.  These shall be the following costs:

a)    Labor cost for checking, selecting and/or rectifying the Claimed Parts, at the hourly rate specified by Nissan;

b)    Supply of the necessary Replacement Parts or Nissan's purchase cost of the Replacement Parts required to replace and/or repair the Claimed Parts; and

c)    Other costs incurred in transport, packing, manipulation, tools and operations required for replacing or repairing the Claimed Parts, line stoppage, manpower idle time, and subcontract.

## PART 4. Tires

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 66 of 130 PageID #: 251

# EXHIBIT 1

**Article 9. Warranty Procedure for Tires**

*Supplier shall be responsible for Warranty Expenses related to tires and such expenses shall be handled directly with consumers pursuant to the consumer warranty.*

# EXHIBIT 1

Exhibit A
## **SUPPLIER COMPETITORS**

Bosch

TRW

Advics

Akebono

Hitachi Group including, but not limited to Tokico, UnisiaJecs, Hitachi chemical, and Hitachi cable

Mando

Mobis

Delphi

Valeo

Bridgestone

Michelin

Pacifica Group

Goodyear

Pirelli

Kumho

Toyó

Hankcook

Denso

Visteon

Brembo

Siemens

Nissin Kogyo

Sumitomo Group Co.'s

(47)

# EXHIBIT 1

EXHIBIT 1

1  Vicki I. Sarmiento (SBN 134047)
   LAW OFFICES OF VICKI I. SARMIENTO
2  333 N. Garfield Avenue
   Alhambra, CA 91801
3  Telephone: (626) 308-1171
   Facsimile: (626) 308-1101
4  Email: vsarmiento@vis-law.com

5
   Attorneys for Plaintiff, HILARIO CRUZ
6

7  *Additional Counsel on Signature Page*

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9             **COUNTY OF LOS ANGELES - CENTRAL**

10

11  HILARIO CRUZ, an individual,        | Consolidated Cases
                                        | No. BC 493949  (Lead Case)
                                        | No. BC 529912
12            Plaintiff,                | No. BC 577815

13        vs.                           | **CONSOLIDATED COMPLAINT**

14  SOLOMON METHENGE, an individual,    | (Personal Injury, Wrongful Death, Property
    and DOES 1 to 100, inclusive,       | Damage, Survival Claim, Product Liability)
15
            Defendants.                 | Dept. 47
16
                                        | **DEMAND FOR JURY TRIAL**
17  CONSOLIDATED FOR ALL PURPOSES
    WITH:
18

19
    ARACELI MENDEZ v. NISSAN NORTH
20  AMERICA, CONTINENTAL
    AUTOMOTIVE SYSTEMS et al;
21

22  and

23  JUANA DE LA CRUZ BERNARDINO v.
    NISSAN NORTH AMERICA,
24  CONTINENTAL AUTOMOTIVE
    SYSTEMS et al;
25

26

27      Plaintiff Hilario Cruz ("CRUZ") brings this action on behalf of himself and as successor

28  in interest on behalf of his deceased minor children, Hilda Cruz and Stephanie Cruz, against

                                        1

Consolidated Complaint
*Cruz v. Methenge, et al.,* Case No. BC 493949 (Lead Case)
Case 3:19-cv-00395   Document 13-1   Filed 05/24/19   Page 70 of 130  PageID #: 255

EXHIBIT 1

1   Defendants Nissan North America, Inc. ("NISSAN"), Continental Automotive Systems, Inc.

2   formerly known as Continental Teves ("CONTINENTAL"), Solomon Methenge

3   ("METHENGE"), and unknown persons DOES 1 to 98.

4       Plaintiff Araceli Mendez ("MENDEZ"), a minor by and through her guardian ad litem,

5   Juana Bernardino, brings this action on behalf of herself and as successor in interest on behalf of

6   decedent Saida Mendez-Bernardino against Defendants NISSAN, CONTINENTAL,

7   METHENGE, and DOES 1 to 20.

8       Plaintiff Juana de la Cruz Bernardino ("BERNARDINO"), brings this action on behalf

9   of herself against Defendants NISSAN, CONTINENTAL and DOES 1 to 25.

10       CRUZ, BERNARDINO, and MENDEZ (collectively "Plaintiffs") allege the following:

11                        **CONSOLIDATED CASES**

12      1.     This case is the consolidation of three actions: *Hilario Cruz v. Solomon*

13   *Methenge*, LASC Case No. BC 493949 (LEAD CASE); *Araceli Mendez, by guardian ad litem*

14   *Juana Bernardino v. Solomon Methenge et al.*, LASC Case No. BC 529912; and *Juana de la*

15   *Cruz Bernardino v. Nissan North America, Inc. et al.*, LASC Case No. BC577815. These

16   separately filed actions involve the same parties and are based on the same or similar claims;

17   arise from the same or substantially identical transactions, incidents, or events requiring the

18   determination of the same or substantially identical questions of law or fact. Specifically, the

19   cases arise from the wrongful deaths of Saida Mendez-Bernardino and her children Hilda and

20   Stephanie Cruz from an automobile crash on August 29, 2012, involving defendant

21   METHENGE and his vehicle, a 2004 Infiniti QX56, VIN 5N3AA08C14N809115, bearing

22   California License Plate Number 6WQW730 (the "SUBJECT VEHICLE").

23      2.     Plaintiff CRUZ is the father of decedents Hilda and Stephanie Cruz, who were 4

24   and 6 years old. He was not married to decedent Saida Mendez-Bernardino at the time of the

25   accident. Plaintiff MENDEZ is the only surviving child of decedent Saida Mendez-Bernardino.

26   Plaintiff BERNARDINO is the mother of decedent Saida Mendez-Bernardino, who was her

27   only offspring. BERNARDINO is also the grandmother of decedents Hilda and Stephanie

28   Cruz.

2

EXHIBIT 1

## JURISDICTION AND VENUE

3.     This court is the proper court because the injury to Plaintiff occurred in its jurisdictional area.

4.     Defendant NISSAN is a California corporation.

5.     Defendant CONTINENTAL, formerly known as Continental Teves, does substantial business in the State of California, is registered to and in fact is doing business within the State of California, and otherwise maintains requisite minimum contacts with the State of California. Additionally, Defendant CONTINENTAL distributes in this district, receives substantial compensation and profits from sales, maintenance, and service of vehicles in this jurisdiction, including the SUBJECT VEHICLE.

6.     None of the causes of action stated here has been assigned or otherwise given to any other court or tribunal.

## THE PARTIES

7.     Plaintiff CRUZ is, and at all times herein mentioned was, a resident of the County of Los Angeles, State of California. CRUZ is the father and sole heir of his daughters, decedents Stephanie Cruz and Hilda Cruz. CRUZ brings this action in his individual capacity for his claim of Wrongful Death pursuant to Cal. Code of Civ. Proc. §377.60 and as the decedents' successor in interest for all survival claims pursuant to Cal. Code Civ. Proc. §§377.10 *et seq.*

8.     Plaintiff MENDEZ is, and at all times herein mentioned was, a resident of the County of Los Angeles, State of California. MENDEZ is a minor and is represented by her duly appointed guardian ad litem, Juana Bernardino. MENDEZ is the daughter and heir of decedent Saida Mendez-Bernardino. Plaintiff brings this action in her individual capacity for her claim of the Wrongful Death of her mother, Saida Mendez-Bernardino, pursuant to Cal. Code of Civ. Proc. §377.60 and as the decedent's successor in interest for all survival claims pursuant to Cal. Code Civ. Proc. §§377.10 *et seq.*

9.     Plaintiff BERNARDINO is, and at all times herein mentioned was, a resident of the County of Los Angeles, State of California. BERNARDINO is the mother and heir of

3

EXHIBIT 1

1 | decedent Saida Mendez-Bernardino. BERNARDINO brings this action in her individual

2 | capacity for her claim of the Wrongful Death of her daughter, Saida Mendez-Bernardino,

3 | pursuant to Cal. Code of Civ. Proc. §377.60. BERNARDINO received financial support from

4 | her daughter, Saida Mendez-Bernardino.

5 |     10.    Defendant NISSAN is a corporation organized under the laws of the State of

6 | California with its principal place of business in Gardena, California. NISSAN directs and

7 | coordinates all of Nissan's activities, including design, development, and marketing of Nissan

8 | vehicles in the U.S. market. NISSAN engaged in these activities affecting the design and sale

9 | of the SUBJECT VEHICLE from its principal place of business in Gardena, California, and has

10 | continued to perform significant and meaningful activities in connection with them in California

11 | since 2004.

12 |     11.    Defendant CONTINENTAL is a corporation organized under the laws of the

13 | State of Delaware with its principal place of business in Auburn Hills, Michigan.

14 | CONTINENTAL designed, manufactured, and supplied defective component parts of the

15 | SUBJECT VEHICLE in the U.S. market including California and maintains business and

16 | engineering offices in California.

17 |     12.    Defendant METHENGE is, and at all times herein mentioned was, a resident of

18 | the County of Los Angeles, State of California, and was the driver of the SUBJECT VEHICLE

19 | at the time of the August 29, 2012, collision.

20 |     13.    The true names and capacities of the DOE defendants , whether individual,

21 | corporate, partner, associate or otherwise, are unknown to Plaintiffs at this time. Plaintiffs

22 | allege that each Defendant designated herein as a DOE is responsible in some manner for the

23 | events and happenings referred to herein, and legally caused the injuries and damages alleged in

24 | this complaint. Said DOE defendants were at all times herein mentioned agents, employees,

25 | partners and/or joint venturers of their co-defendants, and each of them acted within the course

26 | and scope of such agency, employment, partnership, or joint venture. Plaintiffs will amend this

27 | CONSOLIDATED COMPLAINT to allege the true names and capacities of DOE defendants

28 | when ascertained.

4

Consolidated Complaint
Case 8:19-cv-00996  Document 13-1  Filed 05/24/19  Page 73 of 130  PageID #: 258
*Cruz v. Methenge, et al.*, Case No. BC 493949 (Lead Case)

EXHIBIT 1

## SUBJECT VEHICLE

14.     The SUBJECT VEHICLE is a 2004 Infiniti QX56, VIN 5N3AA08C14N809115, bearing California license plate number 6WQW730. Defendant NISSAN was the ultimate developer, designer, manufacturer, assembler, tester, inspector, marketer, advertiser, distributor and seller, warrantor, and service and maintenance provider for the SUBJECT VEHICLE.

15.     Defendant CONTINENTAL was the designer, manufacturer, assembler, tester, inspector, distributor, supplier, and seller of the defective component parts installed in the SUBJECT VEHICLE.

16.     Defendant NISSAN is the developer, designer, manufacturer, assembler, tester, inspector, marketer, advertiser, distributor and seller, warrantor, and service and maintenance provider of all 2004-2008 Nissan Armada and Titan Trucks, and Infiniti QX56 vehicles (hereinafter "Defective Vehicles"), including the SUBJECT VEHICLE.

## FACTS

17.     The Defective Vehicles posed a significant and immediate safety threat to all users of such vehicles and to the public in general in that the Delta Stroke Sensor ("DSS"), an integral electronic component of the vehicles which affects critical safety aspects of braking, was well known by Defendants NISSAN and CONTINENTAL to be defective and faulty, having a high and unreasonably high incidence of failure during normal and customary use. The failure of this defective part disables the braking ability of the Defective Vehicles to the point where drivers are, without warning and suddenly, unable to stop their vehicle within a reasonably safe time and distance, or at all.

18.     Defendants NISSAN and CONTINENTAL have concealed, and continue to conceal and omit to disclose the critical safety defect to consumers for their significant financial gain. Defendants NISSAN and CONTINENTAL have failed to take steps to mitigate the unreasonable danger and hazard posed by this concealed danger.

19.     At all times relevant to this action, Defendant NISSAN marketed, sold, distributed, advertised, warranted, serviced and maintained the Defective Vehicles as safe to

**5**

EXHIBIT 1

1    use, when, in fact, NISSAN had reason to know, and did know, that the Defective Vehicles,

2    including the SUBJECT VEHICLE, were not safe to use for their intended purpose.

3        20.      Defendants NISSAN and CONTINENTAL intentionally, recklessly, and/or

4    negligently concealed, suppressed, and omitted the risks, dangers, defects and disadvantages of

5    the SUBJECT VEHICLE.

6        21.      The failure of the Delta Stroke Sensor in the SUBJECT VEHICLE may have

7    caused Defendant METHENGE to drive through a controlled and busy intersection, and despite

8    applying the brakes in a manner reasonably anticipated to bring the SUBJECT VEHICLE to a

9    complete stop, he lost control of it and collided with the vehicle occupied by CRUZ's two

10    daughters and MENDEZ's mother/BERNARDINO's daughter, causing their deaths.

11        22.      **Delta Stroke Sensor Function and Failure in the SUBJECT VEHICLE**

12        a.      The Delta Stroke Sensor (or "DSS") in the Defective Vehicles is an electronic

13    component which interfaces with and connects to the Electronic Control Unit ("ECU"). The

14    Delta Stroke Sensor, which is contained within the sealed Brake Booster Assembly, collects

15    information about a vehicle's primary mechanical braking system and provides input and

16    information to the ECU.

17        b.      The Delta Stroke Sensor measures the application of manual driver pressure to

18    the brake pedal. The Delta Stroke Sensor determines whether the driver has pressed the brake

19    pedal, and if so, how far and how quickly. The Delta Stroke Sensor performs these

20    measurements by converting the mechanical movement of the brake pedal into an electrical

21    signal within a range of pre-set values to be communicated to the ECU.

22        c.      When properly functioning, the DSS monitors the performance of the primary

23    mechanical braking system and reports a failure of that system to the ECU which will then

24    trigger the functioning of the vehicle's secondary braking system. The defect in the DSS results

25    in a deactivation of an otherwise properly functioning primary mechanical braking system, and

26    as Defendants have known, materially and adversely affects the braking power of the Defective

27    Vehicles. Defendants NISSAN and CONTINENTAL have likewise known that it is not

28    possible to predict when a DSS failure will occur.

6

EXHIBIT 1

d.     When the DSS fails, the electronic computer system in Defective Vehicles may record a diagnostic trouble code C1179. This error code can be downloaded and read by technicians using certain proprietary diagnostic equipment used by Defendants NISSAN and CONTINENTAL to diagnose and repair the Defective Vehicles. On numerous occasions, however, technicians at NISSAN dealerships have not been able to reproduce a reported braking failure in Defective Vehicles on an initial test drive, or to retrieve any error code, despite the driver's report of braking problems consistent with a DSS failure. Furthermore, DSS failures are not always reproducible, and resulting error codes are not always stored in the ECU indefinitely for a proper diagnosis.

e.     Ultimately, as a result of a DSS failure, a Defective Vehicle will experience a substantial loss of braking power, approximately fifty percent. In other words, a Defective Vehicle's stopping distance can more than double. When this occurs, routine traffic stops become emergency events where crashes are avoided only by the favor of good fortune. Moreover, no inspection of a Defective Vehicle's mechanical brake system would reveal the latent and dangerous defect hidden within the sealed Brake Booster Assembly that manifests itself intermittently.

f.     Defendant METHENGE may have experienced this loss of substantial braking power caused by the failure of the DSS at the time of the August 29, 2012 collision.

23.    **Defendants NISSAN and CONTINENTAL Knew About the Delta Stroke Sensor Defect and its Safety-Related Consequences**

a.     Since 2003, NISSAN and CONTINENTAL knew of the subject braking defect in the Defective Vehicles but failed to take any action to notify owners and consumers alike of the defect. Instead, Defendants NISSAN and CONTINENTAL manufactured, produced, marketed, sold, and distributed the defective SUBJECT VEHICLE.

b.     NISSAN's undisclosed internal documents described the true nature of the defect. An internal communication from NISSAN's "Planner, Technical Training Instructional Design" employee aptly describes the defect: "[i]ncidentally the vehicle exhibits radical braking behavior in the event of this stroke sensor failure." Another internal document titled "Market

7

EXHIBIT 1

1  Reply" truthfully describes the failure as: "Brakes poor performance due to delta stroke sensor."

2      c.      By 2004, NISSAN knew the DSS in the Defective Vehicles suffered from a

3  serious safety defect.

4      d.      In October 2005, one dealer reported to NISSAN "three QX56s that have failed

5  to stop when the brakes were applied...[W]e understand from Infiniti that the brake booster is

6  the problem...[T]he third occurred in a Dallas neighborhood and the driver, Mrs....Lesier, ran 2

7  or 3 stop signs but did not hit anything or anyone. This is a dangerous situation."

8      e.      On October 27, 2005, NISSAN and CONTINENTAL engineers held a "2nd

9  Meeting" to discuss the investigation of DSS failures. The discussions between Defendants

10  NISSAN and CONTINENTAL led to a root cause analysis implicating "[f]ailsafe logic not

11  optimal against the tolerance of DSS signal." On December 22, 2005, NISSAN adopted an

12  "[i]mproved failsafe" reprogramming countermeasure to address this root cause. This

13  reprogramming "fix", identified in the TSB, did not work.

14      f.      On May 12, 2006, Defendant NISSAN issued a document entitled Technical

15  Service Bulletin ("TSB") No. NTB06-040. The TSB involves all 2004-2006 Nissan Titan and

16  Armada vehicles fitted with Vehicle Dynamic Control ("VDC"). Likewise, on May 12, 2006,

17  NISSAN issued a similar TSB No. NTB06-011 involving the 2004-2006 Infiniti QX56 vehicles,

18  including the SUBJECT VEHICLE (the TSB's are referred to herein collectively as "TSB").

19  Specifically, the TSB involves a braking defect in the Defective Vehicles which reveals error

20  code C1179 only after computerized diagnostic interrogation. Error code C1179 refers to

21  failure of the Delta Stroke Sensor.

22      g.      NISSAN delivered the TSB to the National Highway Traffic Safety

23  Administration ("NHTSA") in compliance with 49 C.F.R. 579.5 which requires that Defendant

24  NISSAN "furnish to NHTSA's Early Warning Division a copy of all notices, bulletins, and

25  other communications [sent to various sources] . . . regarding any *defect* in its vehicles or items

26  of equipment (including any failure or malfunction beyond normal deterioration in use, or any

27  failure of performance, or any flaw or unintended deviation from design specifications, whether

28  or not such *defect* is safety-related." (Emphasis added). Therefore by May, 2006, NISSAN had

8

EXHIBIT 1

1  concluded that the *defect* identified in the TSB resulting in Delta Stroke Sensor failure/error

2  code C1179 constituted a defect in the Defective Vehicles.

3       h.     The issuance and delivery of a technical service bulletin such as the TSB to

4  NHTSA requires the completion of several internal steps at NISSAN, each of which takes

5  significant time and effort. These steps were taken in conjunction with CONTINENTAL, the

6  designer and manufacturer of the DSS, the defective component part installed in the Defective

7  Vehicles' brake boosters. After the defect is isolated and analyzed, NISSAN purports to

8  develop a fix in conjunction with its component parts supplier, CONTINENTAL. Defendants

9  NISSAN and CONTINENTAL developed and implemented the lengthy 22 page TSB which

10  describes a means of reprogramming the VDC Control Unit through use of an 8 MB (Orange)

11  Reprogramming Card to address the Delta Stroke Sensor/C1179 defect in the Defective

12  Vehicles. The DSS failure investigation began, according to NISSAN, at the "start of

13  production" in 2003. As such, Defendants NISSAN and CONTINENTAL had actual

14  knowledge of the Delta Stroke Sensor/C1179 error code *defect* at the "start of production" in

15  the spring of 2003. But, Defendants hid this knowledge from the public.

16       i.     To analyze the defect, Nissan's Total Customer Satisfaction is required to review

17  and analyze customer complaints of DSS failure/error code C1179.

18       j.     NISSAN and CONTINENTAL performed testing that confirmed the same

19  failure effect in the DSS that creates a loss of braking power—a clear safety issue. However, in

20  NISSAN's TSB issued to its dealership network, NISSAN did not describe a safety issue, but

21  instead described a "vibration in the brake pedal while braking."

22       k.     The cheap software reprogramming fix in the TSB that NISSAN touted to

23  NHTSA, its dealers, and technicians did not fix the defect, and NISSAN was aware of the

24  TSB's failure to correct the defect by the end of 2006

25       l.     Throughout 2007, NISSAN and CONTINENTAL continued work on a real fix.

26       m.     In April 2008, NISSAN manufactured new vehicles with safe DSSs that had

27  been redesigned by CONTINENTAL. But NISSAN and CONTINENTAL failed to disclose the

28  defect, the safety implications, and the true fix to the public or to those that purchased or drove

9

Consolidated Complaint   Document 13-1   Filed 05/24/19   Page 78 of 130   PageID #: 263
*Cruz v. Methenge, et al.*, Case No. BC 493949 (Lead Case)

EXHIBIT 1

1   the Defective Vehicles, including the SUBJECT VEHICLE driven by Defendant METHENGE

2   on August 29, 2012.

3         n.     NISSAN worked with CONTINENTAL to determine the root cause of the DSS

4   issues. Internally, NISSAN employees have made various claims about CONTINENTAL's role

5   in the development and manufacture of the defective component part at issue: "Continental

6   engineering did not have cable harness experience/design best practice…list this as a lesson

7   learned…."; "[T]hey have been very poor in response and difficult to work with….";

8   "[C]ontinental Teves was difficult to work with during the time of the Delta Stroke Sensor

9   issue…[t]hey—their primary focus was in not being responsible for the issue and providing

10   investigation results…."; "[T]hey have also shown that they don't have the capability to properly

11   test parts, especially on this side of the ocean, bottom line is that we are upsetting a lot of

12   customers, spending warranty money to replace boosters, and they have no financial incentive

13   to quickly identify root cause and take appropriate countermeasure…."

14         o.     By late 2007, CONTINENTAL determined that the manufacturing process for

15   the DSS in the Defective Vehicles could be improved. The original process involved the

16   application of a flux solution to a DSS connector before soldering the terminal and wire harness.

17   However, CONTINENTAL determined that the flux solution would sometimes become

18   contaminated with excessive chlorine and result in a DSS with abnormal series resistance. The

19   manufacturer implemented a temporary countermeasure, modifying the process so that the flux

20   solution was changed every two days, and CONTINENTAL then developed a permanent

21   redesign of the terminal connector so that the process no longer required any application of flux.

22   The redesign, in which the connector was crimped instead of soldered, was implemented in

23   vehicles manufactured beginning April 2008.

24         p.     Since 2003, NISSAN has received complaints relating to the alleged braking

25   defect in their Defective Vehicles through NHTSA, the Better Business Bureau, NISSAN

26   internet forums, NISSAN dealerships, and directly by owners of Defective Vehicles. Defendant

27   NISSAN shared this information with its component part supplier, Defendant CONTINENTAL,

28   as they worked in tandem to analyze and secretly develop a countermeasure and permanent fix

10

EXHIBIT 1

for the defect.

q.     Despite NISSAN's and CONTINENTAL's wealth of knowledge relating to the subject defect in the SUBJECT VEHICLE's braking system and its clear safety implications, the Defendants have and continue to suppress and conceal this knowledge and have failed to disclose that the SUBJECT VEHICLE's braking system is defective and dangerous.

r.     NISSAN internally forecasted that another 10,000 Defective Vehicles in California would experience a substantial braking failure. This forecast demonstrates that NISSAN knowingly subjected those 10,000 innocent California consumers, their families, and those driving in their vicinity to potentially fatal crashes.

s.     NISSAN was not "concerned" about these potential future brake failures because "customers are nontechnical, and many times they don't understand the operations of their vehicle."

24.     <u>Evidence of Defendants NISSAN's and CONTINENTAL's Intent to Conceal</u>

a.     Defendants NISSAN's and CONTINENTAL's intent to conceal the Delta Stroke Sensor/Error Code C1179 defect and its manifest safety implications are evidenced by each's inactions and conduct in light of their undisputed knowledge of the safety defect.

b.     NISSAN and CONTINENTAL began investigating the defect at the "start of production" in 2003 and should have identified the cause of the defect soon thereafter. Through customer complaints and their own testing of the Delta Stroke Sensor/error code C1179 defect, Defendants NISSAN and CONTINENTAL knew that they were manufacturing and distributing vehicles with a defect which causes substantial loss of braking power. Yet, rather than acknowledge the safety hazard posed by the defect, NISSAN and CONTINENTAL concealed the safety hazard posed by the defect through deception.

c.     Defendant NISSAN deceptively described the manifestation of the defect in the TSB as follows: "The brake warning light is or was ON, and/or the ABS warning light is or was ON, and/or there is or was vibration in the brake pedal while braking." Defendants NISSAN and CONTINENTAL intentionally and deceptively concealed the true safety hazard posed by the Delta Stroke Sensor/error code C1179 defect in the TSB and elsewhere—that the defect can

11

Consolidated Complaint
Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 80 of 130 PageID #: 265
*Cruz v. Methenge, et al.*, Case No. BC 493949 (Lead Case)

EXHIBIT 1

1    cause sudden, unexpected, and substantial loss of braking power—because they were aware that

2    disclosure of the safety hazard posed by the defect would have forced them to incur significant

3    losses to cover the replacement/recall of Brake Boosters to render the Defective Vehicles safe to

4    drive.

5         d.      In the TSBs, NISSAN failed to mention the Delta Stroke Sensor (or Brake

6    Booster) by name and failed to disclose that DSS failure causes this safety defect. NISSAN has

7    NOT updated, modified, or withdrawn the TSBs – despite identifying the actual root cause

8    (design of the sensor attachment) and secretly implementing an effective countermeasure (re-

9    design of DSS) in 2008. NISSAN continues to conceal the nature of the safety defect and to

10    promote an unnecessary and ineffective remediation identified in the TSB despite admitting

11    internally that the real fix requires replacement of the brake booster assembly.

12         e.      Rather than disclose this critical safety defect and recall the Defective Vehicles

13    as Defendant should have done, Defendants NISSAN and CONTINENTAL made a conscious

14    decision to ignore the problem at the expense of the safety of its customers, those operating the

15    Defective Vehicles, and the public at large. Despite significant and exclusive knowledge of this

16    material safety defect, NISSAN and CONTINENTAL fraudulently concealed this safety

17    problem, and otherwise prevented reasonable consumers and members of the public, including

18    Plaintiffs, from discovering this hazard. As a result of this concealment, the SUBJECT

19    VEHICLE experienced a defect that caused the wrongful death of CRUZ's daughters and

20    MENDEZ's mother (BERNARDINO's daughter).

21      25.    **METHENGE and the SUBJECT VEHICLE**

22         a.      On or about August 21, 2012, METHENGE purchased the "SUBJECT

23    VEHICLE," a 2004 Infiniti QX56.

24         b.      At the time of the purchase, the SUBJECT VEHICLE had recently been

25    approved for resale with a salvage certificate issued on August 2, 2012. The SUBJECT

26    VEHICLE cleared a full inspection of its braking system before it was certified on August 2,

27    2012. The inspection would not have revealed the latent DSS defect.

28

12

EXHIBIT 1

1      c.     A post-collision mechanical inspection of the SUBJECT VEHICLE performed

2  by the Los Angeles Police Department ("LAPD") on or about November 1, 2012 revealed no

3  defects in the SUBJECT VEHICLE's braking system that would have contributed to the August

4  29, 2012 collision. The LAPD did not know about, or inspect for, the defective Delta Stroke

5  Sensor.

6      26.     <u>The August 29, 2012 Collision</u>

7      a.     On August 29, 2012, at approximately 7:30 a.m., decedent Saida Mendez-

8  Bernardino was driving her vehicle with CRUZ's daughters, Hilda and Stephanie, as

9  passengers. CRUZ's daughters were 4 and 6 years old.

10      b.     Saida Mendez-Bernardino's vehicle was westbound on Willoughby Avenue and

11  had a green light at the intersection of Highland Avenue and Willoughby Avenue in Los

12  Angeles, California. METHENGE was northbound on Highland Avenue.

13      c.     Upon seeing traffic stopping in front of him, METHENGE drove around the

14  stopped cars in front of him and drove on opposite lanes of travel (i.e. southbound lanes) in an

15  attempt to avoid a collision.

16      d.     The SUBJECT VEHICLE entered the intersection of Highland and Willoughby

17  and broadsided Saida Mendez-Bernardino's vehicle.

18      e.     Witnesses described the SUBJECT VEHICLE as "out of control."

19      f.     Decedents' vehicle was run off the road and collided with a streetlamp pole.

20      g.     The jaws-of-life had to be used to extricate decedents Stephanie and Hilda Cruz,

21  and their mother Saida Mendez-Bernardino, from their vehicle.

22      h.     CRUZ's daughters, Stephanie and Hilda, and MENDEZ's

23  mother/BERNARDINO's daughter, Saida, died as a result of their injuries sustained during the

24  collision.

25      27.     <u>NISSAN and CONTINENTAL Recently Provided Notice of a Class Action
    Lawsuit Settlement Regarding the Delta Stroke Sensor Defect in the

26      SUBJECT VEHICLE</u>

27

    a.     On December 5, 2014, plaintiffs in the class action litigation *Banks, et al. v.*

28
*Nissan North America, Inc.*, Case No. 4:11-CV-02022-PJH currently pending in the United

13

EXHIBIT 1

1  States District Court for the Northern District of California, filed a motion for preliminary

2  approval of a nationwide class action settlement of consumer claims against NISSAN arising

3  from the Delta Stroke Sensor defect described herein.

4        b.      On December 24, 2014, District Court Judge Phyllis J. Hamilton entered an

5  order preliminarily approving the *Banks* class action settlement, and provisionally certifying a

6  nationwide settlement class for consumer claims regarding the DSS failure in Defective

7  Vehicles, including the SUBJECT VEHICLE. The settlement excludes claims for personal

8  injuries.

9        c.      When news reports surfaced in December 2014 concerning the class action

10  settlement in *Banks, et al. v. Nissan North America, Inc.*, Plaintiffs learned for the first time of

11  the possibility of a hidden defect in METHENGE's vehicle and began diligently investigating

12  before each filed their actions against NISSAN and CONTINENTAL shortly thereafter.

**FIRST CAUSE OF ACTION**
STRICT PRODUCTS LIABILITY-WRONGFUL DEATH-SURVIVAL CLAIM
(By Plaintiffs CRUZ, MENDEZ, BERNARDINO Against Defendants
NISSAN and CONTINENTAL and DOES 1-18 and 21- 98)

16      28.     Plaintiffs incorporate by reference paragraphs 1 to 27 as if fully set forth herein.

17      29.     Defendants NISSAN and DOES 1-18 and 21-98 designed, engineered,

18  manufactured, tested, assembled, marketed, advertised, distributed, sold and put into the stream

19  of commerce the Defective Vehicles including the SUBJECT VEHICLE.

20      30.     Defendants CONTINENTAL and DOES 1-18 and 21-98 designed, engineered,

21  manufactured, tested, assembled, distributed, supplied, and/or sold and otherwise put into the

22  stream of commerce the defective Brake Booster Assembly, including the defective Delta

23  Stroke Sensor, installed in the SUBJECT VEHICLE that caused the brake failure experienced

24  by Defendant METHENGE on August 29, 2012.

25      31.     Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 are strictly

26  liable for the deaths of Plaintiff CRUZ's children because the SUBJECT VEHICLE and its

27  component parts were defective and unreasonably dangerous for normal use due to its defective

28  design, manufacture, production, assembly, marketing, advertising, testing, sale, maintenance

EXHIBIT 1

1  and service; and due to said Defendants' failure to provide adequate warnings of the substantial

2  dangers known or knowable at the time of the SUBJECT VEHICLE's design, engineering,

3  manufacturing, testing, assembly, marketing, advertising, inspection, maintenance, sale and/or

4  distribution.

5      32.    Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 designed,

6  engineered, manufactured, tested, assembled, marketed, advertised, inspected, maintained, sold,

7  distributed, and placed on the market and in the stream of commerce a defective product, the

8  SUBJECT VEHICLE, which was unreasonably dangerous to the consumer, knowing that the

9  product would reach and did reach the ultimate consumer without substantial change in the

10  defective condition it was in from the date when it left said Defendants' control.

11      33.    Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 knew or

12  should have known that the ultimate users or consumers of this product would not, and could

13  not, inspect the SUBJECT VEHICLE so as to discover the latent defects described above.

14      34.    The SUBJECT VEHICLE was defective when it left the control of Defendants

15  NISSAN, CONTINENTAL and DOES 1-18 and 21-98.

16      35.    Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 knew or

17  should have known of the substantial dangers involved in the reasonably foreseeable use of the

18  SUBJECT VEHICLE, whose defective design, manufacturing and lack of warnings caused it to

19  have an unreasonably dangerous propensity to lose substantial braking ability without

20  warning—creating an unreasonably dangerous condition that would inevitably result in a fatal

21  traffic collision.

22      36.    The SUBJECT VEHICLE was, at the time of the collision, being used in the

23  manner intended by Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, and in

24  a manner that was reasonably foreseeable by said Defendants. Upon seeing the traffic stopping

25  in front of him, Defendant METHENGE attempted to apply his brakes but was unable to stop

26  the SUBJECT VEHICLE as a result of brake failure consistent with the failure of the Defective

27  Vehicles' defective Delta Stroke Sensor (DSS). Defendant METHENGE drove around the

28  stopped cars in front of him and drove on opposite lanes of travel (i.e. southbound lanes) in an

EXHIBIT 1

1  attempt to avoid a collision, and collided with the car driven by decedent Saida Mendez-

2  Bernardino.

3    37.    Defendant METHENGE was a foreseeable user of the SUBJECT VEHICLE, and

4  Plaintiff CRUZ's children and Plaintiff MENDEZ's mother/BERNARDINO's daughter were

5  foreseeable victims of a collision caused by the hidden defect in the SUBJECT VEHICLE.

6    38.    Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, despite

7  clear knowledge of the extreme and hidden danger posed by the defect in the SUBJECT

8  VEHICLE, failed to provide adequate warnings of the defect to operators so that operators

9  could protect themselves from the danger posed by the SUBJECT VEHICLE.

10    39.    The failure of Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-

11  98 to design, manufacture, and/or provide adequate warnings of the risks of substantial harm

12  associated with the foreseeable use of the SUBJECT VEHICLE was a substantial factor, and

13  legal and proximate cause, in causing the injuries and wrongful death of Plaintiff CRUZ's

14  daughters and MENDEZ's mother/BERNARDINO's daughter.

15    40.    In addition, the aforementioned malfeasance, nonfeasance, defective design,

16  manufacture and distribution, failure to warn, conscious disregard and despicable conduct were

17  done with the advance knowledge, authorization, approval, and ratification of officers, directors

18  and/or managing agents of the aforesaid Defendants, and each of them.  Persons within the

19  corporate hierarchy of Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, who

20  were authorized to act on behalf of said Defendants, acted despicably in willful and conscious

21  disregard of the rights and safety of others.  Acts of malicious conduct attributable to

22  Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 were done by a person or

23  persons with the authority to make corporate policy decisions on behalf of said Defendants

24  and/or the power within the corporate structure of said Defendants to enforce or not enforce the

25  corporate policies of said Defendants.

26    41.    Information regarding risks of death and serious injury to others inherent in the

27  design, manufacture, sale and distribution of the Defective Vehicles including the SUBJECT

28  VEHICLE was known to responsible officers, employees and agents of Defendants NISSAN,

16

EXHIBIT 1

1 | CONTINENTAL, and DOES 1-18 and 21-98 who exercised substantial discretionary authority
2 | over decisions that resulted in the formulation of corporate policy for said Defendants.
3 | Corporate decisions regarding the design, manufacture, distribution, warning, and marketing of
4 | the Defective Vehicles including the SUBJECT VEHICLE that constituted despicable conduct
5 | in this case were made by persons within the corporate hierarchy of said Defendants who were
6 | authorized to make those decisions on behalf of Defendants NISSAN, CONTINENTAL and
7 | DOES 1-18 and 21- 98.

8 | 42.  As a legal and proximate result of the wrongful conduct of Defendants, NISSAN,
9 | CONTINENTAL, and DOES 1-18 and 21-98, as alleged herein, decedents Hilda and Stephanie
10 | Cruz suffered loss and damages before their death for which they had a cause of action.  As
11 | successor in interest to decedents' estate, Plaintiff CRUZ seeks recovery of decedents' survival
12 | damages pursuant to C.C.P. §377.34 including but not limited to punitive damages.  Based upon
13 | said Defendants' malice and conscious disregard as set forth in greater particularity in
14 | paragraphs 14-24 and 29-41, *supra*, Plaintiff CRUZ is entitled to an award of punitive and
15 | exemplary damages.

16 | 43.  As a legal and proximate result of the wrongful conduct of Defendants NISSAN,
17 | CONTINENTAL, and DOES 1-18 and 21-98, Plaintiff CRUZ is entitled to wrongful death
18 | damages, including but not limited to noneconomic damages for loss of love, companionship,
19 | comfort, care, assistance, protection, affection, society, and moral support; and economic
20 | damages including but not limited to loss of gifts, benefits, reasonable services, financial
21 | support, property damage, funeral and burial expenses pursuant to C.C.P. §377.61.

22 | 44.  As a legal and proximate cause of the wrongful conduct of Defendants NISSAN,
23 | CONTINENTAL and DOES 1 to 18 and 21-98 as alleged herein, Plaintiff MENDEZ's mother,
24 | decedent Saida Mendez-Bernardino, suffered loss and damages before her death for which she
25 | had a cause of action.  As successor in interest to decedents' estate, Plaintiff MENDEZ seeks
26 | recovery of decedents' survival damages pursuant to C.C.P. §377.34 including but not limited to
27 | punitive damages.  Based upon said Defendants' malice and conscious disregard as set forth in
28 | greater particularity in paragraphs 14-24 and 29-41, *supra*, Plaintiff MENDEZ is entitled to an

17

EXHIBIT 1

1   award of punitive and exemplary damages.

2       45.     As a legal and proximate result of the wrongful conduct of Defendants NISSAN,

3   CONTINENTAL and DOES 1-18 and 21-98, Plaintiff MENDEZ is entitled to wrongful death

4   damages, including but not limited to noneconomic damages for loss of love, companionship,

5   comfort, care, assistance, protection, affection, society, and moral support; and economic

6   damages including but not limited to loss of gifts, benefits, reasonable services, financial

7   support, funeral and burial expenses pursuant to C.C.P. §377.61.

8       46.     As a legal and proximate result of the wrongful conduct of Defendants NISSAN,

9   CONTINENTAL and DOES 1-18 and 21-98, Plaintiff BERNARDINO is entitled to wrongful

10  death damages, including but not limited to noneconomic damages for loss of love,

11  companionship, comfort, care, assistance, protection, affection, society, and moral support; and

12  economic damages including but not limited to loss of gifts, benefits, reasonable services,

13  financial support, funeral and burial expenses pursuant to C.C.P. §377.61.

14      47.     Prejudgment interest on the damages set forth herein should be awarded in the

15  event that judgment for Plaintiffs be rendered; said sum should be calculated from the time that

16  this action arose or as provided under the California Civil Code.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

**SECOND CAUSE OF ACTION**
NEGLIGENCE – WRONGFUL DEATH – SURVIVAL CLAIMS
(By Plaintiffs CRUZ, MENDEZ, BERNARDINO Against Defendants
NISSAN, CONTINENTAL and DOES 1-18 and 21-98)

48.     Plaintiffs incorporate by reference paragraphs 1 to 47 as if fully set forth herein.

49.     At all times herein relevant, Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 were and are engaged in the business of selling, designing, manufacturing, fabricating, distributing, retailing, wholesaling, recommending, testing, modifying, controlling, advertising, creating, processing, preparing, constructing, packaging, utilizing, warranting, servicing, repairing, maintaining, marketing, leasing, renting, vending, installing, handling, labeling, promoting, advertising, furnishing, retailing, analyzing, inspecting, supplying, warning and placing into the stream of commerce the Defective Vehicles including the SUBJECT VEHICLE.

50.     Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, including their employees, agents, directors, officers, shareholders, partners and associates, had a legal duty to act reasonably to protect persons who may come in contact with their product which includes adequately and properly managing and operating their business and retail operations; and to use reasonable care in the design, engineering, manufacturing, testing, assembly, marketing, advertisement, inspection, maintenance, sale, supply, warning and distribution of the Defective Vehicles including the SUBJECT VEHICLE; and to adequately and properly train and supervise their employees and agents, including their designers, inspectors, quality control agents and other manufacturing, testing, distribution, and delivery personnel; recalling the Defective Vehicles including the SUBJECT VEHICLE; and acting without negligence, conscious disregard, despicable or other wrongful conduct.

51.     Defendants NISSAN and CONTINENTAL and DOES 1-18 and 21-98 breached said duties and are guilty of one or more of the following negligent acts and/or omissions:

a.      Failing to use due care in the design, engineering, manufacturing, testing, assembly, marketing, advertising, inspection, maintenance, sale and/or distribution of the SUBJECT VEHICLE and its components, and/or to utilize and/or implement reasonably safe

19

EXHIBIT 1

1  designs and/or warnings in its manufacture;

2  b.   Failing to provide adequate and proper warnings to the public and to Plaintiffs of

3  the SUBJECT VEHICLE's danger when used in the manner for which it was intended;

4  c.   Failing to design, manufacture, incorporate or to retrofit the SUBJECT VEHICLE

5  with reasonable safeguards and protections against brake failure that was reasonably foreseeable

6  when the SUBJECT VEHICLE was used in the manner for which it was intended;

7  d.   Failing to adequately identify and mitigate hazards in accordance with good

8  engineering practices and to give reasonable warnings, including recall of the Defective Vehicles

9  and the SUBJECT VEHICLE;

10  e.   Failing to make timely and adequate corrections to the manufacture and design of

11  the SUBJECT VEHICLE and its components; and

12  f.   Failing to use due care in the testing, inspection, maintenance and servicing of the

13  SUBJECT VEHICLE and its components at all times prior to the incident;

14  52.   Defendants NISSAN and CONTINENTAL and DOES 1-18 and 21-98 knew or

15  should have known from its testing of the production models of the SUBJECT VEHICLE and

16  its components, and/or other Defective Vehicles they manufactured, distributed, inspected and

17  maintained, that the SUBJECT VEHICLE and its components were defective, dangerous or

18  likely to become dangerous when used or misused in an intended or reasonably foreseeable

19  manner. Said Defendants had unfettered ability, after years of in-house testing and

20  investigations, to minimize the substantial risk of serious bodily harm or death caused by

21  Defective Vehicles including the SUBJECT VEHICLE by redesigning, properly manufacturing,

22  adequately warning, or recalling them. Said Defendants consciously chose not to take such

23  steps. These acts prevented the public from becoming aware that the SUBJECT VEHICLE

24  was, in reality, unsafe, dangerous and defective, thereby causing the described injuries, deaths,

25  and damages to Plaintiffs and the decedents herein.

26  53.   Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 knew or

27  should have known that the SUBJECT VEHICLE and its components had a propensity to

28  become unreasonably dangerous during a catastrophic braking failure. Said Defendants knew

EXHIBIT 1

1    of and had developed safer alternatives, and adequate corrections were available which would

2    have avoided the incident and the deaths of Plaintiff CRUZ's minor children and MENDEZ's

3    mother/BERNARDINO's daughter.

4         54.    Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 designed,

5    engineered, manufactured, tested, assembled, marketed, advertised, inspected, maintained, sold,

6    distributed, placed on the market and in the stream of commerce, and/or maintained and

7    serviced the SUBJECT VEHICLE in a manner and in a condition that was unreasonably

8    dangerous.

9         55.    A reasonable manufacturer/distributor/seller under the same or similar

10   circumstances would have warned of the danger, and/or recalled the Defective Vehicles

11   including the SUBJECT VEHICLE.

12        56.    The failure of Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-

13   98 to design, manufacture, or provide adequate warnings of the risks of substantial harm

14   associated with the foreseeable use of the SUBJECT VEHICLE was a substantial factor, and

15   legal and proximate cause, in causing the injuries and wrongful death of Plaintiff CRUZ's

16   children and Plaintiff MENDEZ's mother/Plaintiff BERNARDINO's daughter.

17        57.    In addition, the aforementioned malfeasance, nonfeasance, defective design,

18   manufacture and distribution, failure to warn, conscious disregard and despicable conduct were

19   done with the advance knowledge, authorization, approval, and ratification of officers, directors

20   and/or managing, agents of the aforesaid defendants, and each of them.  Persons within the

21   corporate hierarchy of Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, who

22   were authorized to act on behalf of said Defendants, acted despicably in willful and conscious

23   disregard of the rights and safety of others.  Acts of malicious conduct attributable to

24   Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 were done by a person or

25   persons with the authority to make corporate policy decisions on behalf of said Defendants

26   and/or the power within the corporate structure of said Defendants to enforce or not enforce the

27   corporate policies of said Defendants.

28        58.    Information regarding risks of death and serious injury to others inherent in the

21

Consolidated Complaint
Cruz v. Methenge, et al., Case No. BC 493949 (Lead Case)
Case 3:19-cv-00996   Document 13-1   Filed 05/24/19   Page 90 of 130  PageID #: 275

EXHIBIT 1

design, manufacture, sale and distribution of the Defective Vehicles including the SUBJECT VEHICLE was known to responsible officers, employees and agents of Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, who exercised substantial discretionary authority over decisions that resulted in the formulation of corporate policy for said Defendants. Corporate decisions regarding the design, manufacture, distribution, warning, and marketing of the Defective Vehicles including the SUBJECT VEHICLE that constituted despicable conduct in this case were made by persons within the corporate hierarchy of said Defendants who were authorized to make those decisions on behalf of Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98.

59.     As a legal and proximate cause of the wrongful conduct, acts and omissions, of Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98 as alleged herein, decedents Hilda and Stephanie Cruz suffered loss and damages before their death for which they had a cause of action.   As successor in interest to decedents' estate, Plaintiff CRUZ seeks recovery of decedents' survival damages pursuant to C.C.P. §377.34 including but not limited to punitive damages. Based upon said Defendants' malice and conscious disregard as set forth in greater particularity in paragraphs 14-24 and 49-58, *supra*, Plaintiff CRUZ is entitled to an award of punitive and exemplary damages.

60.     As a legal and proximate result of the negligence of Defendants NISSAN, CONTINENTAL, and DOES 1-18 and 21-98, Plaintiff CRUZ is entitled to wrongful death damages, including but not limited to noneconomic damages for loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support; and economic damages including but not limited to loss of gifts, benefits, reasonable services, financial support, property damage, funeral and burial expenses pursuant to C.C.P. §377.61.

61.     As a legal and proximate cause of the wrongful conduct, acts and omissions, of Defendants NISSAN, CONTINENTAL and DOES 1-18 and 21-98 as alleged herein, decedent Saida Mendez-Bernardino suffered loss and damages before her death for which she had a cause of action.   As successor in interest to decedents' estate, Plaintiff MENDEZ seeks recovery of decedents' survival damages pursuant to C.C.P. §377.34 including but not limited to punitive

22

EXHIBIT 1

1    damages. Based upon said Defendants' malice and conscious disregard as set forth in greater

2    particularity in paragraphs 14-24, and 49-58, *supra*, Plaintiff MENDEZ is entitled to an award

3    of punitive and exemplary damages.

4        62.      As a legal and proximate result of the negligence of Defendants NISSAN,

5    CONTINENTAL and DOES 1-18 and 21-98, Plaintiff MENDEZ is entitled to wrongful death

6    damages, including but not limited to noneconomic damages for loss of love, companionship,

7    comfort, care, assistance, protection, affection, society, and moral support; and economic

8    damages including but not limited to loss of gifts, benefits, reasonable services, financial

9    support, funeral and burial expenses pursuant to C.C.P. §377.61.

10       63.      As a legal and proximate result of the negligence of Defendants NISSAN,

11    CONTINENTAL and DOES 1-18 and 21-98, Plaintiff BERNARDINO is entitled to wrongful

12    death damages, including but not limited to noneconomic damages for loss of love,

13    companionship, comfort, care, assistance, protection, affection, society, and moral support; and

14    economic damages including but not limited to loss of gifts, benefits, reasonable services,

15    financial support, funeral and burial expenses pursuant to C.C.P. §377.61.

16       64.      Prejudgment interest on the damages set forth herein should be awarded in the

17    event that judgment for Plaintiffs be rendered; said sum should be calculated from the time that

18    this action arose or as provided under the California Civil Code.

19

20

21

22

23

24

25

26

27

28

23

EXHIBIT 1

**THIRD CAUSE OF ACTION**
NEGLIGENCE – WRONGFUL DEATH-SURVIVAL CLAIMS
(By Plaintiffs CRUZ and MENDEZ Against
SOLOMON METHENGE and DOES 1-18 and 21-98)

65.     Plaintiff incorporates by reference paragraphs 1 to 14 and 26 as if fully set forth herein.

66.     At all times relevant to this action, Defendant METHENGE and DOES 1-18 and 21-98, and each of them, owed the decedents a duty of reasonable care as well as statutory duties established in California Vehicle Code, which duties said Defendants and each of them did breach as described herein.

67.     On August 29, 2012, at approximately 7:30 a.m., decedent Saida Mendez-Bernardino was driving her vehicle with her two daughters, decedents Hilda and Stephanie Cruz, as passengers.

68.     Mendez-Bernardino's vehicle was westbound on Willoughby Avenue and had a green light at the intersection of Highland Avenue and Willoughby Avenue in Los Angeles, California. Defendant METHENGE was northbound on Highland Avenue.

69.     Witnesses described the SUBJECT VEHICLE as "out of control" as it swerved out of its northbound lane on Highland Ave. and onto the southbound land on Highland Ave. and entered the intersection of Highland and Willoughby against a red light broadsiding decedents' vehicle. Plaintiffs are informed and believe decedents' vehicle was run off the road and collided with a streetlamp post.

70.     Plaintiffs are informed Defendant METHENGE was driving over the posted speed limit and with a suspended license.

71.     Plaintiffs are informed Defendant METHENGE entered the intersection of Highland and Willoughby against a red light when he broadsided decedents' vehicle.

72.     The jaws-of-life had to be used to extricate Hilda and Stephanie Cruz, as well as their mother, Saida Mendez-Bernardino, from the vehicle.

73.     As a direct result of the negligence of Defendants METHENGE and DOES 1-18 and 21-98, Plaintiff CRUZ's daughters and Plaintiff MENDEZ's mother died as a result of the

24

EXHIBIT 1

1  injuries sustained during the collision.

2      74.    Defendant METHENGE drove the SUBJECT VEHICLE with gross negligence,

3  recklessness and/or with a conscious disregard of the probability of harm to others, including

4  Plaintiff CRUZ's daughters and Plaintiff MENDEZ's mother.

5      75.    As a proximate cause of the wrongful conduct of Defendants METHENGE and

6  DOES 1-18 and 21-98 as alleged herein, decedents Hilda and Stephanie Cruz suffered loss and

7  damages before their death for which they had a cause of action.   As successor in interest to

8  decedents' estate, Plaintiff CRUZ seeks recovery of decedents' survival damages pursuant to

9  C.C.P. §377.34 including but not limited to punitive damages.  Based upon said Defendants'

10  malice and conscious disregard as set forth in greater particularity in paragraphs 26 and 66-74,

11  *supra*, Plaintiff CRUZ is entitled to an award of punitive and exemplary damages.

12      76.    As a proximate result of the negligence of Defendants METHENGE and DOES

13  1-18 and 21-98, Plaintiff CRUZ is entitled to wrongful death damages, including but not limited

14  to noneconomic damages for loss of love, companionship, comfort, care, assistance, protection,

15  affection, society, and moral support; and economic damages including but not limited to loss of

16  gifts, benefits, reasonable services, financial support, property damage, funeral and burial

17  expenses pursuant to C.C.P. §377.61.

18      77.    As a proximate cause of the wrongful conduct of Defendants METHENGE and

19  DOES 1-18 and 21-98 as alleged herein, decedent Saida Mendez-Bernardino suffered loss and

20  damages before her death for which she had a cause of action.   As successor in interest to

21  decedent's estate, Plaintiff MENDEZ seeks recovery of decedent's survival damages pursuant

22  to C.C.P. §377.34 including but not limited to punitive damages.  Based upon said Defendants'

23  malice and conscious disregard as set forth in greater particularity in paragraphs 26 and 66-74,

24  *supra*, Plaintiff MENDEZ is entitled to an award of punitive and exemplary damages.

25      78.    As a proximate result of the negligence of Defendants METHENGE and DOES

26  1-18 and 21-98, Plaintiff MENDEZ is entitled to wrongful death damages, including but not

27  limited to noneconomic damages for loss of love, companionship, comfort, care, assistance,

28  protection, affection, society, and moral support; and economic damages including but not

Consolidated Complaint
*Cruz v. Methenge, et al.*; Case No. BC 493949 (Lead Case)
Case 2:18-cv-00396   Document 13-1   Filed 05/24/19   Page 94 of 130   PageID #: 279

<u>EXHIBIT 1</u>

limited to loss of gifts, benefits, reasonable services, financial support, property damage, funeral and burial expenses pursuant to C.C.P. §377.61.

79.    Prejudgment interest on the damages set forth herein should be awarded in the event that judgment for Plaintiffs be rendered; said sum should be calculated from the time that this action arose or as provided under the California Civil Code.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.    For economic and noneconomic damages as allowed by law according to proof;

2.    For wrongful death damages that under all the circumstances of the case may be just pursuant to C.C.P. §377.61 according to proof;

3.    For survival damages as provided by C.C.P. §377.34 according to proof, including but not limited to punitive damages;

4.    For punitive and exemplary damages as allowed by law;

5.    For costs of suit incurred herein;

6.    For prejudgment interest on damages awarded from the time the action arose; and

7.    For such other and further relief as the court deems just and proper.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial as to all claims, issues, and requests for relief.

Dated:  January 14, 2016                LAW OFFICES OF VICKI I. SARMIENTO

By: _____
Vicki I. Sarmiento, Esq.
Attorney for CRUZ

Dated:  January 14, 2016                LAW OFFICES OF CLAUDIA C. BOHORQUEZ

By: _____
Claudia C. Bohorquez, Esq. (SBN 150647)
Attorney for MENDEZ and BERNARDINO

EXHIBIT 1

1

5757 Wilshire Blvd., PH-3
Los Angeles, CA 90036
Tel: (323) 964-8125; Fax: (323) 964-5270
Email: cbohorquez@bohorquezlawgroup.com

2

3

4
Dated: January 14, 2016

CORY WATSON, P.C.

5

6
By: _____

7
F. Jerome Tapley, Esq.(*Pro Hac Vice*)
Attorney for CRUZ, MENDEZ, BERNARDINO
Hirlye R. "Ryan" Lutz, III, Esq. (*Pro Hac Vice*)

8
Adam W. Pittman, Esq. (*Pro Hac Vice*)

9
2131 Magnolia Avenue
Birmingham, AL 35205

10
Tel: (205) 328-2200; Fax: (205) 324-7896
Email: jtapley@corywatson.com

11
rlutz@corywatson.com
apittman@corywatson.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27

Consolidated Complaint
Cruz v. Methenge, et al. Case No. BC 493949 (Lead Case)
Case 2:16-cv-00896 Document 29 Filed 05/24/19 Page 96 of 130 PageID #: 281

EXHIBIT 1

1    **PROOF OF SERVICE**

2    STATE OF CALIFORNIA               )
                                        )    ss.
3    COUNTY OF LOS ANGELES             )

4         I am employed in the County of Los Angeles, State of California, I am over the age of 18
5    and not a party in the within action; my business address is 333 N. GARFIELD AVENUE,
     ALHAMBRA, CALIFORNIA 91801.
6

7         On January 14, 2016, I served the foregoing documents described as **CONSOLIDATED
     COMPLAINT** served on all parties in this action by placing a true copy thereof enclosed in
8    sealed envelopes addressed as follows:

9                              [SEE ATTACHED SERVICE LIST]

10   (XX)          **BY MAIL.** I deposited such envelope(s) in the mail at Alhambra, California.
                   The envelope(s) were mailed with postage thereon fully prepaid. I am "readily
11                 familiar" with the firm's practice of collection and processing correspondence for
12                 mailing. Under that practice it would be deposited with the U.S. Postal Service
                   on the same day in the ordinary course of business. I am aware on motion of the
13                 party served, service is presumed invalid if postal cancellation date or postage
                   meter date is more than one day after the date of deposit for mailing in affidavit.
14

15   (  )          **BY OVERNIGHT MAIL.** I caused such envelope to be delivered by overnight
                   mail, to the offices of the addresses(s).
16

17   (  )          **BY PERSONAL SERVICE.** I caused such envelope(s) to be delivered by hand
                   to the addressee(s).
18

19   (  )          **BY FACSIMILE.** I caused all of the pages of the above entitled document to be
                   sent to the recipients noted on the attached service list via electronic transfer
20                 (FAX) at the respective FAX numbers.

21        Executed this 14th day of January, 2016 at Alhambra, California.

22        I declare that I am employed in the office of a member of the bar of this Court at whose
23   direction the service was made.

24        I declare under penalty of perjury under the laws of the United States of America and the
     State of California that the foregoing is true and correct.
25

26

27                                                 _____
                                                   Joana Fregoso
28

EXHIBIT 1

1

2

3

**CRUZ vs. METHENGE**

**CASE NO.: BC 493949 (Lead Case)**

**SERVICE LIST**

| | |
|---|---|
| John Fuchs, Esq.<br>2999 Overland Avenue, Suite 206<br>Los Angeles, CA 90064<br>Telephone: (310) 842-9223<br>Facsimile (310) 842-9224<br>johnpaulfuchs@sbcglobal.net | Attorneys for Defendant, Solomon Methenge |
| Kirk J. Wolden, Esq.<br>Carter Wolden Curtis, LLP<br>1111 Exposition Blvd Ste 602<br>Sacramento, CA 95815<br>Telephone: (916) 567-1111<br>Facsimile: (916) 567-1112<br>kirk@cwclawfirm.com | Attorneys for Defendant, Solomon Methenge |
| Walter M. Yoka, Esq.<br>Anthony F. Latiolait, Esq.<br>Yoka & Smith, LLP<br>445 S. Figueroa Street, 38th Floor<br>Los Angeles, CA 90071 | Attorney for Defendant, Continental Automotive Systems, Inc. |
| Mark V. Berry, Esq.<br>Jordan s. Tabak, Esq.<br>BOWMAN AND BROOKE LLP<br>970 West 190th Street, Suite 700<br>Torrance, CA 90502 | Attorneys for Defendant, Nissan North America, Inc. |
| Claudia C. Bohorquez, Esq.<br>Law Offices of Claudia C. Bohorquez<br>5757 Wilshire Blvd., PH3<br>Los Angeles, CA 90036<br>Telephone: (323) 964-8125<br>Facsimile: (323) 964-5270<br>cbohorquez@bohorquezlawgroup.com | Attorney for Plaintiffs, Araceli Mendez by and through her Guardian Ad Litem |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Exhibit C

EXHIBIT 1

09/23/2015  14:34    2133867849          CC SOLUTIONS                          PAGE  86/41

1  Kirk I. Wolden, SBN 138902
   Clifford L. Carter, SBN 149621
2  CARTER WOLDEN CURTIS, LLP
   1111 Exposition Boulevard, Suite 602
3  Sacramento, CA 95815
   Telephone:   (916) 567-1111
4  Facsimile:    (916) 567-1112

5  Attorney for Cross-Complainant SOLOMON MATHENGE

**CONFORMED COPY**
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 2 2 2015

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
       Natasha Rose

6

7

8                    SUPERIOR COURT OF CALIFORNIA

9               COUNTY OF LOS ANGELES [CENTRAL DISTRICT]

10  HILARIO CRUZ, individually and as   for          Case No. BC493949,
    Minors Hilda and Stephanie Cruz,                 Related Case BC529912
11
                    Plaintiffs,                      **CROSS-COMPLAINT BY SOLOMON
12                                                   MATHENGE FOR DAMAGES
         vs.                                         INCLUDING PUNITIVE DAMAGES
13                                                   AND FOR EQUITABLE INDEMNITY;
    NISSAN NORTH AMERICA, INC.,                      DEMAND FOR JURY TRIAL**
14
                    Defendant.
15
    SOLOMON MATHENGE,
16
                    Cross-Complainant,
17
         vs.
18
    NISSAN NORTH AMERICA, INC., INFINITI
19  OF SANTA MONICA, CONTINENTAL
    TEVES, CONTINENTAL AUTOMOTIVE
20  SYSTEMS, INC., and ROES 1 through 50;
    inclusive,
21
22                  Cross-Defendants.

23

24       Cross-Complainant SOLOMON MATHENGE, by and through his undersigned counsel,

25  cross complains for damages and equitable indemnity against Cross-Defendants NISSAN NORTH

26  AMERICA, INC., INFINITI OF SANTA MONICA, a business of unknown form and origin,

27  CONTINENTAL TEVES, CONTINENTAL AUTO SYSTEMS, INC and Roes 1-XX.

28       1.       SOLOMON MATHENGE brings these claims against Cross-Defendants NISSAN

                                         1

Cross-Complaint by Solomon Mathenge

Case 3:19-cv-00396   Document 13-1   Filed 05/24/19   Page 100 of 130 PageID #: 285

EXHIBIT 1

1   NORTH AMERICA, INC ("NNA"), INFINITI OF SANTA MONICA (collectively "NISSAN" and
2   "NISSAN Cross-Defendants"), and CONTINENTAL TEVES and CONTINENTAL
3   AUTOMOTIVE SYSTEMS, INC. (collectively "CAS" or "CAS Cross-Defendants"), as the entities
4   which developed, designed, manufactured, assembled, tested, marketed, promoted, advertised,
5   distributed, sold, warranted, maintained, and serviced MATHENGE's 2004 Infiniti QX56 SUV, and
6   its Delta Stroke Sensor component.

7       2.      Cross-Complainant MATHENGE's 2004 QX56, and all Defective Vehicles, suffer
8   from the same intrinsic design defect involving the Delta Stroke Sensor ("DSS"), an electrical
9   component housed within the active brake booster. All Defective Vehicles pose a significant and
10  immediate safety threat to all users of such vehicles and to the public in general in that DSS failure
11  disables the braking ability of Defective Vehicles to the point where drivers are, without warning
12  and suddenly, unable to stop their vehicle within a reasonably safe time and distance, or at all. As
13  the result of the failure of the DSS in MATHENGE's 2004 QX56 the COLLISION described in
14  greater detail below, and the injuries and loss suffered by MATHENGE and others, occurred.

15      3.      For many years, the NISSAN and CAS Cross-Defendants have continued, to their
16  significant financial gain, to conceal and hide the critical DSS safety defect to consumers including
17  MATHENGE.    NISSAN should have long ago voluntarily recalled all Defective Vehicles,
18  including MATHENGE's 2004 QX56, to fix and render said Vehicles safe to operate on the roads.
19  Instead, NISSAN and CAS have hidden the defect and the foreseeable likelihood of its catastrophic
20  consequences.

21  WHEREFORE, Cross-Complainant MATHENGE alleges as follows:

22      4.      At all times relevant to this action, the NISSAN and CAS Cross-Defendants
23  intentionally, recklessly, and/or negligently concealed, suppressed, and omitted the risks, dangers,
24  defects and disadvantages of Defective Vehicles, and their DSS component. At all times relevant to
25  this action, said Cross-Defendants designed, supplied, marketed, sold, distributed, advertised,
26  warranted, serviced and maintained such VEHICLES as safe to use, when, in fact, they had reason
27  to know, and did know, that its Defective Vehicles were not safe to use for their intended purpose.
28  Such Vehicles posed a serious risk to the safety of owners, users, passengers, occupants, pedestrians

2

Cross-Complaint by Solomon Mathenge

<u>EXHIBIT 1</u>

1   and fellow drivers due to the DSS defect.

2             **JURISDICTION AND VENUE**

3      5.     Plaintiff, one or more Cross-Defendants, and Defendant and Cross-Complainant

4 SOLOMON MATHENGE are all residents of California, and Los Angeles County.

5 MATHENGE's Defective Vehicle was purchased in Santa Monica and in Los Angeles County, and

6 Los Angeles County is where the COLLSION occurred. None of the causes of action stated here

7 has been assigned or otherwise given to any other court or tribunal. The NISSAN and the CAS

8 Cross-Defendants do substantial business in the State of California, and within this County, are

9 registered to and in fact are doing business within the State of California and otherwise maintain

10 requisite minimum contacts with the State of California. Additionally, NNA and CAS distribute in

11 this County, receive substantial compensation and profits from sales, maintenance, and service of

12 Defective Vehicles in this County, and have and continue to conceal and make material omissions

13 in this County so as to subject them to *in personam* jurisdiction and venue in this Court.

14             **CROSS-COMPLAINANT**

15      6.     Defendant and Cross-Complainant SOLOMON MATHENGE is an individual who

16 resides in the County of Los Angeles, State of California. He is a Defendant in this proceeding,

17 having been sued for wrongful death by Hilario Cruz individually, and for survival damages for and

18 on behalf of Cruz's decedent children, six (6) year old Hilda and four (4) year old Stephanie. By

19 this Cross-Complaint, MATHENGE sues the NISSAN and CAS Cross-Defendants for his own

20 damages arising from the COLLISION and COLLISION AFTERMATH, and cross-complains for

21 implied equitable indemnity against them on the claims stated against him as a defendant.

22             **THE COLLISION**

23      7.     Cross-Complainant MATHENGE was operating his 2004 QX56, VIN

24 #5N3AADBC14N8D9115, on August 29, 2012 as he approached the intersection of Highland and

25 Willoughby in Los Angeles. He attempted to brake but his car did not respond, and he was unable

26 to slow his Defective Vehicle. He made an emergency maneuver to avoid colliding with the

27 vehicles in front of him but was unable to avoid colliding with a vehicle driven by Saida Mendez-

28 Bernardino. MATHENGE was seriously injured, and three others, including a six year old girl and

3

EXHIBIT 1

1  a four year old girl, were killed as a consequence. Cross-Complainant MATHENGE first became
2  aware of the possibility of a hidden and concealed defect in his 2004 QX56 in early December 2014
3  as a potential cause of the COLLISION, at the time news reports began to surface about the
4  settlement of a class action in *Banks v. Nissan North America, Inc.*

## THE COLLISION'S AFTERMATH

6  8.  After the COLLISION, Cross-Complainant MATHENGE was confronted with the
7  sickening reality that the COLLISION in which was involved had killed a young mother and her
8  two small children. MATHENGE was not believed and falsely accused of having recklessly and
9  intentionally caused these tragic deaths. Starting after February 2013 and through to date, he has
10 faced insinuation, accusation, and a criminal investigation that has led to him being charged with,
11 arraigned for, and aggressively prosecuted for multiple counts of criminal homicide, charges which
12 have yet to be withdrawn. MATHENGE would not have been subjected to any of this intolerable
13 and uncivilized treatment, and its extreme emotional distress, had the NISSAN and CAS Cross-
14 Defendants not acted in the outrageous way in which they did, intentionally hiding and concealing
15 the DSS Defect from Cross-Complainant MATHENGE, the government, and the public, in a
16 manner substantially certain to cause severe emotional distress to those injured thereby. Cross-
17 Complainant MATHENGE first became aware of the possibility of a hidden and concealed defect
18 in his 2004 QX56 in early December 2014 as a potential cause of the COLLISION AFTERMATH,
19 at the time news reports began to surface about the settlement of a class action in *Banks v. Nissan*
20 *North America, Inc.*

## CROSS-DEFENDANTS

22 9.  Cross-Defendant NISSAN NORTH AMERICA, Inc. is an active California
23 corporation which directs and coordinates all of Nissan's activities, including design, development,
24 and marketing of Infiniti and Nissan vehicles including Defective Vehicles in the U.S. market. This
25 Cross-Defendant engaged in these activities affecting the design and sale of all Defective Vehicles,
26 including MATHENGE's 2004 QX56, from its principal place of business in Gardena, California,
27 and has continued to perform significant and meaningful activities in connection with them in
28 California since 2004.

4

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

10.   Cross-Defendant INFINITI OF SANTA MONICA is a business of unknown form and origin located on Santa Monica Blvd., in Santa Monica, California. This Cross-Defendant inspected, warranted, maintained, serviced and sold the MATHENGE QX56 as a merchantable, certified vehicle under factory warranty in or about June 2006, just one month after NISSAN issued its TSB. Cross-Complainant MATHENGE is informed and believes that this Cross-Defendant also sold MATHENGE's defective Vehicle as a new vehicle in or about 2004.

11.   Cross-Defendant CONTINENTAL AUTOMOTIVE SYSTEMS, INC. is a U.S. corporation which Cross-Complainant is informed and believes was formerly known as Cross-Defendant known as CONTINENTAL TEVES. The CAS Cross-Defendants participated in the design, manufacture and supply of DSS components in Defective Vehicles, and in the testing and investigation which led to the issuance of the TSB and redesign of the DSS.

12.   The true capacities of ROES 1 through 50—whether individual, corporate, or otherwise, are presently unknown to Cross-Complainant who therefore sues such ROES by these fictitious names. MATHENGE will amend this Cross-Complaint to allege their true identity(ies) when ascertained. Each of the named Defendants, including ROES 1 through 50, are legally responsible in some manner for the COLLISION, and the injuries and severe emotional distress suffered by MATHENGE as a result. MATEHNGE is further informed and believes, and thereon alleges, that Cross-Defendants, and each of them, and ROES 1 through 50, are and were at all relevant times the principals, owners, agents, employees or lawful affiliates of each other Cross-Defendant and were acting within the course and scope of such relationship, and with consent and knowledge of the remaining Cross-Defendants.

### CROSS-DEFENDANTS' DEFECTIVE VEHICLES

13.   The NISSAN and CAS Cross-Defendants are the developer, designer, supplier, manufacturer, assembler, tester, inspector, marketer, advertiser, distributor, seller, warrantor, and servicer and repairer of all 2004-2008 Nissan Armada and Titan Trucks, and Infiniti QX56 vehicles ("Defective Vehicles"), and their DSS component. All Defective Vehicles, including MATHENGE's 2004 QX56, suffer from the same intrinsic DSS design defect. This dangerous defect causes the brakes on Defective Vehicles to fail to perform in the manner the reasonable

5

EXHIBIT 1

1　consumer expects--suddenly and without any advance warning. This DSS defect was the sole and

2　substantial factor in causing the COLLISION, and the unthinkable tragedy it has and continues to

3　wreak on those foreseeably and directly affected by the COLLISION.

## GENERAL ALLEGATIONS

5　　　**A.**　　**Delta Stroke Sensor Function and Failure**

6　　　14.　　Cross-Complainant MATHENGE alleges that the following accurately describes the

7　function of the DSS in Defective Vehicles, and the sudden, unexpected, dangerous and unsafe

8　braking failure it defective condition causes.

9　　　15.　　The DSS installed in all Defective Vehicles is an electronic component which

10　interfaces with and connects to the Electronic Control Unit ("ECU"). The DSS provides input and

11　information to the ECU which is vital to the proper and effective operation of the braking system on

12　all Defective Vehicles. The DSS is contained within the brake booster assembly unit of all

13　Defective Vehicles, and cannot be inspected or examined without costly removal and destruction of

14　the expensive brake booster assembly. The DSS was designed and supplied by the CAS Cross-

15　Defendants.

16　　　16.　　The DSS measures the application of manual driver pressure to the brake pedal.

17　Succinctly, the DSS determines whether the driver has pressed the brake pedal, and if so, how

18　much, and how fast. The DSS does this by interpreting the mechanical movement of the brake

19　pedal into an electrical signal within a range of pre-set values which values are then communicated

20　to the ECU.

21　　　17.　　The ECU is responsible for providing information to the Anti-Lock Braking System

22　("ABS") actuator/Vehicle Dynamic Control system ("VDC") and the Electronic Brake Distribution

23　("EBD") unit in all Defective Vehicles. The DSS is a safety device that is used in conjunction with

24　ABS actuator to determine how much vacuum pressure to apply to the power assist for each wheel's

25　brake in the event of brake lock-up—it is used to enable the anti-lock braking function. Power

26　assist is the term used to describe the mechanical advantage created by modern power braking

27　systems on automobiles, including Defective Vehicles. Defective Vehicles are designed to generate

28　power assist through a vacuum-boosted system, and the braking boost available to each of the

6

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

brakes is substantial, amounting to up to 250 times the pressure manually exerted by the driver against the pedal. Upon DSS failure, Defective Vehicles no longer have vacuum boost. The resulting failure mode instead relies upon something NISSAN calls its Optimized Hydraulic Braking ("OHB") system. Defective Vehicles operating in OHB mode have substantially reduced braking ability and substantially increased stopping distances. As such, DSS failure caused by the DSS defect, as NISSAN and the CAS Cross-Defendants has known for many years, materially and dangerously diminishes the braking power of Defective Vehicles—well below reasonable consumer expectations and needs.

18.     When DSS failure occurs, the electronic computer system in all Defective Vehicles registers a diagnostic error code C1179 which may be downloaded and read by technicians using certain proprietary diagnostic equipment the NISSAN Cross-Defendants developed and used, primarily through its retail automobile dealer service departments, to diagnose and repair all Defective Vehicles.

19.     After a Defective Vehicle which has suffered DSS failure is turned off and then then on again, the system resets itself and the power assist functions as it should until the defective DSS fails again, repeating the same sudden and unexpected loss of braking event.

20.     Within the last two months, Cross-Complainant has discovered and been made aware of a class action lawsuit involving the DSS defect. He then learned about many other drivers who have also suffered DSS failure in their Defective Vehicles. These drivers describe an essentially analogous experience of applying the brakes, pushing the pedal all the way to the floor and with little if any braking response which is far less than adequate to stop the Vehicle in a safe manner. This experience is typically associated with illumination of instrument panel lights including the brake and/or VDC light on the instrument panel. Most all of these drivers, who, unlike MATHENGE, did not suffer catastrophic consequences as a result of their first DSS failure, have gone on to suffer multiple failures before taking their Vehicles to NISSAN dealerships where they are given the run-around and misled about the problem by the dealerships, and even NISSAN and CAS corporate. Some have had paid for the ineffective reprogramming fix called for by the fraudulent TSB, only to have the Defect generally re-manifest.

7

EXHIBIT 1

B. **NISSAN's Longstanding Knowledge of the DSS Defect and its Danger**

21. On May 12, 2006, Cross-Defendant NNA issued a document entitled Technical Service Bulletin ("TSB") No. NTB06-040 to its dealerships and to mechanics. The TSB involves all 2004-2006 Nissan Titan and Armada vehicles fitted with Vehicle Dynamic Control ("VDC"). Likewise, on May 12, 2006, NISSAN issued a similar TSB No. NTB06-011 involving 2004-2006 QX56 vehicles. The TSB's are referred to herein collectively as "TSB." The TSB identifies an issue with Defective Vehicles, including Plaintiff MATHENGE's 2004 QX56, involving a braking issue which results in error code C1179 on computerized diagnostic interrogation. The TSB was developed in conjunction with the CAS Cross-Defendants.

22. Around the time the TSBs were issued Cross-Defendant NNA delivered copies of the TSB to the National Highway Transport Safety Administration ("NHTSA"). The TSB was delivered to NHTSA in order for NNA to comply with 49 C.F.R., 579.5. 49 C.F.R. 579.5 which requires that Defendant "furnish to NHTSA's Early Warning Division a copy of all notices, bulletins, and other communications [sent to various sources] . . . regarding any *defect* in its vehicles or items of equipment (including any failure or malfunction beyond normal deterioration in use, or any failure of performance, or any flaw or unintended deviation from design specifications, whether or not such *defect* is safety-related." (emphasis added). Thus, by no later than May 12, 2006, NISSAN had already concluded that the *defect* identified in the TSB (resulting in error code C1179 for DSS failure) constituted a defect in all Defective Vehicles including Plaintiff MATHENGE's 2004 QX56. However, in neglecting to advise the U.S. Government and NHTSA of the safety nature of the defect, NNA actively misled and defrauded the government, which relied on the TSB to describe a defect which was not a safety hazard.

23. Based upon counsel's investigation to date and their understanding of NNA's internal procedures, the issuance of a Technical Service Bulletin such as the TSB requires the completion of several internal steps at NNA, each of which takes significant time and effort. First, the defect must be reported to NISSAN's Total Customer Satisfaction Department from either of the following sources: 1) NNA's own testing; or 2) customer complaints. NNA in turn spends significant time and effort analyzing the testing data and/or customer complaint database. Once

8

EXHIBIT 1

1 NNA concludes that a complaint may involve a defect that is worthy of further attention, it conducts
2 further investigation and testing to analyze and troubleshoot the problem. Then, after the defect is
3 isolated and analyzed, NNA purports to develop a fix. NNA, with the CAS Cross-Defendants,
4 developed and implemented the lengthy 22 page TSB which describes a means of reprogramming
5 the VDC Control Unit through use of an 8 MB (Orange) Reprogramming Card to address the Delta
6 Stroke Sensor/C1179 defect in Defective Vehicles. The internal NISSAN investigation which
7 preceded issuance of the May 12, 2006 TSB would have taken months or even years to complete,
8 and directly the involved the CAS Cross-Defendants.

9      24.    The DSS failure investigation began, according to Cross-Defendant NNA, at the start
10 of production in 2003. As such, NISSAN and the CAS Cross-Defendants had actual knowledge of
11 the Delta Stroke Sensor/C1179 error code *defect* at the "start of production" in the Spring of 2003.

12      25.    To analyze the defect, Cross-Defendant NNA's internal procedures require it to
13 perform its own testing to replicate the defect. Additionally, Nissan Total Customer Satisfaction
14 was required to review and analyze customer complaints of Delta Stroke Sensor failure/error code
15 C1179. Cross-Complainant's counsel has been contacted by approximately 100 owners of
16 Defective Vehicles, each of whom describe an essentially analogous experience of applying the
17 brakes and pushing the pedal all the way to the floor, but experience little braking response, and far
18 less than adequate to stop the vehicle in a safe manner. These descriptions of Defective Vehicle
19 owners' experiences involving the Delta Stroke Sensor failure/C1179 defect are consistent with the
20 descriptions of many individuals who have reported the DSS issue to NISSAN or who filed
21 complaints with NHTSA since 2004 regarding braking failure in Defective Vehicles. NNA's own
22 testing created the same failure effect which is a clear safety issue and not "vibration in the brake
23 pedal while braking" as Cross-Defendant NNA purports to describe the problem in the TSB.
24 NISSAN and CAS were well aware of the significant safety hazard posed by the Delta Stroke
25 Sensor/C1179 defect identified in the TSB by 2003.

26      **C.    NISSAN'S Ongoing Concealment of the DSS Defect**

27      26.    The NISSAN and CAS Cross-Defendants knew well before 2006 that the DSS
28 Defect caused a significant loss of braking power, thus posing a significant safety hazard to

9

EXHIBIT 1

1  operators of all Defective Vehicles, and for those who might unluckily cross their paths. The Cross-
2  Defendants knew full well that the defect would present itself without warning and suddenly in
3  whatever dynamic driving situation a Defective Vehicle operator (and those around him or her)
4  might then be facing, such as a busy intersection. Yet, rather than acknowledge the safety hazard
5  posed by the defect ultimately described in the TSB, NISSAN and CAS falsely concealed the safety
6  hazard posed by the defect, deceptively describing the manifestation of the defect in the TSB as
7  follows: "The brake warning light is or was ON. and/or The ABS warning light is or was ON.
8  and/or There is or was vibration in the brake pedal while braking." NISSAN intentionally and
9  deceptively concealed the true safety hazard posed by the Delta Stroke Sensor/error code C1179
10 defect in the TSB and elsewhere because they were aware that disclosure of the defect as a safety
11 hazard would have likely forced NISSAN to incur significant losses to cover the replacement/recall
12 of Brake Boosters to render Defective Vehicles, like MATHENGE's 2004 QX56, safe to drive, and
13 face multiple product defect suits. NISSAN and CAS intentionally mis-described the true hazard in
14 order to conceal it from public disclosure and knowledge, an unscrupulous plan which NISSAN has
15 continued to execute until the present. NISSAN and CAS have also hindered and obstructed public
16 disclosure of documents which would have confirmed the true safety hazard DSS failure poses and
17 their long-standing internal knowledge, and have continuously rejected and denied that the DSS
18 issue is a defect or that it poses any safety issue in very recent filings in other litigation.

19    27.    The TSB identified a supposed "reprogramming" fix which it had developed to
20 allegedly remediate the DSS Defect. This "fix" was no fix at all, and the NISSAN and CAS Cross-
21 Defendants were well aware of this no later than late 2006. Due to repeated, post-reprogramming
22 DSS failures in the majority of reprogrammed Defective Vehicles, NISSAN had internally
23 abandoned the reprogramming fix as a legitimate or adequate remedial measure for DSS failure by
24 no later than late 2007, if NISSAN ever believed or had reason to believe it was a reasonable fix at
25 all. In early 2008, a redesigned DSS which corrected the defect intrinsic to the prior DSS went into
26 production as part of a new brake booster assembly part. Despite the availability of this safe and
27 effective part, which incorporated a new, non-defective DSS, NISSAN and CAS did not notify the
28 owners of Defective Vehicles of its availability or of the need to replace their existing brake booster

10

EXHIBIT 1

1  assembly to make their Vehicles safe to drive on public highways and roads. NISSAN failed to
2  advise those who had had their Defective Vehicles reprogrammed using NISSAN's and CAS'
3  fraudulent and defective "fix" that reprogramming was not an effective or reasonable solution to
4  mitigate the DSS safety hazard, or that there was a reasonable and safe fix in the form or
5  replacement with a newly designed Brake Booster Part which NISSAN itself began selling and
6  installing in production vehicles in early 2008. NISSAN continued to allow and promote use the
7  cheap but ineffective reprogramming fix discussed in the TSB for those Defective Vehicle owners
8  who complained about the Defect when it manifested in their Vehicles, and failed and refused to
9  explain and rectify the reasonable confusion caused by its continued reliance on the TSB and its
10  reprogramming "fix." NISSAN and CAS allowed so, because the cost of brake booster assembly
11  replacement is approximately $1,000.00, recklessly choosing money and profits in conscious
12  disregard of the safety of: (1) people driving and riding in Defective Vehicles like Plaintiff
13  MATHENGE; and, (2) even more tragically, complete innocents who had the misfortune to be in
14  the path of a Defective Vehicle during DSS failure, like six (6) year old Hilda Cruz and four (4)
15  year old Stephanie Cruz, who fell fatal victim to NISSAN's and CAS' corporate greed on August
16  29, 2012.

17    28.   Despite these facts, the NISSAN Cross-Defendants' TSB remains an active technical
18  service bulletin, and neither NISSAN nor CAS have done nothing to withdraw, correct, modify, or
19  clarify their concealed fraud, or to otherwise admit to the true nature of the safety hazard posed by
20  the defect.

21    29.   The NISSAN and CAS Cross-Defendants' fraud and concealment of the Delta
22  Stroke Sensor/Error Code C1179 defect and its manifest safety implications are evidenced by the
23  foregoing inaction and conduct in light of its undisputed knowledge of the safety defect. Through
24  customer complaints and/or its own testing of the Delta Stroke Sensor/error code C1179 defect,
25  NISSAN and CAS knew full well they were dealing with a defect which causes the substantial loss
26  of braking power—an obvious safety hazard. Yet, rather than acknowledge the safety hazard posed
27  by the defect ultimately described in the TSB, NISSAN and CAS falsely concealed the safety
28  hazard posed by the defect in the TSB and elsewhere. Since May of 2006, NISSAN and CAS have

11

EXHIBIT 1

1  continued to conceal the true safety hazard posed by the Delta Stroke Sensor/error code C1179

2  defect despite a mounting body of evidence, primarily in the form of increasing complaints by

3  Owners of Defective Vehicles to NHTSA and to NISSAN directly, of sudden and frightening losses

4  of substantially all braking power. Given the safety hazard posed by said defect, and its positive

5  obligation to correct its prior misrepresentation to NHTSA and others in the TSB that the defect did

6  not constitute a safety issue, NISSAN and CAS remain obligated to correct the prior

7  misrepresentation in the TSB and to disclose the true facts regarding the Delta Stroke Sensor/error

8  code C1179 defect to Owners of Defective Vehicles.

## FIRST CLAIM FOR RELIEF

### (Strict Product Defect)

11  30.  Cross-Complainant MATHENGE hereby incorporates by reference paragraphs 1-29

12  as though fully set forth herein.

13  31.  On or about August 29, 2012, MATHENGE suffered severe physical and emotional

14  injuries when, due to the wrongful conduct of the NISSAN and CAS Cross-Defendants, he was

15  involved in the COLLISION.

16  32.  The NISSAN and CAS Cross-Defendants designed, engineered, manufactured

17  tested, assembled marketed, advertised, distributed, sold, warranted, serviced and repaired, the

18  Defective Vehicle involved in the Collision, and the DSS.

19  33.  The NISSAN and CAS Cross-Defendants are strictly liable to MATHENGE for his

20  injuries and harm because his 2004 QX56 was defective and unreasonably dangerous for normal

21  use due to its defective DSS design, below reasonable consumer expectations, and because of

22  NISSAN'S and CAS' failure to warn or provide any let alone adequate and timely warning of the

23  substantial hazard Defective Vehicles posed when operated in a reasonably expected and

24  foreseeable manner.

25  34.  The NISSAN and CAS Cross-Defendants designed, engineered, manufactured

26  tested, assembled marketed, advertised, distributed, sold, warranted, serviced and repaired

27  Defective Vehicles, and placed and allowed them to remain in the stream of commerce in a

28  condition unreasonably dangerous to consumers, knowing the product would reach the ultimate

12

EXHIBIT 1

1  consumer without substantial change in the defective condition it was from the date when it left

2  each NISSAN and CAS Cross-Defendants' control and care, and responsibility.

3      35.  The NISSAN and CAS Cross-Defendants knew or should have known that the

4  ultimate users or consumers of this product would not, and could not, inspect their Defective

5  Vehicles so as to discover the latent defect of the DSS.  MATHENGE's 2004 QX56, like all

6  Defective Vehicles, was defective when it left Cross-Defendants' care, custody and control.

7      36.  The NISSAN and CAS Cross-Defendants knew or should have known of the

8  substantial dangers involved in the reasonably foreseeable use of Defective Vehicles whose

9  dangerous design, manufacturing and lack of warnings caused it to have and to maintain

10  unreasonably dangerous propensity to suffer sudden and unexpected loss of braking power without

11  warning during normal and expected operation.

12      37.  MATHENGE's Defective Vehicle was, at the time of MATHENGE and others'

13  injuries, being used in the manner intended by the NISSAN and CAS Cross-Defendants, and in a

14  manner that was reasonably foreseeable by NISSAN and CAS as involving a substantial danger not

15  readily apparent if adequate warning of the danger had been given at any time.

16      38.  MATHENGE was a foreseeable user of his Defective Vehicle.

17      39.  MATHENGE's damages and injuries were the legal and proximate result of the

18  NISSAN and CAS Cross-Defendants' failure to design and manufacture, and to provide adequate

19  warnings and disclosure of the hidden defect from which Defective Vehicles suffered.

20  MAHTNEGE has suffered special and general damages in excess of the jurisdiction of this Court as

21  a result.

22      40.  Based upon the NISSAN and CAS Cross-Defendants' fraud and reckless conduct,

23  engaged in in conscious disregard of MATHENGE, and others' rights as more particularly

24  described in Paragraphs 7-8, 13-29, above, MATHENGE is entitled to an award of punitive

25  damages against Cross-Defendants.

26  **SECOND CLAIM FOR RELIEF**

27  (Negligence)

28      41.  Cross-Complainant MATHENGE hereby incorporates by reference paragraphs 1-40

13

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

1 | as though fully set forth herein.

2 | 42. The NISSAN and CAS Cross-Defendants owed a duty to MATHENGE to use

3 | reasonable care in the design, engineering, manufacturing, testing, assembly, marketing,

4 | advertising, inspection, distribution, sale, warranting, servicing, warning about, and ongoing

5 | maintenance and remediation of safety-related defects in Defective Vehicles and their DSS

6 | component.

7 | 43. MATHENGE was a foreseeable user of his Defective Vehicle.

8 | 44. The NISSAN and CAS Cross-Defendants breached their duty, *inter alia*, in one or

9 | more of the following ways:

- Designing, supplying, manufacturing, and otherwise placing in the stream of commerce, Defective Vehicles which suffered from an intrinsic DSS defect;

- Failing to adequately identify and mitigate the hazard in the testing, inspection, and assembly of Defective Vehicles prior to the MATHENGE Vehicle having been placed in or returned to service;

- Failing to make timely and adequate correction and/or remediation during the warranty period and thereafter (given the obvious safety-related nature of the defect);

- Failing to warn of and disclose the Defect in a reasonable manner at any time; and

- Otherwise being careless and negligent.

21 | 45. The NISSAN and CAS Cross-Defendants knew or should have known at all relevant

22 | times that all Defective Vehicles, including MATHENGE's 2004 QX56 suffered from a dangerous

23 | safety-related braking defect in the DSS.

24 | 46. Safer and readily available alternative designs and manufacturing processes existed

25 | were available which could have and would have avoided the COLLISION, and MATHENGE's

26 | injuries and damages. The NISSAN and CAS Cross-Defendants failed unreasonably to employ or

27 | utilize these alternatives, or to warn.

28 | 47. The NISSAN and CAS Cross-Defendants designed, engineered, manufactured,

14

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

1   tested, assembled, marketed, advertised, inspected, maintained, distributed, sold, warranted,

2   serviced, and maintained and otherwise placed Defective Vehicles in the stream of commerce in an

3   unreasonable manner and in a condition unreasonably dangerous to the consumer, including

4   MATHENGE.

5       48.    MATHENGE's damages and injuries were the legal and proximate result of the

6   NISSAN and CAS Cross-Defendants' failure to design and manufacture, and to provide adequate

7   warnings and disclosure of the defect from which Defective Vehicles suffered, and in failing to

8   provide any or adequate warning at any time of the hazard they knew about to the exclusion of all

9   others. MATHENGE has suffered special and general damages in excess of the jurisdiction of this

10   Court as a result.

11       49.    The NISSSAN and CAS Cross-Defendants' negligence was of a gross and egregious

12   nature, and well beyond the boundaries of conduct described as simply "below the standard of

13   care." Based upon NISSAN's and CAS' recklessness, engaged in in conscious disregard of

14   MATHENGE, and others' rights as more particularly described in Paragraphs 7-8, 13-29, above,

15   MATHENGE is entitled to an award of punitive damages.

16                         **THIRD CLAIM FOR RELIEF**

17                 (Intention Infliction of Emotional Distress)

18       50.    Cross-Complainant MATHENGE hereby incorporates by reference paragraphs 1-49,

19   as though fully set forth herein.

20       51.    The NISSAN and CAS Cross-Defendants have engaged in outrageous conduct

21   against MATHENGE. As described above, their conduct in designing, manufacturing, distributing,

22   providing warnings, warranting, servicing and maintaining MATHENGE's Defective Vehicle, and

23   fraudulently concealing and hiding it dangerous DSS Defect from MATHENGE and all owners and

24   operators of Defective Vehicles, despite the availability of a reasonable and certain fix for the DSS

25   Defect, until it reasonably and foreseeably caused the COLLISION, and the COLLISION

26   AFTERMATH, was so extreme as to go beyond all possible bounds of decency, and to be

27   reasonably regarded as intolerable in a civilized community.

28       52    The NISSAN and CAS Cross-Defendants, by their conduct and actions, and

15

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

1  knowledge, intended to cause MATHENGE, as an operator of one of their unsafe Defective
2  Vehicles, emotional distress, and were substantially certain their conduct and actions would cause
3  MATHENGE severe emotional distress.

4      53.    The NISSAN and CAS Cross-Defendants' conduct was in reckless disregard of
5  MATHENGE's rights in that they knew that emotional distress would probably result from its
6  outrageous conduct, and NISSAN gave little or no thought to the consequences of such conduct.

7      54.    MATHENGE has suffered severe emotional distress as the result of the COLLISION
8  AFTERMATH.

9      55.    The NISSAN and CAS Cross-Defendants' conduct was a substantial factor in
10  causing MATHENGE's severe emotional distress.

11      56.    Based upon Cross-Defendants' fraud and reckless conduct, engaged in in conscious
12  disregard of MATHENGE, and others' rights as more particularly described in Paragraphs 7-8, 13-
13  29, above, MATHENGE is entitled to an award of punitive damages.

14      **FOURTH CLAIM FOR RELIEF**
15      **(Negligent Infliction of Emotional Distress)**

16      57.    Cross-Complainant MATHENGE hereby incorporates by reference paragraphs 1-56,
17  as though fully set forth herein.

18      58.    The NISSAN and CAS Cross-Defendants' conduct in designing, manufacturing,
19  distributing, selling, warning, warranting, servicing and repairing MATHENGE's Defective
20  Vehicle, and fraudulently concealing and hiding it dangerous DSS Defect from MATHENGE and
21  all owners and operators of Defective Vehicles, despite the availability of a reasonable and certain
22  fix for that DSS defect, until it reasonably and foreseeably caused the COLLISION, and the
23  COLLISION AFTERMATH, was grossly negligent and wrongful.

24      59.    As a result of the pre-existing known and foreseeable relationship between the
25  NISSAN and CAS Cross-Defendants on the one hand, and owners and operators of Defective
26  Vehicles including MATHENGE on the other, NISSAN and CAS had a duty to take reasonable
27  steps to protect and to disclose to MATHENGE the safety-related defect in his 2004 QX56 before
28  he injured or killed himself or others. NISSAN and CAS breached this duty when, since before and

16

EXHIBIT 1

1    at least 2006, they engaged in the despicable, fraudulent and unreasonable concealment of the
2    dangerous DSS Defect.

3        60.     MATHENGE has suffered severe emotional distress as the result of the COLLISION
4    AFTERMATH.

5        61.     NISSAN's and CAS' conduct was a substantial factor in causing MATHENGE's
6    severe emotional distress.

7        62.     The NISSSAN and CAS Cross-Defendants' negligence was of a gross and egregious
8    nature, well beyond the boundaries of conduct described as simply "below the standard of care."
9    Based upon NISSAN's and CAS' recklessness, engaged in in conscious disregard of MATHENGE
10    and others' rights as more particularly described in Paragraphs 7-8, 13-29, above, MATHENGE is
11    entitled to an award of punitive damages.

12                            **FIFTH CLAIM FOR RELIEF**
13                              (Implied Equitable Indemnity)

14        63.     Cross-Complainant SOLOMON MATHENGE Incorporates by reference paragraphs
15    1-62, as though fully set forth herein.

16        64.     Plaintiff Hilario Cruz, individually and under Cal. Civ. Proc. Code section 377.34 for
17    decedent minors Hilda, Stephanie, and Araceli Cruz (in a related matter) have filed complaints for
18    personal injury and property damage, wrongful death and survival.

19        65.     Plaintiff MATHENGE incorporates the allegations of the operative Cruz Complaints
20    herein solely as evidence of its allegations and claims against MATHENGE, but not for the
21    purposes of admitting any factual allegation of those Complaints.

22        66.     As set forth above, the COLLISION was caused solely, directly by and through the
23    active negligence and wrongdoing of the NISSAN and CAS Cross-Defendants, which was the sole
24    and substantial factor in the COLLISION that took the lives of Hilda and Stephanie Cruz, and their
25    mother.

26        67.     Any and all damages sustained or recovered by the Plaintiffs are the direct result of
27    NISSAN's and CAS' negligence and other wrongful conduct.

28        68.     In the event that MATHENGE is held liable in the principal Cruz action and related

17

EXHIBIT 1

1  action, such liability arises only by reason of the active and primary negligence of NISSAN and
2  CAS, and through no fault of MATHENGE, whose fault, if any, is secondary and passive only.

3      69.    For the foregoing reasons, MATHENGE is entitled to equitable indemnification and
4  equitable contribution from the NISSAN and CAS Cross-Defendants.

5      70.    MATHENGE has and will continue to incur expenses of attorneys' fees, court costs,
6  and other litigation expenses to defend against the principal Cruz complaint, and that by reason of
7  the foregoing, MATHENGE is entitled to recover such fees, expenses and costs incurred in this
8  action against NISSAN and CAS. The amount of said fees, expenses and costs is unknown at this
9  time, and leave of court will be sought to amend this Cross-Complaint to reflect the actual amounts
10 when the same have been ascertained.

11 **RELIEF REQUESTED**

12     WHEREFORE, Cross-Complainant SOLOMON MATHENGE prays judgment against the
13 NISSAN and CAS Cross-Defendants, and each of them, as follows:

14 **ON HIS FIRST AND SECOND CLAIMS FOR RELIEF:**

15     1.    Special, compensatory damages
16     2.    General damages;
17     3.    Punitive damages;
18     4.    Costs of suit;
19     5.    Interest; and
20     6.    Such other and further relief as the court deems proper.

21 **ON HIS THIRD and FOURTH CLAIMS FOR RELIEF:**

22     1.    Emotional distress damages;
23     2.    Punitive damages;
24     3.    Costs of suit;
25     4.    Interest; and
26     5.    Such other and further relief as the court deems proper.

27 **ON HIS FIFTH CLAIM FOR RELIEF:**

28     1.    Injunctive relief including a declaration that the NISSAN and CAS Cross-

18

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

1   Defendants are obligated to indemnify MATHENGE for any and all losses incurred against him

2   including fees and expenses, and for any award made against him on the principal and related

3   complaints;

4          2.      Restitution and payment of money in an amount to be determined by the Court;

5          3.      Attorneys' fees, and costs and expenses of suit;

6          4.      Interest; and

7          5.      Such other and further relief as the court deems proper.

8   Dated: September 20, 2015                Respectfully submitted,

9                                            CARTER WOLDEN CURTIS, LLP

10

11

12                                           By: _____

13                                               KIRK J. WOLDEN
                                                 Attorney for Cross-Complainant

14

15                          DEMAND FOR JURY TRIAL

16          Cross-Complainant SOLOMON MATEHNGE hereby demands trial by jury on all claims to

17  which he is a party.

18                                           CARTER WOLDEN CURTIS, LLP

19

20                                           By: _____

21                                               KIRK J. WOLDEN
                                                 Attorney for Cross-Complainant

22

23

24

25

26

27

28

                                     19

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

1
2

**PROOF OF SERVICE – CCP § 1013, 1013a, 2015.5**
**and California Rules of Court, Rule 2.306**

3
*Cruz v. Mathenge, et al.*
Los Angeles County Superior Case No. BC493949, Related Case BC529912

4

I, DeeAnne Bagley, declare that:

5
6

I am a citizen of the United States and am over the age of eighteen years and not a party to the within above-entitled action. I am an employee of Carter Wolden Curtis, LLP and my business address is 1111 Exposition Boulevard, Suite 602, Sacramento, CA 95815.

7

On September 22, 2015, I served the within document:

8
9

**CROSS-COMPLAINT BY SOLOMON MATHENGE FOR DAMAGES INCLUDING PUNITIVE DAMAGES, AND FOR EQUITABLE INDEMNITY; DEMAND FOR JURY TRIAL**

10
On the parties in said action addressed as follows:

11

**SEE ATTACHED SERVICE LIST**

12
13
14
15

☐ **BY FACSIMILE MACHINE (FAX):** On _____, 2015, at _____ a.m./p.m. by use of facsimile machine telephone number (916) 567-1112, I served a true copy of the aforementioned document(s) on the parties in said action by transmitting by facsimile machine to the numbers as set forth above. The facsimile machine I used complied with California Rules of Court, Rule 2.301 and no error was reported by the machine. Pursuant to California Rules of Court, Rule 2.306, I caused the machine to print a transmission record of the transmission, a copy of which is attached to this Declaration.

16
17
18
19

☐ **BY MAIL:** I am familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service and that each day's mail is deposited with the United States Postal Service that same day in the ordinary course of business. On the date set forth above, I served the aforementioned document(s) on the parties in said action by placing a true and correct copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, for collection and mailing on this date, following ordinary business practices, at Sacramento, CA, addressed as set forth above.

20
21

☐ **BY PERSONAL SERVICE:** By personally delivering a true copy thereof to the office of the addressee above.

22
23

☒ **BY TRANSMITTING VIA EMAIL OR ELECTRONIC TRANSMISSION:** The document(s) listed above to the addressees listed on the attached service list at the email addresses listed thereon.

24
25

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on September 22, 2015 at Sacramento, CA.

26
27

DeeAnne Bagley

28

20

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

1

**SERVICE LIST**

2  Claudia C. Bohorquez
3  Museum Square Building
   5757 Wilshire Boulevard, PH-3
4  Los Angeles, CA 90036
   Telephone:    (323) 964-8125
5  Facsimile:    (323) 964-5270
   Email: ccblawyer@gmail.com
6

7  Vicki I. Sarmiento
   333 North Garfield Avenue
8  Alhambra, CA 91801
   Telephone:    (626) 308-1171
9  Facsimile:    (626) 308-1101
10 Email: vsarmiento@vis-law.com

11 John Paul Fuchs
12 Law Offices of John Paul Fuchs
   2999 Overland Avenue
13 Los Angeles, CA 90064
   Email: johnpaulfuchs@sbcglobal.net
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

Cross-Complaint by Solomon Mathenge

EXHIBIT 1

Exhibit D

EXHIBIT 1



**NNA Headquarters**
**Legal Department (A-5-F)**
One Nissan Way
Franklin, TN 37067
Direct Dial: 615-725-5318

May 7, 2015

Kevin Collins
Deputy General Counsel - Commercial Legal Affairs
Continental Corporate Law Dept.
1830 MacMillan Park Dr.
Fort Mill, SC 29701

RE: ***Bernardino v. NNA and CAS***
***Delta Stroke Sensor – Tender***

Dear Kevin:

I am writing to you regarding a matter of mutual interest to our respective companies.

As you may be aware, Nissan North America, Inc. ("NNA") and Continental Teves, Inc. ("Teves") are parties to a Master Purchase Agreement ("MPA"). Under the MPA, Teves supplied to NNA certain braking systems ("Systems"). The Systems were incorporated into Nissan vehicles that ultimately were sold to consumers.

NNA recently was sued in a lawsuit captioned *Juana De La Cruz Bernardino v. Nissan North America, Inc., et al.,* Case No. BC577815, Superior Court of the State of California, County of Los Angeles - Central (the "Litigation"). (A copy of the complaint is attached.) As you will see, plaintiffs assert claims based on alleged defects in certain components that were used in the Systems (namely, the "Delta Stroke Sensors").

I am writing pursuant to Articles 11 (Recall and Reimbursement) and 12 (Indemnification) of the MPA, to provide formal notice of the Litigation.

Because the claims asserted by plaintiffs relate specifically to the Delta Stroke Sensors that were incorporated into the Systems supplied by Teves, we should discuss the continued defense of this matter and cost. I would like to schedule a telephone call to discuss this matter with you or another appropriate person at Teves as soon as convenient. Please advise regarding your availability.

Thank you.

Sincerely,

EXHIBIT 1

*Nissan North America, Inc.*
*Legal Department*

*/S/*

Ruth Anderson Gates
Senior Counsel

Attachments

# EXHIBIT 1

Exhibit E

EXHIBIT 1



**Ⓒntinental**

*VIA E-MAIL: RUTH.GATES@NISSAN-USA.COM*

June 22, 2015

Ruth Anderson Gates
Senior Counsel
Nissan North America, Inc.

Re:    **Bernardino v. Nissan North America, Inc./Continental Automotive
       Systems, Inc.
       Delta Stroke Sensor Tender**

Dear Ms. Gates:

Please accept this letter as Continental Automotive System, Inc.'s ("CAS") response to
Nissan North America's ("NNA") May 7, 2015 letter regarding the above captioned
matter.

While we recognize that the Master Purchase Agreement may call for CAS to hold NNA
harmless in certain circumstances where, among other things, there are allegations of a
defect in design, workmanship, and/or performance of a part supplied by CAS, the
information provided in the *Bernardino* case to date, does not support acceptance of
NNA's tender of defense at this time. As an initial matter, we first need to reach a point
of understanding what happened in this accident through discovery and inspection of the
accident vehicle to determine whether there were any issues with the Delta Stroke Sensor
("DSS") and/or the Optimized Hydraulic Braking system that caused or contributed to the
accident. What we have learned to date is that:

- The service records from NNA indicate that there was no history of faults with the
  DSS in the subject vehicle or any indication that it had ever had the C1179 fault
  code associated with the DSS;
- The subject vehicle had a salvaged title at the time of the accident which had only
  been issued a short time before the accident;
- The vehicle had been purchased only six days before the subject accident;
- The driver, Solomon Mathenge had a suspended driver's license at the time of the
  accident;
- The accident occurred as a result Mr. Mathenge driving out of control at a high
  rate of speed on the wrong side of the road before entering an intersection against
  a red light and striking another vehicle; and

EXHIBIT 1

- Both eye witness statements in the accident report indicate that the vehicle was *accelerating* as it entered the intersection which is inconsistent with any DSS or OHB issue and inconsistent with the defect allegations in *Banks* and *Bernardino* actions.

Based on the information received to date, there is nothing to indicate that the failure or malfunctioning of a component supplied by CAS caused or contributed to the accident and therefore, CAS must respectfully deny NNA's tender at this time.

CAS agrees to reevaluate the tender after discovery and investigation into the subject vehicle have taken place. In that regard, the parties are in the process of discussing a download protocol for an inspection of the accident vehicle to determine if any diagnostic codes associated with the DSS are present.

Should you wish to discuss this matter further, please do not hesitate to contact me.

Respectfully,

Kevin P. Collins
Deputy General Counsel
Commercial Legal Affairs
Continental Corporate Legal Department
1830 MacMillan Park Drive
Fort Mill, SC 29707

EXHIBIT 1

| STATE OF TENNESSEE<br>16th JUDICIAL DISTRICT<br>CIRCUIT COURT | **SUMMONS** | CASE FILE NUMBER<br>75651 |
|---|---|---|

| PLAINTIFF<br><br>NISSAN NORTH AMERICA, INC. | DEFENDANT<br><br>vs. CONTINENTAL AUTOMOTIVE SYSTEMS, INC. |
|---|---|

TO: (NAME & ADDRESS OF DEFENDANT)
CONTINENTAL AUTOMOTIVE SYSTEMS, INC.
SERVE: Registered Agent
CT Corporation System
300 Montvue Rd.
Knoxville, Tennessee 37919-5546

**FILED**

APR 22 2019

List each defendant on a separate summons.

**YOU ARE HEREBY SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, RUTHERFORD COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU ARE DIRECTED TO FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGEMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff:<br>(Name, address & telephone number)<br>George Nolan<br>Leader, Bulso & Nolan, PLC<br>414 Union Street, Suite 1740<br>Nashville, Tennessee 37219<br>615-780-4114 | DATE ISSUED & ATTESTED<br>April 5, 2019<br><br>MELISSA HARRELL, Circuit Court Clerk<br><br>By: _____ Deputy Clerk |
|---|---|

**CERTIFICATION**

I, MELISSA HARRELL, Clerk of the Circuit Court of Rutherford County, Tennessee, do certify this to be true and correct copy of the original summons issued in this cause.

BY: _____ DEPUTY CLERK

| TO THE SHERIFF:<br><br>Please execute this summons and make your return within thirty days of issuance as provided by law. | DATE RECEIVED<br><br>Sheriff |
|---|---|

**RETURN ON PERSONAL SERVICE OF SUMMONS**

I hereby certify and return that I served this summons together with the complaint as follows:

| DATE OF PERSONAL SERVICE: | Sheriff<br><br>BY: |
|---|---|

Submit three copies: service copy, defendant's copy, file copy.

6 ADA COORDINATOR (615-494-4480)

EXHIBIT 1

## ACCEPTANCE OF SERVICE

I do hereby accept service of process and a copy of this complaint in this cause for all purposes.
This the _____ day of _____, 20 _____.

_____

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _12th_ day of _April_, 20 _19_, I sent, postage prepaid by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case # _75651_ to the defendant _Continental Automotive Systems Inc_ on the _19th_ day of _April_, 20 _19_. I received the return receipt, which has been signed by _Samantha Sutton_ on the _15th_ day of _April_, 20 _19_. The return receipt is attached to this original summons to be filed by the Clerk of Court.

Sworn to and subscribed before me this _19th_ day _____
of _April_ 20 _19_.

_Sandra Chadwell_

My Commission Expires: _Jan 6_ 20 _20_

SANDRA CHADWELL
STATE OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY
Commission Expires

Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process

_George Nolan_

## NOTICE OF PERSONAL PROPERTY EXEMPTION

**TO THE DEFENDANT(S):**

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption on execution or seizure to satisfy judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. This list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:    MELISSA HARRELL, Circuit Court Clerk
Room 106, Judicial Center
116 W. Lytle Street
Murfreesboro, TN 37130

Please state file number on list.

PS Form 3811, July 2015 PSN 7530-02-000-9053

2. Article Number (Transfer from service label)
7017  1150  0001  9499  3471

9590 9402 3318 7196 7857 16

Domestic Return Receipt

SENDER: COMPLETE THIS SECTION
■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
CT Corporation System
300 Montvue Road
Knoxville, TN 37919-5546

COMPLETE THIS SECTION ON DELIVERY
A. Signature
X _Samantha Sutton_   ☐ Agent   ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery
_Samantha Sutton_   APR 15 2019
D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

REC'D APR 19 2019

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

EXHIBIT 1

| STATE OF TENNESSEE<br>16th JUDICIAL DISTRICT<br>CIRCUIT COURT | **SUMMONS** | CASE FILE NUMBER<br>*15651* |
|---|---|---|

| PLAINTIFF | DEFENDANT |
|---|---|
| NISSAN NORTH AMERICA, INC. | vs. CONTINENTAL TIRE THE AMERICAS, LLC |

**TO: (NAME & ADDRESS OF DEFENDANT)**
CONTINENTAL TIRE THE AMERICAS, LLC
SERVE: Registered Agent
CT Corporation System
300 Montvue Rd.
Knoxville, Tennessee 37919-5546

FILED

APR 22 2019

_____ O'CLOCK _____M
MELISSA HARRELL
DEPUTY CLERK

List each defendant on a separate summons.

YOU ARE HEREBY SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, RUTHERFORD COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU ARE DIRECTED TO FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGEMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff:<br>(Name, address & telephone number)<br>George Nolan<br>Leader, Bulso & Nolan, PLC<br>414 Union Street, Suite 1740<br>Nashville, Tennessee 37219<br>615-780-4114 | DATE ISSUED & ATTESTED<br>*April 5, 2019*<br><br>MELISSA HARRELL, Circuit Court Clerk<br><br>By: _____ Deputy Clerk |
|---|---|

### CERTIFICATION

I, MELISSA HARRELL, Clerk of the Circuit Court of Rutherford County, Tennessee, do certify this to be true and correct copy of the original summons issued in this cause.

BY: _____ DEPUTY CLERK

| TO THE SHERIFF:<br><br>Please execute this summons and make your return within thirty days of issuance as provided by law. | DATE RECEIVED<br><br>Sheriff |
|---|---|

### RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that I served this summons together with the complaint as follows:

| DATE OF PERSONAL SERVICE: | |
|---|---|
| | Sheriff<br><br>BY: |

& ADA COORDINATOR (615-494-4480)

Submit three copies: service copy, defendant's copy, file copy.

EXHIBIT 1

## ACCEPTANCE OF SERVICE

I do hereby accept service of process and a copy of this complaint in this cause for all purposes.
This the _____ day of _____, 20 _____.

_____

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _12th_ day of _April_, 20 _19_, I sent, postage prepaid by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case # _75651_ to the defendant _Continental Tires the Americas LLC_ on the _17th_ day of _April_, 20 _19_. I received the return receipt, which has been signed by _Samantha Summons_ on the _15th_ day of _April_, 20 _19_. The return receipt is attached to this original summons to be filed by the Clerk of Court.

Sworn to and subscribed before me this _19th_ day of _April_ 20 _19_

_Sandra Chadwell_

My Commission Expires: _Jan 6_, 20 _20_

Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process

_George Nolan_

SANDRA CHADWELL
STATE OF TENNESSEE
NOTARY PUBLIC
DAVIDSON COUNTY
My Commission Expires JAN

### NOTICE OF PERSONAL PROPERTY EXEMPTION

**TO THE DEFENDANT(S):**

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. This list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:  MELISSA HARRELL, Circuit Court Clerk
Room 106, Judicial Center
116 W. Lytle Street
Murfreesboro, TN 37130

Please state file number on list.

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CT Corporation System
300 Montvue Road
Knoxville, TN 37919-5546

9590 9402 3318 7196 7857 23

2. Article Number (Transfer from service label)
7017 1450 0000 3282 0394

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  □ Agent  □ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  □ Yes
If YES, enter delivery address below:  □ No

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

REC'D APR 17 2019

Domestic Return Receipt