DATED OCTOBER 22, 2004

**BETWEEN**

**NISSAN NORTH AMERICA, INC.**

**AND**

CONTINENTAL TIRE NORTH AMERICA, INC.
CONTINENTAL TEVES, INC.
CONTITECH NORTH AMERICA, INC.

## <u>MASTER PURCHASE AGREEMENT</u>

**Revisions to MPA Articles as dated above:**
**Article 1.1, 2.1, 2.3, 3.1(2), 3.2, 4.1, 4.1.2, 4.2, 4.2.1, 4.2.2, 4.3, 4.4, 4.5, 5.1, 6.2, 6.4, 7.2, 7.2.1, 8.1, 8.1(2), 9.2, 9.2.1, 10, 11, 12.1, 12.2, 12.3, 14.1, 14.2, 15.2, 15.3, 15.4, 15.5, 16.1, 16.2, 16.3, 16.4, 16.5, 16.6, 16.7, 17.1, 17.1.1, 17.2, 18.1.1, 18.2.1, 18A.1, 19, 22.6(1), 25(5), 27.5A.1, 27.5A.4, 27A, 29.3, 29.4, 34, 39.1, 39.2, 39.3**

**CCP: Article 1.1, 4, 5, 6.1, 6.1, 6.5, 6.6, 8(c), 9**

**Exhibit A**

149629v5

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Article 1. | Definitions and Interpretation............................................................. | 1 |
| Article 2. | Agreement........................................................................................... | 6 |
| Article 3. | Specifications..................................................................................... | 6 |
| Article 4. | Vendor Release and Delivery............................................................. | 7 |
| Article 5. | Receipt and Inspection; Title & Risk of Loss.................................... | 8 |
| Article 6. | Packaging, Marking and Shipping..................................................... | 9 |
| Article 7. | Price, Invoicing and Payment...........................................................10 |
| Article 8. | Changes.............................................................................................11 |
| Article 9. | Warranties..........................................................................................12 |
| Article 10. | Quality Assurance.............................................................................12 |
| Article 11. | Recall and Reimbursement...............................................................13 |
| Article 12. | Indemnification.................................................................................. 13 |
| Article 13. | Right of Access to Supplier's Claims' Information............................ 14 |
| Article 14. | Handling of Drawings........................................................................ 14 |
| Article 15. | Intellectual Property Rights............................................................... 15 |
| Article 16. | Infringement....................................................................................... 16 |
| Article 17. | Nissan Property.................................................................................. 17 |
| Article 18. | Tooling................................................................................................18 |
| Article 18A. | Insurance........................................................................................... 19 |
| Article 18B. | Grounds for Insecurity; Adequate Assurance of Performance..................... 20 |
| Article 19. | Service Parts...................................................................................... 20 |
| Article 20. | Sales to Third Party........................................................................... 21 |
| Article 21. | Subcontracting................................................................................... 21 |
| Article 22. | Confidentiality.................................................................................... 22 |
| Article 23. | Advertising......................................................................................... 23 |
| Article 23A. | Audits................................................................................................. 23 |
| Article 24. | Facility Inspection............................................................................. 24 |
| Article 25. | Change of Circumstances.................................................................. 24 |
| Article 26. | Term.................................................................................................... 24 |
| Article 27. | Termination and other Remedies....................................................... 25 |
| Article 27A. | Product Liability Limitation............................................................... 29 |
| Article 28. | Waiver and Remedies......................................................................... 29 |
| Article 28A. | Notices............................................................................................... 30 |
| Article 29. | Entire Agreement............................................................................... 30 |
| Article 30. | Assignment......................................................................................... 30 |
| Article 31. | Independence..................................................................................... 31 |
| Article 32. | Severability......................................................................................... 31 |
| Article 33. | Force Majeure..................................................................................... 31 |
| Article 34. | Survival............................................................................................... 32 |
| Article 35. | Governing Law.................................................................................... 32 |
| Article 36. | Jurisdiction......................................................................................... 32 |
| Article 37. | Attorneys' Fees.................................................................................. 32 |
| Article 38. | Hazardous Substances...................................................................... 33 |
| Article 39. | Taxes.................................................................................................. 33 |
| Article 40. | Compliance with Laws....................................................................... 35 |
| Article 41. | Third Party Beneficiaries................................................................... 36 |
| Article 42. | Covenant of Further Assurances....................................................... 36 |
| Article 43. | Negotiated Term................................................................................. 36 |
| Article 44. | [Reserved]........................................................................................... 36 |
| Article 45. | Counterparts....................................................................................... 36 |

149629v5

| Article 46. | Safety Issues.................................................................................... | 36 |
| Article 47. | Records Management Program............................................................... | 37 |
| | | |
| Schedule 1. | Claim Compensation Procedure............................................................ | 39 |
| PART 1. | Definitions and Interpretation | |
| Article 1 | Definitions and Interpretation........................................................... | 39 |
| PART 2. | Warranty Claim | |
| Article 2. | Purpose............................................................................................ | 40 |
| Article 3. | Scope.............................................................................................. .. | 40 |
| Article 4. | Applicable Warranty Period................................................................. | 40 |
| Article 5. | Warranty Expenses............................................................................ | 41 |
| Article 6. | Liability Rate..................................................................................... | 42 |
| Article 7. | Compensation Calculation & Payment..................................…........... | 44 |
| PART 3. | Plant Claim | |
| Article 8. | Procedure for Plant Claim................................................................... | 44 |
| PART 4. | Tires | |
| Article 9. | Warranty Procedure for Tires.............................................................. | 45 |
| | | |
| Exhibit A | Supplier Competitors........................................................................ .. | 46 |

149629v5

This Master Purchase Agreement is made the 22 day of October, 2004 ("Effective Date").

BETWEEN:

(1)     Nissan North America, Inc., a corporation organized and existing under the laws of California and having its registered office at 18501 South Figueroa Street, Gardena, CA 90248 ("Nissan")*, and its address for notice purposes at Nissan North America, Inc. Attn. Purchasing (Bin 39D), 983 Nissan Drive, Smyrna, TN 37167*; and

(2)     CONTINENTAL TIRE NORTH AMERICA, INC.("CTNA"), a corporation organized and existing under the laws of the state of Ohio *and having its registered office at 1800 Continental Blvd. Charlotte, North Carolina*, CONTINENTAL TEVES, INC.("TEVES"), a corporation organized and existing under the laws of Delaware *and having its registered office at One Continental Drive, Auburn Hills, Michigan*, and CONTITECH NORTH AMERICA, INC., a corporation organized and existing under the laws of Delaware *and having its registered office at 136 Summit Avenue, Montvale, New Jersey* ("CONTITECH") (collectively, the "Supplier").

(collectively, the "Parties" and individually a "Party").

Background

(A)     Nissan and its Affiliates (defined below) are engaged in the design, manufacture, assembly and/or sale of motor vehicles and motor vehicle components.

(B)     TEVES, CTNA, and CONTITECH are engaged in the design, manufacture and/or sale of motor vehicle components and tires.

(C)     Nissan wishes to procure motor vehicle components from Supplier under the following terms and conditions.

Now, Therefore, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to the terms and conditions set forth in this Agreement.


## Article 1.  Definitions and Interpretation

1.1     In this Agreement, the following terms shall have the following meanings:

| | |
|---|---|
| "Acceptance Drawing" | a drawing in any medium, including an electronic version in a CAD format, made by Supplier based upon specification tenders provided by Nissan or any of its Affiliates and design-released by Nissan or any of its Affiliates; |

149629v5

(1)

| | |
|---|---|
| "Affiliate" | an entity that:<br>(i)    is controlled directly or indirectly by;<br>(ii)   controls directly or indirectly; or<br>(iii)  is under common control with Nissan or Supplier, as the case may be. "Control" for this purpose shall mean having a fifty percent (50%) or greater interest in the issued share capital of the other entity; |
| "Agreement" | this Master Purchase Agreement, including the Claim Compensation Procedure, as amended from time to time; |
| "Alliance Partner" | has the meaning set out in Article 14.1. |
| "Applicable Law" | (i) all laws, rules, regulations and executive or judicial orders applicable to the design and manufacture of the Parts or the operation of the facilities (including laws relating to employees and safety) and applicable in (i) any jurisdiction where the Parts are manufactured, (ii) any other jurisdiction specified in Nissan Drawings and accepted by Supplier, and (iii) any other jurisdiction expressly agreed between the Parties. |
| "Background Rights" | (i) any registered patent, registered utility model or registered design right acquired or owned before or after starting Development Work; or<br>(ii) any application to register a patent, utility model or design right filed before or after starting the Development Work. |
| "Change in Control" | the ceasing of Continental AG to have beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended) or control of greater than fifty-one percent (51%) (on a fully-diluted basis, disregarding any director qualifying share ownership) of the combined voting power of the then outstanding interests or stock of the Supplier entitled to vote generally in the election of directors. |
| "Claim Compensation Procedure" | the procedure by which Nissan is reimbursed for the warranty cost by Supplier, a copy of the |

(2)

| | current version of which is attached hereto as Schedule 1; |
|---|---|
| "Confidential Information" | has the meaning set out in Article 22.1; |
| "Date of Last Production" | as to any vehicle model Program for which Parts were supplied, the last date upon which Nissan produces such vehicle; |
| "Development Work" | all work necessary to develop the Parts so that the Parts meet all Specifications and are fit for their intended purpose. ***Development Work includes, without limitation, all initial technical discussions (for example, brainstorming sessions) between Supplier and Nissan, regardless of whether Nissan and Supplier have signed a definitive contract at the time of such discussions. Such discussions may include the exchange of Confidential Information, which shall be treated by the Parties in accordance with Article 22.*** |
| ***"Force Majeure"*** | ***has the meaning set forth in Article 33.*** |
| "Intellectual Property Rights" | any patent, utility model, design right, copyright (including any right in computer software), database right and topography right (whether or not any of these are registered and including applications for registrations of any such thing) and any trade secret, know-how or any right or form of protection of a similar nature or having equivalent or similar effect to any of those which may subsist anywhere in the world, and for the purpose of Articles 16 and 17 shall also include any trademark, service mark***, trade dress,*** trade or business name; |
| ***"Nissan Change"*** | ***a change made by Nissan (without the consent or agreement of Supplier) in the quantity, Price, Specifications, delivery date, shipping method, packaging method with respect to any Parts for which Nissan has issued a Purchase Order or a Release, including changes made pursuant to Articles 4.4 or 8.1.*** |

(3)

149629v5

| | |
|---|---|
| "Nissan Drawing" | a drawing in any medium, including an electronic version in a CAD format, specification tender, standard or other technical document of similar nature made by or belonging to Nissan or any of its Affiliates; |
| "Nissan Indemnified Party" | has the meaning set out in Article 12.1. |
| "Nissan Property" | means all Nissan Drawings, Nissan Trademarks, other Intellectual Property Rights owned by Nissan, Nissan Background Rights, Nissan Intellectual Property Rights, and Confidential Information of Nissan disclosed to Supplier by Nissan has the meaning set out in Article 17.2; |
| "Nissan Other Property" | has the meaning set out in Article 17.2. |
| "Nissan Trademarks" | has the meaning set out in Article 6.6. |
| "Non-conforming Parts" | means Parts that do not conform to the warranty provisions set forth in Article 9. |
| "Parts" | all goods more particularly described in any Purchase Order including, production parts and service parts, *including trial parts and sample parts (only if included in vehicles deemed to be salable to consumers),* accessories, raw materials, and Vendor Tooling *together with any related services required by Nissan and provided by Supplier.* |
| "Price" | the price of the Parts identified in the applicable Purchase Order; |
| *"Program"* | *a vehicle type, model year or model years using the same or substantially the same Parts as identified by Nissan as a "Program" in the Sourcing Documents. The intent of the Parties is to cover the five to seven year life of the model.* |
| "Purchase Order" | any purchase order or amendment to a purchase order submitted by Nissan *and accepted by Supplier* on or after the Effective Date. *For purposes of this definition, Supplier will be deemed to have accepted the purchase order if (i) it fails to object to it in writing* |

(4)

|  | *within ten (10) business days after receipt, or (ii) Supplier acknowledges in writing its acceptance of the Purchase Order or amendment thereto;* |
|---|---|
| "Release" | Nissan's authorization for shipment of the Parts, which may be electronic or in writing; |
| "Service Parts"` | has the meaning set out in Article 19; |
| "Sourcing Documents" | has the meaning set out in Article 29.4. |
| "Specification" | any specification tender (including quality and reliability standards), drawings in any medium (including electronic versions in a CAD format), data descriptions, samples or other information relating to the Parts; |
| "Subcontractors" | has the meaning set out in Article 21; |
| "Supplier Competitor" | means any automotive parts, tires, electronics or components suppliers set forth on Exhibit A. Supplier shall be solely responsible for updating Exhibit A in writing from time to time; |
| ***"Supplier Property"*** | ***means all Background Rights of Supplier, all Supplier Technical Information, all Tooling (other than Vendor Tooling), all Intellectual Property Rights owned by Supplier and all Confidential Information of Supplier disclosed to Nissan;*** |
| "Technical Information" | has the meaning set out in Article 14.2; |
| "Tooling" | all tools, jigs, dies, gauges, fixtures, moulds, patterns and other equipment used by Supplier in manufacturing the Parts; and |
| "Vendor Tooling" | all Tooling paid or to be paid for by Nissan, and used by Supplier in manufacturing the Parts. |

1.2     In this Agreement:

(1)     the above definitions are equally applicable to both the singular and plural forms of any of the terms defined in this Article;

149629v5

(2)    reference to Articles and Schedules are to Articles and Schedules of this Agreement;

(3)    the headings are for convenience only and shall not affect the interpretation of this Agreement;

(4)    the word "including" shall not be given a restrictive interpretation by reason of it being followed by words indicating a particular class of acts, matters or things; and

(5)    any reference to a statutory provision includes a reference to any modification or re-enactment of the provision from time to time in force and all subordinate instruments, orders or regulations made under it.

## Article 2.    Agreement

2.1    Nissan agrees to purchase and Supplier agrees to sell the Parts under the terms and conditions of this Agreement; provided, however, that any specific commitment to purchase and sell shall be subject to the acceptance by Supplier of Purchase Orders issued by Nissan and the Releases thereunder. ***Nissan shall have no obligation to purchase any Parts before such Purchase Orders and/or Releases are issued. No modification or waiver of this Agreement or any Purchase Order shall be deemed effected by either Party's acknowledgment or confirmation containing other or different terms. Should any acknowledgment or confirmation received from the other Party contain additional or different terms than this Agreement or Nissan's Purchase Orders, those terms shall be considered proposals by the other Party that are hereby rejected.***

2.2    Supplier agrees to pursue actively ongoing reduction in the Price and ongoing improvement in the quality of the Parts.

***2.3    The rights of Nissan and obligations owing to Nissan pursuant to this Agreement also shall be enforceable by Nissan with respect to Parts otherwise provided through a tire and wheel assembly provider.***

## Article 3.    Specifications

3.1    Supplier shall manufacture the Parts in accordance with:

(1)    Nissan Drawings furnished from Nissan to Supplier and agreed to by Supplier;

(2)    Acceptance Drawings as defined in Article 1; and

(3)    Specifications designated by Nissan and agreed to by Supplier and Specifications proposed by Supplier and approved by Nissan.

149629v5

3.2    After Nissan Drawings and Specifications are provided to Supplier, and before Supplier manufactures the Parts, Supplier shall review and agree to the same. Supplier shall immediately notify Nissan in the event that Supplier has reason to believe that any Nissan Drawing or Specification are inadequate to produce the Parts that will satisfy all warranties in Article 9 and the other provisions of this Agreement and that will function throughout the greater of the expected life of the Parts of the applicable warranty period.

**Article 4.**    **Vendor Release and Delivery**

4.1    In conjunction with each issued Purchase Order, Nissan may, issue one or more Release(s) to Supplier specifying the quantities of the Parts to be purchased and the required delivery dates. ***Nissan may identify each such quantity or date requirement with a Release Authorization Number ("RAN").***

***4.1.1***  ***At the time of each shipment, Supplier will transmit to Nissan as mutually agreed, an Advanced Shipping Notice ("ASN") which shall include part number, RAN, date of shipment, quantity shipped, forwarding information and other information specified by Nissan.***

***4.1.2***  ***To the extent that one or more RANs have been issued and inventory authorized under such RAN at Supplier's location becomes obsolete due to a Nissan Change, Supplier's raw and fab authorization shall be as set forth in the Sourcing Documents.***

4.2    ***In consideration of Nissan's entering into this Agreement with Supplier, during the term of this Agreement, Supplier shall deliver the Parts, including trial parts and sample parts, to Nissan in the quantity and by the time specified by Nissan in the Purchase Orders and Releases, except in the event of a Force Majeure.*** Supplier's obligations relating to the time for production and/or delivery of the Parts are integral parts of and constitute conditions of this Agreement. In the event that the delivery of the Parts to Nissan is likely to be delayed by reason of Supplier, Supplier shall notify Nissan thereof in advance; provided that such notice shall not release Supplier from its liabilities for all direct costs, losses and damages resulting from incomplete or delayed delivery; without prejudice to Nissan's other available rights and remedies, Nissan shall have the right to reject in whole or in part the delivery of the Parts. Supplier is responsible for all costs (including those arising out of direct losses ***consisting of line stoppages***) and other losses (including loss of profits), as reasonably calculated by Nissan due to incomplete or delayed delivery, except in the event of a Force Majeure. Nothing herein shall prohibit Supplier from objecting to the calculation of costs and Supplier herein does not waive its rights to disagree or object to such calculation.

***4.2.1***  ***If delivery of the Parts is not completed by the time specified (unless such delay is due to a Force Majeure), Nissan reserves the right, without liability, in addition to other remedies available to it by law, to terminate all or any part of the relevant Purchase Order or Release.***

(7)

**4.2.2** *Nissan may, from time to time, upon reasonable notice, change shipping schedules provided in the Purchase Order, or contained in Releases, or direct temporary suspension of scheduled shipments. Nissan and Supplier shall negotiate in good faith in order to minimize any impact on either Party's operation as a result of such change in shipping schedule or suspension of shipments.*

4.3    Shipments in excess of quantities specified by Nissan may be returned to Supplier, and Supplier shall pay Nissan for all return handling and transportation expenses. Nissan reserves the right to accept, at its sole discretion, in whole or in part, any Parts delivered in excess of those specified by Nissan. Within a reasonable time after Nissan's discovery of the overage or Nissan's receipt of written notice from Supplier claiming the delivery of excess quantities, the Parties shall meet in good faith to (i) confirm the number of excess Parts received by Nissan and (ii) determine the Price payable by Nissan for such excess Parts (assuming Nissan has elected to accept such Parts) based upon the Price of the applicable Purchase Order less the additional costs and expenses incurred by Nissan due to the receipt of such Parts, including without limitation, extra handling, transportation, storage and administrative costs and expenses.

4.4    Nissan reserves the right, at its sole discretion, to place emergency orders in addition to regular orders placed from time to time under this Agreement or to require Supplier to deliver the Parts earlier than the time originally specified by Nissan. In any such case Supplier shall use its best efforts to comply with such emergency orders or revised timetable. Nissan shall reimburse Supplier for any increased transportation cost actually incurred by Supplier due to its compliance with Nissan's emergency order (other than those emergency orders caused by or resulting from Supplier's failure to comply with the terms and conditions of a Purchase Order and/or Release) or revised timetable.

**4.5** *As to new Parts being sourced or to be sourced under this Agreement, Nissan shall provide Supplier in the Sourcing Documents a written list of each of the countries where the Parts or vehicles equipped with the Parts are to be sold.*

## Article 5.    Receipt and Inspection; Title and Risk of Loss

5.1    The title to and risk of loss or damage to the Parts shall pass from Supplier to Nissan at the time of delivery of the Parts to Nissan *or Nissan's authorized carrier*. Nissan reserves the right to inspect the Parts in accordance with the standards issued by Nissan from time to time. Nissan may reject any Non-conforming Part at any time before sale of the Parts or vehicles equipped with the Parts. Payment to Supplier shall not be construed as acceptance by Nissan or agreement by Nissan that the Parts conform to the terms and conditions of this Agreement. Any inspection or testing by Nissan shall not relieve Supplier of its obligations under this Agreement.

149629v5

**5.1.1** *In the event of Nissan's rejection of any Non-conforming Parts or revocation of acceptance for Non-conforming Parts, risk of loss or damage shall be treated as never having passed to Nissan and as having rested on Supplier. Acceptance of any Parts under any Purchase Order shall not bind Nissan to accept future shipments, nor deprive it of the right to return the Non-conforming Parts already accepted, nor constitute a waiver of any other right or remedy of Nissan.*

5.2     If any Non-conforming Parts are rejected, Supplier shall, at Nissan's request and at no additional cost to Nissan, promptly deliver replacement Parts conforming to the Specifications and delivery instructions.

**Article 6.     Packaging, Marking and Shipping**

6.1     All Parts shall be properly packaged, labeled, marked and shipped at Supplier's expense (which shall be included in the Price) in accordance with Nissan's requirements:

**6.1.1** *Unless Nissan specifies otherwise, such requirements shall mean in accordance with good industry practices and in such a manner that will not only protect the Parts against hazards of shipment, storage, and exposure, but will permit the securing of the lowest transportation rates consistent with the delivery terms specified in the Purchase Order. Unless otherwise provided in this Agreement or in the applicable Purchase Order, no separate charges shall be made for containers, crating, boxing, bundling, dunnage, drayage, storage or freight provided dunnage requiring replacement due to loss or damage resulting from Nissan's mishandling, abuse or neglect shall, upon Supplier's request, be paid for by Nissan.*

**6.1.2** *Any transportation charges paid by Supplier and to which Supplier is entitled to reimbursement under the terms of the Purchase Order, shall be added to Supplier's invoice as a separate item and the receipted freight bill shall be attached thereto. If Supplier is paid by Evaluated Receipt System (as referred to in Article 7.3) the invoice should be a separate invoice. Any deviation from shipping and billing instructions specified in the Purchase Order shall be at Supplier's risk.*

**6.1.3** *In the event that Nissan's instructions or a Nissan Change result in packaging or freight costs in excess of customary and standard packaging or freight Nissan shall pay Supplier such excess; provided, that if the extraordinary shipping instructions are due to circumstances or delays within the control of Supplier, Supplier shall be responsible for such costs.*

6.2     If Nissan is responsible for arranging transportation, Supplier shall comply with Nissan's instructions. Supplier shall comply with Nissan's requirements to the extent that such requirements are reasonable.

(9)

149629v5

6.3    Each packing slip, bill of lading, shipping notice and invoice shall bear Nissan's applicable part number, Release number, Purchase Order number, date of shipment, quantity shipped, address of Nissan, forwarding information and any other information reasonably requested by Nissan, including serial numbers, if applicable.

6.4    Supplier is responsible for all Nissan's costs, losses, and damages, actually incurred by Nissan, due to Supplier's failure to comply with any or all of its obligations under this Article 6.

***6.5    Supplier agrees to mark all Parts manufactured on behalf of Nissan according to applicable patent and trademark laws, as instructed by Nissan in writing by Nissan from time to time. Nissan shall supply, at its expense, all necessary camera ready art and text and all other necessary information and materials necessary for Supplier's use of the Nissan Trademarks (as defined below). Nissan shall review and approve each use of the Nissan Trademarks before Supplier begins mass production thereof.***

***6.6    Nissan hereby grants Supplier a limited license to use Nissan's trademarks, service marks and logos ("Nissan Trademarks") solely for the purposes of complying with the terms of this Article 6. All goodwill related to the Nissan Trademarks shall inure solely to the benefit of Nissan. Supplier acknowledges Nissan's ownership of the Nissan Trademarks.***

**Article 7.    Price, Invoicing and Payment**

7.1    Unless otherwise agreed in writing, Supplier shall invoice Nissan for the Parts after delivery of the Parts. The Price shall be Supplier's full compensation for the Parts. Nissan shall have no obligation to make any further payment to Supplier in connection with the Parts. No increase in Price shall be accepted by Nissan and no decreases in Price shall be accepted by Supplier without prior written agreement. Invoices shall include all data and supporting documentation requested by Nissan.

7.2    Invoices may be rejected for material non-compliance with any of the provisions of this Agreement. Nissan shall make payment of the Price to Supplier in in accordance with the payment procedure established by Nissan.

***7.2.1  The payment procedure will be set forth in the Purchase Order.***

***7.3    If directed by Nissan, Nissan's Evaluated Receipt System (ERS) shall be applicable to all shipments pursuant to this Agreement or any applicable Purchase Order, and payment to Supplier shall be made in accordance with that system. The date used to calculate payment and any applicable discount shall be based on the receipt date of the Part. Payment terms will be noted on the face of the Purchase Order.***

***7.4    If not directed by Nissan to use ERS, the following rules apply: Invoices shall be received promptly and in duplicate, cover not more than one***

(10)

*Purchase Order and be marked "Attention: Accounts Payable". The date used to calculate payment and applicable discounts shall be based on the date the Parts are received or the date of the receipt of a proper invoice, whichever is later.*

**7.5** *Nissan shall, within forty-eight (48) hours after exercising an offset, give written notice to Supplier specifying the reason in detail, withhold payment under this Agreement, any Purchase Order or any other agreement between Supplier and Nissan, and apply the withheld payments as offsets against costs, damages or other payment due to Nissan under this Agreement, any Purchase Order or any other agreement between Supplier and Nissan. Disputed invoices shall be paid only after resolution of the dispute provided that Nissan may only withhold payment of disputed amounts if it provides Supplier with written notice of the amount and the nature of the dispute.*

## Article 8.    Changes

8.1    Nissan may, following consultation with Supplier, by notice to Supplier, at any time change any one or more of the following:

(1)    quantity;

(2)    Specifications; provided, however, that if Supplier, without any delay after its receipt of the notice from Nissan, submits in writing an explanation that it is reasonably impossible for Supplier to follow such change in specifications, Nissan will discuss another solution with Supplier; or

(3)    methods of packaging or shipment.

If such change results in an increase or a decrease in cost to Supplier, Nissan and Supplier shall mutually agree, after good faith negotiation upon a reasonable adjustment to the Price or other terms as a result of any such change.

**8.1.1** *Neither Supplier nor Nissan, however, shall be allowed during the term of this Agreement to terminate or modify any existing Purchase Order or Release, or to obtain an adjustment in the Price based on its loss or reduction of anticipated profits.*

8.2    Supplier shall not make any changes in the design or composition of any Parts without Nissan's prior written agreement.

**8.2.1** *In the event that any materials used by Supplier in making the Parts become unavailable, Supplier shall locate a source for, and propose to Nissan, alternative materials for use in making the Parts. Nissan shall, in its sole discretion, determine whether the use of such alternative materials is acceptable, and whether an adjustment to the Price or other terms will occur as a result of such change.*

(11)

149629v5

## Article 9.    Warranties

9.1    Supplier warrants that it has good and merchantable title to the Parts and that the Parts shall:

(1)    be free from defects in design (to the extent that Supplier has furnished the design), materials, workmanship and performance;

(2)    be of merchantable quality and fit for the particular purpose for which the Parts are sold;

(3)    comply with all Nissan Drawings, Acceptance Drawings, and Specifications designated or approved by Nissan and agreed to by Supplier pursuant to Article 3.1(3);

(4)    be free and clear of all liens and encumbrances;

(5)    comply with all Applicable Laws provided; however, that Nissan will notify Supplier of the jurisdictions where the Parts or vehicles equipped with the Parts will be sold.

9.2    Warranties shall extend to Nissan for at least the time and mileage limitations of relevant customer warranties.  With respect to handling of and reimbursement for warranty claims, the Parties shall comply in all respects with the terms and conditions of the Claim Compensation Procedure, which shall constitute an integral part of this Agreement.  For the avoidance of doubt, the Parties hereby confirm that the scope of compensation to be reimbursed by Supplier to Nissan in connection with Warranty Claims (as defined in the Claim Compensation Procedure) shall be limited to the Warranty Expenses as more specifically and conclusively defined in the Claim Compensation Procedure.

*9.2.1    Notice of Non-Conforming Parts shall be deemed sufficient if given by Nissan within one hundred eighty (180) days after discovery by Nissan. Such notice may be given orally or in writing.  Nissan shall notify Supplier that the Parts are Non-conforming, troublesome, need repair, or must be watched. Nissan will make commercially reasonable efforts to include a clear statement of all objections that shall be relied upon by Nissan as the basis for breach.*

## Article 10.    Quality Assurance

Supplier shall manufacture the Parts in accordance with quality procedures already agreed and/or to be agreed between Nissan and Supplier.  In addition, Supplier shall continuously monitor the Parts and promptly report to Nissan any Parts that do not comply with the Specifications *and the warranties required of Supplier in Article 9, and shall promptly notify Nissan of any defects or deficiencies in*

(12)

149629v5

*Supplier's design including if Supplier has reason to believe that any Specifications provided by Nissan are not adequate to produce the Parts that will function throughout the greater of the expected life of the Parts or the applicable warranty period, manufacture, or in-use performance.*

## Article 11.    Recall and Reimbursement

Supplier shall reimburse Nissan, to the extent attributable to a defect in Supplier's product, for all reasonable costs incurred by Nissan (including costs for notification, replacement parts, labor, penalties, and fines as a result of any recall, service campaign or similar program initiated by Nissan, or required for compliance with any Applicable Law. Supplier shall also reimburse Nissan for any vehicle repurchase due to the Parts and made pursuant to any laws, rules, regulations, administrative or judicial decisions or orders which require Nissan to repurchase the vehicle under the specific circumstances of the specific situation.   Following prior consultation with Supplier, whenever possible, all decisions regarding recalls, service campaigns, and similar programs shall be made by Nissan, upon consultation in good faith with Supplier in advance.  In cases where the Supplier may be responsible, in whole or in part, for non-conformity or breach of Supplier's warranties of the Parts which may necessitate a recall campaign, service campaign, and similar programs, Nissan will keep Supplier informed of non-privileged facts in connection therewith, and both Parties will negotiate and determine in good faith whether and to which extent the Supplier will reimburse the costs of a recall campaign, service campaign, and similar program; and Supplier shall reimburse Nissan for these costs to the extent attributable to Supplier as determined through the aforementioned discussion. However, if Nissan's decision to carry out such campaign is for the purpose of protecting its reputation and preserving the good will of its customers and, if there is no specific defect attributable to Supplier, Supplier shall not be held liable for any cost therefor.

## Article 12.    Indemnification

12.1    In addition to what is specified elsewhere in this Agreement, Supplier shall indemnify and hold harmless Nissan and its dealers (to the extent indemnified by Nissan or Nissan Affiliates), its Affiliates and their dealers(to the extent indemnified by Nissan or Nissan Affiliates), and their respective officers, directors and employees (the "Nissan Indemnified Parties"), in full against all loss, liability, damages, costs and all expenses, including attorney fees and expert fees, arising out of claims or lawsuits for personal injury, property damage or economic damage alleging:

(1)    defects in design (to the extent that Supplier has furnished the design), warnings (to the extent that Supplier has furnished the warnings), materials, workmanship and performance;

(2)    any violation by Supplier of Applicable Law to Supplier or Supplier's business, facilities or operations;

149629v5

(13)

(3)     any act or omission of Supplier or its employees, agents or sub-contractors designing, manufacturing, supplying or delivering the Parts, including any injury, loss or damage to persons caused or contributed to by any of their negligence or by faulty design, workmanship or materials; or

(4)     any other claims resulting from the negligent acts or omissions of Supplier or its employees, agents or sub-contractors.

In each case above, Supplier shall not be required to indemnify Nissan for those damages and expenses resulting from allegations of conduct or defect reasonably attributable to Nissan or others.  Supplier shall not be required to compensate all or any part of expenses for settlement unless Supplier has been informed in advance that settlement discussions will take place, and, to the greatest extent possible in good faith, has been afforded the opportunity to discuss and consult on the terms of such settlement in advance.

12.2   Upon request from Nissan, Supplier shall, at its sole expense, provide Nissan with reasonable access to documents, records and witnesses in connection with Nissan's defense and resolution of any claim, action or lawsuit described in Article 12.1.


**Article 13.    Right of Access to Supplier's Claims Information**

At Nissan's request, Supplier shall promptly provide access to its records of warranty or product liability claims relating to the Parts other than records or information constituting attorney-client privilege or constituting attorney work product material. Nissan has the right to review and copy such records, and to require Supplier,  to prepare and provide reports or analyses of the quality, reliability, performance, or safety of the Parts, and/or complaints, actions or claims relating to the Parts. Supplier shall retain such records, reports and analyses as required by the applicable laws or for at least five (5) years, whichever is longer.


**Article 14.    Handling of Drawings**

14.1   Supplier shall furnish Nissan with the Acceptance Drawings.  Notwithstanding the provisions of Article 22, Nissan may copy, prepare derivative works and disclose the Acceptance Drawings to any third party, and Nissan and such third party may use such Acceptance Drawings; provided, however, that Nissan shall obtain the consent of Supplier prior to disclosure to a third party (other than Nissan Affiliates or entities with which Nissan has a publicly announced significant business relationship which may be referred to as an "alliance partner" or "strategic alliance" or some relationship similar to the Nissan/Renault Alliance (an "Alliance Partner") and excluding any alliance with any Supplier Competitor, of those Acceptance Drawings that Supplier has designated at the time of submission to Nissan as "Confidential— Not To Be Disclosed To Third Parties Without Consent."  If Supplier refuses to grant consent for disclosure of any Acceptance Drawing, Supplier shall, upon request from Nissan, prepare and submit to Nissan within a commercially reasonable time period drawings that can be disclosed to a third party in place of the subject Acceptance

(14)

Drawings ("Substitute Acceptance Drawings"), after consultation with Nissan regarding the content thereof. In this event, notwithstanding the provisions of Article 22, Nissan may copy, prepare derivative works and disclose the Substitute Acceptance Drawings to any third party and Nissan and such third party entity that Nissan recognizes as a direct competitor of Supplier at the time of such disclosure, may use such Substitute Acceptance Drawings.

14.2    Supplier shall furnish Nissan with access to specifications, concept sheets, CAD data, information and other data Supplier acquires or develops in the course of Supplier's activities under this Agreement as well all other information and data that Nissan deems reasonably necessary to understand the Parts covered by this Agreement and their manufacture, except for highly confidential and proprietary in the organization (including but not limited to source code, software and FMEA) (collectively the "Technical Information"), provided, however, that Supplier may consult with Nissan upon the content of the Technical Information to be furnished to Nissan. As to any Technical Information that is Confidential Information (as defined in Article 22), Nissan shall not copy and disclose such Technical Information to any third party without the prior consent the prior consent of Supplier, except to the limited extent permitted under Article 22.


**Article 15.    Intellectual Property Rights**
15.1    Each Party and/or its Affiliates will retain its rights in the Intellectual Property Rights that it acquired, generated or created at any time.

15.2.   Supplier shall grant and hereby grants Nissan and its Affiliates a perpetual, paid-up, royalty-free, non-exclusive, world-wide irrevocable license to all Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Acceptance Drawings, except for Patents of Supplier (this exclusion shall also apply to the license granted in subparagraph (1) below), with a right to grant sub-licenses to others to use, offer to sell, sell, repair, reconstruct or rebuild the Parts. In the event Nissan has requested Supplier's consent to disclose the Acceptance Drawings to a third party pursuant to Article 14.1, Supplier shall grant and hereby grants Nissan and its Affiliates (1) a perpetual, paid-up, royalty-free, non-exclusive, world-wide irrevocable license to all Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Substitute Acceptance Drawings, with a right to grant sub-licenses to others, to make, have made, use, offer to sell, sell, repair, reconstruct or rebuild, and have repaired, reconstructed or rebuilt, products including the Parts and products similar or identical to the Parts.

15.3    If requested by Nissan, Supplier shall in good faith discuss the granting to Nissan or any of its Affiliates a non-exclusive license with a right to grant sub licenses to others to Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Parts, other than those licensed by Supplier to Nissan and its Affiliates pursuant to Article 15.2, on terms to be agreed by the Parties.

15.4    If either Party makes or creates an invention, patentable discovery, improvement or

(15)

149629v5

process based on the technical data, information, proposals or opinions provided by the other Party, the other Party shall forthwith notify the other Party thereof and the Parties shall discuss in good faith and agree on the ownership of the Intellectual Property Rights subsisting or embodied therein and shall enter into an agreement with respect thereto. If the Parties intend to jointly develop any products each of the Parties agrees that prior to engaging in joint development work of products the Parties will enter into a separate writing setting forth the rights of the Parties as to Intellectual Property and other matters.

15.5    Except as specifically set forth in this Article 15 and Article 27, no right or license, expressed or implied, under any patent or patent application is granted by either Party to the other Party under this Agreement.


**Article 16.    Infringement**

16.1    Subject to Article 16.5, Supplier shall defend, indemnify and hold harmless Nissan and the Nissan Indemnified Parties, in full against all loss, liability, damages, costs and all expenses, including attorney fees and expert fees, arising directly or indirectly out of any claims, actions or lawsuits, alleging infringement of any Intellectual Property Rights   (other than those of Nissan or any Nissan Affiliate) ("Third Party Rights") in connection with the Parts, the operation of the Parts, or their manufacture; provided, however, that the pecuniary amount for which Supplier is liable pursuant to this Article shall be separately discussed and determined by the Parties, in the event that the subject claim, action or lawsuit (i) arises from instructions given by Nissan on the basis of Nissan's own idea or concept and expressly described in any Nissan Drawings , and (ii) arises in spite of Supplier's every due care in conducting appropriate searches to determine whether any Third Party's Rights may be infringed by following Nissan's instructions.

16.2    Nissan agrees that as a condition to Supplier's foregoing obligation to indemnify, Nissan will give reasonably prompt notice of any such claim, demand, loss, expense, damage or injury but in any event within fourteen (14) calendar days after the service of any plaintiff's petition, complaint or claim and shall thereafter cooperate at Supplier's expense with Supplier in the defense thereof. In the event Nissan fails to give timely notice, the obligation to indemnify remains to the extent Supplier has not been prejudiced by such delay.  Supplier shall be responsible for the defense of all such claims and suits; provided, however, that Nissan shall have the right, at its option, to be represented at its own expense, by counsel of its own selection to participate in the defense of any such claim or suit.

16.3    Nissan shall furnish copies of any pleadings which have been served to date, together with all information then available regarding the circumstances giving rise to the suit or claim and cooperate with Supplier, as reasonably requested, in such defense at the expense of Supplier and provide Supplier with reasonable access to documents, records and witnesses in connection with any allegations with respect to

(16)

the infringement of any Third Party Right. Supplier shall not admit to any liability of Nissan in connection with any judgment or settlement without Nissan's prior consent, which consent shall not be unreasonably withheld.

16.4   In the event any claim, action or lawsuit described in Article 16.1 includes allegations of infringement against more than one supplier, including Supplier, Nissan and Supplier agree to cooperatively discuss and determine whether Nissan, entirely or in part, controls or participates with Supplier in the defense and resolution of such claim, action or lawsuit. In the event that Nissan conducts its own defense under this Section 16.4, with Supplier's consent through such discussion, Supplier shall, unless otherwise agreed upon between the Parties, still be liable for the reasonable support and costs of such defense, including reasonable attorney fees and court costs, together with any judgment or final settlement; provided, however, that any final settlement shall be subject to the approval of Supplier, which approval shall not be unreasonably withheld. Nissan will include Supplier in settlement discussions where indemnity has been or will be sought from Supplier under this Section 16.4. Nissan will not settle or compromise any third party claim that gives rise to an indemnification claim under this Section 16.4 without notifying Supplier in advance that settlement discussions will take place and affording Supplier the opportunity to discuss, consult, and participate on the terms of such settlement in advance.

16.5   The indemnification provisions of this Article 16 shall apply only in case that at least one claimed Intellectual Property Right from the intellectual property right family of such third party has been published either by the European Patent Office or by competent patent authorities in Germany, France, U.K., Japan, U.S, China, Spain, Mexico and Korea. In case that neither the claimed patent nor any patent of its patent family of such third party has been either published by the European Patent Office or by competent patent authorities in any of the aforementioned countries at the time of first delivery of the Parts which are subject of such alleged infringement, the scope and pecuniary amount for which Supplier is liable pursuant to this Article 16 shall be separately discussed and determined by the Parties.

16.6   In the event that either Party is involved in a dispute with a third party in connection with Supplier's Intellectual Property Rights relating to the Parts, or either Party believes that there is a likelihood that such a dispute may occur, such Party shall immediately notify the other Party, and shall furnish all information in its possession or under its control relating to such dispute.

16.7   Other than as provided in Article 27.5, this Article 16 states the entire liability of Supplier for any such claim for indemnification with respect to the infringement of any Third Party Right.

**Article 17.   Nissan Property**

17.1   All Nissan Drawings, Intellectual Property Rights owned by Nissan and Confidential Information supplied to Supplier by Nissan ("Nissan Property") shall remain the

(17)

property of Nissan, and Supplier shall use such property only for the purpose of fulfilling its obligations under this Agreement.

**17.1.1** *All Supplier Property shall remain the property of Supplier and Nissan shall use such property only for the purposes of and subject to the restrictions of this Agreement.*

17.2   All supplies, materials or other items paid for or reimbursed by Nissan to perform Supplier's obligations hereunder (collectively the "Nissan Other Property") shall remain the property of Nissan. Supplier shall use the Nissan Other Property only in connection with this Agreement, and shall not use the Nissan Other Property in any manner whatsoever for the benefit of any other customer or third party without Nissan's prior written consent. Supplier shall, immediately upon Nissan's request, deliver the Nissan Other Property to Nissan or its nominee in accordance with Nissan's instructions. The Nissan Other Property shall be marked as the property of Nissan by Supplier, shall not be commingled with the property of Supplier or any third person, and shall not be moved from Supplier's premises without Nissan's prior written approval.

**Article 18.   Tooling**

18.1   Supplier shall maintain the Tooling in good condition so that the manufacture of the Parts is not interrupted.

**18.1.1** *Supplier shall properly house, care for, repair or, if necessary, replace all Vendor Tooling and shall bear the risk of loss or damage thereto (including normal wear and tear) for the production life of the applicable Program (including Service Parts), whether determined by time period or volume produced.  The Vendor Tooling is lent by Nissan to Supplier.*

18.2   Supplier shall only use the Vendor Tooling for manufacturing the Parts for Nissan. Supplier shall, immediately upon Nissan's request, deliver the Vendor Tooling to Nissan or its nominee in accordance with Nissan's instructions.  All Vendor Tooling shall be marked as the property of Nissan by Supplier, shall not be commingled with the property of Supplier or any third person, and shall not be moved from Supplier's premises (except for repair or modification) without Nissan's prior written approval. Supplier shall not modify, lease, transfer or dispose of any Vendor Tooling unless Supplier obtains Nissan's prior written consent.

**18.2.1** *Nissan and Supplier recognize that the Price quoted by Supplier for the Vendor Tooling ordered by Supplier will be an estimate.   Nissan and Supplier agree, however, that absent any changes by Nissan to the plans for the Vendor Tooling that affect the Price,   the estimated total price represents a maximum cost of the Vendor Tooling  and that the firm price shall be based on the actual cost to Supplier of production of the Vendor Tooling.  At such time as firm pricing is established, Nissan will issue an amendment to the applicable Purchase Order to reflect that pricing. Supplier*

(18)

149629v5

*shall use commercially reasonable efforts to produce the Vendor Tooling at the lowest possible cost consistent with Nissan's production part quality requirements. Nissan reserves the right to audit Vendor Tooling cost at tool sign-off. Notwithstanding the foregoing, any increase in the amount of any applicable Purchase Order may be accomplished only upon agreement of Nissan. In the event of a Nissan directed design change in any Part, Supplier shall submit a revised quotation reflecting new maximum Vendor Tooling costs.*

*Article 18A. Insurance*

*18A.1 Supplier shall maintain insurance and keep itself adequately insured with a reputable insurance company against all insurable liability under and against the consequences for any act of Supplier's employees while on the premises of Nissan. The Supplier shall obtain from an insurance provider, reasonably acceptable to Nissan, policy or policies of "All Risk" insurance with respect to the interests of Nissan Property on Supplier's premises or within the care, control or custody of Supplier. Policy limits must be sufficient to cover replacement cost of the Nissan Property (as defined in Article 17) on Supplier's site, or other site as authorized in Article 22 (Subcontracting). Nissan shall be named as an additional insured or loss payee on such policies with a deductible consistent with the deductible maintained by Supplier in the ordinary course of its business.*

*Supplier agrees to carry insurance coverage for activities reasonably connected with this Agreement and applicable Purchase Orders, in the types and at the minimum amounts listed below:*

| | |
|---|---|
| *Commercial General Liability including:*<br>*- Broad From Contractual*<br>*- Personal Injury, including advertising liability* | *$1 million - BI/PD - Combined Single Limit per occurrence* |
| *Automobile Liability (covering all owned, hired and non-owned vehicles)* | *$1 million combined single limit per occurrence* |
| *Workers' Compensation (endorsed to cover volunteers, if applicable)* | *Statutory Limits* |
| *Employer's Liability* | *$1,000,000 per occurrence* |
| *Excess Liability*<br>*- Product Liability* | *$10,000,000 per occurrence* |

(19)

149629v5

| | |
|---|---|
| *Property Insurance – All Risk* | **See above** |

*All policies shall contain a provision whereby the insurer(s) agrees not to cancel or materially alter coverage without thirty- (30) days prior written notice to Nissan.   Nissan shall not be liable for premium associated with any such policy.*

*Supplier shall furnish Nissan with Certificates of Insurance evidencing the above coverages within five (5) business days of execution of this Agreement.*

**18A.2** *Nothing herein shall limit or prohibit Nissan from obtaining insurance for its own account, at its own expense, and any proceeds payable thereunder shall be payable as provided in the underlying policy.*

**Article 18B.  Grounds for Insecurity; Adequate Assurance of Performance**
*When, in Nissan's good faith opinion, reasonable grounds for insecurity arise with respect to Supplier's performance, Nissan may demand from Supplier adequate assurance of future performance.  If assurance of due performance as required herein is not timely provided by Supplier, Nissan may, at its option, treat any applicable Purchase Order as repudiated by Supplier.*

**Article 19.    Service Parts**
Unless otherwise agreed in writing between the Parties, Supplier agrees to continue to supply service parts, as required by Nissan ("Service Parts"), for each model of vehicle, for ten (10) years from the date of last production of such vehicle model for which the Parts were supplied, with the exception of Nissan Motor Co., Ltd., which will require fifteen (15) years.   The Service Parts shall be supplied at full production assembly level and/or at sub-component level, as required by Nissan.  The Service Parts shall meet all Specifications provided by Nissan.

**19.1** *The Price for the Service Parts will be the same as under Purchase Orders for corresponding production Parts until the Date of Last Production.  After the Date of Last Production, the Parties shall negotiate in good faith the price for the Service Parts.*

**19.2** *After the Date of Last Production, certain materials or components for Service Parts may become actually or practically unavailable.  In the event of such actual or practical unavailability, Supplier reserves the right to substitute materials or components of like quality and functionality that meet the technical specifications for the Part, other than the specific specification for the material or component.*

149629v5

Case 3:19-cv-00396   Document 43-3   Filed 10/03/19   Page 24 of 51 PageID #: 748

**Article 20.    Sales to Third Party**

20.1    Supplier shall not, without Nissan's prior written consent, manufacture for the benefit of or supply to a third party any goods that:

    (1)    are based in whole or in part upon the Nissan Drawings;

    (2)    use any Intellectual Property Right of Nissan or any Nissan Affiliates.

    (3)    are based in whole or in part upon the Acceptance Drawings, or any derivative or copy thereof, except that such Acceptance Drawings, or any derivative copies thereof solely reflect Supplier's independently developed and/or owned products.

20.2    Nissan will not withhold its consent to the use of Nissan Drawings and/or Acceptance Drawings by Supplier provided the use of such Nissan Drawings and/or Acceptance Drawings does not require the use of any Intellectual Property Rights of Nissan or any of its Affiliates. This provision shall not be construed as limiting Supplier's use of its Intellectual Property Rights.

**Article 21.    Subcontracting**

Supplier may delegate or subcontract the manufacture of the Parts to third parties ("Subcontractors"). Supplier shall use commercially reasonable efforts to ensure that all Subcontractors adequately support Supplier's obligations under this Agreement, and in no event shall Supplier be released from any of its obligations under this Agreement. *If Nissan notifies Supplier that Nissan has an objection to a particular Subcontractor due to such Subcontractor's performance, Supplier and Nissan shall discuss in good faith the performance of such Subcontractor and shall mutually determine whether such Subcontractor should be terminated.*

**Article 22.    Confidentiality**

22.1    The Parties recognize that each of them ("Receiving Party") may, during the course of this Agreement, gain knowledge of, have access to, and have otherwise disclosed to it certain nonpublic information that is proprietary to the other Party and its Affiliates ("Disclosing Party") and which is of a secret or confidential nature to the Disclosing Party ("Confidential Information"). The following information shall be considered the Confidential Information:

    (1)    Non-public information concerning the business operations of such Party, its Affiliates or dealers (including product planning, manufacturing, advertising programs, sales promotions, complaints, budgets, and forecasts); and

    (2)    inventions, designs, and research and development programs.

149629v5

22.2    The Receiving Party shall not disclose, publish, release, transfer or otherwise make available Confidential Information of the Disclosing Party in any form to, or for the use or benefit of, any third party without the Disclosing Party's prior written consent.

22.3    The obligations of confidentiality shall not apply if:

(1)    the Confidential Information is or becomes (other than through a breach of this Agreement) generally known to the public;

(2)    the Confidential Information was in the Receiving Party's possession prior to its disclosure by the Disclosing Party, as demonstrated by the Receiving Party's written records;

(3)    the Confidential Information is developed independently by the Receiving Party without reliance on information or materials provided by the Disclosing Party, as demonstrated by the Receiving Party's written records;

(4)    the Confidential Information was rightfully received by the Receiving Party without obligation of confidentiality from a third party, as demonstrated by the Receiving Party's written records; or

(5)    disclosure is required by law; provided that the Receiving Party gives the Disclosing Party prompt notice of the request for disclosure, cooperates with the Disclosing Party in obtaining a protective order or other remedy, and discloses only that portion of the Confidential Information which it is legally compelled to disclose.

**22.4    *Disclosure.    The Receiving Party shall use the same degree of diligence and effort to protect its Confidential Information as the Disclosing Party's Confidential Information from disclosure to third parties as Receiving Party uses to protect its own confidential information, but in no event shall the Receiving Party use less than reasonable and customary diligence and effort in protecting such Confidential Information.***

22.5    Each Party acknowledges that the other Party is providing the Confidential Information only for the limited purpose of enabling the Parties hereunder to perform their respective obligations under this Agreement and the Purchase Orders.    The transfer of Confidential Information to the Receiving Party shall not be construed as granting the Receiving Party license or rights in or to the Confidential Information, except the limited right to use the Confidential Information as necessary to perform hereunder.

22.6    Notwithstanding the provisions of Article 22.2:

(1)    Nissan may disclose Supplier's Confidential Information not only to Nissan Affiliates ***on a need to know basis*** but also to an Alliance Partner  provided that (i) Nissan shall ensure that such  Affiliates  and entities are aware of and

(22)

undertake to maintain the secret or confidential nature of Supplier's Confidential Information and further that (ii) Nissan's permitted disclosure shall be limited to Nissan Affiliates if such Supplier's Confidential Information is also Technical Information; and (iii) Nissan shall not disclose Supplier's Confidential Information to any entity that Nissan recognizes as a Supplier Competitor.

(2)     Supplier may disclose Nissan's Confidential Information to any of the Subcontractors defined in Article 21 to the extent necessary for performing Supplier's obligations under this Agreement; provided that Supplier shall ensure that such Subcontractors are aware of and undertake to maintain the secret or confidential nature of Nissan's Confidential Information.

22.7    In any case where Confidential Information is released to a third party entities as permitted under this Agreement, such disclosure shall only be made after the Receiving Party obtains written assurances to hold such Confidential Information as confidential.

22.8    Each Party acknowledges that the disclosure of the other Party's Confidential Information may result in irreparable injury to that Party and that such Party will be entitled to seek injunctive relief in addition to any other legal or equitable remedies that may be available.

*22.9*    ***Copies and Return of Information.  Upon written request after  termination of this Agreement, or earlier if so requested by the Disclosing Party, the Receiving Party of any Confidential Information shall immediately return to the Disclosing Party all originals and copies of the Confidential Information of such Party, including all notes, computer disks, records, drawings or other documents ,or the Receiving Party may destroy all copies of such Confidential Information and certify, in writing, to the Disclosing Party, that all such copies have been so destroyed.***

## Article 23.    Advertising

Supplier shall not in any way advertise the fact that Supplier has entered into this Agreement with Nissan without Nissan's prior written consent.  In addition, Supplier shall not use any trademark, trade name, trade dress, logo or other marks in which Nissan or any Nissan Affiliate has an interest except in such manner as Nissan may direct in writing in advance as provided in Article 6 of this Agreement.

## *Article 23 A.  Audits*

***Supplier shall maintain accurate and complete records of all expenses incurred under the terms of this Agreement and applicable Purchase Orders.  Such records shall be maintained in accordance with generally accepted accounting principles and in a manner that facilitates auditing.  Supplier further agrees to permit Nissan or its representatives to examine and/or***

(23)

149629v5

*audit such records as necessary for Nissan to (i) verify the cost of Vendor Tooling, (ii) verify Supplier's compliance with the requirements of Article 47, and/or (iii) comply with the obligations imposed upon Nissan when acting as a Foreign Trade Zone at reasonable times while this Agreement and applicable Purchase Orders remain in force and for two (2) years after termination.*

## Article 24.    Facility Inspection

Nissan shall have the right to inspect Supplier's facilities and operations at any time during Supplier's business hours and upon reasonable notice  for purposes of verifying Supplier's compliance with its obligations under this Agreement, including, , those relating to Supplier's manufacturing process and quality assurance systems.

## Article 25.    Change of Circumstances

If any of the following circumstances occur or are likely to occur in relation to Supplier, Supplier shall immediately inform Nissan in writing:

(1)    the transfer of all or any substantial part of its business or assets;

(2)    a Change of Control;

(3)    Supplier agrees to keep Nissan informed regarding merger or amalgamation to the extent permitted by the applicable laws or unless restricted by contractual obligations;

(4)    Supplier agrees to keep Nissan informed regarding alteration of its trade name or official name, executive management, location of premises other substantial organization changes; or

(5)    Supplier's voluntary bankruptcy, Supplier's being involuntarily being placed into bankruptcy and such involuntary proceeding is not dismissed within 90 days, Supplier's being placed into administration, receivership or liquidation, commencement of proceedings to be wound up, entering into any voluntary arrangement with its creditors, or the happening of any similar event according to the laws of its domicile.

## Article 26.    Term

This Agreement shall commence on the Effective Date and, unless earlier terminated as provided herein, shall continue in force for an initial period of three (3) years. Unless either Party notifies the other Party in writing at least six (6) months prior to the last day of the initial term or any extension thereof, the term of this Agreement shall be automatically extended for a further period of one (1) year.

Case 3:19-cv-00396   Document 43-3   Filed 10/03/19   Page 28 of 51 PageID #: 752

**Article 27.    Termination and Other Remedies**

27.1    Notwithstanding the provisions of Article 26 **and 27.6**, either Party may terminate this Agreement effective immediately by notice in writing  without liability to the other if the other is in material breach of this Agreement and, if such breach is remediable, such breach has not been remedied within thirty (30) days of written notice.

*27.1.1 Material breaches as set forth in Article 27.1 ("Material Breach"), specifying the details of such breach in reasonable detail, shall include, but not be limited to a Party's:*

*(1)    refusal or failure to make or accept deliveries of conforming Parts in whole or in part covered by any applicable Purchase Order within the time specified in any Purchase Order or RAN; or*

*(2)    failure to perform any other provision of any applicable Purchase Order or any provision of this Agreement and such failure continues for a period of thirty (30) days after the non-breaching party delivers notice to the breaching party of the alleged breach; or*

*(3)    failure to make progress so as in the reasonable opinion of Nissan to endanger the performance of any applicable Purchase Order in accordance with its terms and does not cure such failure within the time period after receipt of notice pursuant to Article 27.1 from Nissan specifying such failure.*

27.2    Notwithstanding the provisions of Article 26, either Party may terminate this Agreement without liability to the other and with immediate effect by serving a written notice on the breaching party in the event that the breaching  party:

(1)    voluntarily becomes bankrupt, is involuntarily placed into bankruptcy and such involuntary proceeding is not dismissed within 90 days, is placed into administration, receivership or liquidation, commences proceedings to be wound up, enters into any voluntary arrangement with its creditors, or on the happening of any similar event according to the laws of its domicile; or

(2)    Supplier undergoes any **Change in Control** or disposes of all or a substantial part of its business or assets (other than for the purposes of a legitimate re-organization) without Nissan's prior written consent, which consent shall not be unreasonably withheld or delayed (provided that Nissan may withhold such consent if it does not receive adequate evidence of Supplier's ability to continue to perform its obligations in accordance with the terms of this Agreement).

27.3    In the event of expiration or termination of this Agreement unless otherwise agreed between the Parties, the following shall apply:

(1)    If the fulfillment of any Release confirmed by Supplier is pending at the time

(25)

149629v5

of the termination by Nissan (terminated for reasons attributable to Supplier) according to Article 27.1 or 27.2 (1), Nissan shall have the right, at its sole discretion, to cancel any such Release or to have it completed by Supplier. If Nissan elects to cancel such Release, Supplier shall immediately terminate all work under this Agreement. Nissan shall furthermore have the option to purchase completed Parts, Parts in the process of manufacture used exclusively to manufacture the Parts, which are possessed by Supplier, at reasonable prices as shall be agreed between the Parties. If Nissan elects to have such Release completed, this Agreement shall continue to apply to such Release.

(2)    If this Agreement is terminated for reasons attributable to Nissan, Nissan shall, upon request from Supplier, purchase completed Parts at the Price and/or Parts in the process of manufacture, which are possessed by Supplier, at reasonable prices as shall be agreed and, unless already covered by a separate development agreement, Nissan shall make appropriate reimbursement for development or other expenses actually incurred and specified in Supplier's quotation, the amount of which Nissan had explicitly agreed to compensate but not amortized as of the date of termination.

(3)    Supplier shall immediately deliver, at Supplier's expense, the Nissan Property, Vendor Tooling, and Acceptance Drawings (if they contain Intellectual Property Rights owned by Nissan) to Nissan or its nominee in accordance with Nissan's instructions; provided, however, that if this Agreement is terminated for reasons attributable to Nissan, the expenses shall be borne by Nissan.

(4)    Each Party shall take all reasonable action necessary to protect property in such Party's possession in which the other Party has an interest. In this case, the possessing party shall reimburse the non-possessing party for reasonable costs (determined in the non-possessing Party's reasonable sole discretion) incurred in connection with such protective action.

(5)    Supplier shall immediately deliver, at Supplier's expense, the Nissan Property, Nissan Drawings, Acceptance Drawings and Vendor Tooling to Nissan or its nominee in accordance with Nissan's instructions.

(6)    If Supplier possesses completed Parts, Parts in the process of manufacture, or Tooling (excluding Vendor Tooling) used exclusively to manufacture the Parts for Nissan, Nissan shall have the option upon written request, to purchase the same at fair market value prices as shall be agreed between the Parties;

(7)    Supplier shall immediately return all Confidential Information of Nissan, or destroy it and certify such destruction.

27.4   In addition, in the event of expiration of this Agreement by its terms or termination of this Agreement for any reason, Nissan and Supplier shall meet and discuss in good faith any matters not described above or further details. The principal objective of

149629v5

such meeting will be to discuss how to minimize any disruption to Nissan's and Supplier's business.

**27.5** **Upon termination by Nissan under Article 27.6, Nissan shall pay to Supplier the following amounts without duplication, and Nissan shall have no further liability under this Agreement or any applicable Purchase Order:**

**(1)** **The Price contracted for but not previously paid for Parts (including profit) that have been completed and delivered in accordance with the terms of applicable Purchase Order(s); and**

**(2)** **The actual costs incurred by Supplier in accordance with applicable Purchase Order(s) to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting practices to the terminated portion of the Purchase Order(s), including the actual cost of work in process and materials delivered to Nissan, and including the actual cost of discharging allocable or apportionable liabilities.**

**27.4A** **Supplier recognizes that (a) if this Agreement is terminated due to Supplier's inability, failure or refusal to perform, or Supplier's Material Breach, insolvency, bankruptcy, being placed into administration, receivership or liquidation, commencement of proceedings to be wound up, entering into any voluntary arrangement with its creditors, or on the happening of any similar event according to the laws of its domicile, and (b) if Supplier is the sole source of the Parts to Nissan for the Program in questions, in order to facilitate Nissan's procurement of the Parts from an alternate supplier, Nissan shall have the following additional rights; provided that such rights shall be limited to the remaining period of the Program and the period required for Service Parts for the Program as provided under this Agreement:**

**27.5A.1** **In addition to those rights granted in Article 15 or elsewhere in this Agreement, or in any other agreement, Supplier hereby grants Nissan and its Affiliates a paid-up, royalty-free, non-exclusive, world-wide irrevocable license limited to the purpose and period set forth above to all Supplier's Intellectual Property Rights subsisting or embodied in or used in connection with the Acceptance Drawings, as well as those Intellectual Property Rights (including Background Rights of Supplier) subsisting or embodied in or used in connection with the Parts or their manufacture, with a right to grant sub-licenses to others, to make, have made, use, offer to sell, sell, repair, reconstruct or rebuild, and have repaired, reconstructed or rebuilt: (a) the Parts for the Program or; (b) parts used by Nissan or its Affiliates as a substitute for the Parts, Service Parts, or products similar or identical to the Parts for the Program (collectively, the "Substitute Parts"). The license**

149629v5

described in this paragraph shall apply only to those Substitute Parts that Nissan or its Affiliates use to replace Parts, Service Parts, or products similar or identical to the Parts for the Program that would otherwise have been provided by Supplier under this Agreement, had this Agreement not been terminated for a reason described in this Article 27.5.

27.5A.2   In the event of a termination as described in this Article 27.5, In order to exercise the rights described in this Article and promptly secure an alternative source of supply for the Program, notwithstanding any other provision in this Agreement (including Article 22), Nissan may copy, prepare derivative works and disclose to an alternate supplier Acceptance Drawings and Technical Information and any other drawings, information or data that Nissan or the alternate supplier deems necessary to procure or produce the Substitute Parts.  Supplier agrees to provide all such Acceptance Drawings and Technical Information, drawings, information or data to Nissan promptly upon Nissan's request.  In the event of a disclosure under this paragraph, upon Supplier's request, Nissan shall secure the agreement of such alternate supplier to maintain the confidentiality of such information, to use such information for the sole purpose of supplying Substitute Parts for the Program to the extent permitted in Article 27.5.1, and to return all such information to Nissan upon the completion of supplying such Substitute Parts for the Program.

27.5A.3   In the event of a termination as described in this Article 27.5, Supplier agrees that with respect to those Intellectual Property Rights described in Article 15.2, Nissan and its Affiliates shall be entitled, at minimum, to a perpetual, paid-up, royalty-free, non-exclusive, world-wide irrevocable license, with a right to grant sublicenses to use for any purpose without additional compensation to Supplier.

27.5A4   This Article 27.5 shall not apply if Nissan has alternate sources for the Parts.  This Article 27.5 shall not apply in the event the Purchase Order is terminated at the option of Nissan pursuant to Article 27.6 below.

27.6   **Termination of Purchase Order at Option of Nissan**
Nissan may terminate any Purchase Order, in whole or in part at any time (including the existence of Force Majeure) by giving thirty (30) days' advance written notice to Supplier.  Upon receipt of a termination notice under this Article 27.6 only, Supplier may submit to Nissan within thirty (30) days from the effective date of termination (unless otherwise extended by Nissan) its termination claim arising out of such termination of orders and related subcontracts.  If Supplier fails to submit a timely termination

(28)

149629v5

*claim, Nissan may determine the amount, if any, due to Supplier with respect to the termination, and such determination shall be subject to negotiation between Supplier and Nissan. Under this Article 27.6 only, Nissan shall pay to Supplier the following amounts without duplication, as a termination claim, and Nissan shall have no further liability under any applicable Purchase Order with respect to types of costs set forth below:*

*(1)    The Price not previously paid for Parts that have been completed and delivered in accordance with the terms of applicable Purchase Order(s); and*

*(2)    The actual costs incurred by Supplier in accordance with applicable RANs issued under the Purchase Order(s) to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of the RANs , including the actual cost of work in process and materials delivered to Nissan, and including the actual cost of discharging allocable or apportionable liabilities.*

## Article 27A.  Product Liability Limitation

If the applicable law in the jurisdiction where the Product Liability Claim is pending provides a certain limitation on the legal remedies available to the claimant or the plaintiff of such Product Liability Claim, such as, but not limited to, Sections 10 and 11 of German Product Liability Law, Supplier's indemnification obligations under Articles 12.1 and 12.2 with respect to such particular Product Liability Claim shall not exceed such limitation as required by such applicable law, excluding for avoidance of doubt any contractual obligations made by Nissan.

## Article 28.    Waiver and Remedies

No delay or omission by either Party in exercising any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power.  No waiver of any breach of any provision of this Agreement shall constitute a waiver of any other breach of such or any other provision. All waivers must be signed by an authorized representative of the Party waiving its rights. Except as specifically limited by this Agreement as provided in Article 27 remedies available to Nissan or Supplier under this Agreement shall be cumulative and additional to any other or further remedies implied or available at law, in equity or under this Agreement.

*28.1  The acceptance of a Non-Conforming Part is not a waiver of any breach as to that Part or other Parts.  The failure of Nissan to insist upon performance of any of the terms or conditions in this Agreement or any applicable Purchase Order shall not be construed as thereafter waiving any such terms or conditions as to an existing or future breach.*

149629v5

(29)

***Article 28A. Notices***

*Any notice, request or demand to be given by Nissan or any of its Affiliates to Supplier or any of its Affiliates or vice versa under this Agreement or any applicable Purchase Order must be in writing and delivered to the address specified in this Agreement or, with respect to notices under a Purchase Order, such other address as is specified in the relevant Purchase Order, as such addresses may have been modified by proper notice. If any notice is given (i) by a private delivery service or recognized overnight courier, it shall be deemed to have been given and received when delivered or attempted to be delivered to the address of the party to whom it is addressed, (ii) by facsimile transmission, it shall be deemed to have been given and received at the time confirmation of such transmission is received by the sender, (iii) by certified or registered mail, it shall be deemed to have been given and received three (3) days after a certified or registered letter containing such notice, properly addressed, with postage prepaid, is deposited in the mail, and (iv) by any other method, it shall be deemed to have been given and received upon actual receipt thereof regardless of how such delivery was accomplished.*

**Article 29.   Entire Agreement**

29.1   This Agreement sets forth the entire and only agreement and understanding between Nissan and Supplier and supersedes all negotiations, commitments and writings prior to the date of this Agreement pertaining to the subject matter of this Agreement.

29.2   This Agreement may not be modified, supplemented or amended except by a written agreement executed by both Nissan and Supplier.

29.3   In the event of any inconsistencies between the terms of this Agreement and the terms contained in any other document, instrument, agreement, Purchase Order or Release related to the supply of the Parts by Supplier to Nissan, the terms of this Agreement shall prevail.

29.4   The Parties agree that in the event of a conflict between the terms of any sourcing documents, including, but not limited to request for quote issued by Nissan, commercial commitment letter signed by Supplier after the date of this Agreement (collectively, "Sourcing Documents") and this Agreement, the terms of the Sourcing Documents shall govern.

**Article 30.   Assignment**

The rights and obligations under this Agreement or this Agreement itself, either in whole or in part, shall not be assigned or transferred by either Party without the prior written consent of the other Party, which consent shall not be unreasonably delayed or withheld. Any assignment or attempted assignment of this Agreement or any part thereof, whether by voluntary act or operation of law, shall be null and void,

(30)

149629v5

unless it is approved in writing by the other Party in advance, which approval shall not be unreasonably delayed or withheld. Notwithstanding the foregoing, Nissan may, upon prior written notice to Supplier, assign its rights and obligations under this Agreement to any of its Affiliates so long as Nissan guarantees the payment and performance of the obligations of such Nissan Affiliates.

**Article 31. Independence**

This Agreement shall not constitute either Party as the agent or legal representative of the other Party for any purpose whatsoever. Neither Party is granted any express or implied right or authority to assume or to create any obligation or responsibility on behalf of or in the name of the other Party or to bind the same in any manner whatsoever.

*31.1 Neither Party's personnel, whether or not located on the other Party's premises, shall represent themselves a, the other Party's employees or agents. Each Party assumes full responsibility for the acts of its agents and employees. No employee, agent, or contractor hired by Supplier to perform work under this Agreement or any Purchase Order is an employee, agent or contractor of Nissan or any other Nissan Affiliate.*

**Article 32. Severability**

If any court of competent jurisdiction finds any provision of this Agreement to be unenforceable or invalid in whole or in part, such finding shall not affect the validity of the other provisions of this Agreement or the remainder of the provision in question.

**Article 33. Force Majeure**

*Neither Party shall be responsible to the other by reason of failure to perform obligations hereunder to the extent that the failure to perform is caused by an act of God, flood, fire, storm, earthquake, shipwreck, acts of public enemy, acts of terrorism as declared by any governmental authority, or acts or omissions of any sovereign government, federal, state, provincial, local board, branch or agency thereof and other similar events beyond reasonable control of the Party whose performance is prevented or interfered with (each a "Force Majeure"), The affected Party shall promptly notify the other Party and shall not be responsible for its failure to perform any obligation required under this Agreement as a result of any of the foregoing. The Parties specifically agree that strikes and labor disputes at the Party whose performance is prevented or interfered with, shall not be included in the force majeure events if those are merely in-house strikes and/or labor disputes which can be controlled by either Party. However, in case of general strikes and labor disputes organized by unions or employers association (i.e. not in-house associations of either Party), which shall be regarded as force majeure of either Party, both Parties will immediately*

(31)

149629v5

*consult and discuss in good faith how to cope with such situation in order not to interrupt the business.*

*Notwithstanding the foregoing, in no event shall any event referenced in this Article 33 relieve any obligation of Nissan to make any payment hereunder for Supplier's performance already completed at the time of the Force Majeure.*

**Article 34.    Survival**

*Article 1 (Definitions), Article 9 (Warranties), Article 11 (Recall and Reimbursement), Article 12 (Indemnification), Article 13 (Right of Access to Supplier's Claims Information), Article 14.2 (Handling of Drawings), Article 15 (Intellectual Property Rights), Article 16 (Infringement), Article 17 (Nissan Property), Article 18.2 (Vendor Tooling), Article 19 (Service Parts), Article 20 (Sales to Third Parties), Article 22 (Confidentiality), Article 23 (Advertising), Article 23.A (Audits), Articles 27.3, 27.4, 27.5, 27.5A and 27.6 (Post-Termination Rights), Article 27.A, Article 30 (Assignment), Article 35 (Governing Law), Article 36 (Jurisdiction), Article 37 (Attorneys' Fees), Article 38 (Hazardous Substances), Article 39 (Taxes), Article 40 (Compliance with Laws), 41 (Third Party Beneficiaries), Article 42 (Covenant of Further Assurances), Article 43 (Negotiated Terms) and Article 47 (Records Management Program) shall survive the expiration or termination of this Agreement for any reason whatsoever.*

**Article 35.    Governing Law**

*This Agreement and all Purchase Orders shall be governed by and construed in accordance with the laws of the state of Tennessee.*

**Article 36.    Jurisdiction**

36.1  *Any proceeding, suit or action arising out of or in connection with this Agreement or any Purchase Order ("Proceedings") with respect to Nissan shall be brought in the state court located in Rutherford County, Tennessee.*

36.2  *The governing law and jurisdiction designations in this Agreement are irrevocable and are for the exclusive benefit of Nissan.*

36.3  *Supplier irrevocably waives (and irrevocably agrees not to raise) any objection, on the ground of forum non conveniens or on any other ground, to the taking of Proceedings in any court referred to in this Article. Each Party also irrevocably agrees that a judgement against it in Proceedings brought in any jurisdiction referred to in this Article shall be conclusive and binding upon it and may be enforced in any other jurisdiction.*

**Article 37.  Attorneys' Fees**

If either Party institutes a Proceeding to interpret or enforce the terms of this Agreement or any Purchase Order, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs, to the extent permitted by law.

**Article 38.  Hazardous Substances**

Supplier agrees to promptly furnish to Nissan Material Safety Data Sheets ("MSDS") conforming to the requirements of the Occupational Safety and Health Administration's Hazard Communication Standard, Title 29, C.F.R. Part 1910, 1200, with respect to the Parts supplied pursuant to this Agreement or any applicable Purchase Order, and to furnish any other information on the Parts and/or substances contained therein which is necessary to enable Nissan to comply with the Hazard Communication Standard and/or other Applicable Laws pertaining to hazardous or harmful substances.

**Article 39.  Taxes**

**39.1 General Provisions**

Supplier shall be responsible for all federal, state and local taxes levied or assessed with respect to the manufacture, transportation, and sale of the Parts.  Supplier shall also be responsible for any state and local property taxes assessed on the Vendor Tooling; subject to the exceptions set forth in Article 39.2 below.  In order to fulfill its responsibility with respect to state and local property taxes on Vendor Tooling, Supplier will include such tooling on its own property rendition forms and pay property taxes on such tooling as if it were owned by Supplier.  Nissan will cooperate with Supplier in obtaining any necessary approvals as may be required by state or local authorities for this procedure.  Supplier shall comply with all applicable valuation and reporting rules for such tooling, including the use of valid non-standard valuations as may be appropriate to accurately reflect the true value of the tooling and legally minimize property tax liabilities.  Supplier shall pay all taxes assessed on such tooling directly to the appropriate authorities in a timely manner.  Supplier shall be responsible for all personal property tax audits and other inquires by the state and local taxing authorities concerning the tooling.  Supplier shall perform the foregoing activities at its own cost and will indemnify Nissan for any taxes, penalties, interest, legal fees, or other costs incurred by Nissan as a result of Supplier's failure to properly perform these activities.  As owner of the Vendor Tooling, Nissan is entitled to all federal and state income and franchise tax credits applicable to such tooling investment. Other property and inventory taxes shall be borne by the Party holding title to the Parts. Supplier shall indemnify and hold Nissan harmless for Supplier's failure to

(33)

*pay any wages, benefits, taxes or other compensation or amounts owed by Supplier on account of the Parts.*

**39.2 Vendor Tooling Property Tax Exceptions**

a. *Definition and Intent.  The intent of this Article 39.2 is to clarify that because the Parties, through this Agreement, have expressly assigned the responsibility of Vendor Tooling property tax to the Supplier, the Supplier would have been unable to include in its quote and, consequently, the Parties would not have included in the Price, an adequate sum to ensure that Supplier was properly compensated for this Vendor Tooling property tax responsibility.  Under such conditions, the Parties herein agree that the Supplier should be entitled to recover from Nissan such additional expense through a Price adjustment or through some other method to be mutually agreed upon by the Parties, including without limitation a lump sum payment at the end of each future tax period for which Supplier is required to pay tax on Nissan's Vendor Tooling.  However, in no event shall a Supplier be permitted to recover such additional expense if Supplier was simultaneously negotiating this Agreement and quoting upon new business and should have included an adequate sum in its Parts quotation or its Vendor Tooling Price quotation to compensate Supplier for the responsibility for Vendor Tooling property tax.  The term "Old Program Vendor Tooling" shall be utilized in this Article 39.2 to mean any and all Vendor Tooling for which Supplier should be permitted to recover the additional expense of accepting responsibility for Nissan Vendor Tooling property tax if such recovery is consistent with the foregoing intent.*

b. *Exceptions.*

   i. *Future Tax Periods.  For all tax periods ending after the Parties have signed this Agreement, Supplier shall be entitled to submit a written claim to Nissan for property tax payments made by Supplier on Old Program Vendor Tooling for any and all jurisdictions for which the Supplier would not have otherwise been required under Applicable Law to pay such tax.  Upon receipt of the written claim, the Parties will promptly agree upon the proper method for allowing Supplier to recover such expense from Nissan.*

      1) *Written claim.  The written claim shall include all reasonable data and calculations used to determine the amount of the tax; a copy of the tax return and receipt or, in lieu of a receipt, such other sufficient documentation to evidence actual payment of the tax to and filing of the necessary documents with the taxing authority; and any other reasonable information requested by Nissan from time to time.  Such "reasonable data and calculations used to determine the amount of the tax" shall include without*

limitation a list of the tools; their dates of acquisition; their cost that relates to each return filed by Supplier; a breakout of the tools included above categorizing them into one of the following: (1) Used for vehicle production parts, (2) Used for service parts only, and (3) Obsolete; and a clear explanation of how the tax liability was calculated showing at a minimum the assessment rate and tax rate for each "return filed amount" charged to Nissan.

    ii.    *Prior Tax Periods.* For all tax periods ending before the Parties have signed this Agreement, Nissan will be responsible for any and all necessary tax filings and/or payments on Vendor Tooling to the extent Nissan was required by Applicable Law to make such filings and/or payments. In the event a taxing authority attempts to assess Supplier with property tax on Vendor Tooling for tax periods ending prior to execution of this Agreement, Supplier shall immediately notify Nissan and Nissan shall indemnify and hold Supplier harmless for any and all liabilities associated with such assessment of property taxes on Vendor Tooling for such prior tax periods to the extent Nissan was required by Applicable Law to make such filings and/or payments.

    iii.    *Cooperation.* Supplier shall cooperate with Nissan to identify obsolete tooling or tooling no longer in full production in order to value such tooling at a lower value for property tax purposes. Supplier and Nissan shall further cooperate with one another and provide such reasonable information necessary to defend a taxing authority's attempt to assess tax on Vendor Tooling for tax periods ending prior to execution of this Agreement.

**Article 40.    Compliance with Laws**

Each Party warrants to the other that it has and will continue, in performing hereunder, to comply with all Applicable Laws, including, without limitation, the Magnuson-Moss Consumer Warranty Act, the Occupational Safety and Health Act of 1970, federal and state automotive and other safety requirements, the Fair Labor Standards Act of 1938, and (if the applicable Purchase Order is made with reference to a government contract) the applicable provisions of the Armed Services Procurement Regulations, the Federal Procurement Regulations, and Executive Order 11246 of September, 1965. In the event that any Parts sold do not conform to such requirements, standards or regulations, Nissan, at its option, may return the Parts for correction or replacement at Supplier's expense, or may demand a full refund of all monies paid pursuant to any applicable Purchase Order. Supplier commits to fulfill all requests for content data on Parts supplied to Nissan, including, without limitation, requests for NAFTA (North American Free Trade Agreement), CAFE (Corporate Average Fuel Economy) and AALA (American Automotive Labeling Act) documentation. Any costs incurred by

(35)

*Nissan as a result of Supplier's non-compliance may be charged back to Supplier. The remedies provided for in this Article shall be in addition to any other remedies provided for herein or by law.*

**Article 41.    Third Party Beneficiaries**
*Except with respect to the Non-Competitive Affiliates, the Parties intend that neither this Agreement nor any Purchase Order shall benefit, or create any right or cause of action in or on behalf of, any person or entity other than the Parties.*

**Article 42.    Covenant of Further Assurances**
*The Parties covenant and agree that, subsequent to the execution and delivery of this Agreement and, without any additional consideration, each of the Parties shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.*

**Article 43.    Negotiated Terms**
*The Parties agree that the terms and conditions of this Agreement are the result of negotiations between the Parties and that this Agreement shall not be construed in favor of or against either Party by reason of the extent to which either Party or its professional advisors participated in the preparation of this Agreement.*

**Article 44.    [Reserved]**

**Article 45.    Counterparts**
*This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a Party by facsimile transmission shall be deemed to be an original signature hereto.*

**Article 46.    Safety Issues**
*Each Party agrees that its employees, when present at the other Party's facility, will abide by the other Party's personnel and safety policies, including without limitation:*
*(1)    Any tobacco-free environment policy, which prohibits the use of all tobacco products within such Party's plants and offices;*

149629v5

（2）     *all safety and substance abuse policies, which, among other things, mandate all individuals on Nissan property to follow certain safety procedures and strictly prohibit all individuals while on such Party's property from possessing, using, selling, purchasing, or having present in the body, drugs or alcohol; and*

（3）     *such Party's solicitation and distribution policy, which, among other things, prohibits all non- employees of such Party, including without limitation Suppliers and their agents, contractors, and employees, from soliciting or distributing any literature or other materials while on the other Party's property.*

**Article 47.**   ***Records Management Program***
*The Records Management Program (the "RMP") at Nissan is an affiliate wide program that involves and concerns all employees, contractors, vendors and suppliers. The RMP encompasses both electronic and paper records on all types of media and includes an annual records training and review process. All suppliers who are listed on a Nissan Records Retention Schedule as the "Office of Record" or as "Custodians" for official Nissan company records and those who maintain confidential or proprietary Nissan company records shall maintain those records in compliance with Nissan's Records Management Policy (the "Policy"). Employees of Supplier who manage Nissan records shall attend annual records management training as scheduled and review records annually, maintaining or deleting records in accordance with the current approved Nissan Records Retention Schedules and Records Management Policies and Procedures. Nissan departments shall provide instruction and coordinate with Supplier to ensure compliance with the Policy. Supplier will be notified in writing by Nissan if Supplier will be designated as the Office of Record or Custodian for any specific Nissan records.*

In Witness Whereof, the Parties have executed this Agreement in duplicate in English by causing these presents to be signed by their duly authorized representatives on the date first above written.

Nissan North America, Inc.,
a California corporation

_____
(name and title)

Continental Teves, Inc.,
a Delaware corporation

_____
(name and title)   *WILLIAM L. KOZYRA*
*PRESIDENT*

_____
(name and title)

*George R. Jurch III, Secretary*

149629v5

(37)

Address for Notices:

Nissan North America, Inc.
Attn: Production Purchasing
983 Nissan Drive
Smyrna, Tennessee 37167
Telecopy: 615-355-2443


With a copy to:
Nissan North America, Inc.
Betsy B. Kohan,
Legal Department
990 West 190th Street
Torrance, California 90502
310-719-8282


CONTITECH NORTH AMERICA, INC.,
a Delaware corporation

_(name and title)_ Timothy P. Rogers

_(name and title)_
George R. Jurch III, Secretary
Contitech North America, Inc.
Attn: President
136 Summit Avenue
Montvale, New Jersey 07645
Telecopy: 201-930-0050


A copy of each notice of breach or notice
claiming indemnification to be sent to:

Continental Tire North America, Inc.
Attn: George Jurch
General Counsel
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-8722

Address for notices:

Continental Teves, Inc.
Attn: President
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-5802


A copy of each notice of breach or notice
claiming indemnification to be sent to:

Continental Teves, Inc.
Attn: George Jurch
General Counsel
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-8722


CONTINENTAL TIRE NORTH AMERICA, INC.,
an Ohio corporation

_(name and title)_ M. J. H. de Louw.

_(name and title)_
George R. Jurch III, Asst. Sec.
Continental Tire North America, Inc.
Attn: President
1800 Continental Blvd.
Charlotte, North Carolina 28273
Telecopy: 704-583-8698


A copy of each notice of breach or notice
claiming indemnification to be sent to:

Contitech North America, Inc.
Attn: George Jurch
General Counsel
One Continental Drive
Auburn Hills, Michigan 48326
Telecopy: 248-393-8722

(38)

149629v5

(39)

149629v5

Schedule 1

CLAIM COMPENSATION PROCEDURE

Nissan is committed to achieve customer satisfaction by producing the highest quality vehicles.

Warranty claim is a measure of potential customer dissatisfaction and will be regarded by the parties as opportunities to improve the quality of vehicles manufactured and distributed by Nissan and Parts supplied by Supplier. Supplier shares the responsibility of ensuring that warranty claims and expenses are minimized.

This is the Claim Compensation Procedure ("CCP") referenced in Article 9.2 of the Master Purchase Agreement between Nissan and Supplier and constitutes part of the Master Purchase Agreement. Nissan and Supplier hereby agree to the following terms and conditions regarding compensation related to claims for the parts and vehicles equipped with the Parts.

## PART 1. Definitions and Interpretation

## Article 1. Definitions and Interpretation

1.1   In this CCP the following terms shall have the following meanings:

| | |
|---|---|
| "Claimed Parts" | those Parts which caused Warranty Claims, and any other parts that are damaged due to those Parts; |
| "Collected Parts" | Claimed Parts collected by Nissan; |
| "Flat Rate Schedule" | Nissan's applicable schedule of labor hours allowed for repair operations; |
| ***"Module Assembly"*** | ***an assembly of multiple Parts that have been bundled for the purpose of sourcing to a single supplier that is responsible to manage each aspect of Nissan's Quality, Cost, Development, Delivery and Management (QCDDM) requirements.*** |
| "Plant Claim" | a claim related to a defect in the vehicle attributable to the Parts that is found between the time of delivery of the Parts by Supplier |

(40)

149629v5

|  | to Nissan and the time the vehicles equipped with the Parts are completed and leave the Nissan's manufacturing plant; |
|---|---|
| "Replacement Parts" | parts that are used to replace or repair the Claimed Parts; |
| "Warranty Claim" | a claim related to a defect in a vehicle or in a Part, which if related to a vehicle is discovered after the completed vehicle leaves Nissan's manufacturing plant, repair of which vehicle or replacement of which Part Nissan must perform free of charge in accordance with the applicable Nissan warranty for the vehicle or Part; and |
| "Warranty Expense" | any cost or expense incurred by Nissan in connection with a Warranty Claim as set forth in Article 5. |

1.2 In this CCP all words and phrases not defined herein shall have the meanings set out in the Master Purchase Agreement and this CCP shall be interpreted in accordance with Article 1 of the Master Purchase Agreement which shall be deemed to have been incorporated by reference, *mutatis mutandis*, into this CCP.

1.3 References to Articles are reference to Articles in this CCP unless otherwise specified.

1.4 The word "including" shall not be given a restrictive interpretation by reason of it being followed by words indicating a particular class of acts, matters or things.

## PART 2. Warranty Claim

### Article 2. Purpose

This CCP describes how responsibility for Warranty Claims is assigned, how Warranty Expenses are determined, and how Warranty Expenses are allocated between Nissan and Supplier.

### Article 3. Scope

This CCP applies to all the Parts purchased by Nissan from Supplier for use by Nissan in the manufacture of vehicles or for sale by Nissan as service parts or accessories for the vehicles. This CCP does not apply to recalls.

### Article 4. Applicable Warranty Period

(41)

149629v5

For Parts installed in the vehicles at the time of, or prior to the vehicle delivery date to the original retail customer, the same time and mileage limitations as provided by Nissan in its applicable warranty, the basic conditions of which shall be described by Nissan in its request for quotation of the Parts and accepted by Supplier in its quotation before the issuance of the Purchase Order, shall apply.

For service parts, the warranty period shall be the greater of:

1)   the remainder of the applicable Nissan warranty period for the Nissan vehicle in which the part is installed; or
2)   the applicable Nissan service part warranty period.

Nissan will separately notify Supplier of the warranty period and mileage limitations applicable for new vehicles, parts and accessories.  When Nissan changes such warranty periods or mileage limitations, Nissan will provide Supplier with up-dated information twice a year at regular intervals.

In the event that Nissan extends the warranty period for the Parts and such change results in an increase in cost to Supplier, Nissan and Supplier shall mutually agree, after good faith negotiation upon a reasonable adjustment to the Price as to the newly extended portion. If the extended warranty period applicable to any market other than Japan, the United States, Mexico, Canada and Europe does not exceed the maximum warranty period which Supplier or any Supplier Affiliate provides to Nissan or any Nissan Affiliate for the Parts, then there shall be no revision of the Price.


## Article 5. Warranty Expenses

Warranty Expenses include the following costs:

a)   Parts' Costs:
The Parts' Costs are Nissan's purchase cost of Replacement Parts used, as well as Replacement Parts' packing, transportation and handling costs, with all taxes and import duties. The "Parts' Costs" shall also include the distributor and dealer handling allowance, which consist of a fee paid by Nissan to its distributors, dealers and/or other repairing agents for the cost of maintaining a service parts inventory and providing warranty claim clerical processing.

b)   Labor Costs:
The Labor Costs are Nissan's authorized hourly labor rate for the repair and installation of Replacement Parts by the dealer multiplied by the time allowance given by Nissan for the repair in the Flat Rate Schedule.

c)   Other Costs:
These mean all other reasonable costs and expenses incurred by Nissan in connection with Warranty Claims not included in the Parts' Costs or the Labor

(42)

149629v5

Costs and that are authorized and reimbursed by Nissan to its distributors, dealers and other repairing agents performing the repair according to the required Nissan standards. Other Costs include sublets, towing, rental reimbursement, cost of travel and transportation, and other miscellaneous direct costs incurred by Nissan or reimbursements made by Nissan in connection with the repair or replacement of the Claimed Parts.

All Warranty Claims shall be subject to Nissan's normal validation procedures and Nissan's applicable Flat Rate Schedule in accordance with Nissan warranty policies.

Warranty Expenses will be identified in Nissan's periodic Supplier Warranty Claim reports, showing all claims approved and paid by Nissan relating to the Parts. Such report will be made available to Supplier on a regular basis.

If Supplier notices a material increase in other costs, Supplier can request a review of Other Costs. Based on the results of such review, the Parties will discuss in good faith whether an invoice adjustment is appropriate.

[Local term for Europe only:]

***All existing warranty agreements for carryover Parts and all Parts which the Supplier has provided prior to the execution of the MPA and CCP, which the Supplier continues to provide, shall remain valid.***

## Article 6. Liability Rate

Nissan and Supplier shall determine Supplier's responsibility percentage of the Claimed Parts (the "Liability Rate") based on the analysis of the Collected Parts. The Liability Rate will be considered as Supplier's responsibility in the Warranty Expenses in accordance with the following provisions:

6.1     Newly Developed Parts

For newly developed and released parts, the initial Liability Rate shall be established at the rate of 60% for Supplier and 40% for Nissan, or tentative agreed Liability Rate. Upon Supplier's request, Nissan shall provide Supplier a representative sample of Collected Parts for review by Nissan and Supplier. Following such review, the initial Liability Rate shall be revised based on the review results of Collected Parts. In no case shall Supplier be responsible for Warranty Claims where Collected Parts contain no defect attributable to Supplier. However, the Parties shall share, on a 50/50 basis, the responsibility for Warranty Claims where the defect cannot be ascertained in the review of Collected Parts (no defect found), it being understood that it is inexpedient for the Parties to spend unreasonable time and costs to determine the root cause of the defect and/or claims and that the number of such Warranty Claims tends to be limited. If such review results in a change from the initial Liability Rate, the new rate shall thereafter be applied until further revision.

(43)

149629v5

Upon Supplier's request, Nissan and Supplier shall arrange for one or more subsequent review(s) of Collected Parts to review the applicable Liability Rate, provided that such reviews shall be conducted no more frequently than once every twelve (12) months. Nissan reserves the right to review the Liability Rate as deemed necessary to ensure the quality of the vehicles and/or allocation of Supplier responsibility.

**6.1.1** *Warranty Compensation Exclusions.*
*Supplier shall in no case be liable for:*
*1) defects which are due to an improper installation, modification, use or handling by Nissan, its agents or customers;*
*2) normal wear and tear of the Parts;*
*3) lack of or improper maintenance of the Parts.*

6.2    Carryover Parts

Carryover Parts are all parts which Supplier has provided Nissan prior to the execution of this CCP and which Supplier continues to provide Nissan. As to such parts, Supplier's Liability Rate shall be as set forth in any agreement between Supplier and Nissan executed prior to the Effective Date of the Agreement, or in the absence of such agreement as has been established by the past business practices of the Parties. By mutual consent the Parties may agree to be bound by Article 6.1 as to some or all Carryover Parts by indicating such in a separate writing executed by both Parties.

6.3    Disagreements

In case of disagreement in the joint review of Collected Parts for review of the Liability Rate at working level, the responsible persons at both Parties' higher level (including management level, if necessary) will discuss and shall solve the issue in good faith.

6.4    Possession of Collected Parts

Collected Parts will be kept by Nissan. Upon Supplier's request, Nissan may, but shall not be obligated to, return Collected Parts to Supplier for Supplier's analysis. In this case Supplier shall inspect all returned parts and give a prompt report to Nissan detailing investigation results, causes for failure and countermeasure proposals.

**6.5**    *Module Assemblies*
*Not withstanding any provision to the contrary, for Parts installed within Module Assemblies the initial Liability Rate shall be established at the rate of 100% for Supplier. Upon Supplier's request, Nissan and Supplier may review Module Assemblies in the field, or may engage in a study of such kind to which both Parties agree is reasonable, in order to determine whether and to what extent the initial Liability Rate for Module Assemblies*

(44)

149629v5

*should be adjusted. In no event will Nissan be expected to provide a representative sample of Collected Parts for Module Assemblies and any contrary provision set forth in Article 6.4 of this CCP or elsewhere in the CCP or Master Purchase Agreement shall be inapplicable to Module Assemblies.*

**6.6    Service Parts and Accessories**
*Unless installed as part of a Module Assembly, service parts, audio or video components, mobile entertainment units, navigation systems, and accessories (including both port and dealer installed accessories as well as factory installed accessories) during the initial Nissan warranty period for the Nissan vehicle, the initial Liability Rate shall be established at the rate of 100% for Supplier. Upon Supplier's request, Nissan will provide a representative sample of Collected Parts for review by Nissan and Supplier. Following such review, the initial Liability Rate may be revised based on the review results of Collected Parts. For the Parts described in this Article 6.6 sold after the initial Nissan warranty period for the Nissan vehicle, the Liability Rate shall be 100%.*


## Article 7.  Compensation Calculation & Payment

Nissan shall calculate Supplier's payment obligations under this procedure by multiplying Warranty Expenses by the applicable Liability Rate and shall issue debits or other requests for payment to Supplier for the resulting amounts. Supplier shall follow the payment method as instructed by the appropriate Nissan department.


## PART 3. Plant Claim

## Article 8. Procedure for Plant Claim

Supplier agrees to pay Nissan for 100% of the Plant Claim expenses incurred by Nissan due to Supplier's responsibility.  These shall be the following costs:

a)    Labor cost for checking, selecting and/or rectifying the Claimed Parts, at the hourly rate specified by Nissan;

b)    Supply of the necessary Replacement Parts or Nissan's purchase cost of the Replacement Parts required to replace and/or repair the Claimed Parts; and

c)    Other costs incurred in transport, packing, manipulation, tools and operations required for replacing or repairing the Claimed Parts, line stoppage, manpower idle time, and subcontract.


## PART 4. Tires

(45)

149629v5

**Article 9.  Warranty Procedure for Tires**

*Supplier shall be responsible for Warranty Expenses related to tires and such expenses shall be handled directly with consumers pursuant to the consumer warranty.*

149629v5

Exhibit A

## **SUPPLIER COMPETITORS**

Bosch

TRW

Advics

Akebono

Hitachi Group including, but not limited to Tokico, UnisiaJecs, Hitachi chemical, and Hitachi cable

Mando

Mobis

Delphi

Valeo

Bridgestone

Michelin

Pacifica Group

Goodyear

Pirelli

Kumho

Toyo

Hankcook

Denso

Visteon

Brembo

Siemens

Nissin Kogyo

Sumitomo Group Co.'s

149629v5