**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

NISSAN NORTH AMERICA, INC.,     )
                                       )
       Plaintiff,                )
                                       )
v.                                   )     No. 3:19-cv-0396
                                   )     JUDGE ALETA A. TRAUGER
CONTINENTAL AUTOMOTIVE     )     MAGISTRATE JUDGE GRIFFIN
SYSTEMS, INC. (successor to Continental     )
Teves, Inc.); CONTITECH NORTH     )     **ORAL ARGUMENT**
AMERICA, INC.; and CONTINENTAL     )     **REQUESTED**
TIRE THE AMERICAS, LLC (successor to     )
Continental Tire North America, Inc.)     )
                                       )
       Defendants.           )
                                       )

## CONTINENTAL AUTOMOTIVE SYSTEMS, INC.'S, CONTINENTAL TIRE THE AMERICAS, LLC'S, AND CONTITECH NORTH AMERICA, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    Introduction

A California jury found Nissan 100% liable for the wrongful death of three young Californians because Nissan's own design and development decisions and negligence were "substantial factors" in causing harm to the underlying decedents in a products-liability action pending there. Yet Nissan has the audacity to ask the Court to foist the California jury's $21.6 million verdict against Nissan, and millions more in excessive attorney's fees and other costs, onto the Continental Defendants. Although Nissan claims it is entitled to express and implied contractual indemnity from Defendants, the record conclusively establishes the opposite:

- The purchase order Nissan issued to Continental Automotive Systems, Inc. ("CAS") for the product at issue — the only governing contract in this case—has no indemnification provision at all.

- There is no contract at all between Nissan and either ContiTech North America, Inc. ("ContiTech") or Continental Tire the Americas, LLC ("Continental Tire") for the product at issue.

- Nissan has stipulated and agreed, and the California Court entered an order that it is barred from pursuing an equitable-indemnity claim against CAS regarding the underlying accident.

Nissan's lawsuit purportedly arises from the sale of one automotive braking component pursuant to one purchase order Nissan issued to just one of the three Defendants. That single assembly was incorporated into one vehicle. Because that purchase order contains no express contract right to indemnification, Nissan implores the Court to retroactively apply a different indemnification provision from a different agreement governing future purchase orders and different sales transactions between Defendants and Nissan that was not even executed until over a year after Nissan issued the governing purchase-order contract to CAS and months after the vehicle at issue was built. There is no legal or factual basis that would permit Nissan's requested abandonment of basic contracting principles and law. And regardless, neither the law nor the indemnification provision in the agreement Nissan wishes to apply retroactively entitle Nissan to indemnity for damages attributable to Nissan's own negligence and design strategies and decisions that formed the sole basis of the California jury's verdict. With no contractual right to indemnity, Nissan makes a desperate claim for implied indemnity, but Nissan has acknowledged that it is barred from any equitable indemnity claim by stipulating and agreeing that CAS's settlement of the claims against it in the underlying action was made in good faith and the subsequent order entered by the California Court finding that the settlement was in good faith. On these undisputed

facts and the applicable law, Nissan's express and implied contractual indemnity claims necessarily fail and summary judgment is appropriate in favor of Defendants.

## II. Factual Background

### A. Nissan issues a purchase order to CAS—and only CAS—for brake booster assemblies

Nissan issued the governing contract in this matter to CAS's predecessor in Auburn Hills, Michigan nearly 17 years ago. It is a simple, one-page purchase order to a single Continental entity for unique brake-booster assemblies, designated by Nissan as part number 460077S010 (the "Assemblies"), to use in its X61A Program, which included Model Year 2004 Infiniti QX56 vehicles. (SUF ¶ 1).[1] The purchase order did not incorporate or even refer to any contract terms other than the basic information provided on the face of the purchase order and required for an enforceable sales contract under the Uniform Commercial Code: part, price, and quantity. (*Id.* ¶ 2). There are no warranties, no remedy provisions, and no indemnity obligations anywhere in the purchase order, and the scope of the contract was expressly limited "to the terms and conditions stated herein." (*Id.* ¶ 3). Purchase Order No. PR00094276 is referred to in these papers as "the Contract." The Contract contains no terms and conditions and does not cross-reference any terms and conditions.[2] (*Id.* ¶ 4).

---

[1] "SUF" references throughout this Memorandum refer to Defendants' Statement of Undisputed Facts filed contemporaneously with this Memorandum.

[2] Several months later, Nissan amended the Contract to change the price of the Assemblies. (dkt 43-1, Purchase Order No. PR00094276, amend. 1.) Like the original purchase order, the amended purchase order contained no indemnification clause and did not contain, incorporate, refer to, or otherwise inform CAS as to the existence of any other contract terms. (*Id.* ¶¶ 5-6).

Pursuant to the Contract, Nissan ordered Assemblies from CAS, and CAS manufactured and supplied the Assemblies to Nissan. (*Id*. ¶ 7). On or around July 26, 2004, well after the Contract was issued and amended for a price change, Nissan incorporated one such Assembly into the Model Year 2004 Infiniti QX56 vehicle bearing VIN 5N3AA08C14N809115 that would later become the subject of the wrongful-death products-liability trial in California for which Nissan now seeks indemnification ("Subject Vehicle"). (*Id*. ¶ 8). Contrary to Nissan's assertions, CAS supplied only certain components and assemblies associated with the Subject Vehicle's braking system. Those components and assemblies included only an Integrated Control Unit ("ICU"), which contained an electronic control unit and hydraulic control unit, the Assembly, also referred to as the Actuation Control Unit ("ACU"), and a yaw rate sensor. (*Id*. ¶ 9). Other suppliers manufactured components that Nissan incorporated into the Subject Vehicle's integrated braking system, including wheel speed sensors, calipers, rotors, wheel bearings, and knuckles. (*Id*. ¶ 10).

Nissan never issued any purchase order to ContiTech North America, Inc. ("ContiTech") or Continental Tire the Americas, LLC ("Continental Tire") for the Assemblies, and neither of those entities ever manufactured any of Assemblies—let along the Assembly at issue—for Nissan. (*Id*. ¶¶ 12-13). Because neither ContiTech or Continental Tire manufactured the Assembly at issue or sold it to Nissan, their presence as defendants in this case is inexplicable and inappropriate and they should be dismissed for that reason alone.

### B. Over a year after Nissan issued the governing purchase-order Contract, Nissan and Defendants execute a separate agreement to govern future transactions

On October 22, 2004—over a year *after* Nissan sent the purchase-order Contract to CAS and three months *after* Nissan manufactured the Subject Vehicle incorporating the Assembly at

4

issue—Nissan and Defendants executed the Master Purchase Agreement ("MPA") on which Nissan's claim for express indemnity is ostensibly premised. (*Id.* ¶ 38). The MPA's terms only apply when Nissan issues a purchase order for a specific part to one of the Defendants and the receiving Continental entity accepts it:

> **Article 2.    Agreement**
> 2.1    Nissan agrees to purchase and Supplier agrees to sell the Parts under the terms and conditions of this Agreement; provided, however, that any specific commitment to purchase and sell shall be subject to the acceptance by Supplier of Purchase Orders issued by Nissan and the Releases thereunder. *Nissan shall have no obligation to purchase any Parts before such Purchase Orders and/or Releases are issued.* **No modification or waiver of this Agreement or any Purchase Order shall be deemed effected by either Party's acknowledgment or confirmation containing other or different terms.    Should any acknowledgment or confirmation received from the other Party contain additional or different terms than this Agreement or Nissan's Purchase Orders, those terms shall be considered proposals by the other Party that are hereby rejected.**

(*Id.* ¶¶ 39-41). Earlier in the MPA, the parties clarified that "Purchase Orders" under the purview of the MPA would only include purchase orders issued by Nissan and accepted by Defendants ***on or after*** the MPA's Effective Date of October 22, 2004:

> "Purchase Order"    any purchase order or amendment to a purchase order submitted by Nissan ***and accepted by Supplier*** on or after the Effective Date.    ***For purposes of this definition, Supplier will be deemed to have accepted the purchase order if (i) it fails to object to it in writing within ten (10) business days after receipt, or (ii) Supplier acknowledges in writing its acceptance of the Purchase Order or amendment thereto;***

(*Id.* ¶ 42). The MPA is a template agreement that Nissan has attempted to introduce in many of its supplier relationships. The MPA ultimately executed between Nissan and Defendants was negotiated, and the bolded and italicized text throughout the MPA denotes specifically negotiated changes to and deviations from Nissan's template. In a change especially relevant to this motion,

5

Nissan and Defendants amended the definition of "Purchase Order" to: i) reflect the need for it to be accepted by Defendants and ii) clarify what constitutes acceptance. (*Id.* ¶ 43). Nissan and Defendants chose, however, to keep intact the temporal clause "on or after the Effective Date" of October 22, 2004. (*Id.* ¶ 44).

The MPA includes a limited indemnification provision in Article 12, but it does not indicate that the provision applies retroactively, and it expressly excludes indemnification for costs arising from Nissan's conduct or defects reasonably attributable to Nissan:

> In each case above, Supplier shall not be required to indemnify Nissan for those damages and expenses resulting from allegations of conduct or defect reasonably attributable to Nissan or others. Supplier shall not be required to compensate all or any part of expenses for settlement unless Supplier has been informed in advance that settlement discussions will take place, and, to the greatest extent possible in good faith, has been afforded the opportunity to discuss and consult on the terms of such settlement in advance.

(*Id.* ¶¶ 45-46). The MPA is a fully integrated document that "sets forth the entire and only agreement and understanding between Nissan and Supplier and supersedes all negotiations, commitments and writings prior to the date of this Agreement pertaining to the subject matter of this Agreement." (*Id.* ¶ 47).

### C. Nissan and CAS are named as defendants in the underlying wrongful-death lawsuit

On August 29, 2012, Solomon Mathenge (age 74) was driving the Subject Vehicle in Los Angeles, California, when he swerved into the oncoming traffic lanes and entered the intersection against a red light striking another vehicle driven by Saida Juana Mendez-Bernardino (age 27) with her two young daughters also in the Subject Vehicle. (*Id.* ¶ 48). Ms. Mendez-Bernardino and her daughters each suffered fatal injuries. (*Id.* ¶ 49). The decedents' surviving kin filed two wrongful-

death lawsuits in California against Mathenge. (*Id.* ¶ 50). Another products liability action was filed against Nissan and CAS, both of which were ultimately named defendants in all three lawsuits, which were eventually consolidated into one proceeding ("the Bernardino Lawsuit"). (*Id.* ¶ 51).

### D. The California jury finds Nissan negligent and responsible for the wrongful deaths of the Bernardino Lawsuit decedents

Before trial, CAS settled with each of the plaintiffs and claimants in the Bernardino Lawsuit. In that settlement, CAS specifically disavowed any liability for the underlying accident. Pursuant to California law, Nissan reviewed CAS's settlement with the Bernardino Lawsuit plaintiffs, and Nissan stipulated that CAS's settlement was made in good faith and the California Court entered an order finding the settlement was made in good faith. (*Id.* ¶¶ 53-54). As part of that stipulation, Nissan agreed that "any and all claims by and between the Parties for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault, shall be barred pursuant to *California Code of Civil Procedure* § 877.6." (*Id.* ¶ 55).

The remaining claims in the Bernardino Lawsuit went to trial in June 2017. During the trial, the Bernardino Lawsuit plaintiffs argued that Nissan placed vehicles into the field with an optimized hydraulic braking ("OHB") strategy that Nissan knew had an "unexpected" and "alarming" feel for its end users. This was a deliberate design decision by Nissan to "give the driver some tactical feedback, hearing, seeing, feeling that the brake system needs attention. So please go get the vehicle serviced. That was a conscious decision made." (*Id.* ¶¶ 56 & 14-28). And when users returned vehicle after vehicle because of surprising and unsettling real-world encounters with Nissan's OHB strategy and related brake feel and pedal travel design choices in

7

the field, Nissan chose not to recall because, according to Nissan, the OHB system operated as Nissan intended. (*Id.* ¶¶ 29-37; 57-58). Nissan alone designed, developed, tuned, and validated the feel, response, and travel of the brake pedal when the Subject Vehicle's OHB system was activated. (*Id.* ¶ 14) And Nissan alone was responsible for the decision whether to recall the Subject Vehicle. (*Id.* ¶¶ 29-31).

The jury agreed with the Bernardino Lawsuit plaintiffs, finding that Nissan's design of its integrated braking system and Nissan's negligence in failing to recall the Subject Vehicle were both substantial factors in causing harm to the decedents. (*Id.* ¶ 62). The jury ultimately awarded the Bernardino Lawsuit plaintiffs a cumulative judgment of $24,931,109, finding Nissan to be 100% responsible for the judgment:

| F. | Comparative Responsibility | | |
| --- | --- | --- | --- |
| 13. | 100% represents the total responsibility for Hilario Cruz's and Araceli Mendez's harm. What percentage of responsibility of harm do you assign to Nissan? | | |
| | Nissan: | 100 | % |
| | Solomon Mathenge: | | % |
| | TOTAL: | 100 | % |

(*Id.* ¶ 62).

Nissan filed several post-trial motions including one to reduce the judgment amount to account for CAS's settlement with the underlying plaintiffs. The Court granted the motion and entered an amended judgment totaling $21,631,109. (*Id.* ¶ 64).

### E. The California Court of Appeals affirms the jury's verdict

Nissan appealed the Bernardino Lawsuit verdict. On February 26, 2019, the California Court of Appeals affirmed the trial court's and jury's findings with respect to Nissan (and only

Nissan). (*Id.* ¶ 65). Regarding the jury's causation findings, the appellate court concluded there "was substantial evidence to support the jury's finding that switching into OHB mode caused the accident in this case." (*Id.* ¶ 66). Because Nissan designed and implemented its OHB strategy with no input from CAS, Nissan alone is responsible for the resulting judgment. In its opinion and order, the appellate court also noted "that Continental had no responsibility for failing to recall the product after the defect was discovered." (*Id.* ¶ 67).

### F. Nissan now seeks indemnification for its own conduct and decisions that the jury deemed to be negligent

On April 5, 2019, Nissan sued Defendants in the Tennessee Circuit Court for Rutherford County. Defendants removed the matter to this Court based on diversity jurisdiction. In its Amended Complaint, Nissan alleges that it is entitled to indemnification from Defendants under the MPA for "all liability and costs associated with the Lawsuit." (Dkt. 43, Am. Compl. ¶¶ 46-47). Likely because the MPA was executed well *after* the sale of the Assembly at issue, Nissan alternatively claims that Defendants have "an implied contractual duty to indemnify and hold Nissan harmless from all liability and costs associated with the Lawsuit under the implied contract that existed among the parties." (*Id.* ¶ 48.) But in the absence of an express contract for indemnity and in the face of the California jury finding Nissan negligent and 100% responsible for the injuries in the Bernardino Lawsuit, Nissan's claims necessarily fail as a matter of law.

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether fact issues exist, "[t]he court must view the evidence and draw all

9

reasonable inferences in favor of the non-moving party." *Alexander v. CareSource*, 576 F.3d 551, 557–58 (6th Cir. 2009). The question that must be answered is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). This case presents the latter of these scenarios, entitling Defendants to judgment in their favor as a matter of law.

## IV.    Argument

A California jury has already determined that Nissan's negligence and OHB strategy and related brake feel and travel design choices were substantial factors in the deaths of the Bernardino Lawsuit decedents, as was its failure to recall. (SUF ¶ 62). So, if Nissan has a right to contractual indemnification from Defendants, it could only arise from a contract that expressly reflects the parties' intention to indemnify Nissan for its own negligence and conduct. But no such document exists between the parties. In fact, there is no contract at all between Nissan and Defendants Continental Tire or ContiTech relating to the Assemblies, and the Contract between Nissan and CAS for the Assembly at issue has no indemnity provision. (*Id.* ¶¶ 12-13).  Having no express contract right to indemnity, Nissan asks the Court to retroactively apply the indemnification provision from a later-executed contract that by its express terms only applies prospectively. Nissan's position finds no support in the documents, facts, or the law. Nissan's claims for contractual indemnity therefore fail as a matter of law, and Defendants are entitled to summary judgment in their favor.

### A. There is no applicable contract at all between Nissan and either ContiTech or Continental Tire relating to the Assemblies

There is a contract principle that is "so fundamental that it rarely receives mention in case law or commentary . . . that only parties to contracts are liable for their breach." *Knight Capital Partners Corp. v. Henkel AG & Co., KGaA*, No. 16-12022, 2018 WL 4931990, at *5 (E.D. Mich. Oct. 11, 2018) (quoting *FCM Grp., Inc. v. Miller*, 17 A.3d 40, 54 (Conn. 2011)).[3] As a corollary to this basic principle, a party cannot assert a breach-of-contract claim against another who is not a party to the alleged contract. *Transport Systems, LLC v. Amazon*, No. 18-CV-11286, 2019 WL 3714487, at *2 (E.D. Mich. Aug. 7, 2019); *Curlee v. State Auto Mut. Ins. Co.*, 2003 WL 22098037, at *2 (Tenn. Ct. App. Sept. 11, 2003) (dismissing plaintiff's breach of contract claim against State Farm because "Curlee and State Farm had no contractual relationship on which a breach of contract claim could be used").

---

[3] There is no choice-of-law provision in the applicable purchase-order Contract. Tennessee "deviates from the traditional lex loci rule" in contracts for the sale of goods subject to the Uniform Commercial Code. *Carbon Processing and Reclamation, LLC v. Valero Marketing and Supply Co.*, 823 F. Supp. 2d 786, 801 (W.D. Tenn. 2011). In sales contracts where the parties do not specify a choice of law, the Tennessee UCC will apply to transactions bearing an "appropriate relation" to Tennessee. T.C.A. 47–1–105. The comments to this statute explain that where, as here, "a transaction has significant contacts with a state which has enacted the Act and also with other jurisdictions, the question what relation is 'appropriate' is left to judicial discretion." *Id.* cmt. 3. In exercising this discretion, the Court may consider factors including (1) where the good in question was produced, (2) where delivery took place, (3) where the majority of negotiations took place, and (4) where the defendant's principal place of business is located. *Carbon Processing*, 823 F. Supp. 2d at 801 (relying on such factors). Because Nissan sent the purchase-order Contract to CAS (the only contracting Defendant relative to the Assemblies) in Michigan, CAS accepted the Contract in Michigan, and CAS maintains its principal place of business in Michigan, Michigan law should govern this matter. Practically speaking, however, the contract principles entitling Defendants to summary judgment are so universal that the Court's analysis is functionally the same regardless of whether Michigan or Tennessee law applies.

Nissan has disregarded these basic contract principles by naming Continental Tire and ContiTech as defendants. Nissan never issued a purchase order to or otherwise contracted with either of these Defendants for the purchase and sale of the Assemblies. (SUF ¶ 12).  Neither Continental Tire nor ContiTech manufactured, sold, supplied, or otherwise had any role whatsoever in providing the Assemblies to Nissan.[4] (*Id.* ¶ 13). Instead, Nissan purchased the unique Assembly at issue through a purchase-order contract issued solely to CAS's predecessor, Continental Teves, Inc. (*Id.* ¶ 1). Nissan's inclusion of Continental Tire and ContiTech appears to be predicated solely on the fact that those entities executed the MPA with Nissan over a year after Nissan issued the purchase-order Contract at issue. But the MPA framework document is not a purchase order and does not obligate Nissan to purchase anything from anyone. (*Id.* ¶ 39). And, as discussed below, however, the parties executed the MPA months after Nissan purchased the Assembly at issue from CAS and, by its express terms, the MPA only applies prospectively.

The lack of a purchase-order contract between Nissan and either ContiTech or Continental Tire relating to the Assembly at issue is fatal to Nissan's contractual indemnity claims against either of them. ContiTech and Continental Tire are therefore entitled to summary judgment of Nissan's contractual indemnity claims.

### B. There is no express indemnity obligation between CAS and Nissan

For Nissan to maintain its contract-based indemnity claim against the only Defendant it actually contracted with for the Assemblies — CAS — the indemnity obligation must be described clearly and unambiguously. Express indemnity provisions are construed strictly against the drafter

---

[4] Not surprisingly, the Bernardino Lawsuit plaintiffs did not name either entity as a party in the underlying product liability case.

and against the indemnitee. *Fireman's Fund Am. Ins. Cos. v. Gen. Elec. Co.*, 253 N.W.2d 748, 751 (Mich. App. 1977); *Reed v. St. Clair Rubber Co.*, 324 N.W.2d 512, 515 (Mich. 1982). For an indemnity contract to be given effect, its terms must be unequivocal. *Pritts v. J. I. Case Co.*, 310 N.W.2d 261, 264 (Mich. App. 1981) (citations omitted); *First Am. Bank of Nashville, N.A. v. Woods*, 734 S.W.2d 622, 632 (Tenn. App. 1987) (noting there must be a "clear and unequivocal expression of an intention to indemnify"); *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 102 (Mich. 2014) ("Where parties have expressly contracted for indemnity, the extent of the duty must be determined from the language in the contract") (internal citations omitted).

In this case, there is no indemnity language at all in the purchase-order Contract between Nissan and CAS for the Assembly at issue. (SUF ¶ 3). There are no terms other than those on the face of the purchase order because the Contract "expressly limits acceptance to the terms and conditions stated herein." (*Id.*) Nor is there an implicit indemnity obligation simply by virtue of a buyer-seller relationship. *See, e.g.*, *First Nat'l Bank of Chicago v. Cumberland Bend Inv., L.P.*, 2002 WL 31835693, at *3 (Tenn. App. Dec. 19, 2002). In the absence of an indemnification provision, Nissan's claims necessarily fail. *Reed*, 324 N.W.2d at 515 (affirming trial court's finding that there was no express contract of indemnity when the contract clauses at issue "totally fail to set forth contractual indemnity provisions").

It is Nissan's burden to establish the terms of the contract, but it cannot do so. Instead, Nissan attempts to resuscitate its express indemnity claim by relying on the later-executed MPA, which is wholly untethered from the Contract at issue. For Nissan to prevail, this Court would have to ignore the plain terms of the Contract and impute retroactive contractual intent that strictly

favors Nissan, the indemnitee. As explained immediately below, what Nissan asks is directly at odds with basic principles of contract interpretation.

### C. The MPA only applies prospectively

A contract is presumably effective on the effective date in the contract itself. *See, e.g.*, *Sta-Rite Indus., LLC v. Franklin Elec. Co.*, 519 Fed. Appx. 370, 379 (6th Cir. 2013). This is particularly true of indemnity contracts, which "cannot be construed to operate retrospectively unless ... the parties expressly provide so in their agreement." *DaimlerChrysler Corp. v. Wesco Distribution, Inc.*, 760 N.W.2d 828, 833 (Mich. App. 2008) (internal citation and quotation marks omitted).[5] The MPA on which Nissan's claims are based does not expressly provide for retroactive application. Rather, the MPA is explicitly *prospective* in scope. (SUF ¶¶ 41-42).

Nissan and Defendants executed the MPA over a year after Nissan issued the purchase-order Contract to CAS and at least three months after Nissan manufactured the Subject Vehicle. (*Id.* ¶ 38). By its plain terms, the MPA only applies to purchase orders issued by Nissan and accepted by one of the Defendants on or after the MPA's Effective Date of October 22, 2004:

---

[5] Although there does not appear to be Tennessee case law stating this same proposition, the common-sense conclusion that contracts apply prospectively unless expressly provided for in the agreement has been broadly embraced by the courts. *See, e.g.*, *Chicago & N.W. Transp. Co. v. Emmet Fertilizer & Grain Co.*, 852 F.2d 358, 360 (8th Cir. 1988) ( "[i]f the parties had intended [the] indemnity obligation to extend to past accidents, they could easily have designed the language ... to say exactly that."); *Servco Pac. Inc. v. Dods*, 193 F. Supp. 2d 1183, 1193 (D. Haw. 2002) (holding that retroactive indemnity provision must be stated "clearly and unequivocally"); *Quality King Distribs., Inc. v. E & M ESR, Inc.*, 36 A.D.3d 780, 827 N.Y.S.2d 700, 703 (2007) (finding that an indemnity clause has no retroactive effect "unless by its express words or necessary implication it clearly appears to be the parties' intention to include past obligations" (internal quotation marks omitted)); *Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 916–17 (Iowa 1975) (noting that such clauses must "plainly manifest[ ] an intention, not to be limited to future losses or liabilities, but also to cover past transactions and existing losses or liabilities" (quoting 42 C.J.S. Indemnity § 12(b), p. 581)).

| "Purchase Order" | any purchase order or amendment to a purchase order submitted by Nissan ***and accepted by Supplier*** on or after the Effective Date. ***For purposes of this definition, Supplier will be deemed to have accepted the purchase order if (i) it fails to object to it in writing within ten (10) business days after receipt, or (ii) Supplier acknowledges in writing its acceptance of the Purchase Order or amendment thereto;*** |
| --- | --- |

(*Id.* ¶ 42). The parties specifically negotiated and agreed on the bolded and italicized terms in the definition of "Purchase Order." (*Id.* ¶ 43). Notably, the parties altered Nissan's standard language before and after the temporal clause "on or after the Effective Date" of October 22, 2004 but chose not to make the MPA apply retroactively. (*Id.* ¶ 44).

Nissan asks the Court to ignore these plain terms and instead interpret the MPA's integration clause in such an unprecedented manner as to have its provisions apply "forward and backward." Nissan's position is contrary to the purpose of integration clauses, which operate only to bar the introduction of parol evidence by a party to later claim that the contract does not represent the parties' true and complete understanding of the agreement. *See, e.g.*, *Security Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999). Not surprising, Nissan cites no authority for its position because no such authority exists. The simple fact is that the MPA expressly limits the application of its framework terms to Purchase Orders issued and accepted after October 22, 2004. (SUF ¶¶ 41-42). The Contract at issue predates the Effective Date of the MPA by well over a year so it is not a Purchase Order subject to the MPA. (*Id.* ¶¶ 1 & 38). If the parties intended the MPA to apply retroactively, they could have simply changed the language to say exactly that. They chose not to and, as a result, the MPA cannot be applied retroactively.

Although addressing an alternative-dispute resolution provision rather than an indemnity clause, the Sixth Circuit's opinion in *Security Watch, Inc. v. Sentinel Systems, Inc.* is dispositive on

this issue. In that case, Sixth Circuit was analyzing the Western District of Tennessee's decision to grant the defendants' motion to dismiss. The district court granted the motion to dismiss in part because of an ADR clause in a later executed contract ("1994 contract"). On appeal, the plaintiffs argued that the 1994 contract was not applicable to claims related to products supplied under earlier contracts, and, therefore, the ADR provision was not applicable either. In the 1994 contract, there was both an ADR provision and a standard integration clause. The Sixth Circuit held that disputes arising under the pre-1994 contracts were not governed by the ADR clause contained in the 1994 contract because: (1) it was clear that the ADR clause didn't reach disputes relating to products shipped under earlier contracts; and (2) it was inappropriate to read the merger clause as superseding prior annual contracts. It stated:

> Merger clauses are routinely incorporated in agreements in order to signal to the courts that the parties agree that the contract is to be considered completely integrated. A completely integrated agreement must be interpreted on its face, and thus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document.

*Id.* at 372. The Sixth Circuit found that the district court ignored the "universally understood purpose of the boilerplate clause" by finding that the 1994 contract constituted the entire relationship of the parties and that any contract prior was a prior written understanding that was superseded by the 1994 contract. *See also Choice Security Sys., Inc. v. AT&T Corp.*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb. 25, 1998) (finding that an identical "run of the mill integration clause" in a later agreement did not cause it to supersede prior agreements especially when there were no other provisions in the contract at issue that "remotely intimated that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements").

16

**E. Nissan's implied indemnity claim is barred by its express stipulation and the court's order in the Bernardino Lawsuit (and its own negligence)**

The fact that Nissan even alleged such a claim is a mystery considering Nissan stipulated to the good faith of CAS's settlement in the Bernardino Lawsuit and, as part of that stipulation, Nissan agreed that "any and all claims by and between the Parties for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault, shall be barred pursuant to *California Code of Civil Procedure* § 877.6." (SUF ¶¶ 53-54). And that is the legal effect of a "good faith" settlement determination (as entered here by the court) under controlling California law, California Code of Civil Procedure section 877.6(c). *See also Bay Development, Ltd. v. Superior Court*, 50 Cal.3d 1012, 1029-1031 (Cal. 1990) (noting that California Code of Civil Procedure § 877.6(c) bars claims for indemnity based on an implied contractual theory).

In this case, Nissan's purported claim for implied indemnity is barred not only by its stipulation in the Bernardino Lawsuit and the order entered by the trial court but also Nissan's own conduct and negligence because Nissan can only maintain a claim for implied indemnity if its liability arises vicariously or by operation of law from the conduct of Defendants and through no fault of Nissan. *Peeples v. Detroit*, 297 N.W.2d 839 (Mich. App. 1980); *Duncan-Williams, Inc. v. Capstone Develop., LLC*, 908 F. Supp. 2d 898, 906 (W.D. Tenn. 2012) ("Under both Alabama and Tennessee law, indemnity is available only in a case where 'one party is held liable solely by imputation of law because of a relation to a wrongdoer.'") (quotation omitted). Stated differently, Nissan must prove that it "is entirely without fault and that it would be held liable only because of its vicarious relationship with [CAS]." *McPike v. Die Casters Equip. Corp.*, 504 F. Supp. 1056, 1065 (W.D. Mich. 1980); *Time & Sec. Mgmt, Inc v. Pittway Corp.*, 422 F. Supp.2d 907, 916-17 (W.D. Tenn.

2006) (dismissing implied indemnity claim where the party asserting it was defending against claims for its own wrongdoing). Nissan cannot meet this burden because it is not free from fault.

In the Bernardino Lawsuit, the jury found that "the design of the 2004 Infiniti QX56's braking system [was] a substantial factor in causing harm to Hilario Cruz, Araceli Mendez and Solomon Menthenge[.]" (SUF ¶ 62). The jury also found that "Nissan's negligence in failing to recall the 2004 Infiniti QX56 [was] a substantial factor in causing harm to Hilario Cruz, Araceli Mendez and Solomon Menthenge[.]" (*Id.*). Unlike Nissan's attempt to bind CAS with those findings, those findings and resulting Judgment are binding on Nissan.

Nissan placed vehicles into the field with an OHB system that Nissan knew had an "unexpected" and "alarming" feel for its end users to "give the driver some tactical feedback, hearing, seeing, feeling that the brake system needs attention. So please go get the vehicle serviced. That was a conscious decision made." (*Id.* ¶¶ 14-28 & 56-58). And when users returned vehicle after vehicle because of surprising and unsettling real-world encounters with Nissan's OHB strategy and related brake feel and pedal travel design choices in the field, Nissan chose not to recall because, according to Nissan, the OHB system operated as Nissan intended. (*Id.* ¶¶ 29-37). For these reasons, the jury in the Bernardino Lawsuit found that Nissan's own system and vehicle design and development strategy and own negligent failure to recall vehicles deploying that strategy were substantial factors in causing the injuries to the decedents. (*Id.* ¶¶ 56-62). Because of these findings, Nissan cannot sustain a claim for implied indemnity. Moreover, the MPA does not provide in "clear and unequivocal terms" an intent to require CAS to indemnify Nissan for Nissan's own culpable conduct. *HMC Techs Corp. v. Siebe, Inc.-Robertshaw Tenn. Div.*, No. E2000-01093, 2000 WL 1738860, at *3 (Tenn. App. Nov. 27, 2000). In fact, the MPA explicitly carves out

indemnification for costs reasonably attributable to Nissan's conduct. (SUF ¶ 46). There is no dispute that Nissan designed, developed, tuned and validated the feel, response, and travel of the brake pedal when the Subject Vehicle's OHB system was activated. (*Id.* ¶ 14). And there is no dispute that Nissan alone was responsible for the decision whether to recall the Subject Vehicle. (*Id.* ¶¶ 29-37). Far from merely "reasonably attributable" to Nissan's conduct, the Bernardino jury found that Nissan's conduct was the sole factor in causing the underlying accident.

Nissan designed a braking strategy to "give the driver some tactical feedback." When that decision led to thousands of complaints, Nissan was defiant, refusing to recall its vehicles because the OHB activation strategy worked as Nissan intended. (*Id.* ¶¶ 14-37). Those are the reasons the Bernardino Litigation plaintiffs sued Nissan and that is how the case was tried. Stated simply, Nissan's own designs, strategies, conduct, and omissions resulted in its damages. Nissan's claims are therefore barred not just by California law but also by the fact that Nissan alone was at fault and 100% responsible for the deaths of the Bernardino Lawsuit decedents. Defendants are entitled to summary Judgment of Nissan's implied indemnity claims.

## V.    Conclusion

Nissan's design choices and negligence have been found to be substantial factors in causing the wrongful death of a young mother and two of her daughters. Nissan's attempts to foist the consequences of its own misconduct on the Defendants are contrary to the law of indemnity. Nissan issued no purchase order to ContiTech or Continental Tire for the Assemblies (because they never manufactured them). And the purchase order Nissan issued to CAS for the Assemblies had no indemnity obligations at all, much less indemnity obligations for Nissan's own design choices and negligence.

19

There are only questions of law presented by this Motion, questions that require no factual development through discovery or otherwise. This is one of those rare circumstances that judgment can be—and should be—entered before the close of discovery. This is a case that never should have been filed against Defendants. There is no factual scenario under which Nissan can offload the consequences of its conduct and negligence onto Defendants. These Defendants are plainly entitled to judgment as a matter of law. Defendants therefore request that this Court grant this Motion, dismiss Plaintiff's Complaint with prejudice, enter judgment in favor of Defendants and against Plaintiff, with costs and fees to be awarded as allowed by law.

Respectfully submitted,

Herbert C. Donovan (*pro hac vice*)          /s/ W. Scott Sims
Andrew B. Fromm (*pro hac vice*)             W. Scott Sims
BROOKS WILKINS SHARKEY & TURCO PLLC          Sims Funk PLC
401 S. Old Woodward Ave. Suite 400           3322 West End. Ave. #200
Birmingham, MI 48009                         Nashville, TN 37203
donovan@bwst.law-com                         (615) 454-9335
fromm@bwst-law.com                           ssims@simsfunk.com

Dated: June 3, 2020

20

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was served on the following individuals via the Court's CM/ECF system on June 3, 2020:

Eugene N. Bulso, Jr.
Paul J. Krog
Leader, Bulso & Nolan, PLC
414 Union Street, Suite 1740
Nashville, TN 37219
gbulso@leaderbulso.com
pkrog@leaderbulso.com

*/s/ W. Scott Sims*