## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| NISSAN NORTH AMERICA, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:19-cv-00396** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| CONTINENTAL AUTOMOTIVE | ) | |
| SYSTEMS, INC., CONTITECH NORTH | ) | |
| AMERICA, INC., and CONTINENTAL | ) | |
| TIRE THE AMERICAS, LLC, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Nissan North America, Inc. ("Nissan") has filed a Motion for Summary Judgment (Doc. No. 55), to which defendants ContiTech North America, Inc. ("ContiTech"), Continental Automotive Systems, Inc. ("CAS"), and Continental Tire the Americas, LLC ("Continental Tire") have filed a Response (Doc. No. 63), and Nissan has filed a Reply (Doc. No. 77). The defendants have filed a Motion for Summary Judgment (Doc. No. 67), to which Nissan has filed a Response (Doc. No. 84), and the defendants have filed a Reply (Doc. No. 96). The defendants have filed a Motion for Hearing. (Doc. No. 72.) For the reasons set out herein, the Motion for Hearing and Nissan's Motion for Summary Judgment will be denied, and the defendants' Motion for Summary Judgment will be granted in part and denied in part.

## I. BACKGROUND

In 2004, a brand-new 2004 Infiniti QX56 was sold to a driver who otherwise has nothing to do with this case. The driver got into an accident in the car, after which he sold the repaired car back to the dealership. In 2006, another driver, who is also otherwise unrelated to this case, bought

the car. He was in an accident as well, but the damage from this accident was severe enough that his insurance company elected to "total" the car. In August 2012, a third driver, Solomon Mathenge, bought the car at an auction in North Hollywood, California. Later that same month, Mathenge was driving the car when he experienced what he perceived as a brake failure. The car careened into oncoming traffic, where it struck a van carrying Saida Mendez and her two daughters. Mendez and her daughters were killed, and Mathenge suffered significant injuries, including a fractured hip and broken ribs. *Cruz v. Mathenge*, No. B286067, 2019 WL 926498, at *3 (Cal. Ct. App. Feb. 26, 2019). The parties agree that some, but not all, of the components of the car's braking system were manufactured by CAS and purchased by Nissan. (Doc. No. 85 ¶¶ 9–10.)

When an investigator from the Los Angeles Police Department inspected Mathenge's car, he found that the brakes were, at least on a mechanical level, fully operational. The State of California, left without any explanation other than human error, brought charges against Mathenge for vehicular manslaughter, on the assumption that he erroneously pushed the gas instead of the brake. While charges were pending, however, Mathenge's daughter learned that there was a pending civil lawsuit based on strikingly similar allegations—specifically, that Nissan drivers had been suddenly and dangerously discovering that their brakes did not seem to respond as expected. There was, moreover, a technical explanation—although it was one considerably more complex than the brakes simply failing. As the California Court of Appeal explained in the concluded California state civil litigation involving the collision between Mathenge and Mendez:

> The 2004 Infiniti QX56 has two methods available to supplement braking power: a vacuum booster and a hydraulic pump. The primary method is through the vacuum booster. The brake pedal pushes a lever, which pushes the booster. Using vacuum, the booster increases the force applied to the brake pedal to provide additional power to compress the hydraulic fluid in the brake system. In the event of a loss of vacuum to the brake booster, Nissan's optimized hydraulic braking

2

system (OHB) uses the hydraulic pump to provide brake pressure. When OHB is triggered, the hydraulic pump is the primary source of hydraulic pressure in the system, rather than the force applied to the brake pedal.

The design of a car includes a target "feel" of the brake pedal during normal driving conditions. OHB is an emergency system, so Nissan did not adjust the feel of the pedal during OHB use based on customer perception. When OHB is activated, the driver often hears the "grinding" sound of the hydraulic pump starting. The brake pedal will feel less linear and have a longer pedal stroke, meaning that the driver would push the pedal further than normal. Subjectively, it will feel different from the driver's expectation of the pedal feel under normal conditions.

The delta stroke sensor (DSS) is part of the OHB system. It measures the stroke in the vacuum booster. If the delta stroke sensor detects data that it interprets as a loss of vacuum through the stroke, or the delta stroke sensor fails, the software sends a fault code to the electronic control unit. The diagnostic trouble code for an issue with the delta stroke sensor is C1179. In vehicles manufactured by other companies using Continental's braking components, a C1179 code triggered a warning light on the dashboard to have the brakes checked. Nissan chose to have a C1179 code activate OHB. The delta stroke sensors in certain Nissan cars, including Mathenge's car, were calibrated to measure from a starting value that was set at the factory. Sensors like this "drift" over time, meaning the "zero" point that the sensor is calibrated to measure from may change over time and start from the wrong point. The drift may cause the sensor to register a false C1179 code.

*Cruz*, 2019 WL 926498, at *1–2. In other words, a CAS-provided sensor had a tendency to falsely diagnose the braking system as suffering from a loss of its vacuum booster, and that false diagnosis would automatically trigger the OHB—an emergency, supplemental source of brake pressure that was intended to protect the driver's safety but that, as a practical matter, suddenly and unexplainedly changed the feel of the brake pedal under the driver's foot, creating what seemed to be a failure of the brakes. An examination of Mathenge's car confirmed that it had sent a C1179 error code, despite its vacuum braking's not having failed *Id.* at *2. The criminal charges against Mathenge were eventually dismissed. *Id.* at *4.

Meanwhile, survivors of Mendez and her children sued Mathenge, Nissan, and CAS, and Mathenge sued Nissan and CAS as cross-defendants. *Id.* CAS settled the claims against it for $3,300,000, and the remaining claims went to trial. *Id.* at *5. On July 21, 2017, a California jury

returned a verdict concluding that the design of the 2004 Infiniti QX56's braking system was a substantial factor in the crash and that Nissan had been negligent in failing to recall the car. *Id.* at *9. Although the jury concluded that Mathenge had been negligent himself, it also concluded that his negligence was not a substantial factor in the crash and assigned 100% responsibility to Nissan. The jury awarded total damages of $7,431,069 to Mendez's sister, $14,000,040 to the children's father, and $3,500,000 to Mathenge, for a total of $24,931,109. (Doc. No. 55-2 at 3–6.) In post-trial proceedings, the court reduced that figure by $3,300,000, to $21,631,109, to reflect an offset based on the settlement amount that had already been paid by CAS. (Doc. No. 55-3.) In reaching its decision regarding the offset, the California court concluded that CAS and Nissan were jointly and severally liable under California law—although this ruling, of course, did not result in actual, enforceable joint and several liability, because any claims against CAS had been settled. (Doc. No. 55-3 at 4–5.) In addition to the awards granted to the plaintiffs, Nissan incurred substantial litigation costs—it claims, $6,084,553.87—over the course of the litigation. (Doc. Nos. 56–58.)

Nissan sued the defendants in Rutherford County, Tennessee Circuit Court on April 5, 2019, seeking indemnification for its liability in the California litigation, and the defendants removed the case to this court. (Doc. No. 1; Doc. No. 1-1 at 7.) Nissan argues that the defendants owe it an obligation of indemnity pursuant to the parties' Master Purchase Agreement ("MPA"), executed October 22, 2004, after the sale of the braking components at issue in this case. The MPA includes the following provision:

> In addition to what is specified elsewhere in this Agreement, Supplier shall indemnify and hold harmless Nissan and its dealers (to the extent indemnified by Nissan or Nissan Affiliates), its Affiliates and their dealers (to the extent indemnified by Nissan or Nissan Affiliates), and their respective officers[,] directors and employees (the "Nissan Indemnified Parties"), in full against all loss, liability, damages, costs and all expenses, including attorney fees and expert fees, arising out of claims or lawsuits for personal injury, property damage or economic damage alleging:

(1) defects in design (to the extent that supplier has furnished the design), warnings (to the extent that Supplier has furnished the warnings), materials, workmanship and performance . . . .

(Doc. No. 43-3 at 13.) "Supplier" is defined to refer to the three defendant companies collectively. (*Id.* at 1.)

The MPA states that it governs the sale of "parts," which are defined as "all goods more particularly described in any Purchase Order." (*Id.* at 4, 6.) It explains:

Nissan agrees to purchase and Supplier agrees to sell the Parts under the terms and conditions of this Agreement; provided, however, that any specific commitment to purchase and sell shall be subject to the acceptance by Supplier of Purchase Orders issued by Nissan and the Releases thereunder. ***Nissan shall have no obligation to purchase any Parts before such Purchase Orders and/or Releases are issued. No modification or waiver of this Agreement or any Purchase Order shall be deemed effected by either Party's acknowledgment or confirmation containing other or different terms. Should any acknowledgment or confirmation received from the other Party contain additional or different terms than this Agreement or Nissan's Purchase Orders, those terms shall be considered proposals by the other Party that are hereby rejected.***[1]

(*Id.* at 6 (formatting in original).) The term "Purchase Order" is defined as follows:

any purchase order or amendment to a purchase order submitted by Nissan ***and accepted by Supplier*** on or after the Effective Date. ***For purposes of this definition, Supplier will be deemed to have accepted the purchase order if (i) it fails to object to it in writing within ten (10) business days after receipt, or (ii) Supplier acknowledges in writing its acceptance of the Purchase Order or amendment thereto*** . . . .

(*Id.* at 5.) The MPA defines its "Effective Date" as October 22, 2004. (*Id.* at 1.)

At the time that the terms of the MPA were adopted, however, Nissan had already been routinely purchasing parts from CAS (or its predecessor company), including the specific braking system components that were installed into Mathenge's car. Those parts were purchased pursuant

---

[1] The MPA uses bold-faced, italicized text to identify language that was negotiated between Nissan and the Continental companies as an amendment or modification of Nissan's template supplier agreement. (Doc. No. 85 ¶ 43.)

5

to purchase orders, with no MPA contemporaneously governing the parties' broader relationship. (*See, e.g.*, Doc. No. 85 ¶¶ 1–8.) The purchase of at least one of the brake components at issue in this litigation was governed by the terms of a 2003 purchase order to CAS's predecessor company designated as "Purchase Order PR00094276." (Doc. No. 85 ¶¶ 1, 8.) Nissan has supplied testimonial evidence that the purchases of the parts relevant to this case were governed by a set of purchase orders, all using the same form. (Doc. No. 84-6 ¶¶ 5–8.)

The following language was included at the bottom of the purchase order:

> THIS PURCHASE ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS AND CONDITIONS STATED HEREIN AND THE TERMS OF THE PRODUCTION PARTS AND MATERIALS PURCHASE AGREEMENT, IF ANY, BETWEEN NISSAN AND SELLER. ANY ADDITIONAL OR DIFFERENT TERMS PROPOSED BY SELLER ARE NOT BINDING UNLESS SEPARATELY AND EXPRESSLY ACCEPTED BY NISSAN IN WRITING.

(Doc. No. 43-2 at 2.) Nissan later amended Purchase Order PR00094276 to change the price of the part, but the amendment did not change the language about Terms and Conditions. (Doc. No. 85 ¶¶ 5–6.) The parties agree that the relevant purchase orders were sent only to CAS (or, rather, its predecessor) and were not sent to the other, affiliated defendants, ContiTech and Continental Tire. (*Id.* ¶¶ 12–13.)

Nissan maintains that its purchase orders, at the time, were typically accompanied by written "Terms and Conditions" on the reverse side. (*See* Doc. No. 99-1 ¶ 17.) Section 8 of the Terms and Conditions stated:

> In addition to what is specified elsewhere on the document, Seller's liability shall also include all cost incurred as a result of vehicle recall programs pursuant to NTMVSA, damage or cost due to problems developed in other parts resulting from defective parts supplied by Seller, and damages or cost arising from claims of personal injury or property damages caused directly or indirectly by defective parts supplied by Seller. Nissan shall have available to it all other remedies implied or provided for by law.

(Doc. No. 43-2 at 14.)

6

The defendants dispute that Nissan has established that those Terms and Conditions were actually included on the back page of the specific purchase order relevant to this case. Nissan has not been able to produce an actual copy of that purchase order with the Terms and Conditions on the back, relying instead on a one-sided, pink copy, supplemented by testimonial evidence explaining its paperwork practices. Specifically, Nissan has provided a Declaration of Paul Garner Jr., a Nissan employee who has worked in the company's purchasing department since 1995. (Doc. No. 84-6 ¶ 2.) Garner explains:

> 5. All purchase orders were printed on four-part carbonless-copy preprinted forms that were fed through tractor-fed impact printers. The forms themselves were the same for all purchase orders generated in the office. A purchasing-department employee generated a particular purchase order by typing the appropriate information into the purchasing department's computer software to populate the form. This information was then printed on the four-part form.
>
> 6. After the purchase order printed, it was reviewed and signed by the [Nissan] buyer having responsibility for the order.
>
> 7. Once the purchase order had been signed, the four parts were separated by administrative staff within the purchasing department. Two of the copies were mailed by these staff to the supplier. A third copy, pink in color, was retained by [Nissan's] purchasing department. The fourth copy was sent to accounts payable to be referenced when paying for materials shipped under the purchase order.
>
> 8. Some of the copies within the purchase-order form packet had preprinted writing on the back. This writing was not on the pink copy retained by purchasing. To the best of my understanding and recollection, the writing was on the copies mailed to the supplier.

(*Id.* ¶¶ 5–8.) The fact that Nissan's pink retained copy had no back-of-page Terms and Conditions, in other words, would not indicate that the actual purchase order sent to the seller did not.

The parties disagree about how, if at all, the purchase order for the components in Mathenge's car relates to the MPA. Article 29.1 of the MPA states that "[t]his Agreement sets forth the entire and only agreement and understanding between Nissan and Supplier and supersedes all negotiations, commitments and writings prior to the date of this Agreement

pertaining to the subject matter of this Agreement." (Doc. No. 43-3at 30.) Article 29.3 states that, "[i]n the event of any inconsistencies between the terms of this Agreement and the terms contained in any other document, instrument, agreement, Purchase Order or Release related to the supply of the Parts by Supplier to Nissan, the terms of this Agreement shall prevail." (*Id.*) Nissan suggests that these provisions should be read, among other things, to impose an indemnification obligation on CAS with regard to parts purchased pursuant to pre-MPA purchase orders. The defendants disagree, arguing that the MPA is expressly forward-looking.

On August 21, 2019, Nissan filed a Motion to Amend Complaint seeking, among other things, to "add common law claims for indemnity and contribution to its pleadings." (Doc. No. 35 at 1.) In their Response, the defendants pointed out reasons why, as a matter of law, common law claims for indemnity and contribution would not be available to Nissan. (Doc. No. 38 at 9–12.) In its Reply, Nissan explained that its "alternative common-law claim is essentially an indemnity claim based upon an implied contract." (Doc. No. 39 at 4.) The court granted Nissan's motion in part and denied it in part, relying significantly on its assurance that it was not seeking to allege a duty of indemnity as a cause of action untethered from the ordinary law of contract, but rather a claim based on an implied contractual duty. The court wrote:

> Tennessee law recognizes that, even if there is no written contract governing a specific transaction, an implied-in-fact contract can "arise under circumstances which, according to the ordinary course of dealing and common understanding . . . show a mutual intention to contract." *Metro. Gov't of Nashville & Davidson Cty. v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 32 (Tenn. Ct. App. 2005) (quoting *Weatherly v. Am. Agric. Chem. Co.*, 65 S.W.2d 592, 598 (Tenn. Ct. App. 1933)). Viewed in the light of Nissan's clarification, this is simply another contract claim pleaded in the alternative, based on an implied contract governing the sale of the Subject Vehicle's [delta stroke sensor] component, to be considered only if the court holds that neither the MPA nor the purchase order Terms and Conditions applies.

(Doc. No. 42 at 10.) Accordingly, the court granted Nissan leave to file an Amended Complaint that would "reflect the allegations of the proposed Amended Complaint (Docket No. 35-1) except that . . . paragraph 48 shall be revised to reflect that Nissan is pleading a claim for indemnity under an implied contract, and . . . paragraph 48 should not contain a claim for contribution." (*Id.* at 13–14.) On October 3, 2019, Nissan filed an Amended Complaint alleging, in relevant part, that the defendants have "an implied contractual duty to indemnify and hold Nissan harmless from all liability and costs associated with the Lawsuit under the implied contract that existed among the parties." (Doc. No. 43 ¶ 48.) Each party now seeks summary judgment in its favor, with Nissan focusing its request for summary judgment on the MPA, and the defendants arguing that none of the agreements or potential agreements provides Nissan a right to indemnity that would apply to these facts.

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Applicability of the MPA

Nissan seeks summary judgment in its favor on the ground that its liabilities arising out of the California litigation are covered by the plain language of the MPA's indemnity provision. The defendants dispute that the MPA's indemnity provision, if it applied, would cover the liabilities at issue, because the defendants maintain that it was Nissan's overall design of its braking system, not the discreet component-level design decisions of CAS, that led to the liability. The defendants argue that, in any event, it is unnecessary to consider this case under the language of the MPA, because the MPA was not in effect when the relevant parts were purchased by Nissan, and, as a result, that purchase was governed only by the contemporaneous purchase order.

In "resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.,* 995 S.W.2d 88, 95 (Tenn. 1999)).[2] The central tenet of

---

[2] The MPA includes a choice of law provision stating that it is governed by Tennessee law, but the pre-MPA purchase orders included no such provision. (Doc. No. 43-3 at 32.) The court considered the question of which state's law governs the parties' contractual relationship in its Memorandum of October 1, 2019. The court concluded that the court did not yet have a sufficient record to determine which state's law of

contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Id.*

The determination of the parties' intent is generally a question of law. *Id.* (citing 5 Joseph M. Perillo, Corbin on Contracts § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law . . . or public policy." *Id.* (quoting 17 Am. Jur. 2d Contracts § 245). If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes.

Nissan bases its argument chiefly on the provisions of the Article 29 merger/integration clause of the MPA. Nothing in Article 29, however, expressly states that all of the terms of the MPA will apply to pre-MPA purchases. Article 29.1 states only that the MPA "supersedes all negotiations, commitments and writings prior to the date of this Agreement *pertaining to the subject matter of this Agreement*." (Doc. No. 43-3 at 30 (emphasis added).) In other words, the MPA, by its own language, does not supersede any prior agreements that governed any subject matter outside the MPA's own scope. Similarly, Article 29.3 states that, "*[i]n the event of any inconsistencies* between the terms of this Agreement and the terms contained in any other document, instrument, agreement, Purchase Order or Release related to the supply of the Parts by

---

contracts should apply, but that it was at least possible that Tennessee law governs. (Doc. No. 42 at 10–11.) The defendants now argue that, although they believe that Michigan law should govern at least the pre-MPA aspects of the parties' relationship, either state's law would support the same analysis and yield the same result. (Doc. No. 68 at 11 n.3.) Nissan argues that Tennessee law should apply. (Doc. No. 84 at 22–23 n.14.) Based on the court's review of the relevant law, it does appear that most of the defendants' arguments rely on well-established principles of contract law that do not differ between Michigan and Tennessee. The court, accordingly, will cite chiefly to Tennessee law, unless the court has identified grounds for finding a potential conflict between the two states' laws, in which case the court will cite both.

Supplier to Nissan, the terms of this Agreement shall prevail." (*Id.* (emphasis added).) In order to rely on that provision, then, Nissan would need to demonstrate an actual inconsistency between the MPA and the terms governing the purchase of the relevant brake components. There is nothing, however, inherently inconsistent about a rule that transactions after a certain date included an indemnity obligation whereas transactions before that date did not.

As the defendants point out, the MPA defines its subject matter as the purchase of "all goods more particularly described in any Purchase Order[,] including[] production parts and service parts." (*Id.* at 4.) If "Purchase Order" were not a defined term, that language could plausibly be read to apply to purchase orders that preceded the MPA's effective date, as well as those sent and accepted thereafter. However, the MPA explicitly defines "Purchase Order" as referring only to "any purchase order or amendment to a purchase order submitted by Nissan and accepted by Supplier on or after the Effective Date"—October 22, 2004. The purchase order governing the brake components that went into Mathenge's car, therefore, was not a "Purchase Order" for the purposes of the MPA, and the relevant transaction fell outside the MPA's subject matter.

Nissan's position is similar to the one rejected by the Sixth Circuit in *Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369 (6th Cir. 1999). In that case, the parties had entered into a series of contracts, only the last of which contained an alternative dispute resolution ("ADR") clause. The ADR clause did not explicitly apply to disputes related to sales made under the earlier contracts, but the last agreement, like the MPA in this case, did have an integration clause. The defendant argued that the integration clause should be read to apply the ADR provision retroactively. The Sixth Circuit, applying general principles of contract law, disagreed:

> We conclude that disputes arising under the pre-1994 contracts are not governed by the ADR Clause of the 1994 Agreement. First, it is clear that ¶ 13 [the ADR clause] alone does not reach disputes relating to products shipped under earlier agreements. Applicable to disputes "arising out of or relating to the Products furnished" under

12

the 1994 Agreement, this ADR provision is very broad in scope and certainly reaches all claims raised by Security with respect to the 1994 Agreement. However, this breadth of scope does not extend over time. Paragraph 12 specifies that the term of the agreement is twelve months, and ¶ 13 does not purport to reach disputes related to pre-1994 agreement products.

Second, it is inappropriate to read the ¶ 19 merger clause as superseding prior annual contracts. Merger clauses are routinely incorporated in agreements in order to signal to the courts that the parties agree that the contract is to be considered completely integrated. A completely integrated agreement must be interpreted on its face, and thus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document.

*Id.* at 372 (citations omitted).

Of course, not every merger or integration clause is the same, and the fact that one did not support a certain reading does not mean that another version would not. Nothing about the language of the MPA, however, would support an alternative analysis. The MPA, like the agreement in *Security Watch*, expressly applies to purchases after a certain date—in this instance, through its definition of "Purchase Order." For that reason, there is no overlapping with prior contracts that would bring the integration clause into play. If the subject matter of the agreements does not overlap and there is no contradiction between the agreements' terms, each sale must be governed by the contract that applied to it, not merely the latest-signed contract.

Moreover, Nissan has not produced any evidence, such as facts about specialized language used in the automotive manufacturing field, that would negate or undermine the most natural reading of the MPA's plain language. The relevant MPA terms, taken together, indicate that, when the parties negotiated for the MPA to cover purchase orders accepted after the effective date, they meant to exclude the purchase orders that preceded it. Both Nissan and the defendants were fully aware that Nissan and CAS had been doing business prior to the MPA. The MPA could easily have been crafted to cover those transactions retroactively. Instead, not only is there an absence of

language mandating retroactive application, but there is express language limiting the scope of the agreement to future purchase orders.

Similarly unavailing is Nissan's argument that the defendants' course of performance—that is, their having indemnified Nissan with regard to other claims arising out of pre-MPA purchases in the past—establishes that the MPA applies here. The Uniform Commercial Code, as adopted in Tennessee, provides that, in covered transactions, "[a] course of performance or course of dealing between the parties . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Tenn. Code Ann. § 47-1-303(d). The UCC also provides, however, that, where an alleged course of dealing cannot be reconciled with the language of the contract, the "[e]xpress terms prevail over course of performance." Tenn. Code Ann. § 47-1-303(e)(1). The MPA includes an express provision limiting its scope to parts bought pursuant to future purchase orders. The defendants' past actions in defending claims arising out of the flaws in the braking system are not sufficient to overcome the plain language of the MPA. The court, accordingly, will deny Nissan's motion for summary judgment based on its MPA claim and grant the defendants summary judgment, insofar as recovery is based on the MPA.

## B. Implied Contract

Nissan has pleaded a claim arguing, in the alternative, that, if the sale of the relevant brake components was not covered by the MPA or any other written agreement including an indemnity provision, then the defendants are subject to an implied contract that imposes effectively the same obligation. Unlike its MPA-based claim, Nissan does not argue that it is entitled to summary judgment under this theory. The defendants, however, do seek summary judgment with regard to any claims based on an implied contract.

14

Tennessee law recognizes that, even if there is no written contract governing a specific transaction, an implied-in-fact contract can "arise under circumstances which, according to the ordinary course of dealing and common understanding . . . show a mutual intention to contract." *Metro. Gov't of Nashville & Davidson Cty. v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 32 (Tenn. Ct. App. 2005) (quoting *Weatherly v. Am. Agric. Chem. Co.*, 65 S.W.2d 592, 598 (Tenn. Ct. App. 1933)). However, "[a] contract cannot be implied . . . where a valid contract exists on the same subject matter." *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991) (citing *Taillie v. Chedester*, 600 S.W.2d 732 (Tenn. Ct. App. 1980)). The evidence presented suggests that every transaction between the parties was governed by at least one written contract: either the MPA, in addition to a purchase order governed by the MPA, or a purchase order alone, combined with any Terms and Conditions incorporated by reference into the purchase order. There is, therefore, no basis for reading an implied contract of indemnification into the parties' relationship, and the court will grant the defendants summary judgment with regard to any claim for indemnity based on an implied contract.

## C. Terms and Conditions

### 1. Whether Relevant Purchase Orders Included the Terms and Conditions

Nissan argues that, even if the purchase of the brake components was not covered by the MPA, and even if there was no implied contract between the parties, then it has a right of indemnity pursuant to the Terms and Conditions referenced in Purchase Order PR00094276 and the other relevant purchase orders. The defendants respond that Nissan has failed to establish that Purchase Order PR00094276 or any other specific purchase order relevant to this case actually included those Terms and Conditions and that, even if the Terms and Conditions do apply, they do not mandate an indemnity obligation here. The defendants attempt to undermine Garner's Declaration

by contrasting it with an earlier Declaration by another potential witness that was more equivocal about Nissan's relevant invoicing practices. (Doc. No. 96 at 3.)

Although Nissan's evidence that Purchase Order PR00094276 or any other specific relevant purchase order included the Terms and Conditions is not ironclad, it is plainly sufficient to allow a reasonable jury to conclude that the Terms and Conditions were included. Nissan has provided testimonial evidence by Garner that the company's policy was to include the Terms and Conditions and explaining why the retained copies would lack them. According to Garner, moreover, the inclusion of the Terms and Conditions on the supplier's copies only was a function of how the paperwork was printed, not any individual, transaction-specific decision by Nissan, which reduces the possibility that the Terms and Conditions may have been omitted for any particular transaction. Finally, Purchase Order PR00094276 plainly refers to Terms and Conditions, supporting the inference that some were included. The defendants are therefore not entitled to summary judgment solely on the ground that the Terms and Conditions were not part of Purchase Order PR00094276 or any other purchase order relevant to Mathenge's vehicle.

2. Whether Section 8 of the Terms and Conditions is an Indemnity Clause

The defendants argue next that, even if the Terms and Conditions apply to the purchase of the brake components that went into Mathenge's vehicle, those Terms and Conditions do not, in fact, create any indemnity obligation. In the relevant language, the seller agrees that its "liability shall . . . include . . . damages or cost arising from claims of personal injury or property damages caused directly or indirectly by defective parts supplied by Seller." (Doc. No. 43-2 at 14.) The defendants argue that, because this language makes no express mention of indemnification, it should not be read as an indemnity clause.

16

The defendants, however, identify no caselaw, from either Tennessee or Michigan, that would require a contract to use the terms "indemnity," "indemnification," or "indemnify" in order for an indemnification obligation to arise, as long as the relevant contractual provision is sufficiently clear. Tennessee has recognized the rule that "contracts that indemnify a party against one's own negligence, while not against public policy, must state that intent in 'expressly clear and . . . unequivocal terms.'" *Phoenix Ins. Co. v. Estate of Gainer*, No. M2007-01446-COA-R3-CV, 2008 WL 5330493, at *7 (Tenn. Ct. App. Dec. 19, 2008) (quoting *Kellogg Co. v. Sanitors, Inc.*, 496 S.W.2d 472, 474 (Tenn. 1973)); *but see Fischbach-Natkin Co. v. Power Process Piping, Inc.*, 403 N.W.2d 569, 571 (Mich. Ct. App. 1987) (holding that the rule "that indemnification contracts will not be considered to indemnify the indemnitee against losses from his own negligent acts unless such an intent is expressed in the contract language itself in clear and unequivocal terms . . . no longer applies"). The plain language of the provision, however, makes CAS liable for "damages or cost arising from claims of personal injury or property damages," if those damages were the result of a defective part. That language, on its face, would cover at least some hypothetical liabilities by Nissan to a driver or drivers. The court therefore will not grant the defendants summary judgment based on its argument that the Terms and Conditions contain no indemnity clause.

### 3. Whether the Terms and Conditions Could Mandate Indemnification in this Case

The defendants argue next that, even if Section 8 of the Terms and Conditions is read as an indemnity clause, it does not apply in this case because Nissan's liability in the California litigation was (1) based on Nissan's improper design of the braking system and (2) its failure to issue a recall, not the defective nature of any individual component. Nissan responds that, because the defendants settled the claims against them in the California litigation before trial, there was

17

Case 3:19-cv-00396   Document 120   Filed 11/25/20   Page 17 of 21 PageID #: 6134

never any occasion to apportion the fault for the braking system's flaws between them, and there remains a contested issue of fact with regard to whether defective CAS parts might have been at fault.

Nissan is correct that, because the California trial and the resulting verdict involved Nissan as the only defendant associated with the manufacture of the car, the jury never had a reason to break down the question of whether Nissan's braking system was flawed because of Nissan's decisions or because of the parts supplied. The Consolidated Complaint in that case explicitly alleged that CAS "designed, manufactured, and supplied defective component parts" that led to the collision—specifically, because "the Delta Stroke Sensor ('DSS'), an integral electronic component of the vehicles which affects critical safety aspects of braking, was well known by [Nissan and CAS] to be defective and faulty, having a high and unreasonably high incidence of failure during normal and customary use." (Doc. No. 43-4 ¶¶ 11, 17.) The jury verdict, however, concluded only that "the design of the . . . braking system" was a substantial factor in the collision (Doc. No. 55-2 at 1)—which could mean, for example, that the DSS was too error-prone but could also mean only that the collision was caused by the fact that the brake system, at Nissan's direction, created an unusual brake feel when an error code was sent. The court therefore cannot determine, from the verdict alone, whether Nissan's liability would fall within the indemnity obligation described in the Terms & Conditions or not. Nissan is therefore correct that the California litigation does not resolve this issue.

Nevertheless, Nissan, as the party opposing summary judgment, still has an obligation to identify evidence sufficient for a reasonable jury to conclude that a defective CAS part was at fault. The defendants contend that, prior to Nissan's response to the defendants' Motion for Summary Judgment in this case, neither Nissan nor any Nissan witness ever contended that the CAS braking

components were defective and that Nissan has only scant, self-serving evidence to that end now. To the contrary, however, Nissan has produced evidence that the delta stroke sensor provided by CAS had a tendency to send false error codes showing that vacuum loss had occurred when it had not. (Doc. No. 87-11 at 181–85.) The evidence also has shown that CAS provided the larger OHB system that caused the confusing brake feel—although CAS, in response, points to evidence that it did so pursuant to Nissan's direction. (Doc. No. 99-1 ¶¶ 1–2.) The defendants point out that Nissan, in the California litigation, argued that none of the vehicle's features amounted to a defect. Nissan, however, lost that case; that is why the parties are here today. The court's duty now is to look at the available evidence and determine whether a reasonable finder of fact could conclude that the CAS parts were defective, an issue not specifically addressed in the prior litigation. Based on the evidence provided, a reasonable finder of fact could so conclude.

It is also immaterial, for the purposes of Nissan's claim in this court, that the California jury concluded that Nissan negligently failed to recall Mathenge's car and that that failure contributed to the collision. The California Court of Appeal interpreted the jury's verdict as "award[ing] the full amount of the plaintiffs' damages in connection with the claim for product liability" with "no apportionment of any separate amount of damages to the cause of action for failure to recall." *Cruz*, 2019 WL 926498, at *21. The entirety of the damages awarded in the California litigation, therefore, is attributable to the design defect, even if Nissan also acted negligently in not issuing a recall.

Nissan goes a step further and argues that this court should hold that the issue of CAS's fault was resolved by the Court of Appeal's conclusion that CAS was—for the purposes of calculating damages in light of the settlement—jointly and severally liable for the damages awarded to Mathenge and the survivors of Mendez and her daughters. *See id.* at *21. CAS,

however, was not a party to the California trial or to the appeal, and no actual finding of liability or fault by CAS was at issue. Rather, the claims against CAS had long been settled, and the Court of Appeal was simply considering the correctness of the trial court's decision to apply an offset to the jury's damages based on that settlement amount.[3] Nissan has not identified any basis pursuant to which CAS would be bound by that dictum in an opinion from a proceeding where it did not appear or have an opportunity to defend itself.

### 4. The Non-CAS Defendants

The defendants argue that, if Nissan's sole basis for liability is the Terms and Conditions, then the court should grant summary judgment to ContiTech and Continental Tire, because neither of them received the purchase orders at issue and, therefore, they were not party to the Terms and Conditions. They are correct. The Terms and Conditions, by their own terms, apply only to the "Seller." (Doc. No. 43-2 at 14.) Each purchase order, in turn, expressly identifies the seller and identifies only one company: CAS's predecessor. (*E.g.*, *id.* at 1.) There is no basis for treating the defendants, other than CAS, as parties to the relevant contractual obligations. Although Nissan argues that ContiTech and Continental Tire would qualify as "Sellers" under the MPA, the court has already concluded, as a matter of law, that the MPA does not apply to Nissan's injury in this case. Because ContiTech and Continental Tire were not parties to the sole agreement on which liability might be premised, the court will grant them summary judgment in full.

## CONCLUSION

For the foregoing reasons, Nissan's Motion for Summary Judgment (Doc. No. 55) and the defendants' Motion for Hearing. (Doc. No. 72) will be denied, and the defendants' Motion for

---

[3] Section 877 of the California Code of Civil Procedure states that, where one of multiple tortfeasors settles the claims against it, the court "shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater." Cal. Civ. Proc. Code § 877.

Summary Judgment (Doc. No. 67) will be granted in part and denied in part. The court will grant defendants Continental Tire and ContiTech summary judgment with regard to all claims against them and will grant CAS summary judgment with regard to the claims against it based on the MPA or any implied duty of indemnity.

     An appropriate Order will enter.

                                               _____

                                             ALETA A. TRAUGER
                                             United States District Judge