| | | |
|---|---|---|
| NISSAN NORTH AMERICA, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:19-cv-00396** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| CONTINENTAL AUTOMOTIVE | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Nissan North America, Inc. ("Nissan") has filed a Motion for Summary Judgment (Doc. No. 187), to which Continental Automotive Systems, Inc. ("Continental") has filed a Response (Doc. No. 201), and Nissan has filed a Reply (Doc. No. 219). Continental has filed a Motion for Summary Judgment (Doc. No. 190), to which Nissan has filed a Response (Doc. No. 206), and Continental has filed a Reply (Doc. No. 215). For the reasons set out herein, Nissan's motion will be denied, and Continental's motion will be granted.

## I. BACKGROUND

### A. The Original Litigation

On August 29, 2012, 74-year-old Solomon Mathenge was driving a 2004 Infiniti QX56 in California when he struck another vehicle in an intersection. The three individuals in the other vehicle—Saida Juana Mendez Bernardino and her two young daughters—were killed. (Doc. No. 207 ¶¶ 87–88.) The decedents' next of kin filed multiple lawsuits arising out of the collision, and those lawsuits were ultimately consolidated into a single proceeding, which the court will refer to as the "Original Litigation." (*Id.* ¶¶ 89–90.) The Original Litigation included claims against both

Nissan, which manufactured Mathenge's vehicle, and Continental, which had supplied Nissan with some components of the vehicle's braking system. (*Id.*)

The theory that the collision was caused by the braking system in Mathenge's vehicle was later summarized by the California Court of Appeal as follows:

> The 2004 Infiniti QX56 has two methods available to supplement braking power: a vacuum booster and a hydraulic pump. The primary method is through the vacuum booster. The brake pedal pushes a lever, which pushes the booster. Using vacuum, the booster increases the force applied to the brake pedal to provide additional power to compress the hydraulic fluid in the brake system. In the event of a loss of vacuum to the brake booster, Nissan's optimized hydraulic braking system (OHB) [manufactured by Continental] uses the hydraulic pump to provide brake pressure. When OHB is triggered, the hydraulic pump is the primary source of hydraulic pressure in the system, rather than the force applied to the brake pedal.

> The design of a car includes a target "feel" of the brake pedal during normal driving conditions. OHB is an emergency system, so Nissan did not adjust the feel of the pedal during OHB use based on customer perception. When OHB is activated, the driver often hears the "grinding" sound of the hydraulic pump starting. The brake pedal will feel less linear and have a longer pedal stroke, meaning that the driver would push the pedal further than normal. Subjectively, it will feel different from the driver's expectation of the pedal feel under normal conditions.

> The delta stroke sensor (DSS) is part of the OHB system. It measures the stroke in the vacuum booster. If the delta stroke sensor detects data that it interprets as a loss of vacuum through the stroke, or the delta stroke sensor fails, the software sends a fault code to the electronic control unit. The diagnostic trouble code for an issue with the delta stroke sensor is C1179. In vehicles manufactured by other companies using Continental's braking components, a C1179 code triggered a warning light on the dashboard to have the brakes checked. Nissan chose to have a C1179 code activate OHB. The delta stroke sensors in certain Nissan cars, including Mathenge's car, were calibrated to measure from a starting value that was set at the factory. Sensors like this "drift" over time, meaning the "zero" point that the sensor is calibrated to measure from may change over time and start from the wrong point. The drift may cause the sensor to register a false C1179 code.

*Cruz v. Mathenge*, No. B286067, 2019 WL 926498, at *1–2 (Cal. Ct. App. Feb. 26, 2019). In other words, a Continental-provided sensor would sometimes falsely diagnose the ordinary braking system as suffering from a loss of its vacuum booster, and, pursuant to Nissan's design of the overall braking system, that false diagnosis would automatically trigger the OHB—an emergency,

supplemental source of brake pressure that was intended to protect the driver's safety but that, as a practical matter, abruptly changed the feel of the brake pedal under the driver's foot, creating what seemed to be a failure of the brakes. An examination of Mathenge's vehicle confirmed the presence of a C1179 error code in its computer. If an errant C1179 code had triggered the OHB in Mathenge's vehicle, such an event could have caused Mathenge to falsely believe that his brakes were failing, contributing to the accident. *Id.* at *5.

Continental and the plaintiffs in the Original Litigation settled prior to trial. (Doc. No. 207 ¶ 91.) Nissan reviewed the settlement between Continental and the plaintiffs and stipulated that that settlement was in good faith. (*Id.* ¶ 92.) As part of that stipulation, Nissan agreed that "any and all claims by and between the Parties for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault, shall be barred pursuant to California Code of Civil Procedure § 877.6."[1] (*Id.* ¶ 93.) Nissan, unlike Continental, did not settle with the plaintiffs, and the case went to trial.

The parties agree that the plaintiffs in the Original Litigation "alleged no design or manufacturing defect claim against Continental at the time of trial," because no such claim remained pending after the settlement. (*Id.* ¶ 96.) Nissan, however, maintains that the plaintiffs' theory of the case still effectively relied on the argument that Continental was at least partly at fault, in that the plaintiffs argued that a "software bug"—that is, the flawed nature of the DSS— had caused the emergency braking system to activate. (*Id.* ¶ 94.) While Continental does not dispute that the plaintiffs in the Original Litigation raised the issue of faulty C1179 codes, Continental points out that the plaintiffs' braking system and software expert in that litigation, Dr.

---

[1] Under California law, such a stipulation does not preclude a potential recovery for indemnity based on an express contractual right, *see Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*, 182 Cal. App. 4th 23, 32 (2010), which is the only type of indemnity that Nissan is currently seeking.

3

Ionnis Kanellakopoulos, testified that the 2004 Infiniti QX56 could have been designed, as other vehicles were, for a C1179 error code merely to trigger the vehicle's brake light, not the emergency braking system itself. With such a design, the worst possible outcome from a false positive error code would have been an unnecessary brake light warning, not a sudden and confusing change in the feel of the brakes. Dr. Kanellakopoulos testified, "[T]he best strategy would have been to just do what Toyota did . . . and what Continental suggested, which was turn on the brake warning light and let the person go to the dealer and take care of it." (*Id.* ¶ 95; Doc. No. 192-53 at 26.) Continental argues that, insofar as that 2004 Infiniti QX56's braking system did, in fact, cause the Mathenge/Bernardino collision, it was due to that overall design decision by Nissan itself, not Continental's components.

On July 21, 2017, the jury in the Original Litigation returned a verdict concluding that the "design of the 2004 Infiniti QX56's braking system was a substantial factor in causing" the collision and that the "benefits of the design of the QX56's braking system [did not] outweigh the risks of the design." (Doc. No. 55-2 at 1–2.) The verdict form did not include any findings regarding any specific components of the "braking system," such as the DSS or OHB, or any findings about the division of design responsibilities between Nissan and Continental. (*Id.*) In addition to finding that the design of the 2004 Infiniti QX56 was defective, the jury found that Nissan was negligent in failing to recall the vehicle. (*Id.* at 2.) Although the jury concluded that Mathenge had been negligent himself, it also concluded that his negligence was not a substantial factor in the crash and assigned 100% responsibility to Nissan. The jury awarded total damages of $7,431,069 to Mendez's sister, $14,000,040 to the children's father, and $3,500,000 to Mathenge, for a total of $24,931,109. (*Id.* at 3–6.)

4

Following the verdict, Nissan filed a Motion to Amend the Judgment, asking the California trial court "to correct the omission of an offset against the entire verdict representing the entire settlement between [the decedents' next of kin] and Solomon Mathenge, on the one hand, and [Continental], on the other." (Doc. No. 55-3 at 3.) California's Code of Civil Procedure provides:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect:
>
> (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater.
>
> (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties.
>
> (c) This section shall not apply to co-obligors who have expressly agreed in writing to an apportionment of liability for losses or claims among themselves.

Cal. Civ. Proc. Code § 877. Nissan argued that, pursuant to that rule, it was entitled to have the award against it reduced to reflect an offset based on the Continental settlement. The plaintiffs opposed the offset, but the court sided with Nissan and reduced the plaintiffs' award by $3,300,000, to $21,631,109, to reflect a deduction of the settlement amount that had already been paid by Continental. (Doc. No. 55-3 at 2, 5.)

## B. This Lawsuit and Nissan's Theories of Recovery

On April 5, 2019, Nissan sued Continental and two affiliated companies in Rutherford County, Tennessee Circuit Court, seeking indemnification for its liability and attorney's fees in the Original Litigation. The defendants removed the case to this court. (Doc. No. 1; Doc. No. 1-1 at 7.) On October 3, 2019, Nissan filed an Amended Complaint with leave of court. (Doc. No. 43.) The court's grant of that leave, however, was not absolute. Nissan had originally requested

5

permission to "add common law claims for indemnity and contribution" (Doc. No. 35 at 1), despite the fact that such claims would, as Continental pointed out in its Response, be barred by Nissan's consent and stipulation regarding Continental's settlement. (Doc. No. 38 at 9–11.) In its Reply, Nissan reframed the proposed new claims as not, in fact, for ordinary common law indemnity or contribution, but as "essentially an indemnity claim based upon an implied contract." (Doc. No. 39 at 4.) The court permitted the amendment, provided that Nissan actually changed the proposed language to state only such a claim. (Doc. No. 42 at 13–14.) Nissan did so, and Nissan's Amended Complaint ultimately stated three potential grounds for liability by Continental: (1) an indemnification duty pursuant to a Master Purchase Agreement ("MPA") that post-dated the sale of the parts at issue in the Original Litigation but that Nissan argued reached that transaction retroactively; (2) an indemnification duty based on terms and conditions incorporated into the purchase order pursuant to which the parts were actually purchased; and (3) an implied contractual duty of indemnity.

Both Nissan and the defendants moved for summary judgment. On November 25, 2020, the court denied Nissan's motion, granted the defendants' motion in part, and denied the defendants' motion in part. (Doc. Nos. 120–21.) Specifically, the court granted the two defendants other than Continental itself summary judgment as to all claims against them and granted Continental summary judgment as to all claims other than those based on the the purchase order. (Doc. No. 121 at 1.) At the time, the purchase order had received relatively limited attention from the parties, who had devoted a substantial amount of their briefing to other issues, particularly the MPA. Now, however, the record provides more background, context, and argumentation regarding what is now Nissan's sole potential ground for recovery.

## C. The Purchase Order

The parties agree that Nissan purchased the relevant components from Continental pursuant to a purchase order designated as "Purchase Order No. PR00094276." (Doc. No. 207 ¶ 23.) Purchase Order No. PR00094276 included the following pre-printed language:

> THIS PURCHASE ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS AND CONDITIONS STATED HEREIN AND THE TERMS OF THE PRODUCTION PARTS AND MATERIALS PURCHASE AGREEMENT, IF ANY, BETWEEN NISSAN AND SELLER. ANY ADDITIONAL OR DIFFERENT TERMS PROPOSED BY SELLER ARE NOT BINDING UNLESS SEPARATELY AND EXPRESSLY ACCEPTED BY NISSAN IN WRITING.

(Doc. No. 187-3 at 1.) Nissan has provided a copy of what it identifies as the relevant Terms and Conditions, including the following Section 8:

> In addition to what is specified elsewhere on the document, Seller's liability shall also include all cost incurred as a result of vehicle recall programs pursuant to [the National Traffic and Motor Vehicle Safety Act], damage or cost due to problems developed in other parts resulting from defective parts supplied by Seller, and damages or cost arising from claims of personal injury or property damages caused directly or indirectly by defective parts supplied by Seller. Nissan shall have available to it all other remedies implied or provided for by law.

(Doc. No. 43-2 at 14.) The Terms and Conditions state that they are to be governed by Tennessee law and that any action to enforce the Terms and Conditions must be brought in Rutherford County, Tennessee. (*Id.*)

Nissan maintains that the Terms and Conditions appeared on the reverse side of the purchase order, and the evidence confirms that that was true, at least with regard to some purchase orders that Nissan used during that time period. Neither party, however, was able to produce a two-sided copy of Purchase Order No. PR00094276 confirming that the Terms and Conditions were included in that particular instance. (Doc. No. 207 ¶ 24.) When the court was considering the earlier motions for summary judgment, Nissan provided a Declaration of Paul Garner Jr., a Nissan employee who had worked in the company's purchasing department since 1995, explaining

7

Nissan's then-contemporaneous system for handling the purchase orders and how that system resulted, as a practical matter, in some copies' being retained without the Terms and Conditions on the back page:

> 5. All purchase orders were printed on four-part carbonless-copy preprinted forms that were fed through tractor-fed impact printers. The forms themselves were the same for all purchase orders generated in the office. A purchasing-department employee generated a particular purchase order by typing the appropriate information into the purchasing department's computer software to populate the form. This information was then printed on the four-part form.

> 6. After the purchase order printed, it was reviewed and signed by the [Nissan] buyer having responsibility for the order.

> 7. Once the purchase order had been signed, the four parts were separated by administrative staff within the purchasing department. Two of the copies were mailed by these staff to the supplier. A third copy, pink in color, was retained by [Nissan's] purchasing department. The fourth copy was sent to accounts payable to be referenced when paying for materials shipped under the purchase order.

> 8. Some of the copies within the purchase-order form packet had preprinted writing on the back. This writing was not on the pink copy retained by purchasing. To the best of my understanding and recollection, the writing was on the copies mailed to the supplier.

(Doc. No. 84-6 ¶¶ 2, 5–8.) Nissan provided a copy of its purchase order template to demonstrate the inclusion of the Terms and Conditions. (Doc. No. 24-2; Doc. No. 25-1; *see* Doc. No. 211-29 (example purchase order).) Nissan contends that a complete copy of Purchase Order No. PR00094276 is unavailable in part "because Continental discarded numerous purchase orders and other files." (Doc. No. 207 ¶ 24.)

The parties have now had the opportunity to explore this issue further, and, while there is still no copy of the specific original purchase order applicable to this dispute containing the Terms and Conditions, there are now several additional pieces of circumstantial evidence relevant to that inquiry. First, Continental's Rule 30(b)(6) witness, sales engineering manager Bill Kimmel, was asked about the practice of purchase orders' including terms and conditions on the reverse side,

and he responded, "I can say that there were documents that had terms and conditions on the back side, but not every document I received had writing or printing on the back side. It was different—different cases, different projects. . . . [B]ecause sometimes they weren't hard copies, like actual physical copies." (Doc. No. 194-8 at 18.) He was then specifically asked whether it was his "testimony that [he had] received a supplier copy original purchase order from Nissan that did not have terms and conditions printed on the reverse side." (*Id.*) He responded, "I would—yes. If I received it . . . electronically or through a fax, then typically it would just be the front page." (*Id.*) He ultimately testified that he could not say whether or not Purchase Order No. PR00094276 had contained Terms and Conditions on its back side. (Doc. No. 202-2 at 23–24.)

Nissan's purchasing manager, Mark Meltzer, was also questioned during his deposition about purchase order practices. (Doc. No. 202 ¶ 4.) Meltzer confirmed that Nissan had used a multicolor, four-copy system for its purchase orders:

> Q. How many copies of the purchase order were created at the time of purchase during the time frame we're talking about?
>
> A. On a per-part basis, there are four copies.
>
> Q. Are there four separate copies or are there—
>
> A. No. They were—they're bound together.
>
> Q. Those were made of paper?
>
> A. Yeah. And they—it was printed out.
>
> Q. And where were those printed, sir?
>
> A. Those were printed on a printing machine when we were in Smyrna before we moved here. It was done in Smyrna.
>
> Q. And then what happened to the—a particular purchase order? What was the practice once that purchase order was printed?

A. Once it's printed, it's sent to the buyer where I reviewed and made sure that the part number's on there, and the information—pertinent information is there. Then I sign it. Then after that, I give it back to the admin, who then separates the copies. The first copy, which is the supplier copy, the original is signed, and that's—that and the acknowledgment sheet is sent to the suppliers.

Q. You just used the term "acknowledgment sheet." Is that just another identical copy of the purchase order or is an acknowledgment sheet something else?

A. The acknowledgment sheet is where the supplier acknowledges that they received the purchase order, and it has the purchase terms and conditions on the back.

(Doc. No. 211-8 at 23–25.) Meltzer testified that Nissan typically sent Continental purchase orders by mail, although he could not remember whether Nissan ever sent one by fax instead. (*Id.* at 36.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla

10

of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Whether the Terms and Conditions Were Incorporated in the Purchase Order

Continental argues first that it is entitled to summary judgment because the only remaining basis for liability is the Terms and Conditions, and "Nissan cannot establish that Continental ever received an original copy of [Purchase Order No.] PR00094276 with Terms and Conditions on the reverse side." (Doc. No. 191 at 18.) Nissan, however, argues that "the record now conclusively demonstrates that the Purchase Orders pursuant to which Continental supplied the parts included Nissan's standard Terms & Conditions." (Doc. No. 189 at 7.) Nissan also argues that, insofar as there is any remaining uncertainty about whether the Terms and Conditions may have been inadvertently omitted from the copy of Purchase Order No. PR00094276 transmitted to Continental—for example, because it was faxed—that order nevertheless incorporated the Terms and Conditions by reference, and Continental knew, through the course of the parties' dealings, what the Terms and Conditions were. (Doc. No. 206 at 4.)

The court has little difficulty rejecting Continental's argument that it is entitled to summary judgment on this ground. Although it would certainly be preferable if Nissan had been able to produce an original purchase order that included the Terms and Conditions, Continental has failed to identify any binding proposition of law actually requiring production of the original document, if its existence and terms can be established through other evidence. To the contrary, the ordinary rule, generally speaking, is that, "[w]hen a written contract . . . has been accidentally lost or

11

destroyed, under circumstances not attributable to any reprehensible negligence on the part of its owner, on his application and due proof the [court] will . . . enforce it.' *Hill v. Hill*, 403 S.W.2d 769, 777 (1965) (quoting 2 Gibson's Suits in Chancery 225 (5th ed.)); *accord Smith v. Gourley*, No. M2002-00044-COA-R3-CV, 2003 WL 724478, at *2 (Tenn. Ct. App. Mar. 4, 2003). Pursuant to that rule, a failure to locate a contract *may* be fatal to a claim, if there is no other sufficient evidence establishing that the contract was formed or what it said. There is, however, no such lack of evidence here. Nissan has provided a substantial amount of evidence that would permit a finder of fact to infer that the Terms and Conditions were, in fact, incorporated into Purchase Order No. PR00094276, likely by being included on the back page of a hard copy that was not retained by Continental. Because a reasonable finder of fact could conclude that Nissan has adequately established that the Terms and Conditions applied to the underlying transaction, there is no basis for granting Continental summary judgment on this ground.

Whether the evidence on this issue is so strongly in Nissan's favor that this aspect of the case can be resolved on summary judgment presents a closer question. Nissan's circumstantial evidence does, at the very least, strongly suggest that the Terms and Conditions were, in fact, incorporated into the purchase order. Indeed, even the reading most favorable to Continental's position is that Nissan typically included the Terms and Conditions with its purchase orders but that it occasionally omitted them when it transmitted a purchase order through a medium prone to accidental omissions of back-page information, such as by facsimile. While that may be a cautionary tale about the risks of double-sided printing, it does not actually show that the parties ever had a meeting of the minds agreeing that Nissan's ordinary terms and conditions would not apply to any particular transaction.

Even if the Terms and Conditions *were* sometimes omitted from specific purchase orders, the evidence shows that Continental was informed of the terms' existence and content and had agreed that the terms applied generally to the parties' dealings. (*See* Doc. No. 189 at 7 (discussing "Sourcing Documents[2]")). The express incorporation of some terms and conditions, moreover, appeared on the front page of Purchase Order No. PR00094276, which Continental would have received, even if it had been transmitted by fax. If Continental knew, through the course of its dealings with Nissan, what that reference to "Terms and Conditions" referred to—and that those Terms and Conditions typically appeared on a back page that might be omitted by fax—then there are grounds for concluding that the Terms and Conditions applied *even if* they were not physically received by Continental in this particular isolated instance. "The terms of an agreement may be contained in more than one document," *Francis v. Lakewood Eng'g & Mfg. Co.*, No. 05-2429, 2009 WL 10699770, at *3 (W.D. Tenn. Mar. 30, 2009), and the question of whether any particular provision was adopted by the parties depends on whether there was "a meeting of the minds . . . in mutual assent to the terms," not on mere technicalities. *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (quoting *Higgins v. Oil, Chem., & Atomic Workers Int'l Union, Local # 3–6 77*, 811 S.W.2d 875, 879 (Tenn. 1991)). If both parties knew what Nissan's Terms and Conditions were, knew that those Terms and Conditions were what the purchase orders were discussing, and knew that the Terms and Conditions were typically included on the back of an order, then there is no basis for concluding that a purchase order expressly incorporating the Terms

---

[2] Continental suggests that the specific parts at issue in this litigation were carved out of the general agreements governing the ordinary purchasing relationship between Nissan and Continental. Nissan disagrees. But even if the brake assembly was carved out of those particular agreements, the agreements provided notice of what the Nissan Terms and Conditions were, and those Terms and Conditions were then (1) expressly referenced on the front side of the purchase order and (2) expressly included on the back side of purchase orders that were not sent by facsimile or email. It is therefore simply not plausible that there was any doubt about whether Purchase Order No. PR00094276 incorporated those terms, even if they may have been omitted in the hard copy.

13

and Conditions should nevertheless be construed to omit them entirely, simply because the back page on which the Terms and Conditions were reiterated was omitted from a fax.

Continental might be entitled to take this issue to trial if there were any meaningful, persuasive evidence that the parties might actually have had a meeting of the minds about excluding the Terms and Conditions from Purchase Order No. PR00094276. Even the story told by Continental, however, is far more likely to have been one of clerical inadvertence than of a departure from the ordinary terms by which Nissan purchased parts from Continental. If a finder of fact concluded that Nissan failed to establish that it sent Continental a copy of Purchase Order No. PR00094276 with the Terms and Conditions on the back of the order, therefore, it would not support a holding that the Terms and Conditions did not apply at all. Rather, the facts would simply show that the same Terms and Conditions were incorporated by reference in a slightly more roundabout way, given that, although they were not on the physical order itself, they were cited expressly on the front of the order, were known to the parties, and appeared on the back of orders that were not faxed or emailed. The court, therefore, can conclude, for the purposes of summary judgment, that the Terms and Conditions applied to the sale of the underlying parts.

**B. Whether the Terms and Conditions Mandate Indemnity Here**

Nissan argues that "Section 8 of the Terms & Conditions imposes upon Continental an obligation to reimburse Nissan for costs it incurs arising out of claims that a defect in the parts Continental supplied directly or indirectly caused an injury" and that, because "[t]he [Original Litigation] plaintiffs undeniably *claimed* that they sustained personal injuries and property damage 'caused directly or indirectly by defective parts supplied by'" Continental, then Continental is obligated to reimburse Nissan for the full award and costs attributable that litigation, regardless of

whether Continental's parts were actually defective or to blame for the underlying collision. (Doc. No. 189 at 8–9.)

Continental, in contrast, argues that Section 8 "unambiguously limits Continental's liability to 'damages and costs' arising from personal injury or property claims that were caused directly or indirectly by defective parts supplied." (Doc. No. 191 at 19–20.) Continental suggests that this provision means that Nissan cannot rely on the indemnity provision without actually establishing that Continental's parts were defective and caused the underlying injuries. Continental points out that "Nissan has been consistent in its position that OHB is not a defect for almost 10 years" and that it has stuck by that "no actual defect" position in this case. (*Id.* at 20; *see also* Doc. No. 201 at 6–7 (collecting citations).) Because Nissan is either unwilling or unable to demonstrate an actual defect in any Continental part, Continental argues, it cannot rely on Section 8.

It is beyond dispute that the Original Litigation—at least originally—included "claims of personal injury or property damages caused directly or indirectly by defective parts supplied by" Continental. It is also beyond dispute that Nissan incurred damages and costs from the Original Litigation. The only matter that is genuinely in dispute is whether the link between those two facts is sufficient to trigger Section 8. Section 8, at most, covers only damages and costs "arising out of" a claim alleging a defect in a part manufactured by Continental. The phrase "arising out of" has been interpreted by Tennessee courts to mean "'originat[ing] from,' 'having its origin in,' 'growing out,' or 'flowing from.'" *Victoria Ins. Co. v. Hawkins*, 31 S.W.3d 578, 582 (Tenn. Ct. App. 2000) (quoting *Anderson v. Bennett*, 834 S.W.2d 320, 322 (Tenn. Ct. App. 1992) (collecting cases)). Based on that ordinary definition, Section 8 would reach, at most, damages actually attributable to a claim that a Continental part was defective. Whether that requires Nissan, in this or any other hypothetical case, to independently demonstrate the existence of an actual defect in

its post-litigation suit for indemnity is, as the court will discuss, a complex question. Continental is correct, however, that, by the plain language of Section 8, it is not enough to show that a lawsuit *included* such a claim and that the damages at issue arose, in some manner, from that lawsuit, because such a showing does not actually establish that the damages arose out of the claim of a defective Continental part itself.

That does not mean that a suit for indemnification under Section 8 would necessarily require Nissan to reestablish facts already litigated in the original lawsuit. For example, Section 8 would provide indemnification for an award entered against Nissan in a case in which the plaintiff's *only* allegation had been that Nissan sold a vehicle containing a defective Continental part that caused a collision—at least as long as Continental had been informed of the allegations in that case and had an opportunity to defend itself, making it subject to collateral estoppel arising out of that litigation. *See Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102, 107 (Tenn. 2016) (listing requirements for collateral estoppel[3]). The difficulty of determining whether Section 8 applies in this particular instance is that the Original Litigation, like many lawsuits, was not about only one thing. "It is well established that 'a party may plead in the alternative'" and may even "make inconsistent allegations" in one complaint. *Third Eye Blind, Inc. v. Near N. Ent. Ins. Servs., LLC*, 127 Cal. App. 4th 1311, 1323 (2005) (citation omitted); *see also Benz-Elliott v. Barrett Enterprises, LP*, 456 S.W.3d 140, 148 (Tenn. 2015) ("[A]lternative pleadings are expressly

---

[3] The full traditional requirements for establishing collateral estoppel are "(1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded." *Bowen*, 502 F.3d at 107 (quoting *Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009)). Tennessee now recognizes some additional forms of "nonmutual collateral estoppel" that do not require actual privity. *Id.* at 116.

16

permitted, regardless of consistency. . . .") (citation omitted). Tennessee's law of indemnity recognizes this complication and has accordingly acknowledged that indemnification does not *necessarily* arise merely because (1) a complaint stated allegations that, if true, would give rise to indemnity and (2) the plaintiff succeeded in some manner on a claim included in that complaint. For example,

> it is not uncommon that an insurer will have a duty to defend based on the allegations in the complaint, yet have no subsequent duty to indemnify the insured. This situation will occur when trial on the merits of the underlying claim proves the facts to be otherwise [than] as alleged, and judgment is entered on a ground dissimilar to the one contained in the complaint.

*Acuity v. Reed & Assocs. of TN, LLC*, 124 F. Supp. 3d 787, 795 (W.D. Tenn. 2015) (quoting *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 835 (Tenn. 1994)).

The plaintiffs in the Original Litigation alleged that multiple interrelated features of the underlying vehicle, not all of which can be attributed to Continental, contributed to the fatal collision, and the jury's eventual verdict did not definitively resolve the question of which such alleged flaws amounted to defects and caused the collision. If the jury in the Original Litigation *had* resolved the question of whether a defective Continental part had been to blame in the collision, that holding would likely be binding on Continental as a matter of collateral estoppel, given that Continental was in privity with Nissan and aware of the litigation. *See Bowen*, 502 S.W.3d at 107. Collateral estoppel, however, only applies to an issue "actually raised, litigated, *and decided on the merits* in the earlier proceeding." *Id.* (quoting *Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009)). As this court wrote in its earlier opinion:

> [B]ecause the California trial and the resulting verdict involved Nissan as the only defendant associated with the manufacture of the car, the jury never had a reason to break down the question of whether Nissan's braking system was flawed because of Nissan's decisions or because of the parts supplied. The Consolidated Complaint in that case explicitly alleged that [Continental] "designed, manufactured, and supplied defective component parts" that led to the collision—specifically, because

17

"the Delta Stroke Sensor ('DSS'), an integral electronic component of the vehicles which affects critical safety aspects of braking, was well known by [Nissan and Continental] to be defective and faulty, having a high and unreasonably high incidence of failure during normal and customary use." (Doc. No. 43-4 ¶¶ 11, 17.) The jury verdict, however, concluded only that "the design of the . . . braking system" was a substantial factor in the collision (Doc. No. 55-2 at 1)—which could mean, for example, that the DSS was too error-prone but could also mean only that the collision was caused by the fact that the brake system, at Nissan's direction, created an unusual brake feel when an error code was sent. The court therefore cannot determine, from the verdict alone, whether Nissan's liability would fall within the indemnity obligation described in the Terms & Conditions or not.[4]

(Doc. No. 120 at 18.)

The jury in the Original Litigation never ruled on, or had any reason to rule on, whether the DSS was, in and of itself, defective or the cause of the collision, because it had no reason to. And Continental, in turn, had no opportunity to defend itself against such a holding in that litigation, because the claims against it had been settled. Rather, the jury in the Original Litigation held only that the vehicle's *braking system* was defective, because the risk that arose from the sensor's triggering the emergency braking system was sufficiently severe to outweigh any benefits of the design. The development of the braking system as a whole, however, was overseen by Nissan, and the system included other manufacturers' parts in addition to Continental's. Nissan, moreover, has conceded in this litigation that "various components of the brake system"— including calipers selected by Nissan— "affect pedal feel." (Doc. No. 207 ¶ 17.) A finding of a defective braking system that created a confusing pedal feel, therefore, cannot be assumed to categorically establish a defective Continental part.

The ambiguity at issue here, it bears noting, is not ultimately about the meaning of the words of Section 8. Rather, it is an ambiguity regarding whether the facts surrounding the Original

---

[4] Nissan points to comments by the trial court judge suggesting that the judge believed the DSS to be defective. (Doc. No. 206 at 5.) The actual award of damages, however, was based on the jury's verdict, which did not consider that subsidiary question.

Litigation establish the applicability of that provision. "The burden of proof is generally on the party seeking to enforce a contract to prove the satisfaction of conditions precedent to the defendant's obligations." *Khalil v. CarCar Dev., Inc.*, No. M2006-02422-COA-R3-CV, 2007 WL 4530829, at *4 (Tenn. Ct. App. Dec. 21, 2007) (citations omitted). The burden is therefore on Nissan to establish that Section 8 applies to the underlying facts.

Typically, a "duty to indemnify . . . is triggered . . . after a fact finder determines the 'true facts'" of the underlying incident in such a manner that also establishes that the incident was "within [the indemnification provision's] coverage." *Am. Guarantee & Liab. Ins. Co. v. Norfolk S. Ry. Co.*, 278 F. Supp. 3d 1025, 1041 (E.D. Tenn. 2017). Nissan is correct that, under such a standard, it will often be unnecessary to relitigate the underlying incident in a subsequent indemnification proceeding. That, though, is not because a provision like Section 8 provides indemnification any time a fact giving rise to indemnity was merely alleged. Rather, in many cases, the judgment in the original proceeding will include a binding determination that the damages did arise out of a covered defect. In such a situation, considering that question anew would be unnecessary and inappropriate.

As the court has already held, however, the judgment in this particular Original Litigation does not permit a finder of fact to conclude that any "true facts" were found that would establish that a defective Continental part led to the Mathenge/Bernardino collision. Even if the jury in the Original Litigation concluded that Continental's DSS provided a false positive in Mathenge's vehicle—which it appears that it did—that does not actually mean that the jury concluded that the DSS or any other specific part was defective. Many products are capable of malfunctioning from time to time, and Nissan has not identified any proposition of law establishing that such errors *per se* establish a product defect, as the term is understood in product liability law. To the contrary,

California law—like the law of other states—has a complex set of tests for evaluating product defect claims that look to issues such as consumer expectations and reasonableness, depending on the allegations at issue. *See Romine v. Johnson Controls, Inc.*, 224 Cal. App. 4th 990, 1000–1001 (2014). The jury in the Original Litigation could well have concluded that, while a Continental sensor did send a false error code, the only actionable defect in the 2004 Infiniti QX56 was Nissan's decision to have a reading from a sometimes-wrong sensor immediately trigger an emergency system that changed the feel of the car's breaks. Nothing on the face of the judgment of the Original Litigation, therefore, establishes that the award against Nissan arose out of a claim for damages "caused directly or indirectly by defective parts supplied by" Continental.

As Continental points out, there are other ways that Nissan could try to meet its burden. Specifically, the parties could simply actually litigate, for the first time, whether Continental's parts, in particular, were actually "defective," as that term is used in the relevant law, and to blame in the underlying collision. *See CSX Transportation, Inc. v. Gen. Mills, Inc.*, No. 1:14-CV-201-TWT, 2018 WL 3458557, at *4 (N.D. Ga. July 18, 2018) (holding that the plaintiff in an indemnification action could "seek[] to prove" the defendant's responsibility for the injury that was at issue in the underlying litigation). Indeed, Continental is apparently prepared to litigate this case on those terms, if it comes to that. In contrast, Nissan has openly spurned such a strategy, criticizing Continental for "approach[ing] this action as though it were a products liability action rather than a breach of contract action." (Doc. No. 189 at 9.) Nissan argues that "Continental's entire effort is in vain," because "[w]hether the parts Continental supplied were *in fact* defective or *in fact* caused the Cruz plaintiffs any injury is beside the point."[5] (*Id.* at 9–10.) And that would

---

[5] Reflecting this narrow strategy, Nissan's Memorandum in support of its Motion for Summary Judgment is, despite the substantial dollar amounts at stake, just 14 pages long, and its Statement of Undisputed Material Facts is around 3 pages long. (Doc. Nos. 188–89.)

likely be true if the California court had actually found those facts already. As the court has already explained, however, the multi-layered nature of the accusations in the California case and the ambiguity of the jury's verdict preclude such a holding.

The court concludes that, as a matter of law, Section 8 grants Nissan a right to indemnification for a personal injury award in two scenarios: first, when there was a preclusive finding, in the underlying lawsuit in which that award was granted, that a Continental part was defective and that that defect caused the relevant injuries; or, in the alternative, when an award was entered against Nissan that was ambiguous and/or not entitled to collateral estoppel on the issue of defect, but which Nissan is able to establish, with evidence, was indeed based on a defective Continental part. Nissan cannot establish the first ground for indemnification because it is simply not true that the verdict and judgment in the Original Litigation were necessarily based on a holding that Continental's parts were defective. Nissan's own litigation decisions, in turn, foreclose the second option, because Nissan has declined to make a factual record in support of a claim that it is entitled to prevail on any basis other than the record and judgment in the earlier lawsuit. Nissan therefore cannot establish that Section 8 applies to the award in the Original Litigation.[6]

Nissan has had numerous opportunities to establish that Continental has an obligation to indemnify it for its costs and liability in the Original Litigation. Nissan tried to pursue "common law claims for indemnity and contribution," despite the fact that any such claims were expressly foreclosed by its own stipulation. (Doc. No. 35 at 1; Doc. No. 42 at 11–12.) Nissan pursued indemnification under the MPA, despite the fact that the MPA post-dated the sale of the relevant

---

[6] For the same reason, Nissan cannot recover the costs or fees associated with that litigation. Nissan must establish at least some basis for allocating any costs or fees specifically to a Continental defect, which it has not done.

Case 3:19-cv-00396   Document 223   Filed 05/26/22   Page 21 of 22 PageID #: 19850

parts and, by its own terms, did not apply to past purchases. (*See* Doc. No. 120 at 12.) Nissan tried to argue, in the alternative, that the MPA should nevertheless be applied by this court, in contradiction of its expressly limited scope, based on Continental's past course of performance—despite the fact that, under the governing law, express terms prevail over course of performance in such a conflict. (*Id.* at 14.) Nissan then tried to rely on an implied contract instead, but that effort failed as well, because, as Nissan's own evidence showed, the transaction at issue was covered by express contractual provisions. (*Id.* at 14–15.) Finally, with only one potential ground for indemnity left, Nissan has argued that it can rely on Section 8 of the Terms and Conditions, without presenting any meaningful evidence that that provision actually applies, simply based on the unproven contents of the complaint in the Original Litigation and an ambiguous verdict that did not find any liability or wrongdoing by Continental at all. That argument, however, is ultimately no more viable than the preceding ones. The court will therefore deny Nissan's motion for summary judgment and grant Continental's. Because this ground for liability was Nissan's last surviving theory of recovery, the court's decision will resolve the case and mandate an entry of judgment for Continental.

## CONCLUSION

For the foregoing reasons, Nissan's Motion for Summary Judgment (Doc. No. 187) will be denied, and Continental's Motion for Summary Judgment (Doc. No. 190) will be granted.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
United States District Judge

22